Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

STATE OF MISSOURI

ED100807

vs.

JEFFREY WEINHAUS

## VOLUME 1

### BEFORE THE HONORABLE JUDGE KEITH SUTHERLAND

### TRANSCRIPT OF TRIAL TESTIMONY

### TAKEN OCTOBER 8TH, 2013

## REPORTED BY KIM WROCKLAGE, CCR



## WROCKLAGE REPORTING, LLC

## 467 BROOKFIELD DRIVE - WASHINGTON, MO 63090

### (636) 583-1953 or (314) 210-6917

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1           IN THE CIRCUIT COURT OF FRANKLIN COUNTY

2                   STATE OF MISSOURI

3

4   STATE OF MISSOURI,

5               PLAINTIFF,        ED100807

6   vs.                   No. 12AB-CR02409-01

7   JEFFREY WEINHAUS,

8               DEFENDANT.

9

10          Volume 1, Trial Testimony taken at the

11  Franklin County Justice Center, 401 E. Main Street,

12  Union, in the County of Franklin, State of Missouri,

13  on the 8th day of October, 2013, before Kim

14  Wrocklage, CCR.

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4   Mr. Robert "Bob" Parks

 5   Franklin County Prosecuting Attorney's Office

 6   20 N. Church Street, 2nd Floor

 7   Union, MO 63084

 8   (636) 583-6370

 9

10   FOR THE DEFENDANT:

11   Mr. Hugh A. Eastwood (heastwood@eastwoodlawstl.com)

12   Law Offices of Hugh A. Eastwood

13   7777 Bonhomme, Ste. 1603

14   Clayton, MO 63105

15   (314) 727-3533

16

17   Mr. Christopher M. Combs (combschris1@gmail.com)

18   Law Offices of Christopher M. Combs

19   4542 West Pine Blvd.

20   St. Louis, MO 63108

21   (314) 578-1465

22

23   ALSO PRESENT: Jeffrey Weinhaus

24

25
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1              INDEX OF EXAMINATION

2                    Voir Dire

3   On Behalf of the State          Page 29,   Line 25

4   On Behalf of the Defendant      Page 77,   Line 20

5

6                 Opening Statement

7   On Behalf of the State          Page 151, Line 3

8   On Behalf of the Defendant      Page 157, Line 17

9

10                Sergeant Folsom

11  Direct Examination by Mr. Parks    Page 166, Line 17

12  Continued Direct by Mr. Parks      Page 205, Line 16

13  Cross Examination by Mr. Eastwood  Page 249, Line 5

14  (Vol. 2)

15

16                Matthew Fox

17  Direct Examination by Mr. Parks    Page 192, Line 14

18  Cross Examination by Mr. Eastwood  Page 198, Line 3

19  Redirect Examination by Mr. Parks  Page 204, Line 17

20

21           Corporal Mertens (Volume 2)

22  Direct Examination by Mr. Parks    Page 374, Line 22

23  Cross Examination by Mr. Eastwood  Page 397, Line 17

24  Redirect Examination by Mr. Parks  Page 445, Line 12

25  Recross Exam by Mr. Eastwood       Page 447, Line 17

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

INDEX OF EXAMINATION CONTINUED


Sergeant Perry Smith

Direct Examination by Mr. Parks     Page 450, Line 11

Cross Examination by Mr. Eastwood   Page 460, Line 21


Corporal Jeff White

Direct Examination by Mr. Parks     Page 482, Line 24

Cross Examination by Mr. Eastwood   Page 493, Line 18

Redirect Examination by Mr. Parks   Page 531, Line 5

Recross Exam by Mr. Eastwood        Page 532, Line 14


Marty Leach (Volume 3)

Direct Examination by Mr. Eastwood  Page 563, Line 4

Cross Examination by Mr. Parks      Page 573, Line 20

Redirect Exam by Mr. Eastwood       Page 576, Line 2

Recross Examination by Mr. Parks    Page 578, Line 16

Further Direct by Mr. Eastwood      Page 580, Line 11


Steve Everhart

Direct Examination by Mr. Combs     Page 581, Line 14

Cross Examination by Mr. Parks      Page 591, Line 2

Redirect Examination by Mr. Combs   Page 592, Line 19

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

INDEX OF EXAMINATION CONTINUED


Heather Clark

Direct Examination by Mr. Eastwood Page 593, Line 22

Cross Examination by Mr. Parks      Page 601, Line 3


Closing Argument

By Mr. Parks          Page 614, Line 11

By Mr. Eastwood       Page 622, Line 4

By Mr. Parks          Page 637, Line 2


Guilt Verdict

By Judge Sutherland Page 650, Line 17


Opening Statement Punishment Phase

By Mr. Parks          Page 664, Line 5

By Mr. Eastwood       Page 664, Line 21


Testimony by Sergeant Folsom

By Mr. Parks          Page 665, Line 6


Testimony by Judy Kropf Weinhaus

By Mr. Eastwood       Page 671, Line 19

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1            INDEX OF EXAMINATION CONTINUED

2

3            Closing Argument Punishment Phase

4    By Mr. Parks          Page 676, Line 17

5    By Mr. Eastwood       Page 678, Line 6

6    By Mr. Parks          Page 679, Line 25

7

8              Sentencing Verdict

9    By Judge Sutherland Page 682, Line 8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              INDEX OF EXHIBITS ADMITTED

 2   State's Exhibit

 3   1 - You Tube Video w/o Captions, Pg. 170

 4   1A- You Tube Video with Captions, Pg. 170

 5   2 - Search Warrant, Pg. 178

 6   3 - Photo of Gun/Holster, Pg. 181

 7   4 - Photo of Gun, Pg. 181

 8   5 - Photo of Command Center, Pg. 183

 9   6 - Photo Contents of Drawer, Pg. 186

10   7 - Photo Individual Items, Pg. 186

11   8 - Photo of Pills in Case, Pg. 186

12   11- Photo of Marijuana Bag, Pg. 214

13   13- Diagram of Scene, Pg. 211

14   14- Photo of Scene from End of Parking Lot, Pg. 233

15   15- Watch Video, Pg. 233

16   16- Photo Position of Cars, Pg. 233

17   17- Photo Driver's Side of Cars, Pg. 233

18   18- Photo Behind Green Car, Pg. 233

19   19- Photo Passenger's Side of White Car, Pg. 233

20   20- Photo Markers for Shell Casings, Pg. 453, Vol. 2

21   21- Photo Holster, Pg. 453, Vol. 2

22   22- Photo Pistol/Holster, Pg. 453, Vol. 2

23   23- Photo of 22 Clipped to Box, Pg. 453, Vol. 2

24   24- Photo of Barrel of Shotgun, Pg. 453, Vol. 2

25   25- Photo of Shotgun Covered in Back Seat, Pg. 453
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1           INDEX OF EXHIBITS ADMITTED CONTINUED

2

3    State's Exhibit

4    26- Photo of Shotgun After Recovery, Pg. 453, Vol. 2

5    27- Pistol and Holster, Pg. 225, Vol. 1

6    31- Lab Report, Pg. 197, Vol. 1

7    32- Statement by Marty Leach, Page 575, Vol. 3

8

9    Defendant's Exhibit

10   B- Notarized Statement by Mr. Leach, Pg. 577, Vol. 3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1          JUDGE SUTHERLAND:  Motions we need to take

 2   up prior to bringing the jury panel in, so let's do

 3   that now.  I'm not sure what was filed first and

 4   what difference it makes, what do you want to take

 5   up first?

 6          MR. PARKS:  We can take up the State's

 7   motion first, Your Honor.

 8          MR. EASTWOOD:  That's fine.

 9          JUDGE SUTHERLAND:  You're talking about the

10   State's motion in limine two?

11          MR. PARKS:  Yes, Your Honor.

12          JUDGE SUTHERLAND:  Argument for the State.

13          MR. PARKS:  Yes, Your Honor.  Mr. Eastwood

14   contacted me yesterday and asked me if I would

15   stipulate to the You Tube video from Wal-Mart, which

16   I said I would; however, it is the State's position

17   that even though the You Tube video of the

18   defendant, which we are going to show, that it's

19   still up on You Tube is irrelevant and prejudicial.

20   I do not believe Mr. Eastwood is going to bring in

21   anybody from You Tube that is going to testify to

22   their standards or anything.  I don't even know if

23   You Tube knows about this video.  We have not

24   contacted them to have it down because it's

25   irrelevant at this point, because what we were

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    concerned about is the actions in 2012.  Arguing

2    that it was still up now and so therefore You Tube

3    thinks that it's an okay video and doesn't have any

4    threats to anybody is irrelevant and prejudicial at

5    this time because we don't know what standards, we

6    have nobody coming from You Tube to talk about the

7    standards and to whether or not they would or would

8    not take the video down.

9              JUDGE SUTHERLAND:  Mr. Eastwood.

10             MR. EASTWOOD:  Your Honor, we discussed the

11   issue of this speech extensively obviously in the

12   Motion to Dismiss and the 8th Circuit's factors,

13   which are both objective and subjective in

14   evaluating speech, and the Court already ruled that

15   Judge Kelly Parker's testimony would be admissible

16   in terms of his subjective reaction to the speech.

17   I think it's important to remember that this speech

18   was expressed in a context and the context was the

19   You Tube website on the worldwide web.  And so I

20   think by allowing, for instance, Judge Parker's

21   reaction to the speech, which is a subjective

22   reaction, I think it's fair to inquire of the

23   investigating trooper whether or not he contacted

24   You Tube, whether or not he investigated the terms

25   of service and guidelines that are posted on the

Weinhaus, Vol. 1                                                    12

1   website along with the video on the same and which

2   do prohibit threats and to inquire what contact he

3   had with You Tube, if any, and obviously if he says

4   I didn't, that's something the jury can hear because

5   the jury is not just making an objective evaluation

6   of this speech, they're also making an evaluation of

7   the speech in the totality of the circumstances.

8   And the context matters, the speech was not, for

9   instance, in the form of a letter mailed directly to

10  Judge Parker.  The speech was in the form of a video

11  uploaded to the worldwide web, which is a public

12  forum.  It's a public forum that has terms and

13  standards and conditions that are publicly posted.

14  I think it's fair -- if the State is allowed, for

15  instance, to introduce Judge Parker's testimony as

16  to his opinion on the speech, that I can also

17  introduce the terms and guidelines that You Tube has

18  posted on their website, and the fact that it is

19  still up there, I think, is relevant.  The fact is

20  that the State, if we look at the elements of the

21  offense, the elements include whether the

22  defendant's speech was reasonably calculated to

23  harass Judge Parker and whether the defendant so

24  acted with the purpose to harass Judge Parker in the

25  performance of Judge Parker's official duties.  The

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 1

1  fact of the matter is this speech is still up there,

2  anyone can go online and access it.  It has not been

3  banned or taken down by You Tube, and therefore I

4  think that matters in terms of what the jury needs

5  to evaluate as to this speech, as to its effect,

6  whether it was reasonably calculated to harass,

7  whether it had a purpose to harass, the fact that

8  it's still up there, that nothing has happened to

9  Judge Parker so far, I think these are all relevant

10 facts.

11           JUDGE SUTHERLAND:  Anything else?

12           MR. PARKS:  Not at this point, Your Honor.

13           JUDGE SUTHERLAND:  Well, whatever You Tube

14 has done or not done has been done by unknown IT

15 people presumably out in California, I would guess.

16 We don't know why they have done or not done any

17 particular thing, and I think it's just simply

18 speculation to question any of the witnesses about

19 whether they contacted You Tube or made any requests

20 to have this video removed or anything of the sort.

21 We don't know why You Tube does or does not do

22 anything.  I read reports of them removing political

23 speech that they don't like, although that's

24 obviously hearsay from newspaper articles, and I

25 think we're just getting into speculation if we

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   permit that.  So I am going to grant the State's

 2   motion in limine to prohibit any reference to the

 3   fact that the You Tube video is still being shown

 4   after the date of the offenses charged here.

 5          MR. EASTWOOD:  Your Honor, may I inquire of

 6   the Court.  Can I at least, on my cross examination

 7   of the investigating trooper, can I inquire whether

 8   or not he did make any contact with You Tube, at

 9   least preliminary questions such as that, did you

10   have contact with the web host, anything like that,

11   did you investigate who the account holder was,

12   their IP address, user name or password, just

13   general?

14          JUDGE SUTHERLAND:  I don't think so.  I

15   think that comes within the ruling on the motion, so

16   I would say no.  You got a motion in limine as well?

17          MR. EASTWOOD:  I do, Your Honor.  We

18   discussed it orally last time.  I have since filed a

19   written second motion in limine.

20          JUDGE SUTHERLAND:  I have had a chance to

21   read that this morning, by the way.

22          MR. EASTWOOD:  The troopers recovered a

23   shotgun and handgun.  This is not the handgun that

24   was on the defendant's person.  This was just

25   another handgun from the defendant's car, which I

1   believe the evidence will show is his wife's, now

2   ex-wife's Subaru.  Those two weapons were in the car

3   after the defendant exited the car.  The troopers

4   had no knowledge of their presence during the

5   interaction with the defendant.  They had no

6   knowledge of their presence when they shot the

7   defendant.  The recording of the defendant indicates

8   that his state of mind believed this ruse that his

9   computers were going to be returned to him, not that

10  he was about to be arrested.  There's no charges

11  involving unlawful possession of these weapons or

12  anything of that sort.  So there's no collateral

13  evidence of bad intent or bad state of mind by the

14  defendant.  The State, of course, wants to argue the

15  defendant was loaded for bear.  I think that's just

16  extremely prejudicial.  There's no indication that

17  these guns came into -- had anything to do with the

18  series of events at the gas station.  I don't

19  think -- there's nothing illegal about having a

20  shotgun in your car, back of your car.  I think it

21  would be prejudicial to the defendant for the State

22  to argue that somehow he had come with an arsenal.

23  I think if they had somehow been used in the

24  incident, if they had somehow come into the

25  officers' knowledge, if they somehow were involved,

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   it would be a different thing but here it's

2   prejudicial.

3           MR. PARKS:  Your Honor, in State versus

4   Whitt, 371 sw 2nd 215, this same type of incident

5   came up into where a car was used, and then when the

6   defendants were taken into custody, the car was

7   searched.  The Supreme Court has said that

8   automobiles may be searched incident to the arrest

9   or the totality of the circumstances going on there.

10  This car was driven to the scene by the defendant.

11  He was armed when he got out of the car.  After the

12  shootout, the entire scene was searched for

13  evidence.  The car was in the middle of the search

14  scene, and these other weapons were found in the

15  car.  It's standard police procedure to search and

16  inventory everything at a crime scene, and I believe

17  that these items, which were found at the crime

18  scene, should be allowed to come in.

19          JUDGE SUTHERLAND:  Anything further?

20          MR. EASTWOOD:  Your Honor, I have not seen

21  this case that the -- the Whitt case that Mr. Parks

22  cited, so I can't respond to that, but I will say

23  this.  Of course the police can search a vehicle

24  pursuant to arrest, and of course the contents would

25  be admissible if they were evident relative to the

1  crime, but here it's not relevant.  It has nothing

2  to do with the attempted assault charge, nothing to

3  do with the resisting arrest charge.  The troopers

4  were not aware of it.  It was not in the immediate

5  possession or within arm's reach of the defendant.

6  He was out of his car when this incident occurred,

7  and therefore it shows nothing except allowing the

8  State to sort of prejudice him with this argument

9  that he was loaded for bear.  Loaded for bear, if he

10  had used them, if he had popped out of the car with

11  an arsenal, I think it would be relevant, but he

12  didn't.

13          JUDGE SUTHERLAND:  Well, that motion is

14  denied.  However, I think it's appropriate for

15  the -- not inappropriate for the State to introduce

16  the evidence of the search.  Whether I let the State

17  argue that the defendant was loaded for bear is

18  quite another matter, but as far as the evidence of

19  the guns themselves being found in the search of the

20  car, the motion is denied.

21          MR. EASTWOOD:  Your Honor, in terms of that

22  also, of course, would then open the door to the

23  defendant being able to produce rebuttal evidence as

24  to state of mind or intent.

25          JUDGE SUTHERLAND:  That remains to be seen.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  I'll take that up during the trial itself.  You also

2  have defendant's amended motion to dismiss the

3  charge of tampering with a judicial officer for a

4  defect in the institution of the prosecution.  As I

5  said a few minutes ago, I have had a chance to

6  read --

7          MR. PARKS:  Didn't we already do that?

8          MR. EASTWOOD:  We did.

9          MR. PARKS:  We had done that and that was

10  denied.

11          MR. EASTWOOD:  I simply renew my motion that

12  the speech ought not go to the jury.  It's not a

13  threat, it's not an incitement to violence, would

14  not reasonably harass a judge under the 8th

15  Circuit's dimwitte (phonetic) factors and for that

16  reason I renew it.

17          JUDGE SUTHERLAND:  What you need to do

18  during trial when we get to that point is object

19  again for the same grounds that would be stated in

20  the motion rather than rearguing it in front of the

21  jury.

22          MR. EASTWOOD:  Absolutely, also I renew my

23  motion to sever.

24          JUDGE SUTHERLAND:  Both of those motions are

25  again denied.  Anything else we need to take up

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   preliminarily?
 2        MR. EASTWOOD:  Yes.  I have a point of
 3   clarification.  The Court previously ruled at the
 4   pretrial hearing on defendant's original motion in
 5   limine, and the Court granted, at least as to the
 6   prosecution's case in chief, that the particulars of
 7   the defendant's Bulletinman statements and
 8   publications, other than the video that is in
 9   question and subsequent videos that Sergeant Folsom
10   viewed, should be excluded.  And so what I'd like to
11   clarify, just for the record before we start having
12   testimony, is I don't think Sergeant Folsom -- when
13   I took his deposition, he talked also about hearing
14   things about other statements the defendant had made
15   or that he was going -- that he had gone to a 911
16   call center, that he was going to occupy a
17   courthouse, I think that's hearsay and I don't think
18   that's part of the record either that Sergeant
19   Folsom used in filing his affidavit for the search
20   in seizing the computers.  So what I don't want to
21   do is sort of kind of expand the record of the
22   defendant's speech that is being submitted to the
23   jury in terms of what the threat was.  I believe,
24   and I think we agree, that the threat was that video
25   that we all watched and discussed and the jury is
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1 going to see.  I don't want sort of hearsay remarks

2 coming in to kind of supplement that speech.

3          MR. PARKS:  Your Honor, the State is going

4 to show the investigation that the officer did.

5 Part of this investigation was going to Crawford

6 County to see what security measures they had taken.

7 Part of the things would be the statements that the

8 defendant made about those when he was confronted at

9 his house.

10          JUDGE SUTHERLAND:  Is that when the search

11 warrant was served or another time?

12          MR. PARKS:  When they went to interview the

13 defendant the first time about the video and that's

14 when they detected the marijuana.  So it's all the

15 things leading up to them going to his house to

16 question him about the video and then finding the

17 marijuana, but what the State is going to show is

18 why did the troopers, how did they find this guy,

19 what did they do in their background investigation

20 before they went out there.

21          JUDGE SUTHERLAND:  Well, anything further

22 Mr. Eastwood?

23          MR. EASTWOOD:  I think we can make a

24 distinction between what the defendant said at his

25 house to the witness, to the troopers when they

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   testify versus what the troopers kind of heard

2   around the courthouse.  That's my fear.  In the

3   deposition the troopers testified they also heard

4   things down in Crawford County from people, and I

5   think that's hearsay.  I can obviously make a

6   hearsay objection at trial, but if that bell is

7   rung, I think that's a pretty big bell that you

8   can't unring in terms of I heard these things from

9   people at the courthouse and they were terrified.

10  If they were witnesses and they were going to come

11  to testify, that would be a different thing, but

12  other than that it's hearsay.

13          JUDGE SUTHERLAND:  At least to a limited

14  extent I think it's admissible to show why the

15  officer did what he did, or officers, if there are

16  more than one.  Certainly not admissible to prove

17  the truth of it.  I think the jury sometimes has

18  problems with that.  I think it's admissible to an

19  extent to show why the officer did what he did.

20  Make your objection at trial and we'll deal with it

21  at the time.  Perhaps I'll say it loud enough so

22  that the jury understands it's not admitted for the

23  truth of it.

24          MR. PARKS:  I have two points of order I'd

25  like to bring up with the Court.  No. 1, on voir

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   dire, normally in this circuit what we do is we ask

2   general questions, and if we get hands then we go to

3   the people that raise their hands to ask specific

4   questions.  We do not just start with okay, juror

5   No. 1 what do you think about this, juror No. 2.  Is

6   that the way the court --

7        JUDGE SUTHERLAND:  Yes, that's the way I

8   always proceed.

9        MR. PARKS:  Secondly, on objections, what we

10  have started doing here is we have made our

11  objections like Judge, I object to that for

12  relevance and then we come to the bench and make the

13  argument.  We don't make the argument here to the

14  Court in front of the jury.  Do you want that?

15       JUDGE SUTHERLAND:  If there's any real

16  argument on it, if it's just a quick one or two

17  three word objection, it obviously should be

18  overruled or granted, but if there is going to be

19  some serious argument about it, I'd like you to come

20  up to the bench, over to this side of the bench

21  where the reporter can hear you.

22       MR. EASTWOOD:  I've talked with Mr. Parks

23  about this already.  Obviously to make a record and

24  preserve the objection, I'm going to have to object

25  to the You Tube video, but I'm not going to get to

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   some foundational objection.

 2          JUDGE SUTHERLAND:  If you make the

 3   objection, state it's for the same reasons as stated

 4   in your motions.

 5          MR. EASTWOOD:  Right.

 6          JUDGE SUTHERLAND:  That will be sufficient

 7   to preserve for the record.

 8          MR. PARKS:  We have agreed that the two You

 9   Tube and watch videos would not have to have

10   foundational basis.

11          MR. EASTWOOD:  Correct.  And I also may use,

12   I don't think I'll need to use it but obviously if I

13   have to impeach I have the Perry Smith recordings of

14   the interviews with the troopers.

15          MR. PARKS:  That's fine.

16          MR. EASTWOOD:  I assume that won't be

17   necessary, simply what you said.

18          JUDGE SUTHERLAND:  That will not be a

19   problem.  Anything else?

20          MR. PARKS:  Not for the State, Your Honor.

21          MR. EASTWOOD:  Not for the defense, Your

22   Honor.

23          JUDGE SUTHERLAND:  I do have a couple of

24   matters.  One, this is a bifurcated trial.

25   Defendant has a right to waive the second phase if

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    he wants to.  Have you had an opportunity to talk to

2    your client about that?

3            MR. EASTWOOD:  I have, Your Honor, and if I

4    can confer with him again just for a second.

5            JUDGE SUTHERLAND:  If you wish.  If he wants

6    to do that, I do have a form for that purpose, but

7    if he doesn't, that's fine.  I've got all week.

8            MR. EASTWOOD:  Yes, Your Honor, we would

9    request jury sentencing.

10           JUDGE SUTHERLAND:  There's a matter to take

11   up with Mr. Weinhaus.  Mr. Weinhaus, you probably

12   had an opportunity to discuss this with your

13   attorney but you understand that you have the right

14   either to testify or not to testify.

15           MR. WEINHAUS:  Yes, sir, I'm aware of that.

16           JUDGE SUTHERLAND:  The Fifth Amendment under

17   the United States Constitution you have the right to

18   not testify, and if your attorney wishes to do so he

19   can offer a jury instruction which would instruct

20   the jury that that cannot be held against you.

21           MR. WEINHAUS:  Yes, sir, I'm aware of that.

22           JUDGE SUTHERLAND:  I'm not asking and I'm

23   not going to ask what your conversations with your

24   attorney, he can certainly give you his advice as to

25   whether he thinks you should testify or not, but you

Weinhaus, Vol. 1                                              25

```
 1  understand that it's entirely up to you, your
 2  decision whether to testify or not.
 3          MR. WEINHAUS:  I'm aware of that, Your
 4  Honor.
 5          JUDGE SUTHERLAND:  And also understanding
 6  that you have the right to change your mind at any
 7  time up to that point, can you tell me if it's your
 8  intent to testify at this point?
 9          MR. WEINHAUS:  No, sir, I don't believe it's
10  necessary.
11          JUDGE SUTHERLAND:  But you do understand you
12  have the right to change your mind?
13          MR. WEINHAUS:  If it's fluid and things
14  change, you'll be the first to know.
15          JUDGE SUTHERLAND:  Well, maybe the third or
16  fourth.
17          MR. EASTWOOD:  I hope so.
18          MR. WEINHAUS:  I won't make any outbursts, I
19  promise, I don't want to get tazed.
20          JUDGE SUTHERLAND:  Let's go off the record
21  for a moment.
22          (WHEREUPON A BRIEF RECESS TOOK PLACE)
23    (WHEREUPON THE JURY PANEL ENTERED THE COURTROOM)
24          JUDGE SUTHERLAND:  State of Missouri versus
25  Jeffrey R. Weinhaus for trial today.  Mr. Parks, is
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   the State ready?

2        MR. PARKS:  State is ready to proceed, Your

3   Honor.

4        JUDGE SUTHERLAND:  Mr. Eastwood, is

5   defendant ready?

6        MR. EASTWOOD:  Defense is ready to proceed,

7   Your Honor.

8        JUDGE SUTHERLAND:  Ladies and gentlemen,

9   today's trial for which you have been called for

10  jury service is a criminal case.  The State of

11  Missouri has charged the defendant, Jeffrey R.

12  Weinhaus, has committed the offenses of two counts

13  of possession of a controlled substance, tampering

14  with a judicial officer, two counts of assault of a

15  law enforcement officer in the first degree, two

16  counts of armed criminal action and resisting

17  arrest.  The defendant has pled not guilty to the

18  charges.  Those are the issues of fact which must be

19  decided by the jury, subject to instructions

20  concerning the law which the Court will give to the

21  jury.  The jury is obligated to follow those

22  instructions.  The trial of a criminal case begins

23  with a selection of a jury of qualified and

24  impartial people.  In order to obtain such a jury,

25  all of you have been summoned as prospective jurors.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   From your numbers, a jury will be selected to hear
 2   the case.  It is necessary that you be asked various
 3   questions.  Your answers will assist the Court in
 4   determining whether it should excuse you from
 5   serving in this case and will assist the attorneys
 6   in making their selection of those who will hear the
 7   case.  The questions which will be asked of you are
 8   not meant to pry into your personal affairs but
 9   rather a necessary part of selecting a jury.  Since
10   this is an important part of the trial, you are
11   required to be sworn before questions are asked.
12   Please rise now and be sworn to answer questions.
13            (WHEREUPON THE JURY PANEL WAS SWORN IN)
14            JUDGE SUTHERLAND:  Please listen carefully
15   to all questions.  Take your time in answering
16   questions.  Some of the questions may require you to
17   recall experiences during your entire lifetime.
18   Therefore search your memory before answering.  If
19   you do not understand the question, raise your hand
20   and say so.  If later on during the examination you
21   remember something which you failed to answer before
22   or which would modify an answer you gave before,
23   raise your hand and you will be asked about it.
24   Your answers must not only be truthful but they must
25   be full and complete.  If your answer to any of
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   these questions involves matters which are personal

2   or private, you may so indicate and you will be

3   given an opportunity to state your answer at the

4   bench.

5          The trial of the lawsuit involves considerable

6   time and effort, and the parties are entitled to

7   have their rights finally determined.  The failure

8   on your part to fully and truthfully answer

9   questions during this stage of the trial could force

10  the parties to have to retry the lawsuit at some

11  future date.  The Court will now read you an

12  instruction on the law applicable to all criminal

13  cases.  The charge of any offense is not evidence,

14  and it creates no inference that any offense was

15  committed or that the defendant is guilty of an

16  offense.  The defendant is presumed to be innocent

17  unless and until during your deliberations upon your

18  verdict you find him guilty.  This presumption of

19  innocence places upon the State the burden of

20  proving beyond a reasonable doubt that the defendant

21  is guilty.  A reasonable doubt is a doubt based upon

22  reason and common sense after careful and impartial

23  consideration of all the evidence in the case.

24  Proof beyond a reasonable doubt is proof that leaves

25  you firmly convinced of the defendant's guilt.  The

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  law does not require proof that overcomes every

2  possible doubt.  If, after your consideration of all

3  the evidence, you are firmly convinced that the

4  defendant is guilty of the crimes charged, you will

5  find him guilty.  If you are not so convinced, you

6  must give him the benefit of the doubt and find him

7  not guilty.  Is there any of you who if selected as

8  a juror could not for any reason follow that

9  instruction?  If so, would you please raise your

10  hand.  Thank you.  I see no hands.

11      It is your duty to follow the law as the Court

12  gives it to you in the instructions even though you

13  may disagree with it.  Are there any of you who

14  would not be willing to follow all instructions

15  which the Court will give to the jury?  If so, would

16  you please raise your hand.  Again I see no hands.

17  Thank you.

18      The State is represented here today by

19  Mr. Robert E. Parks, Prosecuting Attorney of

20  Franklin County.  The defendant is represented here

21  today by Mr. Hugh A. Eastwood and Chris Combs of St.

22  Louis County.  The prosecutor will question you

23  first and counsel for the defendant will question

24  you.  Counsel for the State may proceed.

25          **(VOIR DIRE ON BEHALF OF THE STATE)**

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              MR. PARKS:  Thank you, Your Honor.  Good
 2    morning ladies and gentlemen.  As the Judge said, my
 3    name is Robert Parks.  I'm the elected Prosecuting
 4    Attorney here for Franklin County.  With me today is
 5    Mr. Tim Hoeing, who is my investigator, and he's
 6    going to help me during the voir dire and jury
 7    selection process.  This is the part of the trial
 8    that is known as voir dire.  This is where the
 9    attorneys are going to ask you questions.  We do not
10    mean to pry into your personal life, so if there are
11    any questions that we ask that you feel
12    uncomfortable answering in front of the whole panel,
13    please raise your hand and ask for a conference with
14    the Judge and the two attorneys out of the hearing
15    of everybody else.  Can everybody hear me okay?
16    Does everyone here on the jury panel actually
17    physically live in Franklin County?  We do have some
18    areas in Sullivan that go into Crawford County, some
19    places in Pacific go into a couple of counties.  Is
20    there anyone here who does not actually reside in
21    Franklin County?  Juror No. 7.
22              MS. FLETCHER:  I am borderline St. Louis
23    County, unincorporated Franklin County.
24              MR. PARKS:  Where do you pay your taxes?
25              MS. FLETCHER:  In Arkansas.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Where is your voter

 2   registration?

 3          MS. FLETCHER:  In Arkansas.  I live

 4   part-time in Arkansas but I reside part-time here in

 5   St. Louis at a Pacific address.

 6          MR. PARKS:  Okay.  Well that took me by

 7   surprise because we never had anybody that didn't

 8   live in Franklin County.  The way that I will

 9   proceed this morning is I'm going to ask questions.

10   What I'm going to do is because we have people over

11   here in the jury box, we have people over here, I'm

12   going to direct my questions to the entire panel but

13   I'm going to look to the jury box first, then I'm

14   going to kind of go down the rows.  So if you're in

15   the back row and you got your hand up, I don't want

16   you sitting there for 5, 10 or 20 minutes until we

17   get to you to answer the question.  So we're going

18   to be going over here and come back over here.  Not

19   trying to slight those people in the back row but

20   that's the easiest way I found to do this.  I'm

21   going to ask you when you answer the question to

22   please state your name or your jury badge number and

23   speak up loud enough for us to hear you.  As the

24   Judge told you, the defendant in this case is

25   Mr. Jeffrey Weinhaus.  Mr. Weinhaus, could you
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  please stand.

2          MR. WEINHAUS:  Sure.

3          MR. PARKS:  Thank you.  Does anyone here

4  know Mr. Weinhaus or anyone in his family?  Over

5  here in the jury box.  Juror No. 44, do you know

6  Mr. Weinhaus?

7          MR. PARKER:  Yes, sir.

8          MR. PARKS:  Is there anything about knowing

9  him that would keep you from being fair and

10  impartial?

11          MR. PARKER:  No, sir.  I go to church with

12  the man.

13          MR. PARKS:  Anyone else?  As the Judge told

14  you, the defendant is represented by Mr. Hugh

15  Eastwood and Mr. Chris Combs.  Does anyone here know

16  Mr. Eastwood or Mr. Combs?  I see no hands.  Thank

17  you.  With me today is, like I said, Mr. Tim Hoeing,

18  who is my investigator.  Does anybody know Tim?  I

19  see no hands.  Thank you.

20      This trial is scheduled for three days.  If

21  there is anyone here that was selected for this

22  trial -- is there anyone who could not serve three

23  days on the jury panel for any reason, anybody

24  scheduled for a vacation, have a sick kid at home,

25  going to have surgery, anything like that, anybody

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   in the jury box
 2          MR. CLICK:  Would that be the next three
 3   days or in the near future?
 4          MR. PARKS:  It will be over by Thursday hell
 5   or high water.  The Judge already said we would.
 6          MR. CLICK:  So we're fine.
 7          MR. PARKS:  Anybody in the first row.
 8          MR. HASLAG:  Early in the afternoon on
 9   Thursday I have a doctor's appointment that I waited
10   for for three weeks, and I would prefer not to miss
11   that.
12          MR. PARKS:  If you were selected and it
13   would go on, can you reschedule that if need be?
14          MR. HASLAG:  If I had to, yes, I could
15   but --
16          MR. PARKS:  Juror No. 23.
17          MR. GREGG:  I have a son sick at home.
18          MR. PARKS:  Are you the only caregiver for
19   that son?
20          MR. GREGG:  Right now, yes.  He's got a
21   doctor's appointment tomorrow.
22          MR. PARKS:  If you were on the panel, is
23   there anyone else who could take him to that
24   doctor's appointment?
25          MR. GREGG:  I suppose.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Juror 34.

 2          MS. NOWLIN:  I have to be at the doctor on

 3   Wednesday.  I had surgery last week and I have to go

 4   get my stitches out on Wednesday.

 5          MR. PARKS:  Tomorrow?

 6          MS. NOWLIN:  Yeah.

 7          MR. PARKS:  If for some reason you made it

 8   on the panel, could you please put that off til

 9   Friday?

10          MS. NOWLIN:  I could call and ask, I don't

11   know.

12          MR. PARKS:  Let me ask you this.  If you did

13   make the panel, are you going to be worried about

14   that, is that going to keep you from listening to

15   the evidence and everything here?

16          MS. NOWLIN:  No.

17          MR. PARKS:  But you'd prefer not to if we

18   can get by.  Anyone else in this row.  In the next

19   row and the back row.  The State is going to be

20   calling several witnesses.  One of the witnesses

21   we're going to be calling is Sergeant James Folsom

22   from the Missouri State Highway Patrol.  Sergeant

23   Folsom, could you please stand.  Thank you.  Does

24   anyone here know Sergeant Folsom?

25          Another witness that the State is going to be
```

Weinhaus, Vol. 1

```
 1   calling is Corporal Scott Mertens from the Missouri
 2   State Highway Patrol.  Corporal Mertens, could you
 3   stand up.  Does anyone recognize Corporal Mertens?
 4   Thank you.
 5         The State plans to call Sergeant Perry Smith
 6   from the Missouri State Highway Patrol.  He is not
 7   here this morning.  Does anyone know Sergeant Smith
 8   from Troop C?
 9         The State plans on calling Corporal Jeffrey
10   White, who is a firearms instructor with the Highway
11   Patrol out of Jefferson City.  Does anyone here know
12   of Corporal White?
13         And the State intends to call Mr. Matt Fox, who
14   is a criminalist out of the Missouri State Highway
15   Patrol Crime Lab.  Is anyone familiar with Mr. Fox?
16         Now as you can see, this case from the State is
17   going to call into question a lot of law enforcement
18   officers.  Is there anyone here who is themselves,
19   has a family member, a close personal friend or
20   anyone who is in law enforcement?
21         MS. SENSENBRENNER:  I have friends in law
22   enforcement in California.
23         MR. PARKS:  But nobody here in Missouri or
24   in Franklin County?
25         MS. SENSENBRENNER:  No.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Is there anything about having

 2   friends in law enforcement that would keep you from

 3   listening to the evidence today and rendering a fair

 4   and impartial verdict?

 5          MS. SENSENBRENNER:  No.

 6          MR. PARKS:  Juror No. 13, Mrs. Hoffman.

 7          MS. HOFFMANN:  My sister's grandson is in

 8   south county, I don't know.

 9          MR. PARKS:  He's a law enforcement officer

10   in St. Louis county?

11          MS. HOFFMANN:  Yeah.

12          MR. PARKS:  Do you know anybody from

13   Franklin County, anybody from the Highway Patrol?

14          MS. HOFFMANN:  No.

15          MR. PARKS:  Is there anything that would

16   keep you from listening to the evidence here today

17   and rendering a fair and impartial verdict?

18          MS. HOFFMANN:  No.

19          MR. PARKS:  Anyone in the first row here.

20   Juror No. 25, Ms. Stack.

21          MS. STACK:  I have a cousin that works at

22   the Rolla Police Department.

23          MR. PARKS:  Nobody, though, that works in

24   Franklin County?

25          MS. STACK:  No.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Is there anything about your

 2   association with your cousin or anything that would

 3   keep you from rendering a fair and impartial verdict

 4   here today?

 5          MS. STACK:  No.

 6          MR. PARKS:  That was a no?

 7          MS. STACK:  No.

 8          MR. PARKS:  You need to speak up because the

 9   court reporter has to take down everything and

10   that's the last person in the room that we want to

11   make mad this morning, so keep your voices up.  No.

12   22?

13          MR. HASLAG:  My niece's husband, which we

14   are also neighbors, is a law enforcement officer in

15   St. Clair.

16          MR. PARKS:  In St. Clair?

17          MR. HASLAG:  Yes, sir.

18          MR. PARKS:  Is there anything about that

19   that would keep you from being fair and impartial

20   here today?

21          MR. HASLAG:  I will try my best to be fair

22   and impartial.

23          MR. PARKS:  Yes or no, can you be impartial?

24          MR. HASLAG:  I believe I can.  I think I

25   can, yes.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            MR. PARKS:  The next row, No. 27.

 2            MS. PIERCE:  I know Monte Delmaine, who is a

 3     state patrol officer, a friend of ours.

 4            MR. PARKS:  You haven't discussed that case

 5     with him?

 6            MS. PIERCE:  No.

 7            MR. PARKS:  Is there anything about knowing

 8     Trooper Delmaine that would keep you from being fair

 9     and impartial here today?

10            MS. PIERCE:  No.

11            MR. PARKS:  Anyone else.

12            MR. DZIEJMA:  I'm currently law enforcement

13     in Franklin County.

14            MR. PARKS:  You didn't work on this case

15            MR. DZIEJMA:  Did not.

16            MR. PARKS:  Do you have any personal

17     knowledge from working on the case?

18            MR. DZIEJMA:  No.

19            MR. PARKS:  Could you, as a law enforcement

20     officer, set that aside, listen to the evidence and

21     make a fair and impartial verdict based only on the

22     evidence that you hear today?

23            MR. DZIEJMA:  I believe so.

24            MR. PARKS:  Yes or no?

25            MR. DZIEJMA:  Yes.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              MR. PARKS:  No. 31, Mr. Brendel.

 2              MR. BRENDEL:  I know several people that

 3    work for the Sheriff's Department and one for the

 4    State.

 5              MR. PARKS:  Have you discussed this case

 6    with any one of them?

 7              MR. BRENDEL:  No.

 8              MR. PARKS:  Is there anything about that

 9    that would keep you from being fair and impartial

10    here today?

11              MR. BRENDEL:  No.

12              MR. PARKS:  Anyone else in this row.  The

13    next row, No. 38, Mrs. Scheer.

14              MS. SCHEER:  My cousin works for the

15    Sheriff's Department.

16              MR. PARKS:  Have you talked to him about

17    this case?

18              MS. SCHEER:  No.

19              MR. PARKS:  Is there anything about that

20    that would keep you from listening to the evidence

21    here today and rendering a fair and impartial

22    verdict based only upon the evidence?

23              MS. SCHEER:  No.

24              MR. PARKS:  Anyone else in the row.  No. 41.

25              MS. WALKER:  I have church family that are
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   law enforcement in Franklin County.

2           MR. PARKS:  Is there anything about that,

3   have you discussed this case with any of them.

4           MS. WALKER:  No, sir.

5           MR. PARKS:  Is there anything about your

6   circle of friends that include law enforcement that

7   would keep you from being fair and impartial here

8   today?

9           MS. WALKER:  No, sir.

10          MR. PARKS:  Thank you.  No. 42, Mr. Kriete.

11          MR. KRIETE:  I know Sheriff's Deputy Paul

12  McCluer.

13          MR. PARKS:  Have you discussed this case

14  with him or is there anything about that

15  relationship that would keep you from being fair and

16  impartial here today?

17          MR. KRIETE:  No, sir.

18          MR. PARKS:  Anyone else?  No. 44,

19  Mr. Parker.

20          MR. PARKER:  My nephew is a sheriff's deputy

21  in this county.

22          MR. PARKS:  Is there anything about that

23  that would keep you from being fair and impartial?

24          MR. PARKER:  No.

25          MR. PARKS:  Anyone in the last row, No. 48,

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  Mr. Wilmsmeyer.

2          MR. WILMSMEYER:  I'm currently in law

3  enforcement and I know several people in law

4  enforcement.

5          MR. PARKS:  Is there anything about you

6  being in law enforcement that would keep you from

7  being fair and impartial?

8          MR. WILMSMEYER:  No.

9          MR. PARKS:  Could you listen to the evidence

10  today and render a fair and impartial verdict based

11  only upon that testimony and not your involvement in

12  law enforcement?

13          MR. WILMSMEYER:  Yes.

14          MR. PARKS:  No. 16, Ms. Davis.

15          MS. DAVIS:  I also know a couple of people

16  in law enforcement in Franklin County.

17          MR. PARKS:  Have you discussed this case in

18  any way?

19          MS. DAVIS:  No.

20          MR. PARKS:  Is there anything about knowing

21  them that would keep you from rendering a fair and

22  impartial verdict?

23          MS. DAVIS:  No.

24          MR. PARKS:  No. 18, Ms. Bates.

25          MS. BATES:  I'm friends with the police

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  chief in Pacific, but I have not discussed anything

2  with him and I could be fair and impartial.

3         MR. PARKS:  Thank you very much.

4         MR. CLICK:  Being a long-time resident, I

5  know a number of officers here in town.  We don't

6  know them real well but we do know a number of

7  people.

8         MR. PARKS:  You're Mr. Click?

9         MR. CLICK:  Yes.

10        MR. PARKS:  Is there anything about knowing

11 these people that would keep you from being fair and

12 impartial?

13        MR. CLICK:  No.

14        MR. PARKS:  Thank you.  I'm going to turn

15 that question around just a little.  Is there anyone

16 here who has ever come into contact with law

17 enforcement, either been a suspect or accused of a

18 crime by law enforcement or has been a victim of a

19 crime and come into contact with law enforcement,

20 and I'm talking about anything here.  No. 8.

21        MS. SIEVE:  I had to call the police for

22 domestic violence in St. Louis six years ago.

23        MR. PARKS:  Was there anything about that

24 contact with law enforcement that left a bad taste

25 in your mouth against law enforcement that you could

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    not listen to officers on the stand and be fair and
 2    impartial?
 3              MS. SIEVE:  No.
 4              MS. LAUBINGER:  I've been arrested before.
 5              MR. PARKS:  Anything about that with the
 6    officers --
 7              MS. LAUBINGER:  No.
 8              MR. PARKS:  That you're not going to be
 9    fair?
10              MS. LAUBINGER:  I'd be fair.
11              MR. PARKS:  You'd listen to them and give
12    them the benefit as you would anyone else?
13              MS. LAUBINGER:  Yeah.
14              MR. PARKS:  Nothing about that incident that
15    left a bad taste in your mouth against law
16    enforcement?
17              MS. LAUBINGER:  No.
18              MR. PARKS:  No. 6.
19              MS. BUHR:  A DWI, was arrested for DWI once
20    a long time ago.
21              MR. PARKS:  Has that been taken care of?
22              MS. BUHR:  It was years and years ago.
23              MR. PARKS:  Is there anything about that
24    arrest with the police officers, the court system,
25    anything that left a bad taste in your mouth that
```

Weinhaus, Vol. 1

```
 1  you would not be fair and impartial here today?
 2          JUDGE SUTHERLAND:  I can be fair and
 3  impartial.
 4          MR. PARKS:  No. 11, Mr. Strassner.
 5          MR. STRASSNER:  I'm assuming you're not
 6  including things like traffic violations, that sort
 7  of thing.  Because yeah, I had a speeding ticket
 8  when I was 16.
 9          MR. PARKS:  And you're 17 now so.  Anything
10  about that --
11          MR. STRASSNER:  No, sir.
12          MR. PARKS:  -- dealing with the contact of
13  law enforcement that would keep you from treating
14  them just like you would any other witness?
15          MR. STRASSNER:  No, sir.
16          MR. PARKS:  No. 12, Ms. Terschluse.
17          MS. TERSCHLUSE:  I know law enforcement, in
18  fact she's your daughter Meg, and my grandson was
19  involved in a drug deal with law enforcement.
20          MR. PARKS:  Is there anything about that
21  contact or knowing these people that would taint you
22  against law enforcement to where you could not
23  listen fairly to their testimony and give a fair and
24  accurate or fair and impartial verdict to the
25  defendant?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            MS. TERSCHLUSE:  I think I could give a fair

 2   verdict because they treated them right, my grandson

 3   right, so I'm sure they'd be fair.

 4            MR. PARKS:  So you could be fair and

 5   impartial?

 6            MS. TERSCHLUSE:  Sure.

 7            MR. PARKS:  No. 10, Sensenbrenner.

 8            MS. SENSENBRENNER:  Are you asking in our

 9   lifetime if we had any contact being pulled over?

10            MR. PARKS:  Any contacts you might have had

11   with law enforcement where you don't think the

12   officer treated you fair, where it left a bad taste

13   against officers.  If law enforcement officers get

14   up here to testify, are you going to automatically

15   disregard what they said because of your experience

16   with them.

17            MS. SENSENBRENNER:  I understand, thank you.

18            MR. PARKS:  Are you okay?

19            MS. SENSENBRENNER:  Yes, thank you.

20            MR. PARKS:  No. 19.

21            MR. HATCHER:  I had a DWI about three years

22   ago.

23            MR. PARKS:  Is that disposed of?

24            MR. HATCHER:  Yes, all over with.

25            MR. PARKS:  Is there anything about the way
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   the arresting officer handled that that would keep
 2   you from being fair and impartial to the testimony
 3   of a law enforcement officer?
 4          MR. HATCHER:  No, the only thing I didn't
 5   like was to be kept 24 hours when nobody knew where
 6   I was at, but I had no problem with them.
 7          MR. PARKS:  So you could be fair and
 8   impartial?
 9          MR. HATCHER:  Yes.
10          MR. PARKS:  And that incident would not keep
11   you from believing the law enforcement officers that
12   talk or testify here today.
13          MR. HATCHER:  No.
14          MR. PARKS:  No. 18.
15          MS. BATES:  Several years ago I was involved
16   in an embezzlement case, and I worked along side the
17   officers to help solve that.
18          MR. PARKS:  Is there anything about that
19   that left a bad taste in your mouth that would keep
20   you from automatically not believing what a law
21   enforcement officer said?
22          MS. BATES:  No.
23          MR. PARKS:  Anyone else in the next row
24   there.  In the third row, yes, No. 32.
25          MR. DEBONNAIRE:  You're speaking of things
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   in general that I've done for the law or against?

2          MR. PARKS:  Have you been a victim of a

3   crime or law enforcement came --

4          MR. DEBONNAIRE:  No, no.  Just so your

5   investigator understands, I have a nephew who I had

6   to turn in because of crack, and he's out of prison

7   now, clean and sober and he's got a business, and

8   I'd rather not mention his name.  He's not dirty

9   anymore.

10         MR. PARKS:  Great, that's what we want.

11         MR. DEBONNAIRE:  I don't see him.

12         MR. PARKS:  Is there anything about that

13  incident that left a bad taste --

14         MR. DEBONNAIRE:  No, I did what was right,

15  he came to my house and --

16         MR. PARKS:  We don't want to go into details

17  but is there anything about that, the way law

18  enforcement handled that case that left a bad taste

19  in your mouth?

20         MR. DEBONNAIRE:  No, they cleaned him up and

21  he's now good.

22         MR. PARKS:  Anyone in the next row.  Yes,

23  No. 41.

24         MS. WALKER:  My daughter was a rape victim.

25  I had no problem with the way the police handled it.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  And you could listen to police
 2 officers testify and be fair and impartial?
 3          MS. WALKER:  Yes.
 4          MR. PARKS:  Another.
 5          MR. PARKER:  I had eight felonies since I
 6 was 15 and misdemeanors.
 7          MR. PARKS:  Thank you very much.
 8          MR. ROACH:  I've been arrested.
 9          MR. PARKS:  Is there anything about that
10 arrest that left a bad taste in your mouth with the
11 law enforcement or the court system?
12          MR. ROACH:  No.
13          MR. PARKS:  Could you listen to law
14 enforcement officers testify and treat them the same
15 as anybody else and be fair and impartial.
16          MR. ROACH:  Absolutely, yes.
17          MR. PARKS:  Anyone else in this row.  I
18 believe the evidence in this case will show that on
19 September 11th, 2012 that the defendant arrived at
20 the MFA gas station on Highway K here in Franklin
21 County.  Defendant was wearing a holstered pistol on
22 his side.  He was confronted by Sergeant Folsom and
23 Corporal Mertens.  He attempted to draw his pistol
24 and was shot by the Highway Patrol.  Is there anyone
25 here that believes that the defendant's pistol
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  should have cleared the holster before the law

 2  enforcement officer shot?  Anyone in the jury box?

 3  Anyone back here?  I see no hands.

 4      Does anyone here believe that the law

 5  enforcement officers should have waited for the

 6  defendant to shoot at them and then returned his

 7  fire before they shot him?  Anyone in the jury box?

 8  Anyone back here?

 9          MR. WHITE:  I have a question on your

10  question before.  Did you say he was pulling his gun

11  out of his holster but didn't clear the holster?

12          MR. PARKS:  Yes, do you have any problems

13  with that?

14          MR. WHITE:  No.

15          MR. PARKS:  Anybody here on the second

16  question that believes the defendant should have

17  fired at the troopers before they returned fire?

18          MR. EASTWOOD:  I'm going to ask the Court to

19  instruct the jury pool that Mr. Parks' statements

20  are not evidence, they're hypotheticals.

21          MR. PARKS:  These are hypothetical questions

22  I'm asking, this is not evidence.

23          JUDGE SUTHERLAND:  That's sufficient, go

24  ahead.

25          MR. PARKS:  Does everyone here in the jury

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  pool agree with the proposition that in Missouri you

2  have the right to openly carry a weapon, not talking

3  about carry and conceal but does everybody agree

4  with the proposition that you may at any time wear a

5  handgun on your hip as long as it's not concealed.

6  Does everyone agree with that proposition.

7         MS. DAYTON:  No, I think you should have a

8  carry and conceal.

9         MR. PARKS:  A carry and concealed permit

10  means that you are allowed to carry a weapon on your

11  hand and have a coat over it or have it in your

12  pocket.  That you have to go through special

13  practice and training, but in the State of Missouri

14  you can slap a six gun on your hip and walk around

15  all day, that's the law.  Is there anyone here that

16  does not believe that that is the law.

17         MS. QUENNOZ:  That you don't believe it or

18  that you don't believe in the law?

19         MR. PARKS:  I'm not asking you if you

20  believe in the law.  I'm only asking you if you

21  agree that that is what the law is.  I don't care

22  whether you agree or not with it, that's irrelevant.

23  I just want to know do you understand that you're

24  allowed to that?

25         MS. QUENNOZ:  I don't believe that's the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  law, what you're asking.

2      MR. PARKS:  If I told you that was the law,

3  would you believe that?

4      MS. QUENNOZ:  Well, I would hope you would

5  tell me the law.

6      MR. PARKS:  Well that is, so everybody

7  understands now that you can carry a weapon, you can

8  strap a two gun set on your hips if you want to as

9  long as you don't have a coat over it.  As long as

10  the gun is out in plain view, you're allowed to

11  carry.

12      JUDGE SUTHERLAND:  It's not going to get you

13  very far inside the courthouse or airport but that's

14  another issue.

15      MR. PARKS:  Nothing there.  Does everyone

16  agree with the proposition, though, whether you

17  carry open or you carry concealed that once that

18  weapon is drawn, a whole other set of laws take

19  effect.  You can -- you have the right to carry but

20  you do not have the right to draw, except in

21  specific circumstances.  Does everybody agree with

22  that proposition?  Everybody agree with it in the

23  jury box.  Everybody agree with it out here.  Does

24  everyone here agree with the proposition that you

25  have a constitutional right to criticize your

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   elected officials.  Anybody here that thinks you
 2   can't?  Anybody in the jury box.  Anybody out here
 3   think that you do not have a constitutional right to
 4   criticize your elected officials.
 5        Does everyone here agree with the proposition
 6   that you do not have a constitutional right to
 7   threaten to kill or harm your elected officials.
 8   Everybody agree with that proposition here in the
 9   jury box.  Everybody agree with that out here.  You
10   may criticize but you may not kill or harm,
11   everybody agree with that.
12        Now the Court has told you that the defendant
13   is charged with eight crimes.  This case will
14   proceed in two stages, the first stage we call the
15   guilt phase, and if you are on the jury panel, the
16   first thing that you must decide after hearing the
17   evidence is whether or not the defendant is guilty
18   of each or one or all eight of the charges.  Each
19   one is to be considered separately.  Each one is to
20   be found beyond a reasonable doubt by you as guilt.
21   If you find a guilty verdict on any of the charges,
22   one, all eight, six, five, whatever, if you find a
23   guilty verdict, then we will do what is called the
24   penalty phase in which you will be asked to render a
25   penalty for each count.  The first count is
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    tampering with a judicial official, which is a Class

2    C felony.  That charge has a range of punishment of

3    from one day to one year in the county jail or two

4    years to seven years in the Department of

5    Corrections and/or a fine of up to $5,000.00, which

6    would be assessed by the Court.  So you could find

7    him on that count guilty and sentence him to one day

8    to a year in county jail, you could sentence him

9    from two years to seven years in the Department of

10   Corrections, and on either one of those you could or

11   could not ask the Judge to assess a fine.  Is there

12   anyone here that if they had found the defendant

13   guilty of that charge would not consider the entire

14   range of punishment?  In other words if you say

15   well, he's guilty of that, all I'll consider is the

16   jail time.  I won't consider the prison time.  Is

17   there anyone here that won't consider the entire

18   range?  I see no hands in the jury box.  I see no

19   hands with the rest of the panel.

20       The defendant is charged with possession of a

21   controlled substance, Morphine in Count 2, again the

22   same range of punishment as to Count 1, one day to

23   12 months in the county jail or two years to seven

24   years in a Department of Corrections or a fine.  If

25   you found the defendant guilty of that charge, is

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    there anyone here who could not consider that entire

2    range of punishment.  Anyone in the jury box.

3    Anyone out here.

4        The third count is possession of a controlled

5    substance, marijuana, a misdemeanor amount of

6    marijuana.  That is a Class A misdemeanor where the

7    penalty is one day to 12 months in the Department of

8    Corrections and -- let me start over, I'm sorry.

9    One day to 12 months in the county jail.  There is

10   no prison time on a misdemeanor and/or a fine of up

11   to $1,000.00.  If you convicted the defendant of a

12   possession of marijuana, is there anyone here who

13   could not consider that entire range of punishment?

14   Anyone in the jury box.

15        MR. GREGG:  I couldn't consider that entire

16   range.  I don't believe it should be illegal.  I

17   wouldn't be able to consider a punishment, so.  I

18   don't think it should be illegal.

19        MR. PARKS:  The Judge asked you when he read

20   the instructions and asked you if you could consider

21   the instructions, whether you agree with them or

22   not, if I prove the elements of possession of

23   marijuana and you think I've proved it beyond a

24   reasonable doubt, whether you believe in that charge

25   or not, could you render a guilty verdict?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          MR. GREGG:  I don't think I could.

2          MR. PARKS:  Is there anyone else here that

3     could not consider the full range of punishment on a

4     misdemeanor marijuana charge.

5          The defendant is charged with two counts of

6     assault of a law enforcement officer, the first

7     being on Sergeant Folsom, the second charge being on

8     Corporal Mertens.  These are Class A felonies.  The

9     range of punishment for a Class A felony is minimum

10    of 10 years, a maximum of 30 years or life in the

11    Department of Corrections.  If you found the

12    defendant guilty of the charges of assault of a law

13    enforcement officer, could you consider the entire

14    range of punishment.  Anyone in the jury box who

15    could not consider the entire range of punishment.

16    Anyone back here on a Class A felony 10 years to 30

17    years or life in the Missouri Department of

18    Corrections could not consider that entire range of

19    punishment.  I see no hands.

20         The defendant is also charged with two counts

21    of armed criminal action, which means he used, in

22    this case, he used a weapon to commit the assault of

23    a law enforcement officer.  The range of punishment

24    on an armed criminal action is a minimum of three

25    years up to whatever you want to give him.  Is there

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  anyone here in the jury box that could not consider

2  the entire range of punishment in their deliberation

3  on armed criminal action.  Anyone back here.

4       The last charge is resisting arrest, that is a

5  Class D felony.  The range of punishment for

6  resisting arrest is one day to 12 months in the

7  Franklin County jail or two years to four years in

8  the Missouri Department of Corrections and/or a fine

9  of up to $5,000.00.  Is there anyone here who could

10  not consider the entire range of punishment on

11  resisting arrest.  Anyone in the jury box.  Anyone

12  back here.

13       Has anyone here ever served on a jury panel or

14  been on a jury before, and I don't care whether it

15  was criminal or civil, whether it was in Franklin

16  County, State case or a Federal case.  Anybody here.

17  We'll start over here, you all put your hands down

18  and we'll come back.  Anybody in the first row.

19  Juror No. 9.

20            MS. DUBUQUE:  I was on Grand jury.

21            MR. PARKS:  Here in Franklin County?

22            MS. DUBUQUE:  Yes.

23            MR. PARKS:  How long ago has that been?

24            MS. DUBUQUE:  Two years at least.

25            MR. PARKS:  You never heard anything about

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   this?

2           MS. DUBUQUE:  No.

3           MR. PARKS:  Is there anything about that

4   that would keep you from being fair and impartial

5   here today?

6           MS. DUBUQUE:  No, not at all.

7           MR. PARKS:  Juror No. 11.

8           MR. STRASSNER:  I was an alternate juror on

9   a recent civil case.

10          MR. PARKS:  Here?

11          MR. STRASSNER:  Yes.

12          MR. PARKS:  But you never got to

13  deliberation?

14          MR. STRASSNER:  I didn't get to deliberate.

15          MR. PARKS:  You realize that's a civil case.

16  In a civil case you do not have to have a unanimous

17  verdict.  You understand you do in a criminal case?

18          MR. STRASSNER:  I understand.

19          MR. PARKS:  No. 12.

20          MS. TERSCHLUSE:  I was on the same civil

21  case as he was.

22          MR. PARKS:  Did you make the jury panel?

23          MS. TERSCHLUSE:  Yes.

24          MR. PARKS:  You sat for the deliberations?

25          MS. TERSCHLUSE:  Yes.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Is there anything about that

 2    that would keep you from sitting on this jury and

 3    rendering a fair and impartial verdict?

 4          JUDGE SUTHERLAND:  I don't think so.

 5          MR. PARKS:  Did you all reach the verdict?

 6          MS. TERSCHLUSE:  Yes.

 7          MR. PARKS:  Were you the foreman of that

 8    jury?

 9          MS. TERSCHLUSE:  No.

10          MR. PARKS:  No. 15.

11          MS. DAYTON:  I've been called several times

12    and I have served two or three times, it's been many

13    years but I have served several times, once on a

14    criminal.

15          MR. PARKS:  Was that in Franklin County?

16          MS. DAYTON:  No.

17          MR. PARKS:  Is there anything about that

18    jury service that would keep you from being fair and

19    impartial if you were picked for this jury and

20    serving on this jury?

21          MS. DAYTON:  No.

22          MR. PARKS:  Did you reach a verdict in the

23    case?

24          MS. DAYTON:  Yes.

25          MR. PARKS:  Were you the foreman of any of
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  those jury panels?

2          MS. DAYTON:  No.

3          MR. PARKS:  No. 21.

4          MS. PIOTRASCHKE:  I was on the same one as

5  them.

6          MR. PARKS:  Were you on the jury panel or --

7  were you picked for the jury?

8          MS. PIOTRASCHKE:  No, I was picked, I was on

9  the jury.

10          MR. PARKS:  And you all reached a verdict?

11          MS. PIOTRASCHKE:  Yes.

12          MR. PARKS:  Were you the foreman?

13          MS. PIOTRASCHKE:  No.

14          MR. PARKS:  And realizing this is a criminal

15  trial, not a civil, in a criminal trial -- let me

16  rephrase.  Is there anyone here that does not

17  realize that in a criminal trial all 12 members must

18  agree to whatever their verdict is, there's no

19  getting nine.  All 12 people have to agree,

20  everybody understand that.  Anyone in the next row,

21  No. 25.

22          MS. STACK:  I was in the civil case a few

23  months ago.

24          MR. PARKS:  Was there anything about that

25  jury service that would keep you from serving on

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   this jury and being fair and impartial?

 2           MS. STACK:  No.

 3           MR. PARKS:  Were you actually on the jury

 4   panel?

 5           MS. STACK:  No.

 6           MR. PARKS:  So you never got to the trial?

 7           MS. STACK:  No.

 8           MR. PARKS:  No. 23.

 9           MR. GREGG:  I was on the same civil case.

10           MR. PARKS:  Was there anything about that

11   service that would keep you from being fair and

12   impartial here today?

13           MR. GREGG:  No.

14           MR. PARKS:  Anyone else in this row.  The

15   next row, No. 30.

16           MR. DZIEJMA:  I served on a civil case 10

17   years ago.

18           MR. PARKS:  In Franklin County?

19           MR. DZIEJMA:  Yes.

20           MR. PARKS:  Were you on the jury panel?

21           MR. DZIEJMA:  Yes.

22           MR. PARKS:  Did you all reach a verdict?

23           MR. DZIEJMA:  Yes, sir.

24           MR. PARKS:  Were you the foreman?

25           MR. DZIEJMA:  No.
```

```
 1          MR. PARKS:  Is there anything about that
 2    that would keep you from being fair and impartial?
 3          MR. DZIEJMA:  No.
 4          MR. PARKS:  Mr. Brendel.
 5          MR. BRENDEL:  Franklin County, it was a
 6    malpractice suit in Franklin County.
 7          MR. PARKS:  How long ago was that?
 8          MR. BRENDEL:  Seven years ago, I was on the
 9    jury and I was not a foreman.
10          MR. PARKS:  Did you all reach a verdict?
11          MR. BRENDEL:  Yes.
12          MR. PARKS:  Is there anything about that
13    that would keep you from rendering a fair and
14    impartial verdict?
15          MR. BRENDEL:  No.
16          MR. PARKS:  Anyone else in this row.  Anyone
17    in the next row.  No. 46.
18          MR. HAYS:  I was on a Federal Grand jury in
19    the late '70s.
20          MR. PARKS:  Anything about that Grand jury
21    service that would keep you from being fair and in
22    partial here today?
23          MR. HAYS:  No.
24          MR. PARKS:  Anyone else in this row.
25          MS. RAGAN:  I was called to serve but never
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  selected.

2          MR. PARKS:  Here in Franklin County?

3          MS. RAGAN:  Yes.

4          MR. PARKS:  Thank you very much.  Now the

5  next line of questioning is a little more personal.

6  So if you would feel uncomfortable answering these

7  questions in front of the entire jury panel, just

8  please let me know and we'll have a private

9  conversation with the Judge when we're done with the

10  voir dire.  But has anyone here on the jury panel

11  ever been charged with or convicted of a crime you

12  yourself.

13          MS. FLETCHER:  A felony charge 17 years ago.

14  I feel uncomfortable talking about it.

15          MR. PARKS:  Judge, could we have a

16  conference with No. 7 please.

17          MS. LAUBINGER:  I've had a DWI and I think I

18  mentioned that already.

19          MR. PARKS:  But was there anything about

20  that DWI, the way it was handled, the outcome or

21  anything that would keep you from being fair and

22  impartial here today?

23          MS. LAUBINGER:  No.

24          MR. PARKS:  Anyone else, same thing and we

25  discussed that with juror No. 6.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              MS. BUHR:  Yeah.

 2              MR. PARKS:  No. 22.

 3              MR. HASLAG:  Approximately 10 years ago I

 4    also had a DUI.

 5              MR. PARKS:  Was there anything about that

 6    that left a bad taste in your mouth or would keep

 7    you from being fair and impartial?

 8              MR. HASLAG:  No.

 9              MR. PARKS:  Anything about the way the

10    officers treated you at the scene that you don't

11    think was fair or just?

12              MR. HASLAG:  No, sir.

13              MR. PARKS:  Anyone in the second row.

14    Anyone in the third row.

15              MS. NOWLIN:  I was arrested and charged with

16    two felonies.

17              MR. PARKS:  Is there anything about that?

18              MS. NOWLIN:  No.

19              MR. PARKS:  Anyone else, 44.

20              MR. PARKER:  I've been charged with eight

21    felonies.

22              MR. PARKS:  Anybody in the last row, 47.

23              MR. ROACH:  DUI.

24              MR. PARKS:  How long ago was that?

25              MR. ROACH:  2002.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  That's all been disposed of?

 2          MR. ROACH:  Yes.

 3          MR. PARKS:  Was there anything about that,

 4  the way anyone treated you that you feel you could

 5  not be fair and impartial here today?

 6          MR. ROACH:  No.

 7          MR. PARKS:  Anyone else.  Okay, I'm going to

 8  turn that around just a little bit but has a family

 9  member or a close personal friend that you know, and

10  I'm not talking about well the guy down at the end

11  of the block got arrested at one time, I'm talking

12  about somebody you know and have contact with.  Have

13  they ever been charged with or convicted of a crime,

14  close family member or a close personal friend.

15          MS. DUBUQUE:  How recent do you want to go?

16          MR. PARKS:  If it's going to bother you,

17  then I'd like to know about it.  No. 8.

18          MS. SIEVE:  Unfortunately my daughter is

19  going to be charged with drug possession, and if I

20  have an attitude with anybody, it's with my

21  daughter.

22          MR. PARKS:  Is that being handled by my

23  office.

24          MS. SIEVE:  She's 20, I don't know all the

25  details.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1            MR. PARKS:  Was she arrested in Franklin
2    County?
3            MS. SIEVE:  Yes.
4            MR. PARKS:  Was she charged in Franklin
5    County through a municipality or State court?
6            MS. SIEVE:  I don't know.
7            MR. PARKS:  Is there anything about the way
8    that she is being treated --
9            MS. SIEVE:  No, it's been exceedingly fair.
10           MR. PARKS:  So you could be fair and
11   impartial here today?
12           MS. SIEVE:  Yes.
13           MR. PARKS:  No. 9.
14           MS. DUBUQUE:  I had a son with a Class D
15   felony about 20 years ago.
16           MR. PARKS:  Anything about the way that was
17   handled?
18           MS. DUBUQUE:  No, same way, very fair and he
19   got to go on probation, so they treated him right.
20           MR. PARKS:  So you could be fair and
21   impartial, listen to the testimony, render a verdict
22   based only on that, not about your son's prior
23   convictions.
24           MS. DUBUQUE:  Yes.
25           MS. TERSCHLUSE:  I have a grandson that
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  right now he's in drug treatment and he will be in

2  drug court here when he's released in two weeks.

3           MR. PARKS:  Is there anything about the way

4  the police, the courts, the prosecutors, his defense

5  attorney has handled that case that has left a bad

6  taste in your mouth so where you could not render a

7  fair and impartial verdict if you were picked for

8  this jury?

9           MS. TERSCHLUSE:  No, because I feel he was

10  treated fairly.

11          MR. PARKS:  That's good enough.  Anyone else

12  in the back row.  Juror No. 2.

13          MR. CLICK:  I have cousins, aunts and uncles

14  that all had severe altercations.

15          MR. PARKS:  Is there anything about those

16  altercations, the way they were treated by the

17  police, the court system, the prosecutors, their own

18  defense attorneys, anything there that has left a

19  bad taste in your mouth against the legal system?

20          MR. CLICK:  Most of it was well deserved but

21  one of the uncles resisted address and they beat him

22  so bad I couldn't recognize him the next day.  So at

23  that time it was pretty hard to handle that, to be

24  quite honest.

25          MR. PARKS:  Have you been able to resolve

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    that and set that aside?

2          MR. CLICK:  I understand them fighting with

3    him.  I can be impartial still but I have to admit

4    it was hard at that time.

5          MR. PARKS:  This case involves the charge of

6    resisting arrest.  Could you listen to the facts of

7    the case and render a verdict, putting aside all the

8    family history, and render a verdict based only on

9    the evidence you hear here today?

10         MR. CLICK:  I think so.

11         MR. PARKS:  Anyone else?

12         MS. BUHR:  My brother is in prison.

13         MR. PARKS:  Did those charges arise out of

14   Franklin County?

15         MS. BUHR:  Yes.

16         MR. PARKS:  Was there anything about the way

17   the police treated that, the courts, the prosecutor,

18   defense attorney that you did not think was right?

19         MS. BUHR:  No.

20         MR. PARKS:  Could you listen to the evidence

21   here today, be fair and impartial?

22         MS. BUHR:  Yes.

23         MR. PARKS:  Anyone here in the first row.

24   Ms. Davis.

25         MS. DAVIS:  I have a brother that was in

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   prison.
 2          MR. PARKS:  Did those charges arise out of
 3   Franklin County?
 4          MS. DAVIS:  I don't know for sure.
 5          MR. PARKS:  Was there anything about the way
 6   he was treated by police, by the courts, by the
 7   prosecutor, by his own defense attorneys that left a
 8   bad taste in your mouth?
 9          MS. DAVIS:  No.
10          MR. PARKS:  If you were picked for the jury,
11   could you listen to the evidence today, setting
12   everything aside about your brother and reach a fair
13   and impartial verdict?
14          MS. DAVIS:  Yes.
15          MR. PARKS:  No.
16          MS. RUTHERFORD:  My brother has been in
17   prison, not in Franklin County.
18          MR. PARKS:  Is there anything about his
19   arrest --
20          MS. RUTHERFORD:  No.
21          MR. PARKS:  -- that left a bad taste in your
22   mouth?
23          MS. RUTHERFORD:  No.
24          MR. PARKS:  If you were picked for the jury,
25   could you set that aside and render a verdict based
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   only on the testimony you heard here today.

2          MS. RUTHERFORD:  Yes.

3          MR. PARKS:  Anyone else.  No. 18.

4          MS. BATES:  I'd like to speak privately.

5          MR. PARKS:  No. 18, Ms. Bates, would like a

6   conference with the Court, Your Honor.  No. 19, Mr.

7   Hatcher.

8          MR. HATCHER:  A couple years back, I own a

9   lawn business and I was cutting this residence, my

10  wife was there.

11         MR. PARKS:  We don't want to go into a lot

12  of details.

13         MR. HATCHER:  Anyway, she was taken to the

14  police station in Washington, Missouri.

15         MR. PARKS:  Did you think that she was

16  unfairly arrested?

17         MR. HATCHER:  No.

18         MR. PARKS:  Is there anything about the way

19  the police treated your wife, you, that left a bad

20  taste in your mouth that you could not be fair and

21  impartial?

22         MR. HATCHER:  I just wish I knew more about

23  it and kept in the know.

24         MR. PARKS:  But could you be fair and

25  impartial if you were picked for this jury?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1          MR. HATCHER:  Yes, I could.

 2          MR. PARKS:  No. 21.

 3          MS. PIOTRASCHKE:  I feel I should mention,

 4   my brother-in-law, his son, he is in trouble with

 5   the courts somehow, but I'm not close enough to the

 6   situation to know anything about it.

 7          MR. PARKS:  There's nothing about that

 8   situation, either the police, courts, anything that

 9   you could not render a fair and impartial verdict?

10          MS. PIOTRASCHKE:  No.

11          MR. PARKS:  No. 24.

12          MS. QUENNOZ:  My nephew has been arrested

13   and served time for drugs.

14          MR. PARKS:  Here in Franklin County?

15          MS. QUENNOZ:  Yes.

16          MR. PARKS:  Anything about the way that was

17   handled by the police that you could not set that

18   aside and render a fair and impartial verdict.

19          MS. QUENNOZ:  No, sir.

20          MR. PARKS:  No. 28, Mr. Straatmann.

21          MR. STRAATMANN:  My brother spent time in

22   federal prison for drugs.

23          MR. PARKS:  Is there anything about the way

24   he was treated by the police, the courts, the legal

25   system that you could not set that aside and render

Weinhaus, Vol. 1

```
 1   a fair and impartial verdict?

 2            MR. STRAATMANN:  No.

 3            MR. PARKS:  No. 29.

 4            MS. TYREE:  I have a brother and

 5   brother-in-law in federal prison.

 6            MR. PARKS:  Is there anything about the way

 7   that was handled that would leave a bad taste in

 8   your mouth that you could not put that aside and

 9   render a fair and impartial verdict here in this

10   case today?

11            MS. TYREE:  No.

12            MR. PARKS:  Anyone in the next row, No. 31,

13   Mr. Brendel.

14            MR. BRENDEL:  Son, theft.

15            MR. PARKS:  Was that here in Franklin

16   County?

17            MR. BRENDEL:  Yes.

18            MR. PARKS:  Was there anything about the way

19   that was handled by the police, the courts that left

20   a bad taste in your mouth?

21            MR. BRENDEL:  No.

22            MR. PARKS:  You could be fair and impartial

23   if you were on the jury?

24            MR. BRENDEL:  Yes.

25            MR. PARKS:  No. 33, Ms. Acton.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 1

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MS. ACTON:  I have two sons in Franklin
 2  County jail for drugs.
 3          MR. PARKS:  Is there anything about the way
 4  they were treated by the police or anything that you
 5  think was unfair that you could not be fair and
 6  impartial here today?
 7          MS. ACTON:  No.
 8          MR. PARKS:  Anyone else.  Anyone in the next
 9  row.  No. 42.
10          MR. KRIETE:  My brother had a DWI about 20
11  years ago.
12          MR. PARKS:  And is there anything about the
13  way he was treated by law enforcement, by the legal
14  system that you thought was unfair?
15          MR. KRIETE:  No.
16          MR. PARKS:  Anything about that that you
17  could not set that aside and render a fair and
18  impartial verdict here today?
19          MR. KRIETE:  No.
20          MR. PARKS:  Anyone else.  No. 45.
21          MS. WAHLE:  Nephew.
22          MR. PARKS:  Here in Franklin County?
23          MS. WAHLE:  Yes.
24          MR. PARKS:  Anything about the way that was
25  handled by the police, the court system that you
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   could not set that aside and render a fair and

 2   impartial verdict?

 3           MS. WAHLE:  No.

 4           MR. PARKS:  You could do that?

 5           MS. WAHLE:  I could.

 6           MR. PARKS:  No. 47, Mr. Roach.

 7           MR. ROACH:  Mr. Brother is locked up right

 8   now.

 9           MR. PARKS:  In another state?

10           MR. ROACH:  Yes.

11           MR. PARKS:  Do you know a lot of facts about

12   that case?

13           MR. ROACH:  I just know what he was accused

14   of.

15           MR. PARKS:  Is there anything about that

16   accusation that you think the police or the courts

17   or the prosecutor or his defense attorney did

18   something that you're not happy with?

19           MR. ROACH:  I'll say no.

20           MR. PARKS:  If you were picked for this jury

21   panel, could you set that aside, render a verdict

22   only upon the evidence that you hear in court here

23   today?

24           MR. ROACH:  Yes, sir.

25           MR. PARKS:  Anyone else.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            MR. SWINNEY:  No. 50.  My cousin is in jail.

 2            MR. PARKS:  Is that here in Franklin County.

 3            MR. SWINNEY:  No, sir.

 4            MR. PARKS:  Is there anything about that

 5   incarceration, the way the police, the courts,

 6   anybody handled that?

 7            MR. SWINNEY:  Not at all.

 8            MR. PARKS:  You could be fair and impartial?

 9            MR. SWINNEY:  Yes, sir.

10            MR. PARKS:  Anyone else.  No. 46, Mr. Hays.

11            MR. HAYS:  My son had a few intersections

12   with law enforcement when he was a teenager.

13            MR. PARKS:  Anything about the way the

14   police or courts handled that that would keep you

15   from rendering a fair and impartial verdict here

16   today?

17            MR. HAYS:  No.

18            MR. PARKS:  No. 51, Ms. Tuttle.

19            MS. TUTTLE:  Two sons, one for traffic and

20   one for theft, and it's still in the process.

21            MR. PARKS:  Was that here in Franklin

22   County?

23            MS. TUTTLE:  Yes.

24            MR. PARKS:  Is there anything about the way

25   the police or my office or whoever is handling that
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  or the court system that you did not feel was right?

2          MS. TUTTLE:  No.

3          MR. PARKS:  Is there anything about that,

4  that if you are picked for this panel you could set

5  that aside and render a fair and impartial verdict?

6          MS. TUTTLE:  There's nothing that would --

7          MR. PARKS:  Could you set that aside, yes or

8  no, and render a fair and impartial verdict?

9          MS. TUTTLE:  Yes.

10         MR. PARKS:  No. 24.

11         MS. QUENNOZ:  My son had a DWI.

12         MR. PARKS:  Is there anything about the way

13  that was handled by the police or courts or anything

14  that you could not set that aside?

15         MS. QUENNOZ:  No, sir.

16         MR. PARKS:  You could be fair and impartial?

17         MS. QUENNOZ:  Yes, sir.

18         MR. PARKS:  Your Honor, I do not believe I

19  have anymore questions at this time.

20         JUDGE SUTHERLAND:  I do believe the jury

21  panel would like a little break at this time.

22         MR. PARKS:  I would.

23         JUDGE SUTHERLAND:  Ladies and gentlemen,

24  we'll be in recess for about 15 minutes.  Before we

25  finish up the voir dire, I do need to read you an

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    instruction before we break.  It is the court's duty

2    to instruct you now upon a matter about which you

3    will be reminded at each recess or adjournment of

4    the Court.  Until the case is given to you to

5    decide, you must not discuss any subject connected

6    with the trial among yourselves or form or express

7    any opinion about it, and until you are discharged

8    as jurors, you must not talk with others about the

9    case or permit them to discuss it with you in your

10   hearing.  You must not email, text or blog, instant

11   message or use any form of communication regarding

12   the case or anyone involved in the case until the

13   trial has ended and you have been discharged as a

14   juror.  It is important that your decision be based

15   only on the evidence presented to you in the

16   proceedings in the courtroom.  You must not do any

17   research or investigation on your own regarding any

18   matter involved in the case.  For example, you must

19   not consult books, dictionaries, the Internet or

20   talk to a person you consider knowledgeable.  You

21   should not read, view or listen to any newspaper,

22   radio, electronic communications from the Internet

23   or television report of the trial.  The bailiff and

24   other officers of the Court are not permitted to

25   talk to you about any subject connected with the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   trial, and you are not permitted to talk to them

2   about it.  The attorneys representing the State and

3   the defendant are under a duty not to do anything

4   which may even seem improper.  Therefore at recesses

5   and adjournments they will avoid saying anything to

6   the jury except perhaps something like good morning

7   or good afternoon.  In doing that, they do not mean

8   to be unfriendly but are simply doing their best to

9   avoid even an appearance which might be

10  misunderstood that they are or you are doing

11  anything improper.  The same applies to witnesses

12  and to the defendant.  They have been or will be

13  instructed to avoid all contacts with the jury, even

14  to talk about matters wholly unrelated to the case.

15  We'll be recessed for 15 minutes.  You may go out

16  with the bailiff.

17          (WHEREUPON A BRIEF RECESS TOOK PLACE)

18          JUDGE SUTHERLAND:  Voir dire on behalf of

19  defendant.

20          **(VOIR DIRE ON BEHALF OF THE DEFENDANT)**

21          MR. EASTWOOD:  Good morning everyone.  My

22  name is Hugh Eastwood.  This is my co-counsel, Chris

23  Combs, and I'm a criminal defense attorney.  That

24  means I defend people who are accused of a crime.

25  Accused of a crime, nothing more.  This trial is a

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    little different than some in that it has received

2    quite a bit of coverage in the press.  So first off,

3    I'd like to ask anyone if they read about this trial

4    or heard about it in the press or on TV.  Juror No.

5    3, without saying exactly what you heard, where have

6    you heard about this trial in the press or on TV?

7              MS. COLEMAN:  Local paper.

8              MR. EASTWOOD:  Would that be the Missourian?

9              MS. COLEMAN:  Independent.

10             MR. EASTWOOD:  How closely have you been

11   following?

12             MS. COLEMAN:  I haven't.

13             MR. EASTWOOD:  Just kind of skimmed the

14   headline?

15             MS. COLEMAN:  Exactly.

16             MR. EASTWOOD:  Have you formed an opinion

17   about the allegations against Mr. Weinhaus based on

18   what you've read or seen.

19             MS. COLEMAN:  No.

20             MR. EASTWOOD:  Juror No. 9.  Where have you

21   heard about it?

22             MS. DUBUQUE:  Paper, media and it also

23   happened in the area I live in.

24             MR. EASTWOOD:  Do you live in St. Clair?

25             MS. DUBUQUE:  South of St. Clair off of K.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. EASTWOOD:  How closely have you been
 2   following this matter?
 3          MS. DUBUQUE:  Well, when it comes up, I know
 4   people that know him, kind of in a distant way, we
 5   talk about it.
 6          MR. EASTWOOD:  Do you think you could be
 7   fair and impartial having heard so many things
 8   already?
 9          MS. DUBUQUE:  I think I can.
10          MR. EASTWOOD:  Juror No. 12,
11   Mrs. Terschluse.  Where have you heard about it?
12          MS. TERSCHLUSE:  Newspaper and media.
13          MR. EASTWOOD:  How closely have you been
14   following it?
15          MS. TERSCHLUSE:  Well, I read it but not
16   really, I don't zero in on it.
17          MR. EASTWOOD:  Do you always believe
18   everything you read in the paper?
19          MS. TERSCHLUSE:  No.
20          MR. EASTWOOD:  Have you formed any
21   conclusions already about this matter based on what
22   you read?
23          MS. TERSCHLUSE:  No.
24          MR. EASTWOOD:  Do you think you can be fair
25   and impartial?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            MS. TERSCHLUSE:  I think so.

 2            MR. EASTWOOD:  Juror No. 15, Mrs. Dayton.

 3            MS. DAYTON:  Yes.

 4            MR. EASTWOOD:  Where have you heard about

 5     this matter?

 6            MS. DAYTON:  Mainly in the Missourian.

 7            MR. EASTWOOD:  How closely have you been

 8     following it?

 9            MS. DAYTON:  Not closely at all.  I really

10     couldn't reiterate what the case was all about.

11            MR. EASTWOOD:  How familiar are you with the

12     details?

13            MS. DAYTON:  Not familiar at all.

14            MR. EASTWOOD:  Have you formed any judgments

15     or assumptions about this case so far?

16            MS. DAYTON:  Not at all.

17            MR. EASTWOOD:  Do you think you can be fair

18     and impartial?

19            MS. DAYTON:  Yes, sir.

20            MS. PIOTRASCHKE:  I heard it on the news and

21     read about it.

22            MR. EASTWOOD:  So you heard about it on the

23     news?

24            MS. PIOTRASCHKE:  Yeah, but I didn't pay

25     that much attention to it.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1          MR. EASTWOOD:  Did you form any conclusions

 2     or assumptions?

 3          MS. PIOTRASCHKE:  No.

 4          MR. EASTWOOD:  You could be fair and

 5     impartial?

 6          MS. PIOTRASCHKE:  I think so.

 7          MR. EASTWOOD:  Mr. Haslag, similarly, how

 8     have you been following this?

 9          MR. HASLAG:  I try to keep up with local

10     news through the newspaper every week, that's the

11     only source.

12          MR. EASTWOOD:  Just reading it in the paper?

13          MR. HASLAG:  Yes.

14          MR. EASTWOOD:  How close have you been

15     following it?

16          MR. HASLAG:  I haven't went out of my way to

17     follow it.

18          MR. EASTWOOD:  Juror No. 24.

19          MS. QUENNOZ:  Newspaper and the TV.

20          MR. EASTWOOD:  How closely have you been

21     following it?

22          MS. QUENNOZ:  Just read about it.

23          MR. EASTWOOD:  How many of the details are

24     you familiar with?

25          MS. QUENNOZ:  Just that it happened in

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    St. Clair.

2           MR. EASTWOOD:  You could be fair and

3    impartial?

4           MS. QUENNOZ:  Yes.

5           MR. EASTWOOD:  Juror 27.

6           MS. PIERCE:  I read about it in the

7    Missourian, and my mother-in-law lives right next

8    door to the MFA station, so I am pretty familiar

9    with it, yeah.

10          MR. EASTWOOD:  Have you been to the scene or

11   have you been to that gas station many times?

12          MS. PIERCE:  My whole life, yeah, for years.

13          MR. EASTWOOD:  Do you regularly go in there

14   and talk to people there?

15          MS. PIERCE:  Sometimes.

16          MR. EASTWOOD:  Would you know the store

17   clerk there for instance?

18          MS. PIERCE:  Yes.

19          MR. EASTWOOD:  Do you think that you would

20   be able to be fair and impartial?

21          MS. PIERCE:  Yes.

22          MR. EASTWOOD:  How familiar are you with the

23   details of the allegations?

24          MS. PIERCE:  Somewhat, I read about it in

25   the paper and heard about it also.

Weinhaus, Vol. 1

```
 1            MR. EASTWOOD:  Do you feel you are too
 2  personally affected by having family that lives
 3  right by where so many of these events occurred?
 4            MS. PIERCE:  No.
 5            MR. EASTWOOD:  More hands, juror No. 38.
 6            MS. SCHEER:  I read about it in the paper.
 7  Whenever it first happened, I was paying attention.
 8  I work in a county Government building in Jefferson
 9  County.
10            MR. EASTWOOD:  And do you feel that you
11  could be fair and impartial in this matter?
12            MS. SCHEER:  Yeah.
13            MR. EASTWOOD:  Did you ever feel personally
14  involved in this matter?
15            MS. SCHEER:  I did have to cancel an event
16  because our office was closed.
17            MR. EASTWOOD:  I'll stop you right there.
18  Do you think that you still could be fair and
19  impartial having been personally affected?
20            MS. SCHEER:  I think so.
21            MR. EASTWOOD:  Juror No. 40.
22            MR. CUTLER:  I just read it in the paper.
23            MR. EASTWOOD:  Mr. Cutler, you read about it
24  in the paper?
25            MR. CUTLER:  Yes.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. EASTWOOD:  How close have you followed
 2    it?
 3          MR. CUTLER:  I haven't.
 4          MR. EASTWOOD:  Formed an opinion?
 5          MR. CUTLER:  No.
 6          MR. EASTWOOD:  39, Mrs. Barringhaus.
 7          MS. BARRINGHAUS:  I just remember seeing it
 8    in the paper.
 9          MR. EASTWOOD:  Juror 46, Mr. Hays.
10          MR. HAYS:  I remember the initial television
11    reports and news articles, and I knew I was going to
12    be on a jury --
13          JUDGE SUTHERLAND:  Sir, could you speak up.
14          MR. HAYS:  I heard the initial television
15    reports and just personally read the articles until
16    the weekend when I knew I was going to be summoned
17    for jury duty.
18          MR. EASTWOOD:  Did reading that article
19    before you came here today make you pre judge any of
20    the facts or allegations?
21          MR. HAYS:  I don't think so.
22          MR. EASTWOOD:  Do you think you could be
23    fair and impartial?
24          MR. HAYS:  Yes.
25          MR. EASTWOOD:  Has anybody read comments
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   about this case on social media, that would be

 2   Facebook, Twitter, You Tube, the comment sections of

 3   newspapers when they're online where you can post

 4   comments if you read the paper online.  Has anyone

 5   here read or posted comments about this case on

 6   social media?  I see no hands.  I see hands, all

 7   right.  And that is juror No. 38 again and this is

 8   Ms. Scheer.

 9           MS. SCHEER:  I didn't post, I just read what

10   was on the Missourian's website.

11           MR. EASTWOOD:  In the comment feed?

12           MS. SCHEER:  Yeah, the comments on the

13   Missourian's website.

14           MR. EASTWOOD:  People in Jeff's life who

15   love and support him have raised money in his

16   defense, and they have a website for that.  Has

17   anyone ever gone to that website or received an

18   email from that group of people?  I see no hands.  I

19   see no hands.

20       Now, I know Mr. Parks asked you some questions

21   about law enforcement, about whether you're related

22   to or close to law enforcement or you've had an

23   experience, either you or someone in your life,

24   positive or negative with law enforcement.  And I

25   want to ask some follow-up questions about that.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   Juror No. 22, that's Mr. Haslag.  I know you said

2   you had your niece's husband is your neighbor.  He

3   works for the St. Clair Police Department, and you

4   said you could try your best but that sounded a

5   little hesitant to me.  Is your neighbor an officer

6   for the St. Clair Police Department?

7           MR. HASLAG:  Yes, he is.

8           MR. EASTWOOD:  When you said you could try

9   your best, what did you mean by that?

10          MR. HASLAG:  Well, I mean from what I've

11  heard, maybe I possibly should have said it would

12  cloud my judgment, I probably should have said that,

13  because I mean I believe what he tells me, I have a

14  good relationship with him and from what I've heard

15  from him --

16          MR. EASTWOOD:  About this case?

17          MR. HASLAG:  Right, because everybody talks,

18  right, so I try to be fair and balanced.

19          MR. EASTWOOD:  But he's your friend, he

20  married your niece?

21          MR. HASLAG:  Right.

22          MR. EASTWOOD:  Sure, I get that.  Juror No.

23  31, Mr. Brendel.  I know you said you know some

24  cops.  Have you ever talked about this case with the

25  cops?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. BRENDEL:  No.

 2          MR. EASTWOOD:  Have you commented on this

 3   case?

 4          MR. BRENDEL:  No.

 5          MR. EASTWOOD:  Online?

 6          MR. BRENDEL:  No.

 7          MR. EASTWOOD:  Juror No. 12, that's

 8   Ms. Terschluse.  At one point you said you know

 9   Mr. Parks' daughter?

10          MS. TERSCHLUSE:  Yeah, just through my

11   sister and my niece really.  She's friends with her

12   daughter and we've been at parties where they're at.

13          MR. EASTWOOD:  You're both members of this

14   community?

15          MS. TERSCHLUSE:  Right.

16          MR. EASTWOOD:  Do you think knowing

17   Mr. Parks' daughter might make it a little bit

18   difficult for you to be fair and impartial in terms

19   of the State's witnesses versus the defense's

20   witnesses or evidence that the State puts on versus

21   the defense?

22          MS. TERSCHLUSE:  I think I could be fair

23   because when you're at a party, you don't discuss

24   stuff like this.

25          MR. EASTWOOD:  It would be a different kind
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   of party.  Thank you very much for that.  Juror No.

 2   19, Mr. Hatcher.  I know that you said you had a DWI

 3   and they held you for 24 hours and your wife had an

 4   incident once?

 5           MR. HATCHER:  Yes.

 6           MR. EASTWOOD:  But you also said you could

 7   put those things aside and be fair and impartial

 8   here today?

 9           MR. HATCHER:  I could.

10           MR. EASTWOOD:  So you could put those out of

11   your mind entirely whether you're hearing the

12   testimony of police officers or of other witnesses

13   and render a fair and impartial verdict in this case

14   based only on the evidence and the instructions from

15   the Judge?

16           MR. HATCHER:  Yes.

17           MR. EASTWOOD:  Thank you very much.  Juror

18   No. 23, Mr. Gregg.  So you're a pro legalize

19   marijuana guy?

20           MR. GREGG:  Yes.

21           MR. EASTWOOD:  A lot of people are, it's a

22   fair subject in our community, absolutely, and I

23   know you said you'd have a hard time in the

24   punishment phase if there was a finding of guilt

25   with assessing a punishment to the defendant.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            MR. GREGG:  Yes.

 2            MR. EASTWOOD:  But of course the jury is

 3    given discretion to punish here.  Do you think you

 4    could follow the guidelines and within those

 5    guidelines use your discretion and judgment to

 6    assess punishment?

 7            MR. GREGG:  I'd just feel conflicted about

 8    the situation.  I don't know that I could render a

 9    fair verdict just to be completely honest.  It's

10    just that conflict there.

11            MR. EASTWOOD:  So could you render a

12    punishment of no punishment at all?

13            MR. GREGG:  Yes.

14            MR. EASTWOOD:  Juror No. 2, Mr. Click.  I

15    know you said that some cousins and an uncle and

16    aunt had a run-in with the law?

17            MR. CLICK:  Yes.

18            MR. EASTWOOD:  And one of your family

19    members, a cousin or uncle was beaten?

20            MR. CLICK:  An uncle, yeah.

21            MR. EASTWOOD:  How close are you to these

22    family members?

23            MR. CLICK:  The uncle in question has passed

24    on, it's been several years ago, but it left a

25    lasting impression.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1          MR. EASTWOOD:  Could you put that lasting

 2   impression aside and be fair and impartial here?

 3          MR. CLICK:  I think I can, yes.

 4          MR. EASTWOOD:  You could be fair to the

 5   State and the defense?

 6          MR. CLICK:  Yes.

 7          MR. EASTWOOD:  And listen to the testimony

 8   of law enforcement officers and other witnesses and

 9   have a fair and impartial verdict?

10          MR. CLICK:  I think so.

11          MR. EASTWOOD:  Thank you very much.  Now you

12   are -- I don't know but I would expect you're likely

13   to hear the testimony of law enforcement officers in

14   this trial as the State's witnesses.  Does anyone

15   here disagree with the proposition that law

16   enforcement officers are human, like you and me, and

17   just like you and me, just like any other human

18   being law enforcement officers can tell the truth

19   but they can also lie, does anyone disagree with

20   that?  I see no hands.  Does everyone here think

21   that they could make a decision for themselves about

22   whether a law enforcement officer was telling the

23   truth just like any other human being, any other

24   witness you heard testify?  I see no hands.  Is

25   anyone here just a little bit more likely to believe

1   someone because they are a law enforcement officer

2   testifying under oath as opposed to someone else?

3   Anyone else here just a little more credible, juror

4   No. 4, that's Mr. Suntrup.  Can you tell me about

5   that, sir?

6           MR. SUNTRUP:  Yeah, I believe that law

7   enforcement ought to be believed because they are

8   law enforcement, and if we can't believe our law

9   officers, we're in trouble.

10          MR. EASTWOOD:  So you're more likely to

11  believe a law enforcement officer than just some guy

12  off the street?

13          MR. SUNTRUP:  Yes.

14          MR. EASTWOOD:  And do you feel that would be

15  the case throughout this trial?

16          MR. SUNTRUP:  Uh-huh.

17          JUDGE SUTHERLAND:  Is that a yes?

18          MR. SUNTRUP:  Yes.

19          JUDGE SUTHERLAND:  I thought it was but it's

20  hard for the reporter to get those uh-huhs down very

21  well.

22          MR. EASTWOOD:  Thank you very much, sir.

23  And do you believe that you would be fair and

24  impartial nevertheless while believing a law

25  enforcement officer more than someone off the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    street?

2          MR. SUNTRUP:  Yes.

3          MR. EASTWOOD:  Thank you very much.  Now,

4    you're going to hear a lot about free speech in this

5    case, and I know Mr. Parks asked you some questions

6    about that.  And it seemed like everyone agreed that

7    we all have the right to criticize Government

8    officials.  I want to talk to you for a minute about

9    context, because I think when we talk about speech,

10   context matters.  Does anybody disagree that words

11   mean the same thing no matter where they are said or

12   the context in which they are said.  Does anyone

13   disagree with that?  I see no hands.

14         MR. DZIEJMA:  Could you repeat that.

15         MR. EASTWOOD:  Sure.  Does everyone

16   understand what I mean by context.  For example,

17   saying something in a letter you mailed to someone

18   privately is different than saying something

19   standing in the town square across the street.  Does

20   everyone agree that saying something privately in a

21   letter or phone call is different than saying

22   something to someone in public on the street?

23   Anyone disagree with that?  That's what I mean by

24   context.

25         Now, I want to talk to you about extreme

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    political speech.  By that I mean speech that can be

2    upsetting, that can be offensive, that can be

3    outrageous, that you can really, really disagree

4    with, makes you sick to your stomach.  Does anyone

5    think that speech ought to be banned, ought to be

6    punished?  You really don't like it, it makes you

7    sick to your stomach and it offends you.  I see no

8    hands.

9         Does everyone agree that something that's a

10   threat in one context could not be a threat in a

11   different context?  So for example, if I said to my

12   friend Mr. Combs here, "I'm going to kill you

13   tonight," that might be different than me saying

14   when I walk out of here in a joking manner, "oh,

15   man, I want to kill you."  Those could be read

16   differently, right?  Is it fair to say context

17   matters?  Does anyone disagree with that?  You

18   wouldn't just look at the words but you'd look at

19   how they were said, where they were said, who they

20   were said to.  Does anyone disagree that all those

21   factors are important when you're looking at

22   someone's statements?

23        Does anyone here, and I realize some of you

24   probably use the Internet more than others or don't

25   use it at all, but does anyone here just feel they

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  have difficulty evaluating evidence in the form of a

2  You Tube video?  I see no hands.  Sorry, juror No.

3  11, that's Mr. Strassner.

4          MR. STRASSNER:  I would have to be shown

5  that You Tube video is credible.  I mean obviously

6  any media is able to be manipulated and You Tube

7  videos are not excluded from that.

8          MR. EASTWOOD:  Fair enough, that's a fair

9  thing to say.  In your experience are normally You

10 Tube videos available to anyone on the Internet.

11         MR. STRASSNER:  Generally speaking.

12         MR. EASTWOOD:  But you'd hold the State to

13 requiring an explanation about where this video came

14 from?

15         MR. STRASSNER:  I think that's fair for any

16 information, the source of it needs to be explained.

17         MR. EASTWOOD:  But if the State met that

18 burden, you could be fair and impartial to the State

19 in evaluating that video?

20         MR. STRASSNER:  Of course.

21         MR. EASTWOOD:  Thanks very much.  A few

22 years ago, I think it was the 2010 election, Sarah

23 Palin made an ad that was pretty famous, and in the

24 ad she said, "On election day we're going to put

25 certain congressmen in the crosshairs and take them

```
 1   out of office."  And she actually had pictures of
 2   different congressional seats on the map.  One of
 3   them was the congressional seat of Gabbie Giffords
 4   in Arizona, and tragically about a month later a
 5   very mentally ill man shot congresswoman Giffords.
 6   Everyone heard of that?  Anyone not heard of that?
 7   Who here thinks that Sarah Palin went too far,
 8   anyone?  Who here thinks that Sarah Palin broke the
 9   law?  Who here is offended by what Sarah Palin said?
10   Juror No. 15, Mrs. Dayton.  You say you're offended
11   by what she said?
12         MS. DAYTON:  I just think that a lot of
13   politicians can go too far in their assessment of
14   other opponents, and I think that that's
15   unnecessary.
16         MR. EASTWOOD:  Would you throw them in jail
17   for it?
18         MS. DAYTON:  No, there's free speech.
19         MR. EASTWOOD:  So here if you were asked to
20   judge someone's speech, even if you were offended by
21   it, you thought it went too far, you still could be
22   fair and impartial and follow the law?
23         MS. DAYTON:  Yes.
24         MR. EASTWOOD:  I want to ask you now about
25   the Second Amendment, the right to carry a gun.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  Mr. Parks asked you whether you agreed or disagreed

 2  with the fact that in Missouri under our

 3  constitution, state constitution and our federal

 4  constitution, you have the right to open carry a

 5  gun, not hidden, not concealed, you need a permit

 6  for that, but you have the right to open carry a

 7  gun.  And Mr. Parks asked if anyone thought it was

 8  illegal, and I know I think about three of you did.

 9  Does anyone disagree with that?  Does anybody just

10  think it's wrong that you're able to open carry a

11  gun?  All right, let's start with juror No. 21 and

12  that is Ms. Piotraschke.

13        MS. PIOTRASCHKE:  I think we have too many

14  people carrying guns already.  You can't let

15  everyone walk around with a gun.  I don't think

16  that's right.  I think it's dangerous, too many

17  idiots out there shooting people for no reason.

18        MR. EASTWOOD:  Do you think that someone is

19  automatically inherently more dangerous just because

20  they're carrying a gun on their person?

21        MS. PIOTRASCHKE:  No, I just think there are

22  certain people who should not carry guns because

23  they can't control their temper or they don't know

24  how to operate it, they just think they do or stuff

25  like that.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. EASTWOOD:  Fair enough.  Fair enough.
 2   Would you hold it against someone just for carrying
 3   a gun if you're sitting in judgment of them?
 4          MS. PIOTRASCHKE:  No, I can't say that, no,
 5   but I sure hope none of my neighbors are walking
 6   around carrying guns, and I hope that doesn't get
 7   out of this courtroom.  Let's keep it under wraps.
 8          JUDGE SUTHERLAND:  Don't have an argument
 9   with any of your neighbors.
10          MR. EASTWOOD:  Juror No. 15, Ms. Dayton.  I
11   know at one point you said you didn't like guns.  Do
12   you think that if someone is carrying a gun, open
13   carrying a gun on their side that they're more
14   dangerous?
15          MS. DAYTON:  No.
16          MR. EASTWOOD:  If you're sitting in judgment
17   of someone, would you hold it against them just for
18   the fact that they're carrying a gun?
19          MS. DAYTON:  No, I would not.
20          MR. EASTWOOD:  You could be fair and
21   impartial?
22          MS. DAYTON:  Yes.
23          MR. EASTWOOD:  Juror No. 24, Mrs. Quennoz.
24   You said at one point you don't -- you didn't
25   believe it was legal to open carry a gun?
```

Weinhaus, Vol. 1

```
 1              MS. QUENNOZ:  I'm sorry, I feel silly but I
 2    thought Missouri was a conceal and carry.
 3              MR. EASTWOOD:  Do you not like guns?
 4              MS. QUENNOZ:  Not particularly but I believe
 5    in everyone's right, if that's what you want to do,
 6    you have the right to do that, that's the law.
 7              MR. EASTWOOD:  Do you think someone is more
 8    dangerous because they're carrying a gun?
 9              MS. QUENNOZ:  No.
10              MR. EASTWOOD:  Do you think someone is
11    escalating the danger just because they're carrying
12    a gun?
13              MS. QUENNOZ:  No, sir.
14              MR. EASTWOOD:  You could be fair and
15    impartial of someone you're sitting in front of even
16    though they were carrying a gun?
17              MS. QUENNOZ:  Yes, sir.
18              MR. EASTWOOD:  Juror No. 45, is it Mr.
19    Wahle?
20              MS. WAHLE:  Yes.
21              MR. EASTWOOD:  At one point you made a
22    comment about guns earlier, is it that you don't
23    like guns?
24              MS. WAHLE:  I didn't make a comment.
25              MR. EASTWOOD:  I'm sorry, I'm mistaken.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  What are your thoughts on guns, you don't like them?
 2          MS. WAHLE:  I don't like them.
 3          MR. EASTWOOD:  Do you think someone is more
 4  dangerous because they're carrying a gun?
 5          MS. WAHLE:  Yes.
 6          MR. EASTWOOD:  So you think -- would you
 7  hold it against them in a trial just because of the
 8  mere fact they were carrying a gun?
 9          MS. WAHLE:  No.
10          MR. EASTWOOD:  You wouldn't think
11  automatically that person is more dangerous?
12          MS. WAHLE:  No, I just don't think they need
13  to be carrying a gun.
14          MR. EASTWOOD:  You're also going to hear
15  messages about Christianity, about Evangelical
16  Christianity.  Obviously a lot of people in our
17  community are Christian.  Is anyone offended by
18  Evangelical Christian proselytizing.  Is there
19  anyone that that just rubs them the wrong way, they
20  don't want to hear it?
21          MR. HATCHER:  I think everybody has the
22  right to be a Christian, any religion, it's like
23  freedom of speech again, and that should not stop
24  that person because of one religion, there are
25  several different religions.  I'm Catholic but I
```

1   still go to different churches.  Last time I've been

2   to church was probably five years ago but everybody

3   has a different religion.  You have probably almost

4   five or 10 different religions if you were to look

5   at it and sit down and see it, so no, it would not

6   hurt me.

7           MR. EASTWOOD:  Would it change your

8   perception of the defendant because he's an

9   Evangelical Christian?

10          MR. HATCHER:  No, everybody has their

11  belief, that's what I'm saying.

12          MR. EASTWOOD:  Is anyone here going to hold

13  it against the defendant that he is an Evangelical

14  Christian.  I see no hands.  That he likes to speak

15  out about Jesus and the bible and his faith?  Thank

16  you.

17      Drugs, okay, we've talked a little bit about

18  pot.  Does anyone here have such strong views on

19  marijuana that they feel it would affect their

20  ability to either judge the guilt or to impose

21  sentencing in this matter?  Juror 23, we already

22  spoke about that, is that fair to say Mr. Gregg?

23          MR. GREGG:  Yeah.

24          MR. EASTWOOD:  Juror 19, Mr. Hatcher, I see

25  your hand up.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              MR. HATCHER:  I think they should make it
 2   legal not to destroy it but like somebody that has a
 3   chronic disease, they should make it legal, where
 4   they're using it to prevent you from dying.
 5              MR. EASTWOOD:  Medical marijuana.
 6              MR. HATCHER:  Medical marijuana because they
 7   have in California and there are people that are in
 8   pain and that does help them.  So they're not
 9   breaking the law, they are using it by a medical
10   doctor, so I don't see anything wrong with it.  If
11   you got people smoking marijuana in their home, you
12   got these meth labs.
13              MR. EASTWOOD:  Are they a little different?
14              MR. HATCHER:  Yeah, what is the difference
15   between marijuana and -- if it was me, I would tell
16   them to make everything legal and stuff.  I just
17   don't see anything wrong with that.
18              MR. EASTWOOD:  Let's talk about the amount
19   of drugs, the amount of the evidence.  Would the
20   amount of drugs, whether it's a tiny little bit of
21   marijuana for personal use or a big bushel
22   presumably for sale, would that affect anyone's
23   ability either to assess guilt or sentencing?
24              MS. PIOTRASCHKE:  If a guy had one beer or
25   had drank a case of beer, is he just a little bit
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   drunk or a whole lot drunk?

2        MR. EASTWOOD:  Juror 21, I take your point.

3        MS. PIOTRASCHKE:  Does the same thing no

4   matter what.

5        MR. EASTWOOD:  Would it affect your sense of

6   sentencing perhaps, how severe a crime it was?

7        MS. PIOTRASCHKE:  I don't think so.  If he's

8   done the crime, whether he was drunk or not drunk,

9   he's still got it, whatever it was.

10       MR. EASTWOOD:  Would you impose a different

11  sentence for a lot of marijuana as opposed to a tiny

12  amount?

13       MS. PIOTRASCHKE:  No.

14       MR. EASTWOOD:  You'd impose the same

15  sentence?

16       MS. PIOTRASCHKE:  For the crime, yes, but if

17  you're judging him for the intake of marijuana,

18  that's something else, but we're not, we're judging

19  him on what, something else.

20       MR. EASTWOOD:  I want to talk about

21  prescription drugs.  I'm sorry, sir, juror No. 11

22  and that is Mr. Strassner.

23       MR. STRASSNER:  Going back to your previous

24  point, I believe there's different laws regarding

25  different amounts of marijuana that would entail

```
 1   different sentencing and so forth.
 2         MR. EASTWOOD:  Yes, you are correct, sir,
 3   within degrees.  Does anyone have any further hands
 4   on pot?
 5         Prescription drugs.  We live in a society where
 6   increasingly people take prescription drugs for a
 7   variety of ailments, ongoing, sometimes temporary,
 8   sometimes ongoing.  You will -- I anticipate you
 9   will hear evidence about prescription Morphine
10   tablets.  Does anyone here in their own life or life
11   of people close to them have a particularly good or
12   bad experience with prescription painkillers?
13         MS. SIEVE:  Can you clarify.
14         MR. EASTWOOD:  Sure.  Does anyone here,
15   either themselves personally or someone close to
16   them in their life, have a particularly good or
17   particularly bad experience with prescription
18   painkillers that would affect their ability to be
19   fair?
20         MS. SIEVE:  As a nurse, after surgery,
21   patients are often given pain medication, so I've
22   seen a real need for it, but I don't have a bias,
23   they either have it legally or they don't.
24         MR. EASTWOOD:  You're Mrs. Sieve?
25         MS. SIEVE:  Yes.
```

```
 1          MR. EASTWOOD:  So patients can be prescribed
 2   painkillers.
 3          MS. SIEVE:  And there's a good purpose for
 4   it.
 5          MR. EASTWOOD:  What is that purpose?
 6          MS. SIEVE:  It allows them to get up and
 7   move, which decreases blood clots and increases
 8   healing.  There's a lot of positive effects but
 9   you're asking a question of whether he has it
10   prescription or not prescription, so there's a whole
11   lot of missing information.
12          MR. EASTWOOD:  Juror No. 10, I'm sorry, No.
13   2, Mr. Click.
14          MR. CLICK:  I had a close personal family
15   member who was eventually hooked on prescription
16   pain medication and wound up getting them anyway she
17   could and pretty much destroyed her life in the
18   process.
19          MR. EASTWOOD:  Does that make you -- does
20   that make it difficult, that's an upsetting thing to
21   watch, isn't it?
22          MR. CLICK:  Yes.
23          MR. EASTWOOD:  She's a drug addict?
24          MR. CLICK:  Pretty much.
25          MR. EASTWOOD:  Does that make it difficult
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   for you to be fair when you hear about allegations
 2   of possession of a prescription.
 3            MR. CLICK:  I have little sympathy for it.
 4            MR. EASTWOOD:  Sympathy for the person
 5   accused?
 6            MR. CLICK:  Yes.
 7            MR. EASTWOOD:  So would it make it difficult
 8   for you to be fair and impartial given this
 9   experience you went through?
10            MR. CLICK:  Given my background, I would
11   always try to be impartial in any court situation,
12   but I would probably struggle with that one a little
13   bit but I would still be impartial.
14            MR. EASTWOOD:  Those memories from your own
15   personal life might come in a little bit?
16            MR. CLICK:  Yes.
17            MR. EASTWOOD:  Juror No. 10,
18   Mrs. Sensenbrenner, did you have your hand up
19   earlier?
20            MS. SENSENBRENNER:  No.
21            MR. EASTWOOD:  Any hands over here on the
22   prescription drug issue?  Does everyone agree that
23   prescription drugs are more and more commonly
24   prescribed today.  I see a lot of heads shaking.
25   Does everyone think that it's a pretty common thing
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   in most family medicine chests to have a bunch of
 2   prescription pills for different members of the
 3   family?  I see a lot of nods yes, pretty common
 4   thing.  Does anyone think it's reasonable for your
 5   average family to worry that if the police came into
 6   their house, they might not be able to produce a
 7   current prescription for every single last pill in
 8   the house?  Does anyone think that's reasonable,
 9   juror No. 21, you're shaking your head.
10           MS. PIOTRASCHKE:  I got all my
11   prescriptions, you keep them for your tax purposes.
12   I can't imagine having something that you don't have
13   proof that it's legal or whatever.
14           MR. EASTWOOD:  Would you have a problem with
15   someone who couldn't produce a prescription for
16   every last single pill in their medicine chest?
17           MS. PIOTRASCHKE:  I would automatically
18   assume that he got it illegally.
19           MR. EASTWOOD:  You would automatically
20   assume that?
21           MS. PIOTRASCHKE:  Yes, I would.  Even if you
22   don't have the prescription, you should be able to
23   either call the doctor whose name should be on there
24   and he would confirm that you got it.
25           MR. EASTWOOD:  Do you feel that way for any
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  medication, whether that's prescription, whether

 2  it's a painkiller or say diabetes medication,

 3  doesn't matter?

 4        MS. PIOTRASCHKE:  If it's not a

 5  prescription, everybody can have it.

 6        MR. EASTWOOD:  Is it fair to say that some

 7  prescription medicines are different than others,

 8  some are particularly what are called controlled

 9  substances, things like Morphine, painkillers?

10        MS. PIOTRASCHKE:  Yes.

11        MR. EASTWOOD:  And would you treat those

12  drugs differently than you would a more innocuous

13  prescription than like a nasal spray?

14        MS. PIOTRASCHKE:  I'm very careful with all

15  of mine and do exactly what it says.  No, if you've

16  got small children around, you might be more careful

17  of locking it up or something, but medication is

18  medication, you treat it as medication.

19        MR. EASTWOOD:  Fair enough.  Juror No. 10,

20  that's Mrs. Sensenbrenner again.

21        MS. SENSENBRENNER:  A prescription is a

22  prescription.  You are given that by a physician,

23  whether it's nasal spray -- if it's a prescribed

24  nasal spray, it's a prescription.  So I would say

25  that if it's a nasal spray or a painkiller, it is

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   still a prescription.  So I wouldn't define -- you

2   can OD on nasal spray and you can OD on painkillers,

3   so a prescription is a prescription for me.

4           MR. EASTWOOD:  Thank you very much.  Juror

5   No. 46, Mr. Hays.  Could you stand and speak up a

6   little bit.

7           MR. HAYS:  I can agree with what the lady

8   said.  If a drug is a controlled substance, you

9   should have a prescription for that.  These drugs

10  are abused.  And gee, if I had that and I lost the

11  prescription, I'd be worried about that.  I would

12  have a problem with that, someone not having a

13  prescription for a controlled substance.

14          MR. EASTWOOD:  And would you have a problem

15  with someone, whether it was one tablet or 100

16  tablets?

17          MR. HAYS:  Yes.

18          MR. EASTWOOD:  Would that matter for anyone

19  here, whether it was one tablet or 100 tablets?

20  Juror No. 45, Ms. Wahle.

21          MS. WAHLE:  I'm not sure what they're

22  saying.  I have medicine in my cabinet that I don't

23  keep the prescription at home.  Once I have it

24  filled, that's it.  I don't necessarily use all the

25  pills when I need them from a surgery or whatever

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   the case may be, but I wouldn't feel that's any kind

 2   of crime.  Are you saying I should produce my thing

 3   from the doctor to get the drugs, I don't believe

 4   that.

 5           MR. EASTWOOD:  Let me ask you this.

 6           MS. WAHLE:  Don't you give that to them,

 7   don't they keep it?  So I wouldn't have anything at

 8   home, they keep it.

 9           MR. EASTWOOD:  Sitting as a juror in

10   judgment of someone accused of a crime, would the

11   quantity of pills or tablets matter, would it matter

12   if it was one tablet or 100 tablets?

13           MS. WAHLE:  I would say yeah, I think it

14   would.

15           MR. EASTWOOD:  Why would that be?

16           MS. WAHLE:  What do you need 100 oxycodone

17   for.

18           MS. PIOTRASCHKE:  I don't think you can get

19   100.  Those prescriptions aren't for more than 60

20   days.

21           MR. EASTWOOD:  I agree with you, that's a

22   lot of pills.  Why would it matter to you whether

23   it's one or 100?

24           MS. PIERCE:  What are you doing with that

25   many pills.  I would question why you had 100 pills,
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   what are you doing with those.

2        MR. EASTWOOD:  This is juror No. 27,

3   Mrs. Pierce.

4        MS. PIERCE:  I would question if you had

5   just a few pills or if you had 100 pills.  I don't

6   know why you would have 100.  Like I said, a

7   controlled substance like that, you can't get a

8   prescription that big.

9        MR. EASTWOOD:  Juror No. 8, Mrs. Sieve.

10       MS. SIEVE:  I've been a nurse and paramedic

11  for almost 20 years, and I have been in family homes

12  where somebody has chronic pain and there I've seen

13  over 300 Percocet in one bottle before for chronic

14  pain.  Then there comes the problem where so the

15  prescription, what she was asking, the prescription

16  is a label on the bottle, he's not talking about the

17  paper prescription any longer.  So if the person is

18  going to go stay with her granddaughter, because if

19  she can't control her pill consumption, they may put

20  it in those seven day containers that don't have the

21  prescription on them, but they should be able to

22  verify through the pharmacy or doctor that it was

23  prescribed, and they can identify the pills because

24  they all have different manufacturing marks and

25  colors, so it should be traceable to find out if

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  that is indeed their prescription, but it is illegal

2  to transport it without being in the prescription

3  bottle, I believe.

4          MR. EASTWOOD:  Are you saying that sometimes

5  in your experience as a nurse, you've come across

6  people having one or two or a small quantity of

7  tablets without the prescription label bottle?

8          MS. SIEVE:  I have seen that in the seven

9  day pill planners, especially for those who may have

10 trouble reading, their family may plan it for them

11 for the week.  They can't get tops off because of

12 arthritis, so there's different things that have led

13 to that.

14         MR. EASTWOOD:  And I've asked this to other

15 people, sitting here in judgment of someone charged

16 with possession of a substance, would it make a

17 difference to you as to the quantity of the pills or

18 tablets that were there, whether it was one or 100?

19         MS. SIEVE:  I would ask to refer back to the

20 law, for example marijuana, because there's the

21 question of intention to distribute.  So I would

22 hope those questions would be answered.

23         MR. EASTWOOD:  Fair question.  Just so you

24 know, I think the evidence here I anticipate will be

25 about one and a half tablets.  Everyone here seen a

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1   movie in their life?  Anyone have not seen a movie
2   in their life?  I see no hands.  Okay.  Everyone
3   agrees it's fair to say that you're at home and you
4   tune into the movie about halfway through and you
5   watch only 10 or 15 minutes of it, you may not
6   understand everything that's going on in the movie,
7   is that fair to say?  I see a lot of head shaking.
8   Anyone here disagree with the proposition that you
9   have to watch the whole movie, you have to see the
10  whole thing, hear the whole thing before you can
11  come to a judgment not only about whether or not you
12  like it but about to the motivations of the
13  characters, about what they've done, perhaps their
14  true identity, the facts, does anyone disagree with
15  that?
16          MR. STRASSNER:  Sure.
17          MR. PARKS:  Juror No. 11, Mr. Strassner.
18          MR. STRASSNER:  I could read about the movie
19  online.  I could find out these things from the
20  cliff notes version.  There are other ways to get
21  that information.
22          MR. EASTWOOD:  That's a fair point.  Let's
23  take this as an analogy.  If the Judge asked you not
24  to look at the cliff notes, not to talk to other
25  people about it, instead the Judge asked you just to
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   watch the whole movie from start to end before you

 2   made any conclusions about who Luke Skywalker's

 3   father was or whether Kaiser Soze was the real

 4   mastermind or whatever, could you do that, could you

 5   not go online, not talk to other people, watch the

 6   whole movie through and through to reach your

 7   conclusions about it?

 8           MR. STRASSNER:  Yes.

 9           MR. EASTWOOD:  Juror No. 10.

10           MS. SENSENBRENNER:  Sometimes you can sit

11   through an entire movie and still go what?

12           MR. EASTWOOD:  Juror No. 37, Mr. White.

13           MR. WHITE:  I don't know where you're headed

14   towards this, but if someone asks me to make an

15   assumption after watching a half of a movie and not

16   seeing the whole movie, then I would have a problem

17   with it.

18           MR. EASTWOOD:  That's what I'm getting at.

19           MR. WHITE:  I would want to see the whole

20   movie before making a decision.

21           MR. EASTWOOD:  Especially when coming to a

22   verdict against someone.

23           MR. WHITE:  I would want to see the whole

24   movie, not just a part.

25           MR. EASTWOOD:  Does anyone think they don't
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   have to see the whole movie to come to a judgment

2   about it, particularly if the Judge instructed them

3   to watch the whole movie and not to go online, talk

4   to other people about it, does anyone disagree with

5   that?  I see no hands.

6        Finally I want to talk about the burden here.

7   This is not a civil case, this is not one of these

8   things where the scales just need to tip ever so

9   slightly.  This is a criminal trial and therefore

10  the State has the entire burden of proof beyond a

11  reasonable doubt.  Not that you're fairly certain,

12  not that more likely than not, that kind of sorta I

13  bet, probably, beyond a reasonable doubt, firmly

14  convinced.  So that means Mr. Parks in the form of

15  the State has a lot of work to do.  Does anyone have

16  a problem with the fact that the entire burden rests

17  on the State to prove every element of each offense

18  beyond a reasonable doubt?  Does anyone have a

19  problem with that?  I see no hands.  I don't

20  anticipate I'm going to do this but I could just sit

21  here the whole trial and say nothing, do nothing,

22  and if Mr. Parks didn't meet his burden of proving

23  each element of the offense beyond a reasonable

24  doubt, you ought not to convict.  Who would have a

25  problem with that if I sat there the whole trial and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  did nothing and feel like they'd have to hear

 2  something from me in order to render a verdict?

 3        MR. STRASSNER:  The point of your question,

 4  as I understand it, but yes, I would have a problem

 5  with you not doing your portion of the civic duty.

 6        MR. EASTWOOD:  What's my duty?

 7        MR. STRASSNER:  To aid your defendant in

 8  whatever way needs to happen.  If you were to sit

 9  there the whole time, I would come to a conclusion

10  that you're not wanting to do your job.

11        MR. EASTWOOD:  What do you think I'm

12  obligated to do under terms of proof?

13        MR. STRASSNER:  Nothing in terms of proof, I

14  understand your question but the way you posed it

15  leads a little bit of criticism open.

16        MR. EASTWOOD:  Juror No. 10, I saw you

17  nodding.

18        MS. SENSENBRENNER:  I agree that if you're

19  sitting there twiddling your fingers and not

20  listening or partaking in the actions that go on

21  here, then I would say that you're lacking.

22        MR. EASTWOOD:  Sure, perhaps as a defense

23  lawyer, but would I be lacking in terms of the

24  burden of the State?

25        MS. SENSENBRENNER:  No.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. EASTWOOD:  Anyone else have a thought if
 2  I just sat there and did nothing the whole time,
 3  Chris Combs sat there and did nothing the whole
 4  time?
 5          MS. PIOTRASCHKE:  I'd fire you.
 6          MR. EASTWOOD:  Now in America you are under
 7  no obligation to testify in your own defense.  Who
 8  here would have trouble rendering a fair verdict if
 9  they didn't hear the defendant tell his side of the
10  story?  Who here feels that they kind of need to
11  hear the defendant's side of the story to render a
12  fair verdict?  Anyone?  Juror No. 47, that's
13  Mr. Roach.
14          MR. ROACH:  I'd like to hear his story.
15          MR. EASTWOOD:  You'd like to hear his story?
16          MR. ROACH:  From him.
17          MR. EASTWOOD:  You think it's only fair?
18          MR. ROACH:  Yes.
19          MR. EASTWOOD:  Do you think if you don't
20  hear his side of the story, would you hold it
21  against him?
22          MR. ROACH:  I wouldn't hold it against him
23  but I would prefer to hear it from him.
24          MR. EASTWOOD:  Would you think less of his
25  defense maybe?
```

```
 1              MR. ROACH:  Not personally.
 2              MR. EASTWOOD:  Not me, I'm irrelevant but in
 3    terms of your weighing the evidence?
 4              MR. ROACH:  No, I don't think so, but I
 5    would personally like to hear it from him straight.
 6              MR. EASTWOOD:  And you might have a harder
 7    time rendering a verdict if you didn't hear it from
 8    him?
 9              MR. ROACH:  I think I could weigh the
10    differences.
11              MR. EASTWOOD:  Juror No. 18 and your name is
12    Mrs. Bates.
13              MS. BATES:  Yeah, I don't think that it
14    would make any difference in whether or not I was
15    impartial or partial, but I do think that goes back
16    to the whole movie, you know, that's part of the
17    missing movie if the defendant doesn't testify or
18    doesn't tell his side of the story.
19              MR. EASTWOOD:  So you'd have some questions?
20              MS. BATES:  I might have some questions
21    because that movie would not be complete.
22              MR. EASTWOOD:  That's a good point.
23              MS. BATES:  I would feel like I'm missing
24    something.  Whether I am or not is unknown, but I
25    would feel like I'm missing something important.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. EASTWOOD:  If you have some questions
 2   about the allegations against Jeff, about the
 3   State's case against Jeff, do you think it's my job
 4   to answer them?  Anyone?
 5          MS. PIOTRASCHKE:  Say that again.
 6          MR. EASTWOOD:  If you have some questions
 7   about the State's case, do you think it is my job,
 8   do you think it is the defendant's job to answer
 9   those questions?
10          MS. PIOTRASCHKE:  I don't know, I don't know
11   whose job it would be but it would be nice if we
12   could ask questions.
13          MR. EASTWOOD:  We will get to that.  Some
14   judges allow jury questions, some don't, I don't
15   know, we will get to that, but what I'm getting at
16   is if you have questions about the State's case, do
17   you think it's Mr. Parks' job or my job to answer
18   those questions.  Is it the State's job or the
19   defendant's job, and if you think it's the
20   defendant's job at least a little bit, I'd like you
21   to put your hand up and talk to me about it.  Juror
22   No. 30, that's Mr. Dziejma.
23          MR. DZIEJMA:  Your job is to make sure
24   there's due process, so if the State introduces
25   evidence in such a way that it reflects badly on
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   your client and not in a -- sensationalized and

 2   whatever, then that's your obligation to clear that

 3   up and clear up that picture.  So if they introduce

 4   the muddy water, you add the water filter.

 5           MR. EASTWOOD:  You'd ask me to filter the

 6   mud out of their water?

 7           MR. DZIEJMA:  Absolutely.

 8           MR. EASTWOOD:  So you hold it to the

 9   defendant to clear up the picture if the picture was

10   muddy?

11           MR. DZIEJMA:  Sure, because they'd do the

12   same thing for you.  If you muddy the water, they

13   have to clarify it.

14           MR. EASTWOOD:  But I don't have to do

15   anything, right, what's my burden?

16           MR. DZIEJMA:  Your burden is to protect the

17   due process of your client.  So if they misrepresent

18   something or paint it in a tinted light that favors

19   the prosecution, is it not your obligation to say

20   well, introduce some doubt?

21           MR. EASTWOOD:  Maybe we're talking about two

22   different things here.  I guess my question is if

23   the evidence is unclear as to something the State

24   has to prove up, are you going to hold it against

25   the State or are you going to hold it against the

1  defendant to clear it up?

2       MR. DZIEJMA:  The State has to make their

3  case, no question.

4       MR. EASTWOOD:  Any other hands.  If you do

5  find the defendant guilty on any of the counts, you

6  will be asked to assess the punishment.  Who here

7  would have a problem just in principal with

8  mitigating, lessening, reducing the punishment

9  because of whatever evidence you see?  I see no

10  hands.

11       MR. STRASSNER:  I would like you to clarify

12  your question.  Do you mean within the prescribed

13  boundaries of the law?

14       MR. EASTWOOD:  Correct.

15       MR. STRASSNER:  Then fine, thank you, I'm

16  good.

17       MR. EASTWOOD:  Who here feels you did the

18  crime, you do the time, you do the max time.  I see

19  no hands.

20       Finally, and I'm done now almost, do any of you

21  right now, before I sit down here, already have any

22  presumptions about the guilt or innocence of Jeff

23  Weinhaus?  Anyone have any presumptions right now?

24  Any presumptions of guilt?  I remind you that

25  Mr. Weinhaus is innocent until found guilty beyond a

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  reasonable doubt by this jury.  All of us, all of us

2  sitting here in this room today, you will be asked,

3  because of him, you will be asked to sit in judgment

4  of him.  He's in a pretty scary place right now.

5  Thank you.

6         JUDGE SUTHERLAND:  Ladies and gentlemen,

7  we're going to recess again in just a minute to get

8  the trial jury selected.  I think that will take at

9  least 30 minutes, very likely somewhat longer.

10  We'll certainly get it done as quickly as we can.

11  We need No. 7, Ms. Fletcher; No. 18, Ms. Bates; and

12  No. 32, Mr. Debonnaire, so stick around, you wanted

13  to talk privately.  One more time the instruction

14  gets shorter after that first long one.  The court

15  again reminds you of what you were told at the first

16  recess of the court.  Until you retire to consider

17  your verdict, you must not discuss this case amongst

18  yourselves or with others or permit anyone to

19  discuss it in your hearing.  You should not formally

20  express any opinion about the case until it is

21  finally given to you to decide.  You may not do any

22  research or investigation on your own about any

23  matter regarding this case or anyone involved with

24  the trial.  Do not communicate with others about the

25  case by any means.  Do not read, view or listen to

```
 1   any newspaper, radio or electronic communication
 2   from the Internet or television report of the trial.
 3   We're in recess, not quite in recess, but you may go
 4   out with the bailiff, except those three jurors I
 5   mentioned.
 6           MR. PARKS:  Judge, No. 30 would like to have
 7   a conference as well.
 8           JUDGE SUTHERLAND:  Okay, No. 30.
 9      (WHEREUPON THE JURY PANEL EXITED THE COURTROOM)
10      (WHEREUPON MS. FLETCHER APPROACHED THE BENCH)
11           JUDGE SUTHERLAND:  Ms. Fletcher, if you want
12   to come on up.  Ms. Fletcher, what was it?
13           MS. FLETCHER:  I was charged with a felony
14   17 years ago, and I felt uncomfortable the way I was
15   treated by the police department.
16           JUDGE SUTHERLAND:  Do you mind telling us
17   what that was?
18           MS. FLETCHER:  Promoting prostitution in the
19   third degree.
20           JUDGE SUTHERLAND:  Were you charged or
21   convicted?
22           MS. FLETCHER:  I was charged with a felony
23   in the third degree.
24           JUDGE SUTHERLAND:  Was that in Arkansas?
25           MS. FLETCHER:  No, Florissant, 17 years ago.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1           JUDGE SUTHERLAND:  So there was no

2    conviction on your record?

3           MS. FLETCHER:  Well, it was a felony charge

4    17 years ago, so I guess it would still be on there.

5    It's like 20 years or something.

6           JUDGE SUTHERLAND:  It is?

7           MR. PARKS:  Yeah.

8           JUDGE SUTHERLAND:  Any questions?

9           MR. EASTWOOD:  If you were chosen to serve

10   on this jury, do you think you would be fair and

11   impartial?

12          MS. FLETCHER:  I think I can.  I know I

13   should be saying yes or no.  Yes, yes.

14          MR. EASTWOOD:  Would you believe a policeman

15   less than someone off the street?

16          MS. FLETCHER:  No.

17          MR. EASTWOOD:  Would you treat him any

18   differently than any other witness?

19          MS. FLETCHER:  No.  And I have one other

20   thing as far as you were asking about if we have

21   something we need to do or take care of.  I have

22   injured my back pretty bad, so I'm in a lot of pain,

23   I've been going to rehab and I've been sick for the

24   last month, so I'm kind of in here struggling.

25          JUDGE SUTHERLAND:  Is it a problem to sit

```
 1   for an hour, hour and a half, two hours at a time?
 2          MS. FLETCHER:  Yeah, I'm getting my body
 3   readjusted right now, my hips and pelvis, so I
 4   wanted to let you know that.
 5          JUDGE SUTHERLAND:  Any questions?
 6          MR. PARKS:  No questions.
 7          MR. EASTWOOD:  No questions.
 8          JUDGE SUTHERLAND:  Ms. Bates.
 9       (WHEREUPON MS. BATES APPROACHED THE BENCH)
10          JUDGE SUTHERLAND:  What was it that you had?
11          MS. BATES:  Well, we were speaking about
12   family members that had run-ins with the law, and I
13   recently had my youngest son, he was charged with a
14   felony, ended up being it was reduced to a
15   misdemeanor.  It was for invasion of privacy in St.
16   Louis County, and he didn't serve any jail time but
17   he is on two years probation and that kind of thing,
18   and it was a little harsh, I thought it was a little
19   harsh punishment for what it was for, but it wasn't
20   the jury that imposed that, it was a judge.
21          MR. PARKS:  Is there anything about that
22   that would keep you from being fair and impartial,
23   could you set that aside?
24          MS. BATES:  I could set that aside but I
25   guess in a little part of the back of my mind I
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   thought the punishment was strong.  So I don't know
 2   how much that would -- I'm not saying that that
 3   would necessarily affect my discussion of the
 4   punishment.
 5            MR. PARKS:  Would it affect your ability to
 6   render a fair and impartial verdict as to guilt or
 7   innocence?
 8            MS. BATES:  No.
 9            MR. PARKS:  Could you then consider the
10   entire range of punishment?
11            MS. BATES:  Yes, I could consider the entire
12   range of punishment.
13            MR. PARKS:  And you could put away what
14   happened to your son while you considered that
15   entire range?
16            MS. BATES:  Yes.
17            MR. PARKS:  No other questions, Your Honor.
18            MR. EASTWOOD:  You would not treat a law
19   enforcement officer's testimony any differently?
20            MS. BATES:  No, and his didn't have anything
21   to do with it, no, he was very pleasant.
22            MR. EASTWOOD:  Your issue was with the
23   severity of the process?
24            JUDGE SUTHERLAND:  It was that nasty judge.
25            MR. COMBS:  But you're not going to believe
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    the officers' testimony any more than anyone else's?

2            MS. BATES:  No, sir.  Like I said, it was

3    the severity of the punishment.

4      (WHEREUPON MR. DEBONNAIRE APPROACHED THE BENCH)

5            JUDGE SUTHERLAND:  Mr. Debonnaire, you

6    indicated to the bailiff at the first recess that

7    you had something you wanted to bring up.

8            MR. DEBONNAIRE:  I'm sorry but you said it

9    was hypothetical.  If he drew on the officer, I

10   couldn't sit there and truthfully judge him, anybody

11   that draws on a law enforcement officer.  If that

12   comes out in court and I'm sitting over there and he

13   drew on the officer, there is no reason for that and

14   I can't forgive that.  If that is the case, you

15   wouldn't want me on there.  I'm sorry.

16           JUDGE SUTHERLAND:  There's no wrong answers.

17           MR. PARKS:  The question is if he's charged

18   with attempted assault of a law enforcement officer

19   and I prove all elements of that charge, would you

20   find him guilty?

21           MR. DEBONNAIRE:  Under those circumstances,

22   yes, sir.  As I stated, if you find all those facts,

23   if he had more than just like one or two doses, I

24   carry them here in my pocket, I carry them for

25   myself, I have many illnesses, so if that's all he's

Weinhaus, Vol. 1

1   got, I have no problem with that, but that drawing a

2   weapon on an officer, a clear officer, I can't live

3   with that.

4           MR. COMBS:  So sir, could you sit here and

5   listen to the facts?

6           THE WITNESS:  Yes, sir, I can listen as well

7   as anyone else, sir.  And if you can prove to me

8   that there was some kind of justification, although

9   I'm sorry, I just don't see it, a guy with a badge

10  is a guy with a badge and I just do what he tells

11  me, whether I agree with him or not, whether he's

12  wrong or not.

13          MR. COMBS:  So you would be more likely to

14  believe a police officer's testimony?

15          MR. DEBONNAIRE:  Yeah, that's just the way I

16  was raised.  I'm sure there's many reasons, like I

17  said, I know there are circumstances and I would be

18  willing to listen to them, but as I said, I don't

19  know, I'd have to ask the judge how would you --

20  would you want me to think, I've never been in this

21  position.  I'm a child of the Clayton war era.

22          JUDGE SUTHERLAND:  I am too, I'm older than

23  you are.  I saw plenty of the Lone Ranger.

24          MR. DEBONNAIRE:  And I'm a citizen of the

25  United States, and that's his job to tell me whether

```
 1   I screwed up big time or not.
 2          MR. PARKS:  The question is can you listen
 3   to the evidence, can you render a fair and impartial
 4   verdict based only upon the evidence?
 5          MR. DEBONNAIRE:  Only on the facts, yes,
 6   sir, that you or these gentlemen instruct me to
 7   believe, and I trust you to give me the truth.
 8          JUDGE SUTHERLAND:  I'm not necessarily the
 9   fountain of truth for the world.  I'm just the
10   umpire.
11          MR. DEBONNAIRE:  Well, I'll be watching your
12   face.  I try to be a reasonable man because should I
13   ever be in a situation like this, I would want to --
14   hopefully someone would be fair with me.
15          JUDGE SUTHERLAND:  Any other questions?
16          MR. PARKS:  No, sir.
17          MR. EASTWOOD:  No, sir.
18          MR. COMBS:  Thank you, sir.  I appreciate
19   it.
20          JUDGE SUTHERLAND:  Mr. Dziejma.
21      (WHEREUPON MR. DZIEJMA APPROACHED THE BENCH)
22          MR. DZIEJMA:  In the interest of disclosure,
23   I'm a retired State employee, and I worked for Troop
24   C from 1998 to about 2002, so I worked under Captain
25   Johnson, and then I think it was probably 2004 or
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   2005 after I left employment, I actually testified

2   against the State, against the Highway Patrol in a

3   civil lawsuit.

4           MR. EASTWOOD:  You've been on both sides?

5           MR. DZIEJMA:  I've been on both sides.  The

6   truth is the truth.

7           JUDGE SUTHERLAND:  Do you know any of the

8   officers?

9           MR. DZIEJMA:  They don't look familiar.

10  Maybe our paths crossed at a meeting or something

11  but no.

12          JUDGE SUTHERLAND:  What was your capacity?

13          MR. DZIEJMA:  I was a brown shirt uniform.

14          MR. COMBS:  As law enforcement, you said you

15  would be more likely to believe a police officer

16  than a typical citizen?

17          MR. DZIEJMA:  I am a police officer now.

18          MR. COMBS:  You would give more credibility

19  to a police officer?

20          MR. DZIEJMA:  I would have a tendency to

21  probably do that, sure.  If I'm given 50/50 and who

22  are you going to believe, I'm going to choose the

23  cop.

24          MR. PARKS:  But you're going to be fair and

25  impartial?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          MR. DZIEJMA:  As far as the factual evidence

2    that appears, that's fair and impartial, but if

3    you're telling me one word against the other word.

4          MR. COMBS:  You're going to take the police

5    officer's?

6          MR. DZIEJMA:  All he has is his credibility.

7          JUDGE SUTHERLAND:  Thank you, sir.

8    Challenges for cause on behalf of the State.

9          MR. PARKS:  No. 7, Katherine Fletcher.  No.

10   1, I don't know where she lives, putting everything

11   else aside.

12         JUDGE SUTHERLAND:  Any objection to

13   Ms. Fletcher?

14         MR. EASTWOOD:  No, with the back issue,

15   that's not --

16         JUDGE SUTHERLAND:  The residency issue, the

17   promoting prostitution.  The challenge to juror No.

18   7, Katherine Fletcher, full cause is granted.

19         MR. EASTWOOD:  That's a prosecution, Judge.

20         MR. PARKS:  No. 19, John Hatcher, he's the

21   one that thinks marijuana should be legal.

22         MR. EASTWOOD:  That's 22.

23         JUDGE SUTHERLAND:  Hatcher wanted to

24   legalize drugs.

25         MR. PARKS:  He wanted to legalize all drugs.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        MR. EASTWOOD:  I would object to that.
 2   That's a policy point of view and that's a fair
 3   point of view to have.  I rehabilitated him several
 4   times by saying he could be fair and impartial.
 5        JUDGE SUTHERLAND:  We have plenty of jurors,
 6   he needs to move to Washington or Colorado or
 7   California or something.  The challenge to juror No.
 8   19, John Colin Hatcher, for cause is granted.
 9        MR. PARKS:  No. 22, Mr. Haslag, he said he
10   has a doctor's appointment tomorrow.
11        JUDGE SUTHERLAND:  I think he was a little
12   reluctant when you asked if he could reschedule.
13        MR. PARKS:  He said it took him a while to
14   reschedule it.
15        MR. EASTWOOD:  I have no objection to that,
16   Your Honor.
17        JUDGE SUTHERLAND:  He's related to a
18   St. Clair police officer as well and indicated that
19   might be a problem.  Challenge to juror 22, Kevin
20   Gerard Haslag, for cause is granted.
21        MR. PARKS:  No. 23, Isaac Gregg, does not
22   believe that marijuana should be illegal, and when I
23   asked him he said he could not follow the
24   instruction given by the Court.
25        MR. EASTWOOD:  I think I did rehabilitate
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  him to the extent that he said if the punishment was
 2  no punishment, he could give it.
 3         MR. COMBS:  Which it is because it's a
 4  misdemeanor.
 5         MR. PARKS:  There's no such thing as no
 6  punishment.
 7         JUDGE SUTHERLAND:  Challenge to juror No.
 8  23, Isaac J. Gregg, for cause is granted.
 9         MR. PARKS:  No. 44, Billy Parker, he's a
10  frequent flyer.  He's set for jury trial in two
11  weeks on a felony charge.
12         JUDGE SUTHERLAND:  He's got eight felonies.
13         MR. COMBS:  He looked pretty proud.
14         JUDGE SUTHERLAND:  Challenge to juror 44,
15  Billy C. Parker, for cause is granted.
16         MR. PARKS:  No. 34, Bridgett Nowlin, she
17  said she had to go in to get stitches removed
18  tomorrow after surgery.
19         JUDGE SUTHERLAND:  I'm with her, I got some
20  out last Wednesday in my head, so I don't have any
21  problem with that.  Do you have any problems with
22  that, 34?
23         MR. EASTWOOD:  I don't think that's
24  necessarily -- she said she could get them out
25  later.
```

```
 1            MR. COMBS:  It's a matter of 48 hours.

 2            MR. PARKS:  She said she could call the

 3  doctor.

 4            MR. COMBS:  Stitches dissolve these days.

 5            JUDGE SUTHERLAND:  Not all of them.  I'll

 6  deny that.  With agreement I'd grant it but she can

 7  put that off a couple of days.

 8            MR. PARKS:  She also has a felony forgery

 9  charge that she did not disclose, Your Honor.

10            JUDGE SUTHERLAND:  A conviction?

11            MR. PARKS:  She's been arrested with two

12  felony charges.  It's on her criminal history but

13  the charges, it doesn't tell whether they have

14  been --

15            MR. COMBS:  She admitted to them.  She

16  didn't describe what they were but she did admit to

17  being charged with two felonies when we asked.

18            MR. PARKS:  I think under the circumstances,

19  she ought to be --

20            JUDGE SUTHERLAND:  Yeah, I changed my mind,

21  challenge to juror 34, Bridgett Renee Nowlin, for

22  cause is also granted.  I'm not sure she would have

23  been reached anyway.

24            MR. PARKS:  And then No. 6, Paulette Buhr.

25            JUDGE SUTHERLAND:  Reason?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          MR. PARKS:  She just had a recent DWI within

2    a year.  Her brother is in prison and she said -- I

3    believe she stated she couldn't put that aside.

4    She's the one with the leather jacket there.

5          MR. EASTWOOD:  My notes, Your Honor, don't

6    indicate that she has a problem putting that aside.

7    I think she also said she was treated fairly in her

8    DWI.

9          JUDGE SUTHERLAND:  Yeah, my notes indicate

10   that she didn't have a problem with that either.

11         MR. COMBS:  Same notes, Your Honor.

12         JUDGE SUTHERLAND:  Challenge to juror No. 6,

13   Paulette M. Buhr, for cause is denied.

14         MR. PARKS:  That's all I have, Your Honor.

15         JUDGE SUTHERLAND:  Challenges for cause on

16   behalf of defendant?

17         MR. EASTWOOD:  I believe juror No. 4,

18   Mr. Suntrup, testified that he would always believe

19   a law enforcement officer.

20         JUDGE SUTHERLAND:  Yes.

21         MR. PARKS:  But he said he could be fair and

22   impartial.

23         JUDGE SUTHERLAND:  He also said if there

24   were one or two stories, he's going to believe the

25   cop.  So the challenge to juror No. 4, Robert A.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Suntrup for cause is granted.

2         MR. COMBS:  Juror No. 9, Sharon Dubuque,

3    she's got something with a felony.  She said the

4    cops were fair but I know there's a handful of

5    people that know the case, I don't know how you plan

6    on handling that.

7         JUDGE SUTHERLAND:  Just having seen, read or

8    heard a media report, even multiple, doesn't

9    disqualify a person.  The question is whether they

10   made up their mind or they're biased for or against

11   one side and nobody indicated that.

12        MR. EASTWOOD:  I have 10, she admitted that

13   she would believe a police officer more than the

14   typical person.  She said she had many friends in

15   law enforcement.

16        MR. PARKS:  But she said she could be fair

17   and impartial and set that aside.

18        JUDGE SUTHERLAND:  Challenge to juror No.

19   10, Luisa Sensenbrenner, is denied.

20        MR. EASTWOOD:  Certainly 12 who knows your

21   daughter wouldn't be fair.

22        MR. PARKS:  She said she knew law

23   enforcement.

24        MR. COMBS:  The one that knows your daughter

25   and that you know.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        MR. PARKS:  I don't know them, she knows my

2   daughter.  She's from New Haven and my daughter is a

3   police officer in New Haven.

4        MR. COMBS:  So she's friends with law

5   enforcement who is the prosecutor's daughter in a

6   case.

7        JUDGE SUTHERLAND:  That's a little iffy but

8   I think I'll grant it.  She's the one whose grandson

9   is going into drug court as soon as he gets out of

10  treatment.  Challenge to juror No. 12, Frieda

11  Lorraine Terschluse, for cause is granted.

12       MR. COMBS:  No. 15, she didn't even know

13  that it was a law that you could carry an open

14  weapon.  She said she didn't believe it or know it

15  was a law, so if she can't be directed to follow the

16  law, that's the pinnacle issue in this case.

17       MR. PARKS:  She never said she couldn't

18  follow it, she said she didn't know that was the

19  law.

20       MR. COMBS:  She said she didn't like guns or

21  didn't agree people should be allowed to carry a

22  gun.

23       JUDGE SUTHERLAND:  There's a lot of people

24  that don't like them.

25       MR. COMBS:  She seems pretty prejudicial

1  when that's the pinnacle issue to the most serious

2  charges in our case.

3        MR. PARKS:  Carrying the gun is not the

4  problem, using the gun is the problem.

5        JUDGE SUTHERLAND:  I don't think anything

6  she says disqualifies her from this case.  Challenge

7  to 15, Arlys Dayton, is denied.

8        MR. COMBS:  How about No. 18, Ms. Bates who

9  came up and spoke with us.  It seemed like you agree

10  with me, if you need an explanation I can give one.

11        JUDGE SUTHERLAND:  The big note I have with

12  Ms. Bates is she indicated there's "something

13  missing", quote, if the defendant doesn't testify.

14  So challenge to juror No. 18, Loren C. Bates, for

15  cause is granted.

16        MR. COMBS:  Jumping ahead but to get this

17  out of the way I think that Mr. Dziejma, he was law

18  enforcement.

19        JUDGE SUTHERLAND:  No. 30.

20        MR. PARKS:  Your Honor, he said he could be

21  fair and impartial.  He was truthful with the Court

22  and said that he would balance the testimony from

23  the witness stand and make a decision.

24        MR. COMBS:  But --

25        JUDGE SUTHERLAND:  The challenge is well

 1   taken.  Challenge to juror No. 30, Kevin M. Dziejma,

 2   is granted.

 3           MR. COMBS:  No. 38, Your Honor, was the

 4   woman who had a cousin who works for the Sheriff's

 5   Department, lived by the gas station, said she felt

 6   personally involved in the case.

 7           MR. PARKS:  That was 27.

 8           JUDGE SUTHERLAND:  27 was her mother that

 9   lived by the gas station.  38 was the one that said

10   her office was closed.

11           MR. PARKS:  38 lives (sic) in Jefferson

12   County.  So when Jefferson County courthouse was

13   shut down --

14           JUDGE SUTHERLAND:  She lives in Jefferson

15   County?

16           MR. PARKS:  No, she works in the Jefferson

17   County Courthouse, lives in Franklin.

18           MR. COMBS:  Her cousin also works for the

19   sheriff's department.

20           JUDGE SUTHERLAND:  When the courthouse was

21   closed, was that as a result of this?

22           MR. PARKS:  Yes.

23           JUDGE SUTHERLAND:  Challenge to 38, Melissa

24   B. Scheer, for cause is granted.

25           MR. COMBS:  And then 32, that gentleman, he

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  doesn't seem mentally stable, that's the gentleman

2  that came up in tears.  I don't think he's capable

3  of sitting on this trial, I really don't.  I think

4  that that's -- I really don't think he's mentally

5  stable.

6       MR. PARKS:  I don't have any reason to doubt

7  that he's not stable, but I don't think that it's a

8  cause to strike.

9       JUDGE SUTHERLAND:  I don't know about

10  stable, he's wishy washy.

11       MR. COMBS:  That was a wrong choice of

12  words, I apologize.  He was a very nice man but it

13  would be taxing on him when he said he had health

14  problems.  I don't think he would be a suitable

15  juror.

16       JUDGE SUTHERLAND:  I'm not buying that one.

17       MR. EASTWOOD:  He did say he would listen to

18  a cop more -- he said he was brought up to listen to

19  a policeman over someone else.

20       MR. COMBS:  And a judge.

21       JUDGE SUTHERLAND:  Challenge to juror 32,

22  John M. Debonnaire, for cause is denied.  It's an

23  interesting name.  Any other challenges for cause?

24       MR. EASTWOOD:  We're getting to the high

25  numbers here, so they're probably moot.

1              MR. COMBS:  That was 51, son is in jail in
2   Franklin County.  I have that she said she would
3   have trouble being unbiased.  Her son is serving in
4   jail in the county where this case is being tried.
5              MR. PARKS:  I don't have anything negative
6   about her.  She said that her son was charged here
7   but she could put that aside and render a fair and
8   impartial --
9              JUDGE SUTHERLAND:  I think she did too.  I
10  don't think she's going to be needed.  Challenge to
11  juror 51, Michelle Kay Tuttle, for cause is denied.
12  So we need 24 for the first 12.  I believe that
13  would take us just through Mr. Debonnaire, No. 32.
14  Anybody disagree with that?  So draw the line there
15  after Mr. Debonnaire.  First 12 will be stricken,
16  six each from those and then we'll take the next
17  three, which would be 32, 35 and 36 for the
18  alternate and each of you gets one strike.
19             MR. EASTWOOD:  I'm sorry, perhaps I
20  misheard, it's 33, 35 and 36?
21             JUDGE SUTHERLAND:  34 was stricken for
22  cause.
23             MR. EASTWOOD:  And we get one strike there.
24             JUDGE SUTHERLAND:  So I will mark the rest
25  of them as not needed.  Okay, Mr. Parks gets his

1  first, he'll give you the master list when he's

2  finished, and when you're done, give it to the clerk

3  and we'll get them in here.  I don't want to swear

4  them in until after lunch.

5          MR. EASTWOOD:  Your Honor, I think I should

6  bring it to the court's awareness.  I was passed a

7  note that juror No. 31, Mr. Brendel, had –– I was

8  passed this note by the defendant's ex-wife.  Mr.

9  Brendel was posting comments about this case on

10  Facebook.  I obviously have not verified that.  I

11  inquired of him about it and he denied it, so I

12  can't prove that he's wrong, juror 31.  I just bring

13  that to the Court's attention for the record because

14  it's an unverified allegation.  I have no reason to

15  doubt, however, that the allegation is false either.

16          JUDGE SUTHERLAND:  If we can come up with

17  something but they haven't been able to run that

18  down.  He's working under some other phoney baloney

19  name.

20          MR. COMBS:  There would be no way to prove

21  or disprove it probably.

22          JUDGE SUTHERLAND:  We'll let it ride for

23  now.

24          (WHEREUPON A BRIEF RECESS TOOK PLACE)

25          JUDGE SUTHERLAND:  Trial jury is picked,

```
 1  let's bring them in, seat them and discharge the
 2  rest of the folks and then we'll go to lunch.
 3      (WHEREUPON THE JURY PANEL ENTERED THE COURTROOM)
 4          JUDGE SUTHERLAND:  Ladies and gentlemen,
 5  those of you who were not selected for the trial
 6  jury today, also known as the people in the back,
 7  all you over here know what your fate for the next
 8  couple of days.  You'll be excused in a minute.  In
 9  the event you need a written excuse for some kind
10  for work because you were on jury service today, you
11  can pick that up at the Circuit Clerk's office on
12  the first floor on your way out.  I want to thank
13  you for making yourselves available for jury
14  service.  I understand your term of potential jury
15  service lasts until the end of December, so you're
16  stuck until the end of the year.  I'm not from
17  Franklin County, but if Franklin County is like
18  every other circuit in the State, there's not going
19  to be any trials between Christmas and New Years, so
20  you don't have to worry about that a whole lot.
21  Nobody wants to aggravate potential jurors in the
22  holiday season.  If any of you wish to stay and
23  watch all or part of the trial, you can do so.  It's
24  your courtroom and tax dollars that pay for this
25  place, and you can stay if you wish to do so, but
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  with that you are excused and free to go.

2  (WHEREUPON THE EXCUSED JURORS EXITED THE COURTROOM)

3          JUDGE SUTHERLAND:  Ladies and gentlemen of

4  the trial jury, we're going to eat lunch.  Let me

5  just say that if you need to contact anybody, pick

6  up a child from school or tell somebody you're going

7  to be late for a meeting or late afternoon,

8  something like that, you can certainly do that, not

9  a problem.  You'll be free to go wherever you want

10  for lunch today.  The next couple of days, assuming

11  we're still going on Thursday, which I have a

12  feeling we will be, we'll give you a captive lunch

13  in the jury room at lunch, but today we're not

14  prepared for that.  So you're free to go anywhere

15  you want for lunch.  If you live close by and you

16  can go home for lunch, that's fine, but we're going

17  to recess for an hour.  So I need you to get back in

18  the jury room as quickly as possible so we can get

19  going on time.

20      The Court again reminds you of what you were

21  told at the first recess of the Court.  Until you

22  retire to consider your verdict, you must not

23  discuss this case among yourselves or with others or

24  permit anyone to discuss it in your hearing.  You

25  should not form or express any opinion about the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  case until it is finally given to you to decide.  Do
 2  not do any research or investigation on your own
 3  about any matter regarding this case or anyone
 4  involved in the trial.  Do not communicate with
 5  others about the case by any means.  Do not read,
 6  view or listen to any newspaper, radio or electronic
 7  communication from the Internet or television report
 8  of the trial.  That's the official instruction that
 9  I have to read.  I want to give you my own
10  unofficial instruction.  When you go out to lunch,
11  you'll go home this evening, wherever you need to go
12  if it's not home and somebody, you'll see somebody
13  you know or relative, somebody is home, how are you
14  doing, what are you doing today, well I'm on this
15  jury.  And they may something like oh, is it an
16  interesting case, tell me all about it.  What I need
17  you to do is say I'm sorry, the Judge told me I
18  can't talk about the case until it's all over with.
19  When it's over, I'll give you a call or see you at
20  home or church, see you at school, whatever it may
21  be and I'll tell you all about it, but I just can't
22  talk about it now.  If you can do that, we won't
23  have any problems.  It's just after 1 o'clock, so
24  let's say we'll be in recess until five minutes
25  after 2:00 for lunch.

1           MS. LAUBINGER:  We have children, so how

2     late will this usually run?

3           JUDGE SUTHERLAND:  We'll probably go today

4     to somewhere around 5 o'clock, give or take a little

5     bit, just depends on where we are with the witnesses

6     and evidence, but let's call it 5 o'clock give or

7     take a little bit.  We're in recess until 2:05.

8           (WHEREUPON A LUNCHEON RECESS TOOK PLACE)

9           JUDGE SUTHERLAND:  Are we ready to bring the

10    jury in?

11          MR. PARKS:  State is ready.

12          MR. EASTWOOD:  Defense is ready.

13      (WHEREUPON THE JURY ENTERED THE COURTROOM)

14          JUDGE SUTHERLAND:  Ladies and gentlemen of

15    the jury, I'd ask you at this time, I didn't have a

16    chance to tell you to stand up because you haven't

17    sat down yet.  If you'd raise your right hand to be

18    sworn as a trial jury in this case.

19           (WHEREUPON THE JURY WAS SWORN IN)

20          JUDGE SUTHERLAND:  This case will proceed in

21    the following order.  First the Court will read to

22    you two instructions concerning the law applicable

23    to this case and its trial.  Next the attorney for

24    the State must make an opening statement outlining

25    what he expects the State's evidence will be.  The

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1   attorney for the defendant is not required to make
2   an opening statement then or at any other time;
3   however, if he chooses to do so, he may make an
4   opening statement after that of the State or he may
5   reserve his opening statement until the conclusion
6   of the State's evidence.  Evidence will then be
7   introduced.  At the conclusion of all of the
8   evidence, further instructions in writing concerning
9   the law will be read to you by the Court, after
10  which the attorneys may make their arguments.  You
11  will then be given the written instructions of the
12  Court to take with you to your jury room.  You will
13  go to that room, select a floor person, deliberate
14  and arrive at your verdict.  If you find the
15  defendant guilty in the first stage of the trial, a
16  second stage of the trial will be held.  During the
17  second stage, additional instructions will be read
18  to you by the Court, additional evidence may be
19  presented and the attorneys will make their
20  arguments as to punishment.  With the additional
21  instructions of the Court, you will return to the
22  jury room to deliberate and determine the punishment
23  to be assessed.  Sometimes there are delays or
24  conferences out of your hearing with the attorneys
25  about matters of law.  There are good reasons for
```

```
 1   these delays and conferences.  The Court is
 2   confident that you will be patient and
 3   understanding.  We will have recesses from time to
 4   time.
 5        The following two instructions of law are for
 6   your guidance in this case.  The two of them, along
 7   with other instructions in writing read to you at
 8   the close of all the evidence, will be handed to you
 9   at that time to take to your jury room.  Instruction
10   No. 1, those who participate in a jury trial must do
11   so in accordance with established rules.  This is
12   true of the parties, the witnesses, the lawyers and
13   the judge.  It is equally true of jurors.  It is the
14   Court's duty to enforce those rules and to instruct
15   you upon the law applicable to this case.  It is
16   your duty to follow the law as the Court gives it to
17   you; however, no statement, ruling or remark that I
18   may make during the trial is intended to indicate my
19   opinion of what the facts are.  It is your duty to
20   determine the facts and to determine them only from
21   the evidence and the reasonable inferences to be
22   drawn from the evidence.  In your determination of
23   the facts, you alone must decide upon the
24   believability of the witnesses and the weight and
25   value of the evidence in determining the
```

```
 1   believability of a witness and the weight to be
 2   given to testimony of the witness.  You may take
 3   into consideration the witness' manner of all
 4   testifying, the ability and opportunity of the
 5   witness to observe and remember any matter about
 6   which testimony is given and the interest, bias or
 7   prejudice the witness may have; the reasonableness
 8   of the witness' testimony considered in the light of
 9   all of the evidence in the case and any other matter
10   that has a tendency in reason to prove or disprove
11   the truthfulness of the testimony of the witness.
12   It is important for you to understand that this case
13   must be decided only by the evidence presented and
14   the proceedings in this courtroom and the
15   instructions I give you.  The reason for this is
16   that the evidence presented in Court is reviewed by
17   the lawyers and Court, and the lawyers have an
18   opportunity to comment on or dispute evidence
19   presented in Court.  If you obtain information from
20   other places, the lawyers do not have the
21   opportunity to comment on or dispute it.  Fairness
22   in our system of justice requires giving both sides
23   the opportunity to view and comment on all evidence
24   in the case.  It is unfair to the parties if you
25   obtain information about the case outside this
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   courtroom; therefore, you should not visit the scene

2   of any of the incidents described in this case, nor

3   should you conduct your own research or

4   investigation.  For example, you should not conduct

5   any independent research of any type by reference to

6   textbooks, dictionaries, magazines, the Internet, a

7   person you consider to be knowledgeable or any other

8   means about any issue in this case or any witnesses,

9   parties, lawyers, medical or scientific terminology

10  or evidence that is in any way involved in this

11  trial.  You should not communicate, use a cell

12  phone, record, photograph, video, email, blog,

13  tweet, text or post anything about this trial or

14  your thoughts or opinions about any issue in this

15  case to any person.  This prohibition on

16  communication about this trial includes use of the

17  Internet, websites such as Facebook, Myspace,

18  Twitter or any other personal or public website.

19  Faithful performance by you of your duty as jurors

20  is vital to the administration of justice.  You

21  should perform your duties without prejudice or fear

22  and solely from a fair and impartial consideration

23  of the whole case.  Do not make up your mind during

24  the trial about what the verdict should be.  Keep an

25  open mind until you have heard all the evidence and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  the case is given to you to decide.

2       Instruction No. 2, you must not assume as true

3  any fact solely because it is included in or

4  suggested by a question asked of a witness.  A

5  question is not evidence and may be considered only

6  as it supplies meaning to the answer.  From time to

7  time the attorneys may make objections.  They have a

8  right to do so and are only doing their duty as they

9  see it.  You should draw no inferences from the fact

10 that an objection has been made.  If the Court

11 sustains an objection to a question, you will

12 disregard the entire question and you should not

13 speculate as to what the answer of the witness might

14 have been.  The same applies to exhibits offered but

15 excluded from the evidence after an objection has

16 been sustained.  You will also disregard any answer

17 or other matter in which the Court directs you not

18 to consider or anything the Court requires stricken

19 from the record.  The opening statements of

20 attorneys are not evidence.  You must not consider

21 as evidence any statement, remark or argument by any

22 attorney addressed to another attorney or to the

23 Court; however, the attorneys may enter into

24 agreements or stipulations of fact.  These

25 agreements and stipulations become part of the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    evidence and are to be considered by you as such.

2    Opening statement on behalf of the State.

3          **(OPENING STATEMENT ON BEHALF OF THE STATE)**

4          MR. PARKS:  Thank you, Your Honor.  In

5    August of 2012, Sergeant Folsom received a call from

6    Judge Parker, who is a presiding judge in Crawford

7    County.  Judge Parker asked Sergeant Folsom to

8    investigate a harassing You Tube video that had been

9    put up that Judge Parker had felt was a threat to

10   him.  So, Sergeant Folsom will tell you that he came

11   up, he got a copy of the video, he looked at the

12   video and he started his investigation.  He started

13   his investigation in Crawford County because the

14   defendant was running for coroner in Crawford

15   County, and it was believed since he was running for

16   office in Crawford County, he lived in Crawford

17   County.  Sergeant Folsom will tell you that he

18   checked to see what effect this video had had on the

19   Court system and the judicial system and the police

20   system in Crawford County.  He then began to do the

21   investigation.  He went to the house where the

22   defendant listed his address in his campaign filings

23   and couldn't find him.  They then ran a license

24   check of a car that people had seen the defendant

25   driving and that car came back registered to a woman

Weinhaus, Vol. 1

```
 1   who lived in Piney Park here in Franklin County.
 2   And so Sergeant Folsom and Corporal Mertens with the
 3   Highway Patrol went to Piney Park to talk to the
 4   defendant.  When they arrived at Piney Park, they
 5   knocked on the door, defendant came to the door,
 6   they recognized him from the You Tube video.
 7   Sergeant Folsom was on the steps and he'll tell you
 8   there's bushes, it's a narrow step, but when the
 9   defendant opened the door and came out and closed
10   the door behind him very quickly, Sergeant Folsom
11   will tell you he smelled the odor of marijuana.
12   They asked the defendant if they could move over to
13   the driveway because of the small size of the porch,
14   which the defendant readily agreed to do.  They
15   began to talk to him about the You Tube video.  He
16   admitted making the You Tube video, and they had
17   about a 20 or 30 minute conversation about the
18   contents of the You Tube video.  At this time the
19   defendant turned to go back into the house.
20   Sergeant Folsom told him, "I'm sorry, you can't go
21   back in.  Can we have permission to search your
22   house?  We smell marijuana.  Will you open the
23   door?"  And the defendant said no.
24       And so, Sergeant Folsom will tell you that he
25   came, applied for and was granted a search warrant
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    to go back and search the house at Piney Park.  That

 2    when he got there, he and Corporal Mertens went in

 3    to search the house.  He'll tell you that in the

 4    upstairs drawer they find a nine millimeter pistol

 5    in an Army style holster.  That they went downstairs

 6    and they found what the defendant had called his

 7    command center, and this is the area where he had

 8    made the You Tube broadcast.  And in searching the

 9    area of the command center, as the defendant called

10    it, they found in a Camel snuff tin a pill and a

11    half, which when sent to the lab, the lab personnel

12    will tell you these pills tested positive for

13    Morphine.  They will also tell you that they

14    continued to search, they found other drug

15    paraphernalia, and just outside of the door of the

16    command center on a bag up on top of a high shelf

17    they found a bag containing marijuana.  They seized

18    this evidence, they sent it to the lab, they seized

19    the defendant's computer to check and see if there

20    was anymore threatening emails or videos or anything

21    on there, and they will tell you that this is the

22    normal practice that normally these items,

23    especially drug items, need to be sent off to the

24    lab before they can be -- before we charge anybody

25    with a crime.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Sergeant Folsom will tell you that in the

2  video, and you will see the video, the defendant had

3  given until September 17th for Judge Parker and

4  other officials in Crawford County to vacate their

5  office.  If they did not vacate their office by

6  September 17th, that the defendant and his followers

7  would come, would forcibly remove them from office,

8  would try them in a peoples Court and hang them for

9  treason.  This worried the people in Crawford

10  County, and this worried the people in the Highway

11  Patrol.  So it was decided that before September

12  17th, Sergeant Folsom and Corporal Mertens would

13  place defendant under arrest for threatening a

14  judicial official, for the possession of the illegal

15  Morphine and for possession of the marijuana.

16    They did not want to go back to the defendant's

17  house, because as they told you, it wasn't a very

18  easy place to access, especially through the front

19  door, so they devised a ruse.  The defendant had

20  been asking for the return of a computer, so

21  Sergeant Folsom called the defendant and said hey,

22  we've got your computers.  And Sergeant Folsom will

23  tell you that the defendant said fine, I want to

24  meet you at a public place.  And so it was decided

25  at the MFA station on Highway K in Franklin County

Electronically Filed - EASTERN DISTRICT OF APPEALS - February 25, 2014 - 03:52 PM

 1   on September 11th, 2012 the two parties would meet

 2   the Highway Patrol there with the intention of

 3   taking defendant into custody, the defendant going

 4   with the intention of receiving his computers.

 5          Sergeant Folsom and Corporal Mertens will tell

 6   you that they arrived and had picked this place

 7   because there wasn't much traffic there.  They'd

 8   also brought two Highway Patrol agents from Rolla to

 9   help them to secure the scene, and they had also two

10   uniformed troopers in cars at either end of Highway

11   K in case the defendant ran, they had cars to try to

12   stop him, and it was their intention to take the

13   defendant under arrest when he showed up to pick up

14   his computers.  And they will testify to you that

15   they weren't expecting any trouble from the

16   defendant.  They hadn't had any trouble with him in

17   the past, and they will tell you they didn't have

18   their ballistic vests on.  They had their detective

19   weapons, which are service weapons but with small

20   capacity magazines.  They didn't get their high

21   capacity pistols out of the car.  They didn't get

22   their shotguns or AR-15 rifles because they weren't

23   expecting any trouble from the defendant.  And they

24   will tell you that they were parked on the parking

25   lot back aways when the defendant came in, made a

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   very high rate of speed turn.  While he was turning,
 2   they thought he was going to strike their car.
 3   Before he stopped, he unhooked his seat belt and got
 4   out of the car.  And there was an exchange between
 5   the troopers and the defendant because Sergeant
 6   Folsom will testify when defendant got out of the
 7   car, he had an Army type holster with a pistol in
 8   that holster.  And there was an exchange between the
 9   two.  Sergeant Folsom will tell you he told him what
10   are you doing with that gun, and the defendant will
11   say what are you doing with that gun.  And Sergeant
12   Folsom will tell you at this time the defendant had
13   unhooked the flap, put his hand under the flap, put
14   his hand on the pistol and started to remove the
15   pistol from the holster, at which time the defendant
16   said, "You're going to have to shoot me, man", and
17   he was.  Sergeant Folsom and Corporal Mertens opened
18   fire striking the defendant twice in the chest, once
19   in the neck and once in the head.  The defendant is
20   charged with making the threats of the judicial
21   officers, he's charged with possession of Morphine,
22   charged with possession of the marijuana, charged
23   with the assault of the two law enforcement officers
24   by trying to draw his weapon to shoot them.  He's
25   charged with armed criminal action for the use of
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  that weapon, and he's charged with resisting arrest

2  of the arrest that the two officers were trying to

3  do.

4      There's one other interesting fact about this

5  case.  Unbeknownst to anyone at the time, the

6  defendant was wearing a video/audio recording watch,

7  and we have the shooting recorded on the defendant's

8  watch, which you will be allowed to see.  After

9  hearing the evidence presented by the State, the

10  State will ask you to find the defendant guilty of

11  all eight charges charged against him.

12      JUDGE SUTHERLAND:  Any opening statement for

13  the defendant at this time?

14      MR. EASTWOOD:  Yes, Your Honor.  May I

15  proceed?

16      JUDGE SUTHERLAND:  Yes.

17  **(OPENING STATEMENT ON BEHALF OF THE DEFENDANT)**

18      MR. EASTWOOD:  May it please the Court,

19  Mr. Parks, members of the jury.  Jeff Weinhaus for

20  many years has been a newspaper publisher and a

21  blogger, and he's not really known in Franklin

22  County, but the evidence will show that he is known

23  in Jefferson and Crawford County, and in fact he was

24  running for coroner of Crawford County.  And Jeff

25  published a You Tube broadcast, had a channel on You

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   Tube called Bulletinman and he also published a
 2   newspaper that ran ads distributed in gas stations
 3   and places like that.  And the spirit of this
 4   publication that occurred over decades was a full
 5   throated denouncement of official corruption,
 6   corrupt elected officials, corrupt judges, in this
 7   case Judge Kelly Parker who was a State rep who
 8   became a judge and who Jeff believed to be corrupt
 9   or made statements that indicated a belief that
10   Judge Parker came to the judgeship in a less than
11   entirely pure manner.  And so what you're going to
12   see today, first up most likely, is a You Tube video
13   featuring Jeff.  It's one of many Bulletinman
14   broadcasts, a user named Bulletinman posted on You
15   Tube.  You Tube, I think most of you are familiar
16   with it, it's a video website owned by Google.
17   Anyone can access this material, it's free, it's on
18   the worldwide web, whether you have Internet at home
19   or go to the library, whatever, and you're going to
20   see two versions of this video.  You're going to see
21   one that's just Jeff talking, and you're going to
22   see another one which has captions, You Tube calls
23   them annotations but most of us call those captions,
24   they're boxes of texts that pop-up on the screen
25   during times when Jeff is talking.  You're never
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  even going to hear Jeff state Judge Kelly Parker's

2  name.  You are going to hear him carry on for over

3  nine minutes in a video.  It's pretty over the top.

4  Some of the things he says you may or may not agree

5  with.  It's controversial political speech.  At

6  times he's kind of funny too or he certainly has a

7  tongue in cheek manner.  This is not a very, very

8  serious speech.  This is a type of speech where you

9  might think he's at least getting people who agree

10  with him to laugh along with him.  And remember,

11  it's America, we all have our different views and

12  you may or may not share Jeff's views.  So the State

13  is going to show you two videos, one with these

14  annotations and one without the annotations.  I

15  don't know if they're going to show you who added

16  the annotations.

17      The evidence will also show that Jeff didn't

18  have any cases before Judge Parker.  It's not like

19  Judge Parker was sitting in judgment of him in a

20  criminal or civil trial or someone in his family or

21  life, one of his friends or something like that.  So

22  the evidence will show there was nothing before the

23  judge in which Jeff was trying to influence the

24  judge.  He was just criticizing the judge.  Well, he

25  never mentions the judge by name but these

1  annotations do.

2        Now, Mr. Parks is right, Judge Parker contacted

3  the Highway Patrol.  And two troopers who don't

4  normally patrol this area, they're from Rolla,

5  Sergeant Folsom, Corporal Mertens, came up to Piney

6  Park to a house where Jeff sometimes lived with his

7  wife and his son.  And they did allegedly smell pot,

8  obtained a search warrant and they went through the

9  entire house, they ransacked the entire house, and

10  in the basement Mr. Parks called it a command

11  center, I'm going to call it what it is, which is a

12  basement, they found in this family house a small

13  quantity of pot and a tablet and a half of Morphine.

14  But the main thing they did that day is they seized

15  Jeff's computers.  And if you're running for public

16  office, in this case coroner, and you make regular

17  You Tube videos, it's kind of a big deal if someone

18  seizes your computers because you can't make and

19  upload your videos to You Tube anymore.  So Jeff was

20  angry, angry that his computers were taken.  He felt

21  like it was a direct assault on his First Amendment

22  rights.  It was pay back for criticizing the judge.

23  He was going to have his computers taken away, and

24  he filed what's called a writ of replevin, which is

25  basically an order to give it back with the Missouri

 1  Supreme Court.  The writ was rejected.  He didn't
 2  follow the right filing rules.  Jeff is not a
 3  lawyer, but the point is what he really wanted was
 4  to get his computers back.  And in fact, at some
 5  point he started to make, I'm not sure which
 6  computer, but he started making more videos and he
 7  criticized Sergeant Folsom directly by name.  And in
 8  these You Tube podcasts, he'd call up the Highway
 9  Patrol on the line and you might have heard on a
10  radio show or something kind of make fun of them and
11  make fun of Sergeant Folsom and attack him as
12  someone who was interfering with his First Amendment
13  rights.  And he did something more than that, he
14  started emailing Sergeant Folsom directly saying who
15  is your lawyer going to be when I sue, I'm going to
16  sue you, sue you for a lot of money because you
17  interfered with my rights.  You're trying to stifle
18  my free speech.
19       Sergeant Folsom, by the way, is the trooper who
20  later shot Jeff multiple times.  He contacted
21  Sergeant Folsom through a social network service
22  called Google Circles, you may not have heard of it
23  because it's not nearly as popular as Facebook, but
24  it's out there and it's called Google Circles, and
25  he tried to friend request Sergeant Folsom through

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   Google Circles.  And a few weeks after his computers
 2   were seized, the troopers, Sergeant Folsom and
 3   Corporal Mertens, called Jeff and said, "Hey, Jeff,
 4   we're going to give you your computers back."
 5        Now, in fact they weren't, they were lying to
 6   him, this was all a ruse to serve an arrest warrant
 7   on him, but the evidence will show that Jeff
 8   believed them.  He believed that he was getting his
 9   computers back.  And so although the troopers,
10   you'll hear, had gone to Jeff's house that morning,
11   instead they said let's meet at a neutral location.
12   They didn't say to Jeff, hey, why don't you come
13   down to the police station.  They didn't say to
14   Jeff, hey, let's go to a secluded location.  They
15   said to him let's meet at a gas station.  Gas
16   station is a public place.  You'll hear evidence
17   that there were delivery trucks there that day.
18   There were workmen working on a gutter repair job on
19   the MFA gas station building.  You'll hear there was
20   a store clerk, customers.  You'll also hear that
21   this was a place where Jeff was a regular customer.
22   His habit and custom every day was buying a soda and
23   a pack of cigarettes.  By all accounts an easy going
24   guy.  By all accounts that day was in a good state
25   of mind, a happy state of mind, maybe even a
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  jubilant state of mind, because in Jeff's mind he

 2  won, he was getting his computers back.  He won, he

 3  criticized the judge, they kind of messed with him

 4  taking his computers away but he was getting it

 5  back.

 6       So, Jeff went to meet the troopers at the gas

 7  station.  He drove his wife's Subaru, pulled into a

 8  parking lot, it's on a slight hill, it's kind of

 9  gravelly, it's not a smooth asphalt surface, it's

10  kind of a gravelly surface, and where the troopers

11  were stationed was on a slight incline.  He drove

12  in, circled around and parked his Subaru in a way

13  that would be easy to unload the computers from the

14  troopers' car and load them into the back of his

15  Subaru, which would make sense.  If you're going to

16  go pick up computer equipment, that's what you'd do.

17       Now, Jeff did have an open carry weapon on him.

18  You probably figured that out from this morning

19  where there was a lot of conversation about that,

20  okay, but Jeff did have an open carry weapon on him.

21  And he's not charged here today for unlawful

22  possession of that weapon.  And you'll also hear

23  evidence that that weapon was in a special military

24  style holster, open carry military style holster.

25  It's the type of holster used by Army Rangers when

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    they jump out of airplanes.  Basically it's really

2    difficult to open.  The reason is when you jump out

3    of an airplane, you don't want your gun to fall out.

4    So it requires additional effort, additional force,

5    additional strength and a combination of movements

6    to open the holster at all.  In other words this

7    isn't a situation where anyone could quickly draw a

8    weapon.  It's not that type of situation.  And you

9    will hear that Sergeant Folsom recognized that

10   holster.  He knew, because he was a military

11   veteran, that that was this special type of holster

12   that was used when you jump out of an airplane or

13   whatnot and that it took a little more time and

14   effort to unlatch the holster and retrieve a weapon

15   out of that.

16        Now, the troopers did bring back-up that day.

17   They brought the FBI.  Two FBI agents were stationed

18   way, way from the troopers, from Jeff at the other

19   end of the parking lot.  But you'll also hear the

20   troopers didn't feel Jeff was particularly

21   dangerous.  You'll hear they had vests with them

22   that day, bullet proof vests, they didn't wear them,

23   they were in plain clothes.  Jeff knew them, of

24   course, but they were in plain clothes.  I think

25   they were in golf polo type shirts.  You'll see them

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  on the wrist watch video, and you will see that

2  wrist watch video because Jeff didn't trust those

3  troopers after what they had done to him.  And

4  within seconds of exiting his wife's Subaru, Jeff's

5  fears were confirmed when after a calm exchange of

6  words Jeff was shot four times.

7       You will see the bullets coming out of Sergeant

8  Folsom's gun on this tape.  And before that you will

9  hear Jeff ordered to get down on the ground.  You

10 will see his left hand go up and then within less

11 than three seconds of the order to get down on the

12 ground, you will hear the first bullet fly out from

13 Sergeant Folsom's gun.  And I suggest that the

14 evidence will show that Jeff was complying with the

15 order to get down on the ground.  The evidence will

16 show from the angle at which the bullets entered his

17 body, the angle in which you were looking at the

18 shooter on the tape, this man was complying with the

19 order of the trooper to get down on the ground.

20      You will also hear from three people who have

21 no stake in this case, two were workmen, working men

22 repairing a gutter.  You'll also hear from the store

23 clerk.  They all saw the shooting, none of them saw

24 Jeff's hand on a gun.  The only evidence you'll hear

25 of Jeff's hand on a gun were from the two troopers

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  who shot him, one of whom had been criticized by

2  Jeff pretty badly on the Internet and who ordered

3  him to get down on the ground and within three

4  seconds of that order shot him as he was getting

5  down on the ground.  You'll see the video, you'll

6  see the wounds it caused.  Jeff Weinhaus was air

7  medevaced, air lifted to St. John's Mercy Hospital

8  in St. Louis County, spent two months recovering in

9  the hospital.  At the close of the evidence I'm

10  going to ask you to acquit Jeff, acquit Jeff because

11  the State cannot meet its burden of proving these

12  eight counts beyond a reasonable doubt.  Thank you.

13          JUDGE SUTHERLAND:  Evidence for the State.

14          MR. PARKS:  Thank you, Your Honor.  The

15  State calls Sergeant Folsom.

16          (WHEREUPON SERGEANT FOLSOM WAS SWORN IN)

17          **DIRECT EXAMINATION OF SERGEANT FOLSOM**

18  **QUESTIONS BY MR. PARKS:**

19      Q    Please state your name for the record.

20      A    Henry James Folsom.

21      Q    You are a sergeant with the Missouri State

22  Highway Patrol; is that correct?

23      A    Yes, sir.

24      Q    And how long have you been with the Highway

25  Patrol?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A   I've been with the Highway Patrol 16 plus

2  years.

3      Q   And before that were you in the United

4  States Army?

5      A   Yes, sir.

6      Q   And what was your position in the United

7  States Army?

8      A   In the Army I had several different

9  positions.  I was a military policeman.  I was

10  assigned to protection detail for another Department

11  of Defense agency, basically a body guard, and

12  finally I was a special agent for the United States

13  Army, Criminal Investigation Command, basically a

14  criminal investigator for the Army.

15      Q   What is your assignment now?

16      A   I'm a criminal investigator for the Highway

17  Patrol.

18      Q   Where are you assigned to?

19      A   I'm assigned out of Troop I Rolla Criminal

20  Investigation Unit.

21      Q   Does Crawford County take in Troop I?

22      A   Yes, sir.

23      Q   Franklin County is in Troop C; is that

24  correct?

25      A   Yes, sir.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q    The borderline between the two Highway

2   Patrol troops is the border between Franklin and

3   Crawford County?

4      A    Yes, sir.

5      Q    And have you had any firearms training?

6      A    Yes, sir.

7      Q    Have you taken the required classes through

8   the Missouri State Highway Patrol?

9      A    Yes, sir.

10     Q    And have you had any training in the

11  detection of marijuana?

12     A    Yes, sir.

13     Q    What training have you had?

14     A    While I was assigned in the Army, I served

15  for a year as an undercover drug investigator.

16  During that time we did control burns from the

17  evidence room to certify and familiarize ourselves

18  with the smell of burnt marijuana.

19     Q    So you are familiar with the smell of

20  marijuana?

21     A    Yes, sir.

22     Q    I direct your attention now to August 18 of

23  2012.  Did you receive a telephone call from Judge

24  Kelly Parker?

25     A    Yes, sir.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    What was that phone call in regards to?

2    A    It was in regards to a You Tube video that

3  had been posted by Jeffrey Weinhaus.  They referred

4  to it as a pod cast in which he had allegedly

5  threatened some judicial officers.

6    Q    Did Judge Parker ask you to investigate

7  this?

8    A    Yes, sir.  He stated he felt threatened by

9  it, as well as other members of the judicial office

10  there, and he asked for the Highway Patrol to

11  investigate.

12    Q    And did you review these pod casts?

13    A    Yes, sir, I did.

14    Q    I show you at this time what has been marked

15  as State's Exhibit No. 1.  Do you recognize this?

16    A    Yes, sir, it is a copy of the pod cast made

17  concerning Jeffrey Weinhaus' video.

18    Q    And I show you what has been marked as

19  State's Exhibit No. 1-A.  Do you recognize this?

20    A    Yes, sir.  This is a copy of the pod cast

21  with the captions.

22    Q    And have you viewed these two videos?

23    A    Yes, sir, I have.

24    Q    And are these two videos here in the same or

25  the same as the videos that you saw?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1      A    Yes, sir.

 2           MR. PARKS:  Your Honor, at this time I would

 3    move that State's Exhibits 1 and 1-A be admitted

 4    into evidence.

 5           MR. EASTWOOD:  I would object, Your Honor.

 6    I believe both these, as I previously briefed the

 7    Court, both of these recordings are protected by the

 8    First Amendment, and for those reasons, which the

 9    Court has already been briefed on in writing, I

10    would object.

11           JUDGE SUTHERLAND:  The objections are

12    overruled.  State's Exhibits 1 and 1-A are admitted.

13           MR. PARKS:  And I would ask permission to

14    play these for the jury at this time, Your Honor.

15           JUDGE SUTHERLAND:  You may do so.

16       (WHEREUPON VIDEO WITHOUT CAPTIONS WAS PLAYED)

17      Q    (By Mr. Parks) That is the first video that

18    you looked at during your investigation; is that

19    correct, Sergeant Folsom?

20      A    Yes, sir, it is.

21      Q    You then found another video with captions;

22    is that correct?

23      A    Yes, sir, I did.

24           MR. EASTWOOD:  Your Honor, for the record I

25    object to him playing this video as well for the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   same reasons briefed to the Court, First Amendment

 2   speech.

 3           JUDGE SUTHERLAND:  Objection overruled.

 4      (WHEREUPON VIDEO WITH CAPTIONS WAS PLAYED)

 5      Q   (By Mr. Parks) Now Sergeant Folsom, after

 6   you had seen the video, what did you do next?

 7      A   After I had seen the videos and had them

 8   documented, I met with various law enforcement

 9   officials from state, federal and county agencies to

10   try to look at the videos and determine the validity

11   of the threats being made on the videos.

12      Q   And did you do an investigation in Crawford

13   County itself?

14      A   Yes, at some point I did meet with Crawford

15   County officials.

16      Q   And what did you find out was going on in

17   Crawford County?

18      A   I discovered that of course they had

19   heightened their security due to some of these

20   threats, and reportedly Jeff Weinhaus had visited

21   the 911 dispatch center and had been frequenting the

22   courthouse and had put everyone on edge, and they

23   had taken some security precautions like locking the

24   911 center where he had entered a few days prior and

25   placing an armed guard inside the facility as well
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   as changing the way they entered the courtrooms and
 2   their security.
 3        Q    After this investigation, was it -- what did
 4   you do next in your investigation?
 5        A    After I met with the officials, at that
 6   point it was determined that most of the things that
 7   Mr. Weinhaus had said were under the free speech,
 8   and at that point the decision was made that I would
 9   contact him at his home and try to discuss with him
10   the video and see if he had actually intended to
11   harm anyone or himself and possibly was a danger to
12   anyone.
13        Q    And did you and Corporal Mertens then
14   proceed to the defendant's home in Crawford County?
15        A    We proceeded to several addresses in
16   Crawford County; however, we were not able to locate
17   him.
18        Q    How did you locate the defendant?
19        A    Eventually I had met with the sheriff of
20   Crawford County, Randy Martin, and he had given me a
21   cellular phone photograph picture of the vehicle
22   that Mr. Weinhaus was alleged to have driven.  I
23   read the license plate, it came back to a green
24   Subaru registered to Judy Kropf, who was a resident
25   here in Franklin County.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    That would be the Piney Park location?

2    A    Yes, sir.

3    Q    What did you do next?

4    A    After checking the addresses in Crawford

5    County with no results, myself and Scott Mertens

6    started to drive towards Franklin County.

7    Q    What happened?

8    A    Eventually we came to Mr. Weinhaus'

9    residence there in Piney Park.

10   Q    And what did you do when you came to the

11   residence?

12   A    I went and knocked on the door, and

13   Mr. Weinhaus came to the door and opened the front

14   door.  At the front door it was a really narrow

15   stairwell that was covered with bushes on both

16   sides.  It was a really narrow front pad to step out

17   on, and the door swung outwards.  So when he stepped

18   outside to speak to me on the door, we were in very

19   close proximity to each other, and at that point I

20   smelled the odor of marijuana.

21   Q    Where did you smell this odor coming from?

22   A    Mostly I smelled a very strong odor coming

23   from the house, and since we were standing there

24   almost face-to-face, I smelled the marijuana coming

25   from him also.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    What did you do next?

2    A    I asked him if it would be okay if we could

3  step down from the step, because we were basically

4  face-to-face, and he agreed and led us over to a

5  carport area that was adjacent to his house.

6    Q    And Corporal Mertens was with you this

7  entire time but he wasn't standing up on the porch;

8  is that correct?

9    A    No, there was only room for one person to go

10  up the stairs at a time, so he waited at the bottom

11  of the stairs.

12    Q    When you and the defendant came down from

13  the stairs and went to the carport, what happened

14  next?

15    A    We went to the carport where I began to

16  speak to Mr. Weinhaus.  Of course when I knocked on

17  the door, I informed him the reason why I came to

18  speak to him was about the video and to assess the

19  validity of any threats that he had made, and we had

20  about a 25, 30 minute conversation about the video.

21    Q    Can you highlight that conversation for us?

22    A    In that conversation Mr. Weinhaus, he

23  maintained that he was a peaceful person, that he

24  was trying to call people to arms and wake up

25  America.  He would say things like he was planning

 1   on removing corrupt officials and do this in a

 2   peaceful manner; however, a situation like this was

 3   exactly what the Second Amendment was created for,

 4   and he would kind of waiver with the peaceful

 5   statement and go back with another statement such as

 6   his Army was going to take over America because

 7   basically the constitution had failed.  He just made

 8   some radical type statements about the Government

 9   and his beliefs.

10       Q   Did he accuse any judicial officials of

11   treason?

12       A   Yes, he accused several officials of

13   treason, and he asked myself and Scott Mertens if we

14   knew what the punishment was for treason.

15           MR. EASTWOOD:  Your Honor, I object that the

16   question was leading and move to strike.

17           JUDGE SUTHERLAND:  Overruled, go ahead.

18       Q   (By Mr. Parks) Did he answer his own

19   question for you?

20       A   Yes.  Before we could answer the question,

21   he answered the question and said death is the

22   punishment for treason.

23       Q   At this point was the conversation ended?

24       A   Once we had finished talking about 25, 30

25   minutes, there come a point, he even gave me a copy

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    of his bulletin and explained to me some of his

2    personal beliefs about the Lord Jesus Christ, and

3    once we had come to basically where he started to

4    repeat himself in the conversation, we both kind of

5    ended the conversation.

6        Q    What did you do next?

7        A    At that point he started turning to go back

8    towards his residence, and I asked him to stop and I

9    explained that when I contacted him at the front

10   door that I smelled the odor of marijuana, and it

11   was at that point that I explained -- I asked

12   Mr. Weinhaus if there was any marijuana in the house

13   and he denied.  At that point we had a short

14   conversation and he tried to step around me and go

15   towards the house.

16       Q    What did you do?

17       A    I stepped in front of him and rather than

18   get into an altercation or wrestling match of any

19   kind, I immediately told him to turn around and I

20   was going to handcuff him, and he immediately

21   submitted into the handcuff position and stuck his

22   wrists out.  I handcuffed him.  I explained to him

23   that I handcuffed him for his safety, that I was

24   going to apply for a warrant, and being as there was

25   no other officers there, I didn't want to get into a

```
 1   wrestling match with him trying to get back into the

 2   house.  During that time he was screaming for

 3   someone in the house to come and help him, that the

 4   cops were going to search the house, they were

 5   looking for drugs, and eventually someone did come

 6   to the door.

 7        Q    Do you know who that individual was?

 8        A    It was Judy Kropf.

 9        Q    And what happened with her?

10        A    My partner, Scott Mertens, contacted her and

11   she came to the door of the house.

12        Q    Did you then apply for a search warrant?

13        A    Yes, sir.  I called for, of course, other

14   officers to arrive at the scene.  Once they arrived

15   at the scene, I unhandcuffed Mr. Weinhaus and

16   explained to him that now that we had other

17   officers, he was free to leave but he could not go

18   back in the house.  At that point I left Corporal

19   Mertens with the other officers guarding the house

20   and I came to apply for a search warrant for the

21   home.

22        Q    I show you what has been marked as State's

23   Exhibit 2.  Do you recognize this?

24        A    Yes, sir.

25        Q    What do you recognize this to be?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    A    It is a search warrant which I applied for

2  using an affidavit granting me permission to search

3  the home of Mr. Weinhaus.

4    Q    This is the search warrant that you used to

5  search the house; is that correct?

6    A    Yes, sir.

7    Q    And this search warrant has the items that

8  you seized listed on it; is that correct?

9    A    Yes, sir, it has a return and inventory

10 listing the items.

11   Q    And it also has a picture of the front of

12 the house; is that correct?

13   A    Yes, sir.

14      MR. PARKS:  Your Honor, at this time I would

15 ask that State's Exhibit 2 be admitted into

16 evidence.

17      MR. EASTWOOD:  No objection, Your Honor.

18      JUDGE SUTHERLAND:  State's Exhibit 2 is

19 admitted.

20      MR. PARKS:  I need to get my technical

21 expert up here.

22      JUDGE SUTHERLAND:  Every office should have

23 a 15 year old.

24   Q    (By Mr. Parks) And I show you here from the

25 search warrant, this is a picture of the front of

1  the house; is that correct?

2      A   Yes, sir.

3      Q   And this shows the narrow bushes and the

4  narrow sidewalk leading up to the door?

5      A   Yes, sir.

6      Q   And this is the door that the defendant came

7  out and you asked him to step around to the carport;

8  is that correct?

9      A   Yes, sir, I did.

10     Q   And that carport would be this area over

11 here; is that correct?

12     A   Yes, sir.

13     Q   After receiving the search warrant, what did

14 you do?

15     A   After I received the search warrant, of

16 course I was driven by a local officer, once I

17 received the search warrant, we drove back to the

18 residence where Mr. Weinhaus was, and I contacted

19 Mr. Weinhaus there at his residence and informed him

20 that I had obtained a search warrant.

21     Q   And did you and Corporal Mertens then begin

22 to search the house?

23     A    After I gave Mr. Weinhaus a copy of the

24 search warrant and again informed him that he was

25 free to leave, he did not have to remain, we did

1    begin to search the house.

2        Q    And where did you first start to search?

3        A    We first began to search the main level.  It

4    was a ranch style home with a basement.  We searched

5    the upper level, the main level.

6        Q    And what did you find there?

7        A    Upstairs we found some laptop equipment as

8    well as video cameras, and we also located a nine

9    millimeter handgun in a night stand drawer by the

10   master bed.

11       Q    Was there anything else in that drawer

12   besides the pistol?

13       A    There was the box that the pistol had came

14   in.  The box had paperwork which said that Judy

15   Kropf was the owner of the pistol.  There was also a

16   green Army holster there with the weapon, as well as

17   the weapon was loaded with ammunition in a magazine;

18   however, there was not a round in the chamber.

19       Q    I show you what has been marked as State's

20   Exhibit 3 and 4, do you recognize these?

21       A    Yes, sir.

22       Q    And are these the items or photographs as

23   they appeared to you on the day when you committed

24   or did the search?

25       A    Yes, sir.

 1           MR. PARKS:  Your Honor, I would ask that

 2    State's Exhibits 3 and 4 be admitted into evidence.

 3           MR. EASTWOOD:  No objection.

 4           JUDGE SUTHERLAND:  State's Exhibits 3 and 4

 5    are admitted.

 6       Q    (By Mr. Parks) And I show you what has been

 7    marked here as State's Exhibit No. 3.  Can you tell

 8    the jury what this is a photo of?

 9       A    It's a photo of the top drawer of the night

10    stand.  It contains some hearing protection that you

11    can see on the right of the green holster.  Inside

12    the green holster is a black nine millimeter

13    handgun.

14       Q    And I show you what has been marked as

15    State's Exhibit No. 4, do you recognize this?

16       A    Yes, sir, that is a picture of the handgun

17    after I removed it from the holster.

18       Q    After searching the upstairs, and you say

19    you did not seize this pistol; is that correct?

20       A    No, sir, I did not.

21       Q    And why did you not seize this?

22       A    The pistol was legally registered, it served

23    no evidence of a crime.  It was totally legal for it

24    to be there and we left it where it was.

25       Q    When you had spoken to Mr. Weinhaus before

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  doing the search, had he told you about any specific

2  areas of his house in the basement?

3          MR. EASTWOOD:  Objection, leading.

4          JUDGE SUTHERLAND:  Overruled, he may answer.

5          THE WITNESS:  Would you repeat the question,

6  sir.

7      Q   (By Mr. Parks) Yes.  When you had your

8  conversation with Mr. Weinhaus, did he talk about

9  any specific rooms in the basement of the house?

10     A   I don't recall that we discussed any

11 specific rooms in the basement.

12     Q   Did he call a specific room the "command

13 center"?

14         MR. EASTWOOD:  Objection, leading.

15         JUDGE SUTHERLAND:  Overruled, you may

16 answer.

17         THE WITNESS:  That term did come up during

18 our conversation.

19     Q   (By Mr. Parks) And when you went to the

20 basement of the house, where did you go?

21     A   When we arrived down in the basement, as

22 soon as we entered the basement there was a large

23 main room that was cluttered with boxes and looked

24 like a lot of personal belongings that normally

25 would be in a basement.  There were a lot of

1  cardboard boxes and things in storage.  Just off to

2  the right of the main part of the basement there was

3  cameras set up, a desk with a computer, a lot of the

4  banners and things that you saw in the video where

5  Mr. Weinhaus was running for coroner and the

6  backdrop basically for where he had made the videos.

7      Q   And I show you what has been marked as

8  State's Exhibit No. 5.  Do you recognize this?

9      A   Yes, sir.

10      Q   What do you recognize this to be?

11      A   It is an area in the basement that I

12  observed that Mr. Weinhaus described as his command

13  center, as well as the area that I believe the

14  videos were made.

15      Q   And does this photo fairly and accurately

16  represent what you saw there during the search?

17      A   Yes, sir, it does.

18          MR. PARKS:  Your Honor, I would ask that

19  State's Exhibit No. 5 be admitted into evidence.

20          MR. EASTWOOD:  No objection, Your Honor.

21          JUDGE SUTHERLAND:  State's Exhibit 5 is

22  admitted.

23      Q   (By Mr. Parks) And here again, this is the

24  photo of the command center type room that you saw

25  in the basement of Mr. Weinhaus' house?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yes, sir, it is.

 2      Q    And this is the same back drop that was in

 3  the two videos that we saw previously; is that

 4  correct?

 5      A    I believe it was, yes, sir.

 6      Q    What did you search next?

 7      A    After we searched the main level, we

 8  searched the basement area there by the command

 9  center.  I began to search the desk where the video

10  equipment was -- there was a video camera as well as

11  computer equipment sitting on top of the desk, and I

12  began to search the desk which contained that

13  equipment.

14      Q    And what did you find?

15      A    I opened up one of the drawers in the desk

16  and I found some drug paraphernalia, a set of

17  scales, rubber type Tupperware tub containing some

18  marijuana as well as smoking pipes and other

19  instruments.

20      Q    Was there anything else in that can?

21      A    Yes, sir.

22      Q    What?

23      A    There was a small Camel tin.  It was almost

24  like a tin that Sucrets or something comes in, a

25  small metal tin.
```

```
 1      Q   And what was in that?
 2      A   When I opened up that tin, there was a pill
 3 and a half and a partial portion of a small sliver
 4 of another pill inside that I could see.
 5      Q   And did you seize those items?
 6      A   Yes, sir, I did.
 7      Q   And were those pills sent to the Missouri
 8 State Highway Patrol?
 9      A   Yes, sir, they were.
10      Q   I show you what has been marked as State's
11 Exhibits 6, 7 and 8.  Do you recognize these?
12      A   Yes, sir.
13      Q   What do you recognize these to be?
14      A   Exhibit 6 shows the photograph that I took
15 of the items that were in the desk.  The Tupperware
16 contained the scales as well as the marijuana.
17 Exhibit 7 shows as I'm removing the items from the
18 plastic Tupperware dish it shows the metal tin, it
19 shows the scale removed as well as some smoking
20 devices.  Exhibit 8 shows, after I've opened the
21 tin, it shows a pink pill, a half of a pink pill and
22 a little sliver of a blue pill.
23      MR. PARKS:  Your Honor, I would ask that
24 State's Exhibits 6, 7 and 8 be admitted into
25 evidence.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          MR. EASTWOOD:  May I review the photographs

2  please before maintaining a position?

3          JUDGE SUTHERLAND:  Yes.

4          MR. EASTWOOD:  No objection, Your Honor.

5          JUDGE SUTHERLAND:  State's Exhibits 6, 7 and

6  8 are admitted.

7      Q    (By Mr. Parks) And I have up here what has

8  been admitted as State's Exhibit 6.  Again could you

9  please explain to the jury what these are, it should

10  be on your monitor.

11      A    It's a Tupperware type container containing

12  a scale, as well as a jar containing marijuana

13  residue, as well as the other items that we've

14  spoken about.

15      Q    And I now show you what's been marked as

16  State's Exhibit No. 7.  What is this a photo of?

17      A    This is a photograph as I'm removing the

18  items from the Tupperware container and laying them

19  on the desk to document them.

20      Q    And you said that this was drug

21  paraphernalia.  Could you explain what the drug

22  paraphernalia is here in this picture?

23      A    My picture is clearer than that picture.

24  Inside the Tupperware container there is a blue

25  smoking pipe, a red smoking pipe, as well as an

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   instrument used to grind marijuana or to chop it up
 2   to refine it.
 3        Q    And what would the scale be used for?
 4        A    Measuring.
 5        Q    And I show you what has been marked as
 6   State's Exhibit No. 8.  Could you explain to the
 7   jury what is here.
 8        A    This is a photograph of what was inside the
 9   metal tin when I opened it.
10        Q    And what is this, these two items right here
11   and here?
12        A    There is a pink pill that is whole, there is
13   a half of a pink pill just underneath it, and to the
14   right of the tin there is a sliver of a blue pill.
15        Q    And these are the way that you found the
16   items during your search?
17        A    Yes, sir, it is.
18        Q    And were these items packaged and sent to
19   the Missouri State Highway Patrol lab?
20        A    Yes, sir, they were.
21        Q    I show you now what has been marked as
22   State's Exhibits 9 and 10.  You didn't do the
23   seizing of the evidence, Corporal Mertens did the
24   seizing of the evidence; is that correct?
25        A    We did the seizing of the evidence together.
```

1    He packaged the evidence.  I seized and photographed

2    the evidence and he packaged it.  His handwriting is

3    always much neater than mine.

4        Q    And is this package in the same condition as

5    when you all seized it?

6        A    Yes, sir.  It bears my signature here.  It's

7    still sealed with the tape and initials.  This as

8    well bears my signature here.  It bears the tape and

9    the initials.

10       Q    And both packages have blue tape at the

11   bottom, what is that from?

12       A    The blue tape usually signifies -- officers

13   in the field use red tape and blue tape is used by

14   the laboratories to signify when they've opened the

15   package and conducted an examination.  They reseal

16   it with blue tape.

17       Q    At this time I would ask you if you could

18   open package No. 9.

19           MR. PARKS:  At this time I would ask that

20   State's Exhibits 9 and 10 be admitted into evidence,

21   Your Honor.

22           MR. EASTWOOD:  May I approach, Your Honor.

23           JUDGE SUTHERLAND:  Yes.

24              (BENCH CONFERENCE BEGINS)

25           MR. EASTWOOD:  Right now 9 and 10 are

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  described as marijuana and Morphine pills.
 2  Obviously I'm not going to consent to them being
 3  entered into the record as marijuana and Morphine.
 4        MR. PARKS:  I'm just introducing the
 5  package.
 6        JUDGE SUTHERLAND:  Not proving what they
 7  are?
 8        MR. EASTWOOD:  That's my point.  I don't
 9  have a chain of custody objection or anything like
10  that, but I don't want to concede that this is
11  marijuana or Morphine.
12        JUDGE SUTHERLAND:  I'll overrule the
13  objection on the assumption the State is going to
14  prove this up somehow or another.
15        MR. PARKS:  Not with this witness.
16        MR. EASTWOOD:  Barring that, I have no
17  objection, Your Honor.
18              (BENCH CONFERENCE ENDS)
19     Q   (By Mr. Parks) Could you open State's
20  Exhibit No. 9.  Could you tell us what is in State's
21  Exhibit No. 9.
22     A   In State's Exhibit No. 9 there is a glass
23  container, which is sealed in this cardboard box per
24  our laboratory, Ziplock style bag containing
25  marijuana and a brown paper bag containing
```

```
 1  marijuana.
 2       Q    And could you please open --
 3       MR. EASTWOOD:  I object to the extent that
 4  the witness is not qualified to testify what the
 5  drug is.
 6       MR. PARKS:  Your Honor, the witness has
 7  testified that he has had extensive training --
 8       JUDGE SUTHERLAND:  As far as the marijuana,
 9  yeah, overruled.
10       MR. PARKS:  Only to the marijuana is all I'm
11  asking for.
12       Q    (By Mr. Parks) Could you please open what
13  has been marked as State's Exhibit No. 10, please.
14  And could you tell the jury what was in State's
15  Exhibit No. 10?
16       A    A blue Camel tin that was identified in the
17  photographs earlier.
18       Q    Could you open that tin.
19       MR. PARKS:  And Your Honor, may I pass the
20  tin to the jury so that they may see the contents of
21  the tin?  I might be able to put it on --
22       JUDGE SUTHERLAND:  Yeah, I'd prefer you to
23  put it on the -- not that the jurors would pop the
24  pills but I don't want them to get spilled or
25  knocked out or something.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1       Q    (By Mr. Parks) And I'm going to take these
 2   out.  These are the pink pill and part of the blue
 3   pill; is that correct?
 4       A    Yes, sir.
 5            JUDGE SUTHERLAND:  Mr. Parks, if you have a
 6   ways to go with this witness, I suspect you do, do
 7   you need a break?  I don't want to go another hour
 8   and a half without a break.  Why don't we take a
 9   recess now if that's all right.
10            MR. PARKS:  That will be fine, it's a good
11   stopping point.
12            JUDGE SUTHERLAND:  We'll be in recess for 10
13   minutes.  The Court again reminds you of what you
14   were told at the first recess of the Court.  Until
15   you retire to consider your verdict, you must not
16   discuss this case among yourselves or with others or
17   permit anyone to discuss it in your hearing.  You
18   should not form or express any opinion about the
19   case until it is finally given to you to decide.  Do
20   not do any research or investigation on your own
21   about any matter regarding this case or anyone
22   involved in the trial.  Do not communicate with
23   others about the case by any means.  Do not read,
24   view or listen to any newspaper, radio, electronic
25   communication from the Internet or television report
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    of the trial.  I hope you're paying attention to

2    that because we're going to have a test on that

3    instruction when the trial is over with.  We'll be

4    in recess for 10.

5              (WHEREUPON A BRIEF RECESS TOOK PLACE)

6              JUDGE SUTHERLAND:  We're not finished with

7    the first witness yet, but the parties have agreed

8    to put the laboratory technician from the Highway

9    Patrol laboratory on out of order.  So we're going

10   to interrupt Sergeant Folsom's testimony to do that

11   right now.  If you'd raise your right hand and be

12   sworn by the clerk, please.

13             (WHEREUPON MATTHEW FOX WAS SWORN IN)

14             **DIRECT EXAMINATION OF MATTHEW FOX**

15   **QUESTIONS BY MR PARKS:**

16        Q    Please state your name for the record.

17        A    My name is Matthew Fox.

18        Q    How are you employed?

19        A    I work at the Missouri State Highway Patrol

20   Crime Lab in Jefferson City, Missouri in the drug

21   chemistry section.

22        Q    What are your duties there?

23        A    I test solid dosage specimens for the

24   presence of controlled substances.

25        Q    And what training have you had to do these

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  testings?

 2      A   I have a Bachelors in Science in Forensic

 3  Chemistry from Ohio University in Athens, Ohio.

 4  When I was employed by the Highway Patrol, I

 5  underwent a six month on-the-job training period.  I

 6  passed a proficiency and competency exam.  In

 7  addition I go to various courses, lectures and

 8  seminars about various topics in the field of

 9  forensic chemistry.

10      Q   Have you testified in Court before about

11  your testing of solid materials?

12      A   Yes, sir, I have.

13          MR. PARKS:  Your Honor, may the witness be

14  qualified as a chemist for the Highway Patrol?

15          MR. EASTWOOD:  No objection, Your Honor.

16          JUDGE SUTHERLAND:  Yes, he certainly may.

17  Go ahead.

18      Q   (By Mr. Parks) And I show you what has been

19  marked as State's Exhibit No. 10, do you recognize

20  this?

21      A   Yes, sir, I do.

22      Q   How do you recognize this?

23      A   This item has the unique seven digit lab

24  identifier that was placed on it when it came into

25  my custody, and in addition it has my initials and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   date from when I opened the container.

2        Q   What is the blue tape?

3        A   The blue tape is the seal that I put on the

4   opening of the container after I finish testing the

5   evidence inside.

6        Q   Is this in the same condition except for

7   where we opened it in Court here today?

8        A   Yes, sir, it is.

9        Q   Could you remove the items from there.  And

10  could you open the tin, please.  Do you recognize

11  the item in the tin, the pink item?

12       A   Yes, sir, I do.

13       Q   And how do you recognize that item?

14       A   This item, after I tested it, I repackaged

15  it in the plastic bag, and I can tell that because

16  it has my initials and date as well as the unique

17  seven digit lab identifier that was associated with

18  it.

19       Q   Was there also a half of pill that you

20  tested?

21       A   I did not test the tablet fragment in here,

22  but there is a tablet fragment in here.

23       Q   How do you go about doing the test on this

24  pill?

25       A   So when I receive a tablet, I will open the

1  evidence, I will note any physical characteristics

2  about the evidence when it came in, how it was

3  contained.  I'll note the color, the shape, any

4  pharmaceutical identifiers around the tablet.  I'll

5  do a pharmaceutical look-up for those identifiers.

6       Q    What is a pharmaceutical look-up?

7       A    We have a program called RXID.  It's a

8  computer program that has hundreds of different

9  pharmaceutical identifiers associated with different

10 tablets in it.

11      Q    Are those the numbers that are pre-printed

12 on the tablets?

13      A    Yes, sir.  So I will do a comparison of

14 those numbers.  I will make a printout of that.

15 I'll then take a sample of the tablet to test on my

16 instrument.

17      Q    Did you do so in this case?

18      A    Yes, sir, I did.

19      Q    How do you use controls so that you don't

20 cross contaminate from one experiment to another?

21      A    I open one item at a time.  I completely

22 clean my area between items.  In addition when the

23 sample is run on an instrument, I will also run a

24 blank in between each sample to show there was no

25 cross contamination leading from one sample to

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  another.

2      Q    What kind of test did you do on this item?

3      A    I did two tests.  I did the pharmaceutical

4  identifier look-up, and I did a technique that's

5  known as gas chromatography and mass spectrometry.

6      Q    What is that?

7      A    That's actually two separate techniques.

8  Gas chromatography is the first technique, we call

9  that GC, and the second is mass spectrometry, which

10  we call MS.  GC is a separation technique.  You take

11  a mixture and place it in the instrument, and the

12  instrument will separate it out into its individual

13  components.  Mass spectrometry is an identification

14  technique.  You take an individual specimen, break

15  it down into its unique fragments, and based on

16  those fragments you can tell the composition of the

17  material.

18      Q    Did you do that on the pink pill here?

19      A    Yes, sir, I did.

20      Q    And based upon your test results, were you

21  able to determine what this pill was?

22      A    Yes, sir, I was.

23      Q    What was it?

24      A    The tablet contains morphine schedule two

25  controlled substance.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q    Did you write a report for your findings?

2      A    Yes, sir, I did.

3      Q    And I show you what has been marked as

4  State's Exhibit No. 31.  Do you recognize this?

5      A    Yes, sir, I do.

6      Q    And is that the lab report that you wrote

7  for the items contained in State's Exhibit No. 10?

8      A    Yes, sir, it is.

9      Q    And how can you tell that that report is for

10 this item?

11     A    This report has my signature and the date I

12 completed it, as well as the unique seven digit lab

13 identifier here in the top right-hand corner.

14         MR. PARKS:  Your Honor, at this time I would

15 ask that State's Exhibit No. 31 be admitted into

16 evidence.

17         JUDGE SUTHERLAND:  Any objection?

18         MR. EASTWOOD:  I'm sorry, which exhibit is

19 it?

20         JUDGE SUTHERLAND:  The lab report, 31.

21         MR. EASTWOOD:  No objection, Your Honor.

22         JUDGE SUTHERLAND:  State's Exhibit 31 is

23 admitted.

24         MR. PARKS:  I have no further questions of

25 this witness at this time, Your Honor.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          JUDGE SUTHERLAND:  Cross examination.

 2          MR. EASTWOOD:  Thank you, Your Honor.

 3          CROSS EXAMINATION OF MATTHEW FOX

 4   QUESTIONS BY MR. EASTWOOD:

 5      Q    Mr. Fox, how long have you been with the

 6   Highway Patrol lab?

 7      A    I've been employed with the Highway Patrol

 8   for about seven and a half years now.

 9      Q    Is the Highway Patrol lab an ASCLD certified

10   lab?

11      A    Yes, sir, it is.

12      Q    And I'd ask that you tell the jury what

13   ASCLD is.

14      A    ASCLD lab is an organization that certifies

15   laboratories to a standard.

16      Q    And you have to go through annual

17   accreditation; isn't that right?

18      A    They're not annual accreditations.  I

19   believe our current accreditation cycle is five

20   years.

21      Q    What level certification does the Highway

22   Patrol have?

23      A    It's not the Legacy program, it's the ASCLD

24   lab program.

25      Q    Legacy is a higher certification program?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A    Legacy was the older program.  They've

2   progressed from Legacy to the newest ASCLD lab.

3      Q    And within the lab and pursuant to ASCLD

4   standards, it's fair to say you have to follow

5   certain procedures; isn't that right?

6      A    Yes, sir, it is.

7      Q    Otherwise the science is not considered to

8   be verifiable or proper, is that fair to say?

9      A    Yes, sir.

10      Q    Do you also have a QA/QC manual, quality

11   assurance/quality control manual?

12      A    Yes, sir, we do.

13      Q    And when you do the GC mass spec test, you

14   talked about, in fact you use a standard of the drug

15   in order to compare it against the sample you're

16   testing; isn't that right?

17      A    No, sir, that's not always correct.

18      Q    Oh, okay.  What about here with the

19   Morphine.  Would you have a standard for the

20   Morphine or no?

21      A    We do have a standard present in the lab;

22   however, usually how I do my comparisons is I

23   compare them to a library that we purchased which

24   contains multiple numerous mass specs.

25      Q    So the Morphine that you compared the sample

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  to, was that a standard or was that something from

2  the library?

3      A    That was from the library, yes, sir.

4      Q    How long had you had that library?

5      A    I can't say off the top of my head.  I

6  believe it's a 2008 edition.

7      Q    And in your custom and practice and under

8  ASCLD rules, when you get say a pill, a tablet,

9  looks like it's a Morphine tablet perhaps, how many

10 times do you normally run it through the GC mass?

11     A    With a tablet we do two tests, the first

12 test is the pharmaceutical identifier test and the

13 second test is usually a GCMS test.

14     Q    For the GC mass spec, how many times do you

15 usually run the sample?

16     A    One time.

17     Q    How many times did you run it here?

18     A    One time.

19     Q    And what about for the -- did you perform

20 testing on the marijuana?

21     A    Yes, sir, I did.

22     Q    And how many times did you perform that

23 test?

24     A    I tested three specimens of marijuana.

25     Q    Three tests of the same sample?

1     A    Marijuana testing is a little different than

2   testing we do on powders or tablets.

3     Q    Can you tell the jury about that briefly in

4   layman's terms.

5     A    Sure.  Marijuana testing, what we'll do is

6   when I receive a specimen, I'll first weigh it and

7   look for physical characteristics under a

8   microscope.  If I see those physical

9   characteristics, then I take a specimen of the

10  sample to perform two further tests.

11    Q    Are you aware that some ASCLD labs around

12  the nation have had problems recently?

13    A    I have heard news stories, yes, sir.

14    Q    So has that led you and your lab and the

15  Highway Patrol to take heightened steps to make sure

16  that you're following the procedures and practices

17  that you ought to be?

18    A    We have been continually accredited for a

19  number of years now, and as far as I know we have

20  not had any sort of issue regarding those kind of

21  issues regarding what you've heard about in the

22  news.

23    Q    No issues of misconduct or negligence?

24    A    None that I'm aware of.

25    Q    There's been no failure to follow procedures

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 1

```
 1   that you know of?
 2        A    How would you define a failure?
 3        Q    A failure to perform a proper test on a
 4   controlled substance?
 5        A    No, sir.
 6        Q    Failure to follow the procedures that are
 7   prescribed by ASCLD or your QA/QC manual?
 8        A    No, sir, none that I'm aware of.
 9        Q    And you're satisfied that the data here is a
10   good clean result to show the presence of Morphine?
11        A    Yes, sir.
12        Q    How come you didn't run the blue fragment?
13        A    I did run the blue fragment, sir.
14        Q    Well, I thought you said you didn't.  I
15   thought you said you ran the pink tablet; right?
16        A    No, there are two items here, item 3.8 was a
17   blue tablet fragment, and item 3.9 originally had a
18   purple tablet and a purple tablet fragment.  Usually
19   in cases like this when I have a whole tablet and a
20   tablet fragment, I disregard the tablet fragment and
21   just perform my test on the tablet because the
22   tablet fragment doesn't have the full pharmaceutical
23   identifiers that the tablet would.
24        Q    In your opinion were these different
25   substances or do you not know?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 1

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    I did not make any conclusion about the

 2   purple tablet fragment.

 3      Q    The color difference suggests something

 4   might be different?

 5      A    The color was the same as the tablet.  The

 6   purple tablet fragment had the same color as the

 7   purple tablet.

 8      Q    Now in the Highway Patrol crime lab, you

 9   don't, as a whole, perhaps -- do you specialize just

10   in drugs?

11      A    I work in the drug chemistry section, yes,

12   sir.

13      Q    But there are other sections in the lab;

14   right?

15      A    Yes, sir, there are.

16      Q    Those include latent fingerprints, looking

17   for fingerprints?

18      A    Yes, sir.

19      Q    DNA testing?

20      A    Yes, sir, we have a DNA testing.

21      Q    And other sections too like arson or

22   something like that, I don't know how you're set up.

23      A    There are other sections in addition to the

24   ones that you named, yes, sir.

25      Q    To your knowledge the Camel box that those
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  tablets were in, was any latent fingerprint analysis

2  performed on it?

3      A   I do not know.  I know I did not perform

4  drug analysis on the container.

5      Q   So you have no idea whose fingerprints, if

6  any, are on that?

7      A   No, sir.

8      Q   And to your knowledge was any DNA testing

9  performed on either the tablets or the Camel box?

10     A   To my knowledge, no, sir, there was no DNA

11 testing performed on either item.

12     Q   So to your knowledge no DNA, no

13 fingerprints?

14     A   That is correct, sir.

15         MR. EASTWOOD:  Thank you very much for your

16 time today.  No further questions.

17          **REDIRECT EXAMINATION OF MATTHEW FOX**

18 **QUESTIONS BY MR. PARKS:**

19     Q   You said you identified the blue fragment?

20     A   Yes, there's a bit of confusion.  There are

21 two items within the Camel container, 3.8 was the

22 blue tablet fragment.

23     Q   What was the blue tablet fragment?

24     A   The tablet contained Morphine, a schedule

25 two controlled substance.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1     Q     And then the blue tablet, did you test that?

2     A     Yes, sir.

3     Q     What was that?

4     A     The blue tablet fragment contains Morphine.

5          MR. PARKS:  Thank you.  No further

6  questions.

7          JUDGE SUTHERLAND:  Redirect?

8          MR. EASTWOOD:  None, Your Honor.

9          JUDGE SUTHERLAND:  May this witness be

10  excused?

11         MR. PARKS:  Yes, Your Honor.

12         JUDGE SUTHERLAND:  You may step down.  You

13  are free to go.  Are you going to recall Sergeant

14  Folsom?

15         MR. PARKS:  Yes, please, Your Honor.

16    **CONTINUED DIRECT EXAMINATION OF SERGEANT FOLSOM**

17  **QUESTIONS BY MR. PARKS:**

18     Q     Sergeant Folsom, we talked about you seizing

19  the drugs from your search.  Did you seize any other

20  items?

21     A     Yes, sir, I did.

22     Q     What other items did you seize?

23     A     We seized some computer equipment, some

24  video cameras.

25     Q     After you had seized these items and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    finished your search, what did you do next?
 2        A   After we seized the items and finished the
 3    search, I provided Mr. Weinhaus with a copy of the
 4    return listing the items that we had taken from the
 5    residence.
 6        Q   And then what happened?
 7        A   The return was filed with the courts and the
 8    items were processed as evidence and laid forward
 9    for laboratory examinations.
10        Q   When you serve a search warrant and the
11    person is there, do you usually leave a business
12    card?
13        A   When the person is there?
14        Q   Did you leave a business card with
15    Mr. Weinhaus?
16        A   At some point I believe he asked me for a
17    business card, and I'm obligated to give that to
18    him.  So I provided him with one.
19        Q   And does that have your email address on it?
20        A   Yes, sir, it does.
21        Q   Did you start to receive emails from the
22    defendant at this time?
23        A   Yes, sir, I did.
24        Q   What was he asking for?
25        A   There were various emails.  One of them
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  wanted to know the name of my attorney that would be

2  representing me in the suit, and one of them, I

3  believe, asked where he could serve me with papers.

4      Q    And did he ask for his computers back?

5      A    I do not recall in an email if he asked for

6  his computers back.  I know that he had a writ of

7  replevin that he asked for his computers back, and I

8  received that by email as well.

9      Q    I direct your attention now to September

10  10th.  Was a meeting held between you and your

11  supervisors with the Missouri State Highway Patrol?

12      A    Yes, sir, it was.

13      Q    And at that meeting was it decided that you

14  would arrest the defendant for the drug and the

15  tampering charges?

16      A    At that meeting it was decided that actions

17  needed to be taken to take Mr. Weinhaus into

18  custody, or we were going to have to further monitor

19  his movements before September 17th, such as place a

20  GPS locator on his car or perform some type of

21  technical surveillance on him.

22      Q    After this meeting, what did you do?

23      A    After this meeting, of course I was given my

24  directions that I was to coordinate with you to find

25  out whether or not we could take him into custody or

1   to begin plans to place a locator on his vehicle and

2   set up some type of technical surveillance until the

3   17th because of the heightened state.

4        Q   And you received an arrest warrant for the

5   defendant; is that correct?

6        A   Yes, sir, I did.

7        Q   What did you do next?

8        A   At that point once I received -- I came and

9   applied for the arrest warrant and I received the

10  arrest warrant.  At that point I contacted the

11  Franklin County Sheriff's Department and asked them

12  if they would assist me in serving the warrant.

13       Q   And what happened next?

14       A   They declined, they told me that they were

15  too busy.

16       Q   And what happened next?

17       A   At that point I was, of course, out of my

18  normal patrol area.  I did not know anyone who had

19  jurisdiction to assist me, and Corporal Mertens

20  served the warrant, so I contacted the two FBI

21  agents that we worked with in Rolla who are out of

22  the St. Louis office and asked them if they would

23  accompany us, as well as I arranged for two marked

24  cars to be present during the operation in case

25  Mr. Weinhaus went mobile.

1    Q   I direct your attention to September 11th,

2  2012.  How did you formulate your plan to effect the

3  arrest?

4    A   Based on limited resources, I placed the two

5  uniformed -- first I made arrangements to meet him

6  in a public place.

7    Q   How did you make those arrangements?

8    A   When I contacted him, luckily I was going to

9  bring it up but he brought it up first, I contacted

10  him by phone.

11    Q   What did he tell you?

12    A   That he did not trust me and he wished to

13  meet me in a public place.

14    Q   What place did you decide or agree to meet

15  at?

16    A   We had tentatively made plans to meet at a

17  gas station that was, I believe, less than a mile

18  from his house.  It was a really secluded gas

19  station.  Earlier that morning we drove by his house

20  and we believed that he was probably home; however,

21  I did not want to go to his house and serve the

22  arrest warrant because prior he had made several

23  threats against me, as well as on the Internet he

24  stated in one of his videos that he should have

25  placed a bullet in my head, as well as he called my

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   supervisors and complained that I had stolen items
 2   from his home.  So I felt based on the heightened
 3   awareness that I should not go back to his home.
 4   Which he also made a video where he stated that he
 5   was at home with his guns loaded on Def-Con 4.  So I
 6   contacted him and tried to arrange to meet him in a
 7   public place, and like I said luckily he actually
 8   brought up that it be a public place.
 9       Q   So you agreed to meet at the MFA station on
10   Highway K; is that correct?
11       A   Yes, at the station in the parking lot that
12   was adjacent to the station where it looked like at
13   one time they maybe parked big trucks.
14       Q   And did you arrive at the MFA station first?
15       A   Yes, sir, we did.
16       Q   And what did you do when you arrived there?
17       A   When we arrived there, it took about 45
18   minutes for the federal agents to arrive.  Once they
19   arrived, we looked over the location, we agreed that
20   we would place -- Scott Mertens and I would place
21   our car in a highly visible area just off the road
22   so we could be observed when Jeff was to come to
23   meet us.  We get the agents on the other side of the
24   building, they were dressed in plain clothes.
25   Normally myself and Corporal Mertens wear plain
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  clothes.  We were dressed in plain clothes.  And we

 2  had the two marked units from Troop C Highway Patrol

 3  unit stationed down the road on each side of the MFA

 4  station kind of backed-off into someone's driveway.

 5  In case there was a vehicle pursuit, they could shut

 6  down the road.

 7       Q    And I show you what has been marked as

 8  State's Exhibit No. 13.  Can you see this from your

 9  location there?

10       A    No, I cannot, sir.  I can see the top part.

11  Yes, sir.

12       Q    And is this a diagram of the MFA station on

13  September 12th of 2012?

14       A    Yes, sir, it is.

15       MR. PARKS:  Your Honor, I would ask that

16  State's Exhibit No. 13 be admitted into evidence.

17       MR. EASTWOOD:  No objection.

18       JUDGE SUTHERLAND:  State's Exhibit 13 is

19  admitted.

20       Q    (By Mr. Parks) And Sergeant Folsom, I'm

21  going to ask you if you can take the laser pointer.

22       A    May I stand, sir?

23       Q    Sure, and if you need to come around here to

24  the front, would that be all right?

25       JUDGE SUTHERLAND:  Yeah, it's all right.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   Stay away from the front of it.  I can see all

 2   right, so the jury can see it.  It's not important

 3   if I see it, it's important that the jury see it.

 4        Q   (By Mr. Parks) Does this -- this is the

 5   location.  Where were you parked?

 6        A   Corporal Mertens and I were parked here in

 7   Corporal Mertens' vehicle just off the highway.

 8   There's the main Route K here, and we were parked

 9   highly visible here just off the road.

10        Q   And where were the FBI agents located?

11        A   The FBI agents were originally parked here

12   in their vehicle; however, during the time when we

13   were waiting for Mr. Weinhaus to arrive, someone was

14   repairing the gutters and they had to back up and

15   move here because they were asked by the employees

16   to move their vehicle.

17        Q   And is this the location where the FBI

18   agents were located?

19        A   Yes, sir.  This is the location when the

20   incident took place where their vehicle was parked.

21        Q   And this vehicle here, what is this vehicle?

22        A   This vehicle represents Mr. Weinhaus'

23   vehicle parked.

24        Q   And when he pulled into the driveway or into

25   the parking lot, how did he pull in?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    A    Mr. Weinhaus was coming down Route K here.

2   He made a left turn into the parking lot.  He drove

3   passed our location at a high rate of speed, he

4   turned around here and came passed our vehicle here

5   and applied his brakes and slid on the gravel to a

6   stationary position here.

7    Q    And in this diagram are there any items that

8   were next to the building that you saw that are not

9   on this diagram?

10    A    In the diagram, I previously viewed the

11   diagram, there were gas pumps here; however, there's

12   photographs that show there was a large container

13   here where my dot is that contained propane tanks

14   where you exchange like at Lowe's.

15    Q    Like barbecue kind?

16    A    Yes, sir.

17    Q    Okay, thank you very much.  Sergeant Folsom,

18   I'm going to back up here because I forgot one item.

19   I'm going to show you what has been marked as

20   State's Exhibit No. 11.  Do you recognize this?

21    A    Yes, sir.

22    Q    And what do you recognize this to be?

23    A    It is a photograph of the brown bag that was

24   an exhibit that you previously had me open here, the

25   small brown bag.

```
 1          MR. PARKS:  Your Honor, I would ask that
 2  State's Exhibit No. 11 be admitted into evidence.
 3          MR. EASTWOOD:  Can I see it?  I won't
 4  object.
 5      Q   (By Mr. Parks) To clarify this, where was
 6  this photo taken?
 7      A   This photograph is taken in Mr. Weinhaus'
 8  basement.  There are on the main level to the right
 9  is the area that we referred to as the command
10  center, and this is on a shelf basically between the
11  stairs and the command center.
12          MR. EASTWOOD:  I have no objection, Your
13  Honor.
14          JUDGE SUTHERLAND:  State's Exhibit 11 is
15  admitted.
16      Q   (By Mr. Parks) When Mr. Weinhaus pulled into
17  the MFA station, did anything unusual occur?
18      A   When he pulled into the MFA station, he
19  pulled in at a high rate of speed, and while he
20  drove passed us he was removing his seat belt.
21      Q   What did you think?
22      A   It looked that he was in a hurry to get out.
23      Q   And as a highway trooper, are you trained on
24  high speed exits from cars?
25      A   I received training from my FTO, Eric
```

1   Bolkmer, his training philosophy was there's no

2   reason why anyone should get out of the car faster

3   than you.  So as soon as we begin to pull to the

4   shoulder, we remove our seat belt and begin to get

5   out of the vehicle.  His rule was that we always

6   exited prior to contacting anyone or them exiting

7   their car.

8       Q    And seeing Mr. Weinhaus remove his seat belt

9   before he got the car stopped, did this cause you

10  any thoughts?

11      A    It just appeared to me that he was in a

12  hurry to get out.

13      Q    Was there anything about the way he pulled

14  in and came close to your car that gave you pause?

15      A    Originally I was in the passenger's side and

16  I had opened my door as he was driving passed our

17  vehicle, and I began to step out and when I heard --

18  I could not see his vehicle behind us completely but

19  I heard the engine accelerate, and when I heard the

20  engine accelerate I thought maybe at that point that

21  he was going to ram our vehicle, and I maintained my

22  seat in the position or seat in the vehicle until he

23  drove passed our position.

24      Q    Now were you expecting any trouble from

25  Mr. Weinhaus that day?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1     A   I was not expecting any physical trouble

2    from him, no.

3     Q   How were you dressed?

4     A   I was wearing a pair of 511 style, they're

5    police style plain pocket pants, five pocket pants

6    and a polo shirt with an emblem on it that said

7    Highway Patrol, large emblem.

8     Q   How was Corporal Mertens dressed?

9     A   A different shade of the 511 type pants and

10   a white polo shirt that had the Highway Patrol's

11   emblem on it.

12    Q   Did you have your ballistic vest on?

13    A   No, sir, we did not.

14    Q   Why not?

15    A   We had placed, of course, when we went to

16   meet him, we placed those items in our vehicle;

17   however, it was a bad tactical decision.  We were

18   lazy and they sat in the back seat, and

19   Mr. Weinhaus, when I contacted him on the phone, he

20   told me originally that he would have people there

21   with him, and we felt like No. 1, we didn't deem him

22   to be a threat; and No. 2, if we exited the vehicle

23   and started putting on bullet proof vests and people

24   saw us, they would interpret that the wrong way.  So

25   we made a bad decision, we were kind of lazy and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   didn't put them on.

 2        Q    Were you armed at this time?

 3        A    Yes, sir, we were.

 4        Q    What were you armed with?

 5        A    In our vehicle we always have several

 6   weapons; however, we were armed with our subcompact

 7   Glock on our hip, which is our smallest pistol.

 8        Q    Did you have a larger Glock?

 9        A    Yes, sir.

10        Q    Did you have shotguns?

11        A    Yes, sir.

12        Q    Did you have AR-15s?

13        A    Yes, sir, we did.

14        Q    But did you get any of these out of the car?

15        A    No, sir.

16        Q    When the defendant pulled in and stopped,

17   what did you do next?

18        A    When he pulled in and stopped, I exited the

19   vehicle and I began to talk to him, tried to engage

20   him in dialogue.  I had a manila folder in my right

21   hand, which contained a copy of the arrest warrant

22   as well as the affidavit and other paperwork that I

23   wanted to show him to show him that I actually did

24   have an arrest warrant for him.

25        Q    And what else did you have, if anything?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    All I had was the manila folder in my hand,

 2   my right hand, and my weapon on my left hip, I'm

 3   left-handed.

 4        Q    Did you instruct Corporal Mertens to do

 5   anything at this time?

 6        A    When I got out and I began to walk towards

 7   the rear of Mr. Weinhaus' vehicle, Corporal Mertens

 8   and I kind of met at the trunk of his vehicle.  He

 9   was a step or two in front of me.  I reached forward

10   and grabbed his shoulder and kind of pulled back on

11   him and I explained to him that I wanted him to go

12   to the trunk of our car and open the trunk.

13        Q    Why did you do that?

14        A    I wanted to No. 1 continue the ruse that we

15   had his computer equipment that we were going to

16   return to give the FBI agents time to come across

17   the parking lot to be there, and at the same time

18   when Mr. Weinhaus had exited his vehicle, he turned

19   and faced me and was staring at me, and he never

20   took a step or moved from his vehicle, and I didn't

21   know if he was going to hop back in the vehicle and

22   drive off or if he was possibly waiting for me to

23   come around to speak with him.

24        Q    What happened next?

25        A    Corporal Mertens asked me was I sure and I
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   explained to him that I was sure, that I wanted him

 2   to go to the trunk of the car, and I approached the

 3   rear of Mr. Weinhaus' car and I peaked around the

 4   side where I observed both his hands.

 5        Q    What did you see?

 6        A    They were both empty.

 7        Q    What happened next?

 8        A    When I looked around the car, Mr. Weinhaus

 9   was standing in a bladed fashion towards me.

10        Q    What do you mean by bladed fashion?

11        A    Basically standing sideways with his left

12   foot in front of his right foot at a 45 degree

13   angle.

14        Q    What happened then?

15        A    When I stepped around the side of the

16   vehicle and I had the folder in my hand, it was at

17   that point that I could see on the right hip that

18   Mr. Weinhaus was carrying a large green Army holster

19   with a black handgun in the holster.

20        Q    And what happened then?

21        A    At that point I was kind of shocked, I still

22   had the folder in my hand and I began to place my

23   hand on my weapon as I was bladed facing him, and I

24   asked him what are you doing with that gun.

25        Q    And was your weapon drawn at this time?
```

1      A    I was in the process of removing my weapon

2    from the holster and placing it at the low ready.

3      Q    What is the low ready?

4      A    Down by my side just in front of my hip.

5      Q    When you asked Mr. Weinhaus why he had the

6    gun, what happened then?

7      A    He replied something to the effect of what

8    are you doing with your gun.

9      Q    And what did you say?

10      A    I replied something to the effect of I was

11    authorized, and he said "well, I'm authorized too"

12    or something of that nature.

13      Q    During this conversation, could you see

14    Mr. Weinhaus' hands?

15      A    Yes, sir.

16      Q    What was he doing with his hands?

17      A    At that point both his hands were down at

18    his side, and after he replied "well, I'm

19    authorized," he started reaching his right hand down

20    and manipulated the flap on the holster that he was

21    wearing.

22      Q    Are you familiar with that type of holster?

23      A    Yes, sir.  I was issued that holster in the

24    United States Army for several years, and I

25    personally own one.

1      Q    What happened next?

2      A    He began to pull -- there's a safety ring

3  there which requires you to pull the ring all the

4  way down.  He began to pull the ring down with his

5  right hand and disengage the flap.

6      Q    What happened then?

7      A    At that point, utilizing his right hand, he

8  swept the flap up.  The flap covers the entire

9  weapon and goes all the way down the side of the

10  holster.  He swept the flap up and placed his hand

11  on the buttstock of the weapon.

12      Q    What did you do?

13      A    At that point I ordered him to get on the

14  ground.

15      Q    And what did he do?

16      A    At that point he did not get on the ground.

17  He turned and instead of standing at a bladed

18  position towards me, now he was squared up to me, we

19  were squared face to face, toe to toe.

20      Q    During this time where was the defendant's

21  eyes?

22      A    His eyes never left my face.

23      Q    What happened next?

24      A    At that point I began to raise my weapon

25  thinking that Mr. Weinhaus was going to draw his

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   weapon, and at that point I observed in my line of

 2   sight was some people at the gas station propane

 3   tanks and fuel tanks, and I could not fire my

 4   weapon.

 5        Q    What did you do?

 6        A    Stepped left to change my angle of contact

 7   with Mr. Weinhaus.

 8        Q    Where was Mr. Weinhaus' hands at this time?

 9        A    He was still manipulating the holster on his

10   weapon.  His right hand was on the holster,

11   underneath the holster's flap on the gun.  His left

12   hand I have no idea, I was just staring at his right

13   hand.  My vision began to tunnel in, and I was just

14   fixed on his right hand on that weapon.

15        Q    In a shooting situation, is this unusual for

16   your vision to start tunneling in on one particular

17   area?

18        A    In my training, no, it's not unusual.

19        Q    What happened next?

20        A    At that point I stepped left and I had a

21   clear line of sight, and it was at that point

22   Mr. Weinhaus, I again ordered him as well as

23   Corporal Mertens ordered him to get down on the

24   ground.  At that point he looked me square in my

25   face and said, "you're going to have to shoot me" as

1  he continued to draw the weapon out.

2       Q    And what did you do?

3       A    As he pulled the weapon out, again that was

4  the only thing that I was focused on was the weapon,

5  I watched the weapon come all the way up out of the

6  holster, except for about the last inch of the

7  weapon.

8       Q    What happened next?

9       A    The holster required him to draw the weapon

10  up in an extreme position and then cant the weapon.

11  As soon as he had the weapon all the way up and it

12  was about an inch out of the holster, I fired two

13  shots to his chest and one to his head to

14  incapacitate him as I continued to step left away

15  from the gas pumps.

16       Q    And did you hit him?

17       A    Yes, I hit him.

18       Q    And what did he do?

19       A    At that point I heard -- I did not hear the

20  gunshots from my gun, but I felt the recoil, but I

21  saw the blood begin to spurt from his chest.  He was

22  wearing a dress shirt like I have on now and a tie,

23  and I physically was maybe seven feet from him, and

24  I saw the rounds hit and the blood begin to spurt

25  from his chest, and I saw both his eyes rolled up in

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   his head, and there was just the whites of his eyes

 2   showing.

 3       Q    What did you think had happened at this

 4   time?

 5       A    I was pretty sure that I had killed him,

 6   that I had incapacitated him.

 7       Q    I show you what has been marked as State's

 8   Exhibit No. 27.  Could you open this for us, please?

 9       A    Yes, sir.

10       Q    And I show you a holster that was taken from

11   State's Exhibit No. 27.  Is this the same type of

12   holster that Mr. Weinhaus was wearing?

13       A    Yes, sir.

14       Q    Do you know if this was the same holster?

15       A    I do not know, I know that looks to be the

16   same type holster.

17       Q    Do you know if this was the same holster

18   that you saw in his house when you performed the

19   search warrant?

20       A    No, sir, I do not.

21       Q    But it looks like that same type of holster?

22       A    Yes, sir, it looks like it.

23       Q    And I show you a nine millimeter pistol that

24   was in Exhibit 27.  Do you recognize this?

25       A    Yes, sir, it's a High Point nine millimeter
```

Weinhaus, Vol. 1

```
 1   semiautomatic pistol.
 2       Q   Was this the pistol that the defendant had
 3   on him on September 11th?
 4       A   I believe so.  I did not seize the weapon
 5   but it looks like it.
 6       Q   But it looks like the same weapon?
 7       A   Yes, sir.
 8           MR. PARKS:  Your Honor, I would ask that
 9   State's Exhibit 27 be admitted into evidence.
10           MR. EASTWOOD:  No objection.
11           JUDGE SUTHERLAND:  State's Exhibit 27 is
12   admitted.
13       Q   (By Mr. Parks) Could you take this holster,
14   please.  Could you show the jury how the defendant
15   was wearing this holster on September 11th.
16       A   May I stand, sir?
17       Q   Sure, please.  And you're doing something
18   with the weapon now, what is that?
19       A   This is the belt loop catch, so I'm just
20   lifting up the belt loop catch so I can insert the
21   holster onto my belt.
22       Q   And they have a little -- it has a spring
23   load there that catches back in so it won't fall off
24   your belt; is that right?
25       A   Yes, sir, it has a safety device, I didn't
```

1   clip it but it clips back into the metal.

2        Q    When a weapon is in that holster, how do you

3   get the weapon out?

4        A    In order to retrieve the weapon, you have to

5   pull this black plastic ring here all the way down

6   until the metal clip here breaks free of all the

7   way -- it's secured underneath this plastic all the

8   way into here, so that piece of metal has to come

9   all the way down for the flap to disengage.

10       Q    And when you first saw the defendant, how

11  was the flap of the holster?

12       A    It was secure and the weapon was secured.

13       Q    What did you see the defendant do to this

14  holster?

15       A    I saw him manipulate the flap, pull the flap

16  back and place his hand on the buttstock of the

17  weapon.

18       Q    And then what did he do with the weapon?

19       A    He began to draw the weapon out after he

20  made the comment "you're going to have to shoot me,

21  man", and he drew the weapon out to here where he

22  was just not able to yet cant it forward when I

23  fired.

24       Q    Thank you.  Now after the defendant fell, or

25  let me rephrase that.  How did the defendant fall

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  after he had been shot?
 2      A   I fired two shots to his head, one -- two
 3  shots to his chest and one to his head, and I began
 4  to scan left.  I heard some screaming at the gas
 5  station, and I did not know if there were other
 6  people involved.  Mr. Weinhaus stated he was going
 7  to bring people with him and that he would not be
 8  alone, so I did not know if I hadn't shot one of
 9  those people at the gas station.  So I began to look
10  towards the gas station and scan for other threats
11  when I heard a loud gunshot to my right towards the
12  area where Mr. Weinhaus was standing.  At that point
13  I traversed my weapon back to the right, and I had
14  already taken a step forward and to the left, and I
15  fired one last shot to his head.
16      Q   And did he fall backwards, did he fall
17  forwards, how did he fall?
18      A   When I fired the last shot to his head, he
19  had the weapon in his right hand, the weapon was in
20  his hand, his head immediately flinched back and he
21  dropped violently straight towards the ground and
22  piled up with his arms underneath his chest with his
23  buttocks in the air and his legs kind of tucked
24  underneath him a little bit, almost like a toddler
25  sleeps.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    And where was the weapon at this time?

 2      A    The weapon was underneath him, I presume,

 3  because I couldn't see it.

 4      Q    What did you do?

 5      A    At that point I continued to scan and see if

 6  I saw anyone else with a weapon or anything else.

 7  The FBI agent was running towards me, Mike

 8  Maruschak.  I asked him to cover me as I moved

 9  forward, and I rolled Mr. Weinhaus over onto his

10  left side, and I saw the weapon was lying underneath

11  him, just out of the holster.  The buttstock of the

12  weapon was still in his fingertips; however, none of

13  his fingers were near the trigger guard or trigger

14  housing, and I could clearly see that he was totally

15  incapacitated.  He was totally limp.

16      Q    What did you do then?

17      A    I still had my weapon in my left hand.  I

18  took the weapon from underneath him and jammed it

19  down into the holster.

20      Q    Why did you do that?

21      A    Because I knew that better than to throw it

22  or tuck it in my waist band and shoot myself or have

23  an accidental discharge, I was really nervous, so I

24  jammed the weapon into the holster because I knew it

25  would be secure there, there was no way it could go
```

 1  off.

 2       Q    What did you do with the holster?

 3       A    I asked for Mike Maruschak to cover me and

 4  he assumed the position of cover pointing his weapon

 5  towards Mr. Weinhaus.  I reached down and clipped

 6  those clips that you saw me clip before, and I threw

 7  the whole thing behind me.

 8       Q    The holster and the weapon behind you?

 9       A    Yes, sir, and then I handcuffed

10  Mr. Weinhaus.

11       Q    Did you then call for an ambulance?

12       A    Almost immediately I had yelled after I

13  handcuffed him to call for an ambulance, and Mike

14  Maruschak, the FBI agent, told me he would.  And at

15  that point Corporal Mertens yelled from beside the

16  car that he had already called, they were on the

17  way.

18       Q    I show you now what has been marked as

19  State's Exhibit No. 15.  Do you recognize this?

20       A    Yes, sir.

21       Q    What do you recognize this to be?

22       A    It is a copy of the watch video that was

23  discovered later that Mr. Weinhaus was wearing.  I

24  never saw it, it was some type of digital watch that

25  recorded.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        Q    You didn't see the watch but you've seen the

 2   video?

 3        A    I've seen the video, yes, sir.

 4        Q    Is this a fair and accurate representation

 5   of the video taken from the wrist watch video/audio

 6   camera?

 7        A    Yes, sir, it is.

 8             MR. PARKS:  At this time I would ask that

 9   State's Exhibit 15 be admitted into evidence.

10             MR. EASTWOOD:  I would just ask that

11   Mr. Parks provide a little more foundation in the

12   sense that this was the watch that was worn at the

13   scene as well.  So let me just get that in for the

14   record.

15             MR. PARKS:  I have to do that with another

16   witness, Your Honor, because this witness does not

17   know anything about the wrist watch video at the

18   scene.

19             JUDGE SUTHERLAND:  We ought to wait then.

20             MR. EASTWOOD:  I will not object, then, to

21   the contents of the video itself.

22             JUDGE SUTHERLAND:  State's Exhibit 15 then

23   is admitted.

24             MR. PARKS:  And I ask permission to play the

25   video at this time.
```

1          MR. EASTWOOD:  No objection.

2          JUDGE SUTHERLAND:  Not too long, I guess?

3          MR. PARKS:  About nine minutes.

4          (WHEREUPON THE VIDEO WAS SHOWN)

5      Q   (By Mr. Parks) Sergeant Folsom, is the rest

6  of the video of the ambulance personnel arriving and

7  performing medical procedures on the defendant?

8      A   Yes.  Prior to that there's some of Scott

9  Mertens and I -- Scott Mertens tried to provide

10 medical aid to Mr. Weinhaus while I secured the

11 scene.

12         JUDGE SUTHERLAND:  I assume there's no

13 representation that the date that was showing on the

14 video was accurate?

15         MR. PARKS:  No, Your Honor.

16     Q   (By Mr. Parks) And Sergeant Folsom, I show

17 you what has been marked as State's Exhibit No. 16.

18 Can you identify that, please?

19     A   That is the location of the shooting.

20 There's Corporal Mertens' white patrol car and

21 Mr. Weinhaus' green Subaru.

22     Q   And are those in the same position as on

23 State's Exhibit 13?

24     A   Yes, same as on the diagram.

25     Q   And I show you State's Exhibit 17, do you

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 1

1   recognize this?

2       A    Yes, sir.

3       Q    What is this a photo of?

4       A    It's a photo of the other side of the

5   vehicle.  It's a different angle of the crime scene

6   there at the gas station.

7       Q    And I show you State's Exhibit No. 18, do

8   you recognize this?

9       A    Yes, sir, that is a different angle of the

10  same area, same vehicles.

11      Q    And I show you State's Exhibit No. 19, do

12  you recognize this?

13      A    Yes, sir, that is another angle of the

14  vehicles there in the parking lot.

15      Q    And I show you State's Exhibit No. 14, do

16  you recognize this?

17      A    Yes, sir, that is -- looks like a more

18  distant shot of the area.

19      Q    And these are showing the cars, Corporal

20  Mertens' car and the defendant's car as they were on

21  the day of September 11th, 2012?

22      A    Yes, sir, it does.

23      Q    And do these photographs fairly and

24  accurately represent the way the scene was?

25      A    Yes, sir, they do.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q   Now there's some Highway Patrol and county

2    vehicles in these photographs, but those vehicles

3    came afterwards; is that correct?

4    A   Yes, sir.

5    Q   But these vehicles would be fair and

6    accurate representations of the scene as you saw it

7    that day?

8    A   Yes, sir, it would.

9        MR. PARKS:  Your Honor, I would ask that

10   State's Exhibits 14, 16, 17, 18 and 19 be admitted

11   into evidence.

12       MR. EASTWOOD:  Can I look at them, please,

13   Judge?

14       JUDGE SUTHERLAND:  Yes.

15       MR. EASTWOOD:  No objection, Your Honor.

16       JUDGE SUTHERLAND:  State's Exhibits 14, 15,

17   16, 17 and 18 are admitted.  Did you offer 19 or

18   just 18?

19       MR. PARKS:  18 and 19.

20       JUDGE SUTHERLAND:  18 and 19 are admitted.

21   Q   (By Mr. Parks) I'm going to show you here

22   State's Exhibit No. 14.  Do you see in this picture

23   the propane tanks that you were talking about?

24   A   Yes, sir, here along the building there's an

25   ice machine as well as to the left of it is the cage

Weinhaus, Vol. 1

```
 1    of propane.

 2        Q    And you would have been coming from the

 3    passenger side of the white car, here on State's

 4    Exhibit 13, you would have gotten out of the

 5    passenger side of the white car; is that correct?

 6        A    Yes, sir.

 7        Q    And you would have come around to an area

 8    approximately here?

 9        A    Yes, sir.

10        Q    And this is where you said the defendant got

11    out of his car and was standing approximately here?

12        A    He was standing by the driver's door of his

13    vehicle.

14        Q    Right here?

15        A    Yes, sir.

16        Q    And those are -- you can tell where he was

17    standing by the debris that was left from the

18    medical personnel, is that correct, in those

19    photographs?

20        A    The medical debris represents where he fell.

21    I don't believe it would indicate exactly where he

22    was standing.  He was standing more towards the

23    vehicle, and the medical debris is more towards the

24    left.

25        Q    And you told Corporal Mertens to pop his
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   trunk and he did so here?

 2       A   Yes, sir, he went back to the trunk.

 3       Q   From your position here you're looking over

 4   toward -- right in here is where you saw those gas

 5   tanks; is that correct?

 6       A   Yes, sir, there's gas tanks, people and gas

 7   pumps there.

 8       Q   So you left the cover of your car, moved to

 9   the left so that you wouldn't be firing directly

10   into the gas pumps or the gas tanks; is that

11   correct?

12       A   That is a correct statement; however, you

13   pointed the pointer at the back of our car and I

14   moved from the back of Mr. Weinhaus' car to change

15   the angle.

16       Q   Over into this area?

17       A   Yes, so that my shots would go into the area

18   between the FBI car and the curb.

19       Q   And could you come down and mark on here

20   where you ended up?

21       A   Where I ended up standing up during the

22   shooting, sir?

23       Q   Yes.

24       A   I ended up somewhere in here.  I was

25   originally here.

Weinhaus, Vol. 1

```
 1      Q    And where was the defendant standing?
 2      A    Here.
 3      Q    Put a D there.  And the O is where you
 4   started and the X is where you ended up?
 5      A    Yes, sir.
 6           MR. PARKS:  Your Honor, I have no more
 7   questions of this witness at this time.
 8           JUDGE SUTHERLAND:  I told the jury we'd
 9   recess around 5:00 give or take, and we're right
10   around 5:00, so I think we're going to recess.
11   Sergeant Folsom, I'll have to ask you to come back
12   tomorrow morning.  Ladies and gentlemen, you may
13   have noticed that this particular room is sometimes
14   more like a dictatorship than a democracy.  I want
15   to return a little democracy to the proceeding.  Can
16   we start a little early tomorrow?  Is it okay if we
17   start at 8:30?  Anybody got a problem with that?
18   You have a little question mark on your face, is
19   that a problem, Ms. Stack, is that okay?  If that's
20   all right, we'll start at 8:30.  The earlier we get
21   started, the earlier we'll get done whenever we get
22   done.  If you could be in the jury room perhaps 15
23   minutes before that, 8:15 or so, so we can get a
24   head count and make sure everybody is here, give you
25   a chance to go to the restroom if you need to before
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    we start at 8:30 if that's okay, gentlemen?
 2            MR. PARKS:  Yes, sir.
 3            MR. EASTWOOD:  Yes, sir.
 4            JUDGE SUTHERLAND:  The Court reminds you
 5    until you retire to consider your verdict, you must
 6    not discuss this case among yourselves, with others
 7    or permit anyone to discuss it in your hearing.  You
 8    should not form or express any opinion about this
 9    case until it is finally given to you to decide.  Do
10    not do any research or investigation on your own
11    about any matter regarding this case or anyone
12    involved with the trial.  Do not communicate with
13    others about the case by any means.  Do not read,
14    view or listen to any newspaper, radio, electronic
15    communication from the Internet or television report
16    of the trial.  I show it's about 4:59 p.m.  We're in
17    recess until 8:30 a.m. tomorrow morning.
18            (COURT RECESSED FOR THE DAY)
19
20
21
22
23
24
25
```

Weinhaus, Vol. 1

```
 1  State of Missouri
 2                  SS.
 3  County of Franklin
 4      I, Kim Wrocklage, duly commissioned, qualified
 5  and authorized to administer oaths and to certify to
 6  depositions, do hereby certify that pursuant to
 7  agreement in the civil cause now pending and
 8  undetermined in the Circuit Court of Franklin
 9  County, State of Missouri, to be used in the trial
10  of said cause in said court, I was attended at the
11  Franklin County Justice Center, 401 E. Main Street,
12  Union, in the County of Franklin, State of Missouri
13  on the 8th day of October, 2014.
14      The said witnesses were sworn to testify the
15  truth, the whole truth, and nothing but the truth in
16  the case aforesaid and thereupon testified as is
17  shown in the foregoing transcript.  Said testimony
18  was reported by me in shorthand and caused to be
19  transcribed into typewriting, and the foregoing
20  pages correctly set forth the testimony of the
21  aforementioned witnesses, together with the
22  questions propounded by counsel and remarks and
23  objections of counsel thereto, and is in all
24  respects a full, true, correct and complete
25  transcript.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      I further certify that I am not of counsel or

2  attorney for either of the parties to said suit, not

3  related to nor interested in any of the parties or

4  their attorneys.

5

6      _____/s/ Kim Wrocklage_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25