Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

**STATE OF MISSOURI**

ED100807

**vs.**

**JEFFREY WEINHAUS**

**VOLUME** 2

**BEFORE THE HONORABLE JUDGE KEITH SUTHERLAND**

**TRANSCRIPT OF TRIAL TESTIMONY**

**TAKEN OCTOBER 9TH, 2013**

**REPORTED BY KIM WROCKLAGE, CCR**



**WROCKLAGE REPORTING, LLC**

**467 BROOKFIELD DRIVE - WASHINGTON, MO 63090**

**(636) 583-1953 or (314) 210-6917**

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1            IN THE CIRCUIT COURT OF FRANKLIN COUNTY

2                     STATE OF MISSOURI

3

4   STATE OF MISSOURI,

5              PLAINTIFF,        ED100807

6   vs.                    No. 12AB-CR02409-01

7   JEFFREY WEINHAUS,

8              DEFENDANT.

9

10        Volume 2, Trial Testimony taken at the

11  Franklin County Justice Center, 401 E. Main Street,

12  Union, in the County of Franklin, State of Missouri,

13  on the 9th day of October, 2013, before Kim

14  Wrocklage, CCR.

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4   Mr. Robert "Bob" Parks

 5   Franklin County Prosecuting Attorney's Office

 6   20 N. Church Street, 2nd Floor

 7   Union, MO 63084

 8   (636) 583-6370

 9

10   FOR THE DEFENDANT:

11   Mr. Hugh A. Eastwood (heastwood@eastwoodlawstl.com)

12   Law Offices of Hugh A. Eastwood

13   7777 Bonhomme, Ste. 1603

14   Clayton, MO 63105

15   (314) 727-3533

16

17   Mr. Christopher M. Combs (combschris1@gmail.com)

18   Law Offices of Christopher M. Combs

19   4542 West Pine Blvd.

20   St. Louis, MO 63108

21   (314) 578-1465

22

23   ALSO PRESENT: Jeffrey Weinhaus

24

25
```

```
 1                    INDEX OF EXAMINATION

 2                         Voir Dire

 3    On Behalf of the State          Page 29,   Line 25

 4    On Behalf of the Defendant      Page 77,   Line 20

 5

 6                    Opening Statement

 7    On Behalf of the State          Page 151, Line 3

 8    On Behalf of the Defendant      Page 157, Line 17

 9

10                    Sergeant Folsom

11    Direct Examination by Mr. Parks    Page 166, Line 17

12    Continued Direct by Mr. Parks      Page 205, Line 16

13    Cross Examination by Mr. Eastwood  Page 249, Line 5

14    (Vol. 2)

15

16                     Matthew Fox

17    Direct Examination by Mr. Parks    Page 192, Line 14

18    Cross Examination by Mr. Eastwood  Page 198, Line 3

19    Redirect Examination by Mr. Parks  Page 204, Line 17

20

21               Corporal Mertens (Volume 2)

22    Direct Examination by Mr. Parks    Page 374, Line 22

23    Cross Examination by Mr. Eastwood  Page 397, Line 17

24    Redirect Examination by Mr. Parks  Page 445, Line 12

25    Recross Exam by Mr. Eastwood       Page 447, Line 17
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              INDEX OF EXAMINATION CONTINUED

 2

 3                 Sergeant Perry Smith

 4  Direct Examination by Mr. Parks    Page 450, Line 11

 5  Cross Examination by Mr. Eastwood  Page 460, Line 21

 6

 7                 Corporal Jeff White

 8  Direct Examination by Mr. Parks    Page 482, Line 24

 9  Cross Examination by Mr. Eastwood  Page 493, Line 18

10  Redirect Examination by Mr. Parks  Page 531, Line 5

11  Recross Exam by Mr. Eastwood       Page 532, Line 14

12

13              Marty Leach (Volume 3)

14  Direct Examination by Mr. Eastwood Page 563, Line 4

15  Cross Examination by Mr. Parks     Page 573, Line 20

16  Redirect Exam by Mr. Eastwood      Page 576, Line 2

17  Recross Examination by Mr. Parks   Page 578, Line 16

18  Further Direct by Mr. Eastwood     Page 580, Line 11

19

20                 Steve Everhart

21  Direct Examination by Mr. Combs    Page 581, Line 14

22  Cross Examination by Mr. Parks     Page 591, Line 2

23  Redirect Examination by Mr. Combs  Page 592, Line 19

24

25
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          INDEX OF EXAMINATION CONTINUED

2

3                     Heather Clark

4    Direct Examination by Mr. Eastwood Page 593, Line 22

5    Cross Examination by Mr. Parks      Page 601, Line 3

6

7                     Closing Argument

8    By Mr. Parks          Page 614, Line 11

9    By Mr. Eastwood       Page 622, Line 4

10   By Mr. Parks          Page 637, Line 2

11

12                    Guilt Verdict

13   By Judge Sutherland Page 650, Line 17

14

15        Opening Statement Punishment Phase

16   By Mr. Parks          Page 664, Line 5

17   By Mr. Eastwood       Page 664, Line 21

18

19          Testimony by Sergeant Folsom

20   By Mr. Parks          Page 665, Line 6

21

22        Testimony by Judy Kropf Weinhaus

23   By Mr. Eastwood       Page 671, Line 19

24

25

```
1                   INDEX OF EXAMINATION CONTINUED

2

3                   Closing Argument Punishment Phase

4     By Mr. Parks          Page 676, Line 17

5     By Mr. Eastwood       Page 678, Line 6

6     By Mr. Parks          Page 679, Line 25

7

8                   Sentencing Verdict

9     By Judge Sutherland Page 682, Line 8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              INDEX OF EXHIBITS ADMITTED

 2    State's Exhibit

 3    1 - You Tube Video w/o Captions, Pg. 170

 4    1A- You Tube Video with Captions, Pg. 170

 5    2 - Search Warrant, Pg. 178

 6    3 - Photo of Gun/Holster, Pg. 181

 7    4 - Photo of Gun, Pg. 181

 8    5 - Photo of Command Center, Pg. 183

 9    6 - Photo Contents of Drawer, Pg. 186

10    7 - Photo Individual Items, Pg. 186

11    8 - Photo of Pills in Case, Pg. 186

12    11- Photo of Marijuana Bag, Pg. 214

13    13- Diagram of Scene, Pg. 211

14    14- Photo of Scene from End of Parking Lot, Pg. 233

15    15- Watch Video, Pg. 233

16    16- Photo Position of Cars, Pg. 233

17    17- Photo Driver's Side of Cars, Pg. 233

18    18- Photo Behind Green Car, Pg. 233

19    19- Photo Passenger's Side of White Car, Pg. 233

20    20- Photo Markers for Shell Casings, Pg. 453, Vol. 2

21    21- Photo Holster, Pg. 453, Vol. 2

22    22- Photo Pistol/Holster, Pg. 453, Vol. 2

23    23- Photo of 22 Clipped to Box, Pg. 453, Vol. 2

24    24- Photo of Barrel of Shotgun, Pg. 453, Vol. 2

25    25- Photo of Shotgun Covered in Back Seat, Pg. 453
```

Weinhaus, Vol. 2

1              INDEX OF EXHIBITS ADMITTED CONTINUED

2

3     State's Exhibit

4     26- Photo of Shotgun After Recovery, Pg. 453, Vol. 2

5     27- Pistol and Holster, Pg. 225, Vol. 1

6     31- Lab Report, Pg. 197, Vol. 1

7     32- Statement by Marty Leach, Page 575, Vol. 3

8

9     Defendant's Exhibit

10    B- Notarized Statement by Mr. Leach, Pg. 577, Vol. 3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 2

```
 1          JUDGE SUTHERLAND:  Is Sergeant Folsom ready
 2   to take the stand again.  We concluded your direct
 3   examination yesterday afternoon.  This will begin
 4   cross examination.
 5          CROSS EXAMINATION OF SERGEANT FOLSOM
 6   QUESTIONS BY MR. EASTWOOD:
 7      Q   Thank you, Your Honor.  Good morning,
 8   Sergeant Folsom.
 9      A   Good morning, sir.
10      Q   What did you do today or yesterday or the
11   days before this trial to prepare for your testimony
12   for this trial?
13      A   I read the reports that were written, as
14   well as some of my deposition, and reviewed the
15   videos again.
16      Q   This was the deposition that I took of you?
17      A   Yes, sir.
18      Q   And you've been deposed before, have you?
19      A   Yes, sir.
20      Q   So you're familiar with the process and how
21   it works?
22      A   Yes, sir.
23      Q   And that you were under oath when you take a
24   deposition?
25      A   Yes, sir.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    And when I took your deposition, we reviewed
 2   some of the reports in this case.  We reviewed the
 3   report that you made; is that right?
 4      A    I believe so, yes, sir.
 5      Q    And you also reviewed a report that Perry
 6   Smith made, he's a Highway Patrolman who was the
 7   investigator into the shooting of Jeff Weinhaus; is
 8   that correct?
 9      A    Yes, sir.
10      Q    And you had a chance to review those
11   reports?
12      A    Yes, sir.
13      Q    And you told me at the time that you thought
14   they were pretty accurate and complete; is that fair
15   to say?
16      A    Yes, sir.
17      Q    And you also told me that you wouldn't
18   change anything, at least to your mind; is that
19   correct?
20      A    Yes, sir.
21      Q    And you also told me that you didn't think
22   there were any omissions, glaring omissions from the
23   reports; is that correct?
24      A    I don't remember us using the word
25   omissions, but I said that I wouldn't change
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   anything, that they seemed to be a fair and accurate

2   representation of what was said.

3        Q    Well, let me ask you now then.  To your mind

4   was anything missing?

5        A    Not that I recall, no, sir.

6        Q    Nothing big?

7        A    No, sir.

8        Q    Nothing important, okay.  Did you talk with

9   Mr. Parks before you gave your testimony yesterday?

10       A    Yesterday, yes, sir.

11       Q    What did you talk about?

12       A    We talked about the case and the order of

13   the witnesses and basically how the trial was going

14   to go and some things about the courthouse.  And we

15   had a meeting before that about my testimony.

16       Q    Did you talk about the strategy for the

17   prosecution of Jeff Weinhaus?

18            MR. PARKS:  Objection, Your Honor, that

19   calls for conclusion based upon the witness and gets

20   into the trial strategy of the prosecutor.

21            JUDGE SUTHERLAND:  Sustained.

22       Q    (By Mr. Eastwood) Did you talk with

23   Mr. Parks about what testimony you gave yesterday

24   before you gave that testimony?

25       A    We talked about the investigation and what

Weinhaus, Vol. 2

1   happened yesterday, yes, sir.

2       Q   Sergeant Folsom, how long have you been with

3   the Highway Patrol?

4       A   I came on in January of 1997, so 16 plus

5   years.

6       Q   And before that I think you testified

7   yesterday you were in the military?

8       A   Yes, sir.

9       Q   You were a military police officer?

10      A   Yes, I had three basic positions while I was

11  in the military, three different positions.

12      Q   And I think you also yesterday, correct me

13  if I'm wrong, you also termed yourself to be a body

14  guard; is that fair to say?

15      A   I was assigned to another Department of

16  Defense agency for a year.  I was also on the

17  personal security detail for the Secretary of

18  Defense, as well as the Joint Chairman Chief of

19  Staff, Colin Powell, during my time in the military.

20  I served a little over a year on that detail.

21      Q   What type of training did you have for that

22  type of work as a body guard for those officials?

23      A   Mostly close interpersonal security

24  training, different types of formations, convoys,

25  movements, advanced driving techniques, often to

Weinhaus, Vol. 2

```
 1    where we took -- the people that we protected were

 2    in hostile regions, so we had a lot of specific

 3    training on driving as well as hand-to-hand

 4    interpersonal type skills and combat, if you will.

 5         Q    What type of hand to hand stuff?

 6         A    Mostly in our job we did a lot of disarming

 7    techniques.  We also did a lot of practice drills

 8    and moving the protected person or basically

 9    stepping in front of a person with a weapon.

10         Q    And presumably because sometimes people want

11    to kill these U.S. Government officials; is that

12    fair to say?

13         A    Yes, sir.

14         Q    What's your current rank with the Highway

15    Patrol?

16         A    I'm a sergeant.

17         Q    How long have you had that position?

18         A    I believe since 2005.

19         Q    Is it fair to say you are Corporal Mertens'

20    supervisor?

21         A    Yes, sir.

22         Q    How long have you been his supervisor?

23         A    I think -- I believe my partner retired

24    January 1 of 2006, and I became his supervisor then.

25         Q    So when you say your partner, were you
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    working with Corporal Mertens before then as well?

 2        A   No, I worked with an individual named

 3    Sergeant Ralph O'Rourke, who was my supervisor.

 4        Q   How long have you been with Corporal

 5    Mertens?

 6        A   I believe, and you'd have to check with him,

 7    but I believe we've been together five or six years

 8    now.

 9        Q   Are you currently on active duty with the

10    Highway Patrol?

11        A   I'm currently employed by the Highway

12    Patrol; however, I'm on extended medical leave at

13    the moment.

14        Q   How long have you been on extended medical

15    leave?

16        A   Basically since this incident.

17        Q   Are you working a desk job at all?

18        A   No, there has been no job provided for me.

19        Q   Are you allowed to wear a Highway Patrol

20    uniform when you're on leave?

21        A   No, sir, I'm not.

22        Q   Are you allowed to carry a gun?

23        A   I do not carry a gun.

24        Q   And that's ever since you shot Jeff

25    Weinhaus?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1     A   Yes, sir.

2     Q   Have you ever been disciplined by the

3   Highway Patrol?

4     A   I received a written reprimand from Captain

5   Replogle at the time, yes, sir.

6     Q   Do you have any discipline on your law

7   enforcement license from the State of Missouri?

8     A   No, sir.

9     Q   And you're not still carrying a gun?

10     A   I do not carry a gun, no, sir.

11     Q   I want to turn now to the case that we're

12   here for today, which is it fair to say it's almost

13   three cases, there's a You Tube case, there's the

14   house visit case and there's the MFA gas station

15   case?

16     A   Yes, sir.

17     Q   Let's start in time, we'll start first with

18   the You Tube video.  I know the jury saw that video

19   yesterday, they saw two versions of it.  They saw

20   one with captions or what You Tube technically calls

21   annotations and one without captions.  And what

22   version did you review of that video?

23     A   Initially?

24     Q   Yes, sir.

25     A   Initially I reviewed the first version with

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  no captions after I received the call from Judge

 2  Parker.

 3      Q    And when you reviewed that video, did you

 4  ever hear Jeff Weinhaus state Judge Kelly Parker's

 5  name on that video?

 6      A    No, sir, I did not.

 7      Q    No mention of Judge Parker by name?

 8      A    No, sir, not to my knowledge.

 9      Q    Who gave you that pod cast or we would call

10  it a pod cast, is that fair to say we'll call it a

11  pod cast?

12      A    Yes, sir.

13      Q    Who gave you that pod cast?

14      A    I found it on You Tube where they told me I

15  could find it.

16      Q    You just went online and it was there?

17      A    Yes, sir.

18      Q    Do you recall how many views it had?

19      A    No, sir.

20      Q    I think the one we saw yesterday had over

21  7,000 views, do you disagree with that?

22      A    I do not disagree with it but I do not

23  recall any number.

24      Q    And then when did you see the pod cast with

25  captions?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    On Saturday, which I believe was the 18th, I
 2   reviewed the pod cast Monday morning with the FBI
 3   and it was probably Monday around 9:30 a.m., which
 4   would be the 20th, and I saw the captions then.
 5        Q    And these dates, could you refer, let the
 6   jury know what month and year we're talking about?
 7        A    August.
 8        Q    Of?
 9        A    2012, sorry.
10        Q    Just so we're all clear.  And when you saw
11   the video that had captions, did you make any
12   investigation into why one video had captions and
13   one did not?
14        A    No, I didn't make any investigation into why
15   one had them or not.  I just made sure we had copies
16   of both.  I contacted our forensic computer unit and
17   I had them download from the Internet copies of both
18   so we could receive them and hold them for evidence.
19        Q    Did you make any investigation into who put
20   those captions on the video?
21        A    No, sir, I did not.  We just saved the
22   videos as they were.
23        Q    You don't know who put the captions on the
24   video, do you?
25        A    No, sir, I do not.
```

Weinhaus, Vol. 2

```
 1        Q    Did you make any investigation into who had
 2   access or privileges to post to the Bulletinman
 3   account on You Tube?
 4        A    No, sir.
 5        Q    Do you know if anyone else from the Highway
 6   Patrol did?
 7        A    I know that Sergeant J. Pragman documented
 8   the things on the website and accessed the website,
 9   but he'd probably have to answer that.  I know he
10   did some investigating into the website itself but I
11   did not.
12        Q    That's Sergeant J. Pragman?
13        A    Yes, sir, he's with the Missouri State
14   Highway Patrol forensic computer unit.
15             JUDGE SUTHERLAND:  How do you spell that?
16             THE WITNESS:  P-R-A-G-M-A-N OR M-E-N, I
17   believe, sir.
18        Q    (By Mr. Eastwood) Is he in Jeff City or
19   Rolla?
20        A    He's in Jeff City.
21        Q    That's kind of the headquarters?
22        A    Yes, sir, and he's mentioned in the reports.
23        Q    Did you make any investigation into how many
24   versions of the You Tube video, and I guess when I
25   say versions, the two versions, the one with the
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   captions and one without the captions, were posted

 2   online at that time in August of 2012?

 3       A    No, sir, I did not.

 4       Q    Now, based on just your experience and

 5   common sense, do you agree that You Tube is a public

 6   website that basically anyone with an Internet

 7   connection can go to?

 8          MR. PARKS:  Objection, Your Honor, we're

 9   getting into our motion in limine, I believe.

10          JUDGE SUTHERLAND:  Overruled, he can answer.

11          THE WITNESS:  I do believe a You Tube site

12   can be accessed by anyone with an Internet access

13   anywhere.

14       Q    (By Mr. Eastwood) From home, the library,

15   anywhere?

16       A    Yes, sir, to my knowledge.

17       Q    It's kind of a public place online?

18       A    Yes, sir.

19       Q    Did you make any investigation into whether

20   either version of the pod cast, the one with the

21   captions, the one without the captions, was ever

22   sent by Jeff to Judge Parker in any form?

23       A    To my knowledge Judge Parker never received

24   anything from Mr. Weinhaus.

25       Q    So he never, to your knowledge, Jeff never

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  mailed a CD-Rom or printed out a transcript or

2  anything like that and sent it directly to the

3  Judge?

4      A   To my knowledge he did nothing of that

5  nature.

6      Q   And nothing in the Highway Patrol

7  investigation would show that to your knowledge?

8      A   No, there was nothing that showed that.

9      Q   Did you investigate whether Jeff Weinhaus

10 had any cases or proceedings in front of Judge Kelly

11 Parker?

12     A   As part of my investigation I accessed

13 Casenet and I looked at past and previous cases

14 involving Jeff Weinhaus and I did not see any active

15 cases.

16     Q   So did you investigate -- so no cases in

17 front of Judge Parker?

18     A   To my knowledge there were no cases in front

19 of Judge Parker.

20     Q   Did you investigate whether anyone in Jeff's

21 family or his friends or associates or people in his

22 life had a case or proceeding in front of Judge

23 Parker?

24     A   No, sir, I did not.

25     Q   Do you know or did you investigate whether

1    any case in front of Judge Parker, whether Jeff had

2    a stake in the outcome, and if you want me to

3    clarify that question, I can.

4        A    Please do so.

5        Q    Do you know of any case in front of Judge

6    Parker in August of 2012 where Jeff might get money

7    from the case if it went one way or the other?

8        A    No, I did not know of any such agreement or

9    motivation or anything of that nature.

10       Q    Do you know of any case before Judge Parker

11   where someone that Jeff knew might lose their

12   liberty, might go to jail?

13       A    No, I did not know anything about any of the

14   cases that Judge Parker had before him.

15       Q    Did you know if Jeff ever posted online a

16   map of Judge Parker's home or his courthouse?

17       A    Not to my knowledge.

18       Q    Do you know if he ever posted even an

19   address for that online?

20       A    Not to my knowledge, I didn't see any type

21   of address or anything.

22       Q    Now you've watched the video a few times;

23   right?

24       A    Yes, sir.

25       Q    And so I'm not going to play it for the jury

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  again right now, if we can avoid it, just because I

2  think we've seen it a couple of times and I want to

3  move things along here, but as I watched the video,

4  Jeff Weinhaus never actually states that he would

5  execute Judge Parker; is that correct?

6       A   I do not recall that he stated he would

7  execute anyone.

8       Q   I think he said a jury of Judge Parker's

9  peers would try and execute him; is that fair to

10 say?

11      A   That would be fair to say.

12      Q   So not Jeff, a jury of his peers?

13      A   That is the way I recall it being stated in

14 the video, yes, sir.

15      Q   In the course of your investigation --

16 strike that.

17       Sergeant Folsom, do you think that context

18 matters in speech?

19       MR. PARKS:  Objection, Your Honor, calls for

20 speculation on the part of the witness.

21       JUDGE SUTHERLAND:  Sustained.

22      Q   (By Mr. Eastwood) Well, when you were

23 investigating Jeff Weinhaus' You Tube video, did you

24 think it mattered where the statement was made,

25 whether it was made online or whether it was made

Weinhaus, Vol. 2

```
 1   say to Judge Parker's face?

 2       A   I did not think it mattered where the

 3   statement occurred, as Judge Parker felt threatened

 4   by it.

 5           MR. EASTWOOD:  Move to strike the last

 6   portion of that testimony.  I think that's hearsay?

 7           JUDGE SUTHERLAND:  Motion to strike is

 8   denied, go ahead.

 9       Q   (By Mr. Eastwood) Do you know if Jeff ever

10   did make the statement directly to Judge Parker?

11       A   I have no knowledge that Jeff ever spoke to

12   anyone.

13       Q   Do you know if Jeff ever had knowledge that

14   Judge Parker heard his You Tube broadcast?

15       A   I know that I talked to him during the time

16   that some judicial officials, I did mention Judge

17   Parker by name, felt threatened, and we talked about

18   the video when I was at his house.

19       Q   So you told Jeff that Judge Parker had heard

20   the video?

21       A   Yeah, as well as some other people.

22       Q   To your mind is there a difference between

23   Jeff sending Judge Parker an email that says I'm

24   going to execute you versus making a public video

25   that says if you don't resign in a month, you'll be
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  put on trial by a jury of your peers and executed in

 2  terms of your evaluation of the threat?

 3      A   Yes, there is a difference in my opinion.

 4      Q   And would you agree that it's a lot more

 5  serious for Jeff to send an email directly to Judge

 6  Parker and say I'm going to execute you?

 7      A   Yes, sir.

 8      Q   A lot more threatening?

 9      A   Yes, sir.

10      Q   The video doesn't say how or when anyone

11  would actually execute Judge Parker; right?

12      A   The only date referred to is the September

13  17th date in the video.

14      Q   But it's pretty vague on the details of this

15  threat, is that fair to say, other than the date?

16      A   Yes, sir, it is very vague.

17      Q   And normally in your custom and practice as

18  a law enforcement officer, when you make an

19  investigation, you look into things like means,

20  motive, opportunity; right?

21      A   Yes, sir.

22      Q   And did you know of any means or motive or

23  opportunity that Jeff Weinhaus personally had to

24  execute Judge Parker?

25      A   I did not know what his motivation was or
```

Weinhaus, Vol. 2

```
 1   his actual means.  I just saw what I saw on the You

 2   Tube video and was asked to investigate it.

 3        Q    And normally means, motive and opportunity,

 4   those things are really important in a criminal

 5   investigation; right?

 6        A    Yes.

 7        Q    Did you ever hear the joke what do you call

 8   100,000 lawyers at the bottom of the sea, answer, a

 9   good start?

10        A    Yes, my wife is an attorney, so I've heard a

11   lot of lawyer jokes.

12        Q    Do you think that's a threat?

13        A    No, sir.

14        Q    Why not?

15        A    It's a comedy, a joke that everyone has

16   heard lots of times.

17        Q    Do you think that some people could think

18   that Jeff's video was a joke?

19        A    I think there probably are some people who

20   would think it was a joke; however, I think the

21   majority of people who view that people were

22   offended.

23        Q    When you say the majority, how many people

24   did you talk to about this video?

25        A    Several, more than 20.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    Let's turn next to the day that you visited

 2 Jeff's home in Piney Park.  Who lives in that house?

 3      A    To my knowledge, sir, Judy Kropf, which was

 4 Jeff's wife, and I believe he had another family

 5 member, a son, that maybe stayed there off and on as

 6 well as Jeff.

 7      Q    So three people?

 8      A    Three people, yes, sir.

 9      Q    I think his son's name is Levi, does that

10 sound right?

11      A    It could possibly be.

12      Q    And when you went to his house that day, his

13 wife was home; is that correct?

14      A    Yes, sir, she was.

15      Q    Was his son there?

16      A    No, there was no one else home except for

17 Judy Kropf and Mr. Weinhaus.

18      Q    And when you searched the house, do you

19 recall how many bedrooms there were?

20      A    I do not recall from memory.  There were

21 multiple rooms that weren't being used as bedrooms

22 that could be, I guess, classified as a bedroom.

23      Q    So how many, do you remember anything?

24      A    I know there's at least one bedroom

25 downstairs and maybe two upstairs.  There were some
```

```
 1   rooms that had clutter pretty heavily in them that
 2   possibly could have been bedrooms, but to me they
 3   just looked like storage.
 4        Q   This was in the basement?
 5        A   Upstairs.
 6        Q   And you said there was also a bedroom in the
 7   basement?
 8        A   Yes, sir.  There appeared to be a bedroom in
 9   the basement on the far left side.
10        Q   Did you look inside that bedroom?
11        A   Yes, sir.
12        Q   Was it cluttered too?
13        A   It contained a small bed and some tennis
14   shoes and a dresser.  Looked more like a teenager's
15   room.
16        Q   Teenage boy's bedroom?
17        A   Yes, sir.
18        Q   And that was in the basement?
19        A   Yes, sir.
20        Q   Now I want to talk about this basement for a
21   minute.  When you go out to the house, was the
22   door -- was there a door to the basement?
23        A   I don't recall there being a door.  There
24   was just a set of stairs that went down into the
25   basement from my knowledge.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 2

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    And was the basement locked or secured in
 2 some way from the rest of the house?
 3      A    No, I do not believe that it was secured in
 4 any manner.
 5      Q    And I know yesterday you were calling the
 6 basement the command center; is that correct?
 7      A    Yesterday I called a portion of the basement
 8 the command center.
 9      Q    And in your custom and experience, it's not
10 uncommon for people to have different names for
11 their basement or at least part of their basement;
12 right?
13      A    In my experience I guess no, people call
14 their basement what they want to.
15      Q    Some guys call it a man cave?
16      A    Yes, sir.
17      Q    Bear pit?
18      A    Yes, sir.
19      Q    Or they call it a bunker?
20      A    Right.
21      Q    People have a lot of funny names for their
22 basement or part of their basement?
23      A    Right.
24      Q    It's not uncommon to have a rec room or den
25 down there?
```

Weinhaus, Vol. 2

```
 1      A    No, sir, it's not.

 2      Q    Place to hang out?

 3      A    Yes.

 4      Q    With friends and family?

 5      A    Yes.

 6      Q    So in your experience basements are really

 7   part of the common area of the house; right?

 8      A    I guess in my opinion it depends on what

 9   kind of basement it is.  Some are finished or

10   unfinished, but I'd say a finished basement would

11   definitely be some type of a common area.

12      Q    In this basement there was a bedroom, maybe

13   that's not a common area but maybe the rest of the

14   area is a common area?

15      A    Yes, sir.

16      Q    Now, I believe you testified yesterday that

17   you found computer equipment both upstairs and

18   downstairs in the house, the main floor and the

19   basement level; is that correct?

20      A    Yes, sir, I did.

21      Q    And did you seize all of that equipment?

22      A    Yes, sir, I did.

23      Q    In your experience as a law enforcement

24   officer and just as a human being, are computers at

25   home often shared by family members?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        A    I believe they are, yes, sir.

2        Q    Multiple people can use one computer; right?

3        A    Yes, sir.

4        Q    And you don't know who used the computers

5   that you -- who else in Jeff's family uses the

6   computers that you seized; right?

7        A    No, sir, I do not.

8        Q    There was no investigation whether his wife

9   or teenage son also uses this; right?

10       A    No, there was no investigation into who used

11  what computer.

12       Q    It's also pretty common to store things in a

13  basement in your experience?

14       A    Yes, sir, very common.

15       Q    Now I want to turn to some of the drug

16  paraphernalia that was found.

17            MR. EASTWOOD:  Bob, are the photos up there

18  from yesterday?  May I approach, Your Honor?

19            JUDGE SUTHERLAND:  Sure.

20       Q    (By Mr. Eastwood) I want to hand you what is

21  Exhibit 6, I'll show the jury that.  And this is a

22  picture, as you'll see in a minute, of what I

23  believe you called drug paraphernalia; is that

24  correct to say?

25       A    Yes, sir.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 2

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    And then they have a postage scale there;

2  right?

3    A    I'm not sure what kind of scale it is.  It

4  just appears to be a scale.

5    Q    Is it a modern scale or an old fashioned

6  scale?

7    A    I would have no idea, sir.  It's just a

8  scale to me.

9    Q    It doesn't appear to be an electronic scale,

10  does it?

11    A    No, sir, it is not.

12    Q    In your experience drug dealers use

13  electronic scales?

14    A    In my experience they use whatever they

15  have.

16    Q    But this could be a scale for measuring

17  postage?

18    A    A scale for measuring anything.

19    Q    Could be a scale for measuring flour; right?

20    A    Yes, sir.

21    Q    It's not a digital scale; right?

22    A    To my knowledge, no.

23    Q    It's not an electronic scale?

24    A    To my knowledge, no, it is not.

25    Q    The technology is old enough here this could

Weinhaus, Vol. 2

```
 1  have been Jeff's grandmother's scale; right?

 2       A    Possibly, yes, sir.

 3       Q    And is a postage scale an unusual thing to

 4  have next to a desk in a home office?

 5       A    A postage scale?

 6       Q    Yes.

 7       A    I would say more than likely not.

 8       Q    Not unusual?

 9       A    Not unusual.

10       Q    You might use it to weigh a piece of mail so

11  you know how many stamps to put on it?

12       A    Yes, sir.

13       Q    I want to turn next to September 11th, 2012,

14  the day at the gas station.  Before that day, you

15  knew Jeff was upset by the seizure of your

16  computers; right?

17       A    By the seizure of his computers, yes, sir, I

18  knew he was upset.

19       Q    When I say his computers, for all we know

20  they could be his family's computers; right?

21       A    Yes.

22       Q    Jeff threatened to sue you; right?

23       A    Yes, sir.

24       Q    He emailed you directly and asked who your

25  lawyer was and said he was going to sue you for
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 2

273

```
 1   violating his civil rights for free speech?

 2       A   I don't remember the free speech part.  I

 3   just remember he said he was going to sue me.

 4       Q   Sue you for money?

 5       A   He just said sue.

 6       Q   Well, you didn't think he was going to try

 7   to get you locked up; right?

 8       A   He later called my work and accused me of

 9   stealing items from his home, so I don't know what

10   his motivation was.

11       Q   So he did call your work and denounced you

12   by name to your colleagues; right?

13       A   Yes, sir.

14       Q   Denounced you to your boss; right?

15       A   Yes, sir.

16       Q   And somehow, without the computer equipment,

17   he also managed to make a You Tube video and upload

18   it to the Internet and mentioned you by name?

19       A   Yes, he mentioned he rented a computer on

20   those videos.

21       Q   And in those videos, in some of them he's

22   actually calling the Highway Patrol and denouncing

23   you by name; right?

24       A   Yes, sir.

25       Q   Talking about you're attacking his free
```

Weinhaus, Vol. 2

```
 1   speech rights?
 2        A    Yes, sir.
 3        Q    By seizing his computers?
 4        A    Yes, sir.
 5        Q    So whose idea then was it for you, of all
 6   people from the Highway Patrol, to serve the arrest
 7   warrant?
 8        A    It was not my idea.  I made it very, very
 9   clear to my chain of command that I wanted to be
10   removed from the investigation because of the
11   threats that Jeffrey had made towards me and because
12   I felt that he was personally agitated with me for
13   taking his computers; however, the members of my
14   chain of command had a meeting and they decided that
15   I would follow their orders and that I would bring
16   Jeffrey in by the 17th.  It was absolutely not my
17   idea and I believe it was not an appropriate thing
18   to do.
19        Q    So which of your commanding officers told
20   you that you had to serve that arrest warrant?
21        A    On September 10th?
22        Q    Yes, sir.
23        A    Lieutenant Sean Satterfield was in charge of
24   our division, and he made the decision with my
25   supervisor, Lieutenant George Nolls, that I would
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   either take Weinhaus into custody before the 17th or

2   that I would make arrangements to put a device on

3   him or his wife's car.  We even made arrangements to

4   find out where his wife worked, and we had actually

5   made some plans to start surveillance on Jeff until

6   the 17th if I was not able to get him arrested.

7        Q   Is it legal to put a tracking device on a

8   car?

9        A   They were going to obtain a warrant and put

10  one on there, yes, sir.

11       Q   What were they going to go after his wife

12  for, what crime or potential crime?

13       A   I just believe they wanted to monitor every

14  vehicle that he had access to in case they went near

15  the courthouse.

16       Q   When you say Lieutenant Sean Satterfield was

17  your superior, wasn't the Satterfield family one of

18  the people criticized by Jeff on the You Tube video?

19       A   Yes, sir, he was.

20       Q   Do you think it's fair to say the

21  Satterfields had a personal bone to pick with Jeff?

22           MR. PARKS:  Objection, calls for

23  speculation.

24           JUDGE SUTHERLAND:  Yeah, sustained.

25       Q   (By Mr. Eastwood)  But the Satterfields were

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   in the video?

 2       A   Yes, sir, he was, and his family.

 3       Q   And he's the one that made you go serve the

 4   arrest warrant?

 5       A   Yes, sir, he did.

 6       Q   Someone who threatened you personally?

 7       A   Yes, sir, he did.

 8       Q   You've been with the Highway Patrol

 9   obviously for a while now.  Is it normal procedure

10   for a trooper who is the subject of personal

11   criticism and attack by a suspect to be the one to

12   go serve the arrest warrant?

13       A   No, it is absolutely not policy to do that.

14       Q   That would put you in an unusual position;

15   right?

16       A   It placed me in a grave situation where I

17   was the one that was going to have to take him into

18   custody knowing that he was personally upset with

19   me, whereas a neutral person probably could have

20   talked to him better without agitating him, in my

21   opinion.

22       Q   Jeff didn't apparently have a bone to pick

23   with Corporal Mertens; right?

24       A   No, sir, he did not, to my knowledge.

25       Q   Why didn't he have Mertens serve the arrest
```

Weinhaus, Vol. 2

1   warrant?

2       A   I was told that I would take care of this

3   personally and that I was the one who started this

4   investigation and that I would be the one to take

5   care of this.

6       Q   You were going to take care of this?

7       A   Yes, sir.

8       Q   You also had back-up at the scene though;

9   right?

10      A   I had back-up from two FBI agents.  I had no

11  other back-up.

12      Q   Not Highway Patrol back-up?

13      A   I had two marked units; however, I was told

14  specifically prior to that not to involve the

15  members from the DDCC unit from Troop C.

16      Q   So you had the FBI as the back-up.  Why

17  didn't you have the FBI serve the arrest warrant?

18      A   It was a state warrant that I had applied

19  for and that I filled out the affidavit, and

20  therefore I was directed to serve the warrant, so I

21  served the warrant.

22      Q   So the FBI could not serve the warrant?

23      A   I do not know their technical procedures.  I

24  do not believe that they're in the habit of serving

25  state warrants.  They would normally serve a federal

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  warrant.

2      Q   Why were they providing back-up to a state

3  warrant service?

4      A   They had been involved in the Weinhaus

5  investigation from the beginning, and I'm stationed

6  in Rolla.  It is not unusual for them to back me up

7  as mutual aid law enforcement request or for me to

8  back them up on an investigation.  So you're talking

9  about a relationship of working with the FBI that

10 dates back 10, 15 years.

11     Q   In fact we went through this yesterday, you

12 don't normally serve warrants in Franklin County;

13 right?

14     A   I've never served a warrant in Franklin

15 County other than this warrant.

16     Q   This is the first time?

17     A   Yes, sir.

18     Q   And in fact these FBI agents, they also are

19 out of Rolla; right?

20     A   Yes, sir.

21     Q   So they're also not, to your knowledge,

22 providing back-up in Franklin County?

23     A   I believe that their area does cover

24 Franklin County.  They're stationed in a substation,

25 if you will, out of the St. Louis office, and I

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  believe that they do cover from Rolla, from the

2  Phelps County line, which is the eastern district of

3  the FBI, all the way into the inner City of St.

4  Louis where the regular FBI office covers.

5      Q   Now Sergeant, are you aware of a statutory

6  requirement in Missouri that members of the Highway

7  Patrol notify the sheriff of the county --

8          MR. PARKS:  Objection.  Your Honor, may we

9  approach?

10          JUDGE SUTHERLAND:  Yes.

11              (BENCH CONFERENCE BEGINS)

12          MR. PARKS:  Judge, this has been covered in

13  the Motion to Suppress and the Court has ruled in

14  the State's favor.  I feel that this would just be

15  irrelevant to get into it now because it has no

16  bearing on the case.

17          MR. EASTWOOD:  It goes to the witness's

18  credibility because he testified in his deposition

19  that he contacted the sheriff's office, and I have a

20  letter from Sheriff Toelke saying my office was

21  never contacted.  I think it's a matter fair for

22  impeachment.

23          JUDGE SUTHERLAND:  It was brought up

24  yesterday on direct.  He did testify that he

25  contacted the sheriff's office, so it's a fair

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   subject.

 2           MR. EASTWOOD:  He opened the door.

 3           JUDGE SUTHERLAND:  Of cross, yeah.

 4               (BENCH CONFERENCE ENDS)

 5           JUDGE SUTHERLAND:  Overruled.

 6       Q    (By Mr. Eastwood) Sergeant, are you aware of

 7   a statutory requirement in Missouri that the sheriff

 8   of the county be notified when you serve a search

 9   warrant.

10       A    Yes, sir, I am.

11       Q    And when you served the search warrant to --

12   on Jeff Weinhaus' house, did you notify the sheriff

13   for Franklin County?

14       A    I did not notify him prior to me serving the

15   warrant, and that was my fault.

16       Q    So you did not follow Missouri Law?

17       A    I did not notify him prior to serving the

18   warrant.  I had no cell phone reception when I got

19   back to Jeffrey's house.  When I received the

20   warrant, I called members of my chain of command and

21   let them know a local officer was driving the car,

22   and when we got back to the house, I had no cell

23   signal and I didn't have any of the numbers of

24   anyone in Franklin County because I don't normally

25   work here.  Once I served the warrant and we got
```

1   back to where we had cell signal, it was then that I

2   contacted Mike Maruschak from the FBI, who he had

3   been in contact with the Franklin County Sheriff's

4   Department earlier in the day and let him know.

5        Q    Didn't you testify yesterday that you did

6   contact the sheriff?

7        A    I contacted the sheriff's office immediately

8   when I received the arrest warrant, not the search

9   warrant.

10       Q    Who did you talk to in the sheriff's office?

11       A    When I received the search or the arrest

12  warrant, sir?  When I received the search warrant

13  later, I talked to the sheriff and apologized to him

14  and Subke for not notifying him in a timely manner,

15  and then when I received the search warrant, I

16  talked to a major in their department.

17       Q    Do you remember the major's name?

18       A    I don't remember from memory but it's in the

19  case file.

20       Q    Did you notify them prior to serving the

21  arrest warrant?

22       A    Yes, sir.  When I left this courthouse, I

23  went right downstairs where I had full signal out

24  front, Scott Mertens was with me.  I contacted the

25  sheriff's department, explained who I was and what I

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   needed assistance with, and they informed me that

 2   they were too busy and had too many calls pending to

 3   assist me, and they felt like I could serve the

 4   warrant myself.

 5       Q   So to your mind you followed Missouri Law

 6   with the arrest warrant but not with the search

 7   warrant?

 8       A   With the search warrant I did fail to notify

 9   the sheriff in a timely manner.  Now he knew we were

10   here looking for Jeff, but he did not know that I

11   had applied for the warrant.

12       Q   He knew that you were looking for Jeff the

13   day of the search warrant?

14       A   Yes, the day of the search warrant he knew

15   that -- the FBI had spoken with him as well as other

16   folks.  I hadn't spoke with him directly.

17           MR. EASTWOOD:  Permission to approach, Your

18   Honor?

19           JUDGE SUTHERLAND:  Yes.

20       Q   (By Mr. Eastwood) I have a letter here --

21           MR. PARKS:  I'm going to object at this

22   time.  May we approach?

23           JUDGE SUTHERLAND:  Yes.

24               (BENCH CONFERENCE BEGINS)

25           MR. EASTWOOD:  This goes to the witness's

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  credibility.  It's a letter from the sheriffs saying

 2  we were not aware a search warrant was issued.

 3          MR. PARKS:  It's from the sheriff and the

 4  sheriff isn't here to testify as to the foundation

 5  of the letter.  It's not a letter addressed to him.

 6          MR. EASTWOOD:  It's addressed to the

 7  defendant and it's absolutely fair for impeachment.

 8  Foundation has been laid.

 9          MR. PARKS:  There's no foundation laid for a

10  letter written by the sheriff.

11          MR. EASTWOOD:  The sheriff is in the back, I

12  can have him come up and do a foundation right now.

13          JUDGE SUTHERLAND:  Objection is sustained.

14          MR. EASTWOOD:  So I can't impeach him with

15  this?  May I make an Offer of Proof later?

16          JUDGE SUTHERLAND:  Yes.

17          MR. EASTWOOD:  Thank you, Your Honor.

18                  (BENCH CONFERENCE ENDS)

19      Q    (By Mr. Eastwood) Whose idea was it to meet

20  Jeff at the MFA gas station?

21      A    It was my idea, sir.

22      Q    And why did you not pick him up at his house

23  earlier that day when you noticed his car there?

24      A    I did not want to go back to his house.  It

25  was tactically not a good -- you had to come in a

1  long driveway, it was isolated, there was only one

2  way in and one way out, and I knew how his front

3  door situation was with the bushes and no easy way

4  to move from the door, and Jeff had put a You Tube

5  video on You Tube stating that he -- after I

6  searched his home, he put a You Tube video on

7  stating he should have shot me in the head when I

8  was there and that if he'd have been 10 years

9  younger, that's what he would have done.  So in

10  addition to him calling my employer and other

11  things, I just felt like if I contacted him at home,

12  especially with him saying he was on Def-Con 4 with

13  his guns loaded, that that would provoke some type

14  of confrontation and I didn't feel safe going there.

15      Q   I didn't see this video where he said he'd

16  put a bullet in your head, but are you aware of any

17  investigation into Jeff for threatening you?

18      A   There was none.

19      Q   No charges ever filed for threatening you?

20      A   No, sir.

21      Q   So you say that Jeff said he was going to

22  put a bullet in your head, but no one in law

23  enforcement ever decided to do anything about that?

24      A    Not in the law enforcement agency that I

25  work for, no, sir.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q   Now you said you didn't want to go to his

 2  house because it was too secluded, were you scared?

 3      A   I was nervous about going back to his house

 4  because I did not know his mental status at that

 5  moment, and I knew that he was severely agitated at

 6  me and I felt like if I went back to his house and

 7  knocked on the door, there was going to instantly be

 8  a confrontation.

 9      Q   Why didn't you have Jeff come to a police

10  station?

11      A   Me not being from the area and only knowing

12  where the courthouse was, I wanted to pick an area

13  that was secluded where there weren't a lot of

14  people, and the gas station was like a mile away

15  from his house and it was a rural gas station and

16  parking lot, and if anything bad happened, I didn't

17  think there would be anybody there.

18      Q   But you spoke to the Franklin County

19  Sheriff's Office before then; right?

20      A   Yes, sir.

21      Q   Why didn't you have him come up to the

22  Franklin County Sheriff's Department?

23      A   I did not think he would meet me here.  I

24  felt he would be more likely to meet me in a

25  non-threatening law enforcement place that he was
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  familiar with closer to his home.

 2      Q   I'm a little confused here because you also

 3  told me when I took your deposition that you didn't

 4  think Jeff was dangerous before you saw his gun?

 5      A   I did not think that Jeff was a dangerous

 6  person, but I did not want to go back to his house

 7  where he said he had his guns loaded.

 8      Q   You told me that when you saw Jeff, that he

 9  was armed at the gas station, that you were shocked

10  because he was a man of God; right?

11      A   I was shocked that he was armed and what

12  happened because he claimed to be a man of God, yes,

13  sir.

14      Q   And you told Perry Smith that you were

15  shocked to see that Jeff was armed when he came to

16  the gas station because he was, quote, "a

17  non-confrontational philosophical religious man"?

18      A   That's what I believed, yes, sir.

19      Q   Then how could you have been too scared?

20      A   I was not too scared, I just did not feel it

21  would be appropriate.  To be honest, I felt like

22  Mr. Weinhaus has some mental issues, and to go to

23  his house and instigate something, which is what I

24  felt would have happened, I felt like I needed to

25  take the high road and not do that.  I still to this
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  day believe that Mr. Weinhaus has mental issues and

2  that there were other options available than what

3  happened.

4      Q    You have no education in mental health

5  assessment; right?

6      A    No, sir.

7      Q    But you do know Jeff's character pretty

8  well; right?  You've known him for a long time;

9  right?

10     A    I had only met him from this incident, but I

11 had actually seen some of his videos and postings

12 from Bulletinman for several years.

13     Q    So you were familiar with him; right?

14     A    Yes, sir.

15     Q    And you know that a lot of people that he

16 criticized got a kick or laugh out of some of his

17 commentary; right?

18         MR. PARKS:  Objection, calls for

19 speculation.

20         JUDGE SUTHERLAND:  Sustained.

21     Q    (By Mr. Eastwood) And you told Perry Smith

22 at one point that you didn't mind Jeff even though

23 he told you that you were going to hell; right?

24     A    Yeah, that's what he told me the first day I

25 met him when I talked to him and we talked about our

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  Lord Jesus Christ.  Even though I told him I was
 2  saved, he still told me I was going to hell.
 3       Q   You didn't hold it against him?
 4       A   I didn't hold it against him.
 5       Q   Let's talk about the MFA gas station because
 6  that's the place where you chose to meet Jeff and
 7  arrest him.  You said it was secluded and rural;
 8  right?
 9       A   Yes, sir, it was.
10       Q   But in fact the day you went there it wasn't
11  that secluded; right?
12       A   No, the day that I went there for some
13  reason it was not secluded.
14       Q   There were two repairmen working on the
15  gutter in front of the store; right?
16       A   Yes, sir.
17       Q   You had a deliveryman there delivering
18  sodas?
19       A   Yes, sir.
20       Q   And you had a store clerk inside?
21       A   Yes, sir.
22       Q   And customers coming back and forth?
23       A   I believe so, yes, sir.
24       Q   And then you also had the two FBI agents;
25  right?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A   Yes, sir.

 2      Q   And you had propane tanks?

 3      A   Yes, sir.

 4      Q   And gas dispensing equipment?

 5      A   Yes, sir.

 6      Q   So this wasn't exactly an empty parking lot,

 7  was it?

 8      A   The portion where we parked our vehicle was

 9  an empty parking lot away from the store, and when

10  we set up everyone in position, there was no one

11  there 15 minutes prior.

12      Q   No one there but there were guttermen there;

13  right?

14      A   They weren't there then.

15      Q   But the gutter repairmen were certainly

16  there by the time Jeff got there; right?

17      A   Yes, sir.

18      Q   And the soda deliveryman was there by the

19  time Jeff got there; right?

20      A   Yes, sir, he pulled in.

21      Q   So you basically had a lot of innocent

22  civilians standing between you and Jeff; right?

23      A   No, sir.

24      Q   Well, the guttermen weren't innocent

25  civilians?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1       A    They weren't standing between me and Jeff.

 2   Jeff and me were on the other side of them.

 3       Q    I apologize, let me rephrase.  Jeff was

 4   between you and the guttermen; right?

 5       A    Yes, sir.

 6       Q    Jeff was between you and the deliveryman;

 7   right?

 8       A    Yes, sir, he was.

 9       Q    Jeff was between you and the window of the

10   store; right?

11       A    Yes, sir, he was.

12       Q    And behind that window was the store clerk;

13   right?

14       A    I believe so, yes, sir.

15       Q    And also Jeff was between you and the

16   propane tanks; right?

17       A    Yes, sir.

18       Q    And the gas dispensing tanks?

19       A    Yes, sir.

20       Q    Now you never told Jeff he was going to be

21   arrested before he got there; right?

22       A    No, sir, I did not.

23       Q    I think the word you used was a ruse; right?

24       A    Yes, sir, that is the word that I used.

25       Q    So you lied to Jeff; right?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yes, sir, I did.

 2      Q    You didn't tell him any facts that to his

 3  knowledge Jeff was going to be arrested?

 4      A    No, I did not tell him anything that

 5  indicated he was going to be arrested.

 6      Q    How frequently do you use lies in your work

 7  as a trooper?

 8      A    Sometimes quite frequently.  They're used in

 9  interview or interrogation techniques.  Sometimes

10  they're used to motivate someone to do something.  I

11  felt if I used Jeff computers, that's what he wanted

12  back the most, that he would appear.

13      Q    When do you think it's acceptable to lie to

14  civilians?

15      A    In the course of my duties, if I have to

16  tell someone a lie to do my duty, I do so, but I

17  document that I've lied.  I don't try to pretend

18  that I haven't lied.  I wrote in the report that I

19  lied to him on purpose to get him to the parking lot

20  to meet us.

21      Q    So if I hear you right, it's okay if you lie

22  as long as you fess up to it later?

23      A    I document it to make sure that there's no

24  discrepancy.

25      Q    Do you document all your lies?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A    If I use some type of an interrogation

2  technique, it's normally taped.

3      Q    Now Jeff's house is also on Highway K;

4  right?

5      A    Yes, sir, it is.

6      Q    About three miles to the south of the gas

7  station?

8      A    I'm not sure on the measurement.  I wasn't

9  driving but I thought it was closer to a mile.

10     Q    And you testified yesterday that you were

11  concerned about Jeff bringing an army of supporters?

12     A    That is what he told me, yes, sir.

13     Q    But you also watched that wrist watch video

14  yesterday; right?

15     A    Yes, sir.

16     Q    Does he mention an army of supporters

17  anywhere there on the tape?

18     A    He mentioned -- not during that tape, no.

19  He mentioned it to me during his phone call that he

20  was going to have a lot of people show up with him.

21     Q    And you have no recording of that phone

22  call; right?

23     A    No, sir.

24     Q    In fact you heard that tape yesterday, the

25  only person I hear Jeff talking about bringing is a

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  preacher; right?

2      A   I believe there might have been more than

3  one but yes.

4      Q   He said, "I'm trying to find a preacher to

5  come with me," or words to that effect?

6      A   Yes, sir.

7      Q   In your experience as a law enforcement

8  officer, are preachers usually violent?

9      A   I haven't met too many that are violent, no.

10     Q   So you were concerned about an army of

11 supporters nevertheless?

12     A   I was concerned because he told me he was

13 bringing supporters with him.

14     Q   Then why didn't you put on a bullet proof

15 vest before he got there?

16     A   I still did not believe that Jeff was a

17 violent person.  I believed that he was a blow hard

18 on the Internet and trying to draw attention to his

19 cause.  I underestimated him.  I did not think that

20 he would ever bring a weapon.  Jeff had a history of

21 doing these types of things for 16 years, setting

22 ultimatums and dates, and he always appeared at

23 every court appearance he had.  He never, to my

24 knowledge, had ever been a violent person.

25     Q   He was a jester then, he wasn't a threat?

Weinhaus, Vol. 2

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A   I don't know if I would classify him as a
 2  jester.
 3      Q   But you just said he had a long history of
 4  making these outrageous statements; right?
 5      A   He has a history of making these types of
 6  ultimatums for people to leave office or he's going
 7  to file paperwork or do what he can to remove them
 8  from office.
 9      Q   And he's never, never used violent means
10  against any of these people, to your knowledge?
11      A   To my knowledge he never had.
12      Q   Some people kind of think Jeff was a bit of
13  a joke?
14          MR. PARKS:  Objection, calls for
15  speculation.
16          JUDGE SUTHERLAND:  Sustained.
17      Q   (By Mr. Eastwood) So you were concerned
18  about an army coming but you didn't put on your
19  vest.  How come you didn't take any rifles or heavy
20  firepower out of your vehicle?
21      A   We had them in the back seat, and when I
22  spoke to Jeff, he sounded like he was going to come,
23  and when the gutter people pulled up, honestly I
24  thought they were with Jeff.  I didn't suspect that
25  anyone would get out of an abandoned gas station and
```

Weinhaus, Vol. 2

```
 1   start cleaning the gutters.  I thought that he was
 2   familiar with the store, he went in there, maybe he
 3   knew those people, knew the clerk.  When the soda
 4   man came, I honestly thought he was a soda man, but
 5   I did not think that Jeff was the type of person
 6   that would show up with a weapon and try to resolve
 7   things by force.
 8        Q    The guttermen got there before Jeff did;
 9   right?
10        A    Yes, sir.
11        Q    And you thought they might be with him?
12        A    Yes, sir.
13        Q    By you still didn't go put on a vest?
14        A    At that point we would have had to get out
15   of the car -- Corporal Mertens and I had a
16   conversation.  I actually said we should probably
17   put on our vests, and at that point we had a
18   discussion well, if we get out of the car now to put
19   on the vests, then if those people are with him,
20   they're going to call him and tell him and say they
21   saw us get out of our car and put on bullet proof
22   vests.  So we thought that would spook him.  My
23   final resort was going to have some type of SWAT
24   team encounter Jeff at his home.  So we did not, we
25   made a poor decision.  We believed Jeffrey was not
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   that much of a threat, so we left the vests in the

 2   back seat.

 3        Q    Did you think the guttermen were a threat?

 4        A    I didn't know who they were.

 5        Q    This conversation you had with Corporal

 6   Mertens, you never mentioned that to me in your

 7   deposition, did you?

 8        A    I believe I did, sir.

 9        Q    Really, the part about the guttermen being

10   dangerous and whether or not to put on your vest?

11        A    Yes, I read it in the deposition.  If you

12   hand it to me, I can show you.  I didn't have a

13   conversation about the guttermen but there was an

14   excerpt in there about us making the decision not to

15   put on our vests.

16        Q    I know you testified that you weren't going

17   to put on your vest, but that wasn't my question.

18   My question was whether because the guttermen got

19   there before Jeff did and you thought they might be

20   with Jeff, that you still didn't put on your vest?

21        A    If you can refer to the deposition, there's

22   some conversation in there about that.

23        Q    Really?

24        A    Yes, sir.

25        Q    Did the presence of these guttermen elevate

Weinhaus, Vol. 2

```
 1  your concern for your safety?
 2       A   Are you reading from the deposition?
 3       Q   No I'm not, I'm asking you?
 4       A   I just felt that they were probably
 5  supporters of Jeff, and I went and briefed the FBI
 6  guys that there may be more people showing up than
 7  Jeffrey, so it just kind of heightened our security.
 8       Q   You were more concerned for your safety;
 9  right?
10       A   I still did not believe he was a physical
11  threat.  I believe that we would have a crowd, maybe
12  protests, maybe people verbally protesting the
13  arrest of Jeff.
14       Q   Yesterday you said you made a tactical
15  mistake in not putting on your vest?
16       A   Yes, sir.
17       Q   What other -- did you make other tactical
18  mistakes that day?
19       A   Yes, sir, I did.
20       Q   And what were they?
21       A   I obviously didn't bring better firearm.  I
22  didn't have my vest on.  I had other equipment that
23  I could have had.  I just underestimated Jeffrey and
24  I thought he was a peaceful person and I made those
25  mistakes.  I was complacent.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        Q    You haven't always thought you made

 2   mistakes, though, have you, that day?

 3        A    That day, I make mistakes every day, sir.

 4        Q    But you did tell Perry Smith when he

 5   interviewed you that you would not have done

 6   anything different that day; right?

 7        A    As far as my use of force once the firearm

 8   was introduced, no.

 9        Q    So that wasn't a mistake to your mind?

10        A    No.

11        Q    Now, let's turn to the car that Jeff was

12   driving.  That's a -- that was a Subaru hatchback

13   registered to his wife; right?

14        A    Yes, sir, I believe that is correct.

15        Q    And those hatchbacks, they have a station

16   wagon type door in the back; right?

17        A    I believe they do.

18        Q    And they're a little higher than a normal

19   sedan, is that fair to say?

20        A    Yes, sir, I believe they are.  They are

21   taller than the car we had.

22        Q    In the area where you parked in the gas

23   station, that's on a slight -- I think we have a

24   diagram back here.  I'm going to bring it out and

25   show it to you and the jury.  Can you see that, sir?
```

Weinhaus, Vol. 2

```
1      A    Yes, sir, I can.
2      Q    So this area up here, this is where you were
3  parked; right?
4      A    Yes, sir.
5      Q    And was that area on a slight incline?
6      A    Yes, sir, it was.
7      Q    And was the surface of the parking lot in
8  this area gravely?
9      A    Yes, sir, it was.
10     Q    It wasn't smooth asphalt or anything like
11 that?
12     A    No, it was gravel.
13     Q    So you testified yesterday that Jeff drove
14 in here?
15     A    Yes, sir.
16     Q    And then he came in, circled around and
17 parked there; right?
18     A    Yes, sir.
19     Q    And you also testified that Jeff kind of
20 sped up when he pulled in; right?
21     A    Yes, sir.
22     Q    But we don't really hear that on the tape,
23 do we?
24     A    I don't know if you can or can't hear it.  I
25 was outside the car and I heard the engine speed up.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 2

```
 1      Q   Well, we'll review the tape in a minute and
 2   see whether or not you can hear that, but before we
 3   listen to the tape, I want to ask you this.  Just on
 4   your common experience, if you're going to go up a
 5   hill, an incline and turn around, you might need to
 6   tap your accelerator a little bit?
 7      A   If you were going to go up a hill, yes, but
 8   that was a slight incline in a parking lot.
 9      Q   But presumably a car coming down here, it's
10   going to slow down a little bit to make a turn;
11   right?
12      A   Yes.
13      Q   So it slows down, it turns in and then it
14   needs to go up an incline.  So you're probably going
15   to have to tap the accelerator some to turn around,
16   go up the incline; right?
17      A   Where I heard the accelerator tapped was
18   after he had gone up the incline and had turned his
19   vehicle coming back towards our vehicle.
20      Q   When he was around here?
21      A   He went way around and back there.
22      Q   And you in fact testified that you thought
23   he was going to ram you?
24      A   Yes, I was sitting there with the passenger
25   door open, and when I heard the engine accelerate
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   and he turned so quickly in the parking lot, I
 2   thought maybe he was going to run into the back of
 3   the vehicle.
 4        Q    But he didn't ram you?
 5        A    No, sir, he did not.
 6        Q    And the FBI agents didn't jump out of the
 7   car?
 8        A    They did jump out of the car when they saw
 9   him pull into the parking lot.
10        Q    Oh, really?
11        A    As far as I know.
12        Q    Not after you shot him?
13        A    I believe when they saw him pull in the
14   parking lot they were already heading towards us.
15        Q    What kind of car were you and Corporal
16   Mertens driving?
17        A    A white Chevrolet Impala.
18        Q    Now I want to talk to you about where and
19   how Jeff parked.  This is a fair representation of
20   how Jeff parked, this is the Subaru?
21        A    Yes, sir.
22        Q    Does it make sense that if someone was going
23   to load computer equipment from the back of that car
24   to the back of that car, that might be a somewhat
25   logical place to park?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Objection, Your Honor, calls for

 2   speculation on the part of the witness.

 3          JUDGE SUTHERLAND:  Overruled, you may

 4   answer.

 5          THE WITNESS:  I believe that a position

 6   close to that would be -- he pulled a little far

 7   down, that's quite a distance to carry, but if he

 8   would have pulled right up next to us like that,

 9   that would have been a very common position.

10      Q   (By Mr. Eastwood) When you say quite a

11   distance, it's only about 10 or 15 feet?

12      A   About 15 feet, yes.

13      Q   Now, I want to go over what you spoke with

14   Jeff about when you got -- when Jeff got out of the

15   car, because I have some confusion over that.  You

16   told Perry Smith when he took your recorded

17   interview, the statement the day after the shooting,

18   that you told Jeff, "Jeff, I got your computers

19   right here"; is that correct?

20      A   Yes, sir.

21      Q   And you wrote in your report that you said,

22   "I got the papers right here"?

23      A   When I exited the vehicle, and that was

24   something that there might be a bit of confusion on

25   on my part.  Before Jeff arrived, my partner and I,
```

Weinhaus, Vol. 2

```
 1    Scott Mertens, we always role play things.  So we
 2    had developed a conversation about what we were
 3    going to do to delay Jeff until the FBI came over
 4    and we would have our guys there, and I talked about
 5    maybe we'll go to the trunk, open the trunk, I'll
 6    tell him I got the papers right here, and I know
 7    that when I exited I believe I said something to the
 8    effect of I have the papers right here and I held
 9    the folder up, but I don't know if Jeff was close
10    enough to hear me when I said that.  I had already
11    started talking once I got out of the car.
12        Q   It's fair to say you can't hear it on the
13    video?
14        A   I did not hear it, no, sir.
15        Q   And although you wrote it in your report,
16    I've got the papers right here, you didn't mention
17    in your report that you were role playing with your
18    partner before Jeff arrived, did you?
19        A   No, that's just something common that we do.
20    Before we go talk to anyone, we kind of talk about
21    what we're going to talk about and what strategies
22    we might use and what information we need to obtain.
23    That's just something common that Corporal Mertens
24    and I have done for years.
25        Q   And you didn't mention to Sergeant Bauer
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    that you were role playing and having this

2    conversation with Corporal Mertens before Jeff got

3    there; right?

4        A    No.

5        Q    Not during your scene walk through.  And you

6    didn't mention to Sergeant Perry Smith, the

7    investigating trooper, that you were role playing;

8    right?

9        A    No.

10       Q    So that appears nowhere in any of the police

11   reports; right?

12       A    No, I don't believe it does.

13       Q    It doesn't appear in your deposition either,

14   does it?

15       A    I don't believe it was brought up, no, sir.

16       Q    So this is the first time we're learning of

17   the role playing, okay.  Now, Jeff had an open carry

18   handgun, right; is that fair to say?

19       A    Yes, sir.

20       Q    Generally speaking, unless a citizen is a

21   felon or something, that's legal conduct; right?

22       A    Yes, sir.

23       Q    And in fact it was legal for Jeff to do that

24   day; right?

25       A    As far as I know he was legally carrying a

Weinhaus, Vol. 2

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   firearm that day.

 2        Q    No one else from the Highway Patrol ever

 3   charged him with unlawful possession of a weapon;

 4   right?

 5        A    Not to my knowledge.

 6        Q    And that weapon was in a holster; right?

 7        A    Yes, sir, it was.

 8        Q    This is the holster right here; right?

 9        A    I believe so, yes, sir.

10        Q    You served in the Army for seven years;

11   right?

12        A    Yes, sir, six years, 11 months and 29 days,

13   just a shade shy of seven years.

14        Q    And you saw some rough times and events when

15   you were in the Army?

16        A    Yes, sir.

17        Q    Some violent interactions?

18        A    Yes, sir.

19        Q    Where you shoot to kill because you're

20   dealing with the enemy?

21        A    We shoot to incapacitate, yes, sir.

22        Q    It's not law enforcement, it's war; right?

23        A    Yes, sir.

24        Q    So you recognized this type of holster;

25   right?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    Yes, sir, I own one.

 2        Q    And you recognize it not just because you're

 3   a state trooper but also because you served in the

 4   military and this holster is used in the military;

 5   right?

 6        A    Yes, sir.

 7        Q    And you'd seen this holster, a similar one,

 8   when you searched Jeff's house a few weeks earlier;

 9   right?

10        A    Yes, sir, I did.

11        Q    Mr. Parks introduced into evidence a

12   photograph of that holster in Jeff's bedroom, and

13   you testified that that holster belonged to Judy

14   Kropf Weinhaus?

15        A    I believe the gun.

16        Q    Oh, the gun?

17        A    Yes.

18        Q    You might infer that the holster was hers

19   too but who knows.  And you told Perry Smith that

20   these holsters are very hard to open; right?

21        A    Yes, sir, they are.

22        Q    And you know these holsters, they are very

23   hard to open; right?

24        A    Yes, sir, they are.

25        Q    It requires force to pull down on it?
```

Weinhaus, Vol. 2

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yes, sir, and they're even harder to open

 2  with a gun in them.

 3      Q    Even harder with a gun in them?

 4      A    Yes, sir.

 5      Q    And you've been investigating Jeff for a

 6  while before you went to arrest him on September

 7  11th; right?

 8      A    Yes, sir.

 9      Q    And you knew that he had no military

10  training or experience; right?

11      A    I did not believe he did, no, sir.

12      Q    There's nothing to suggest he did in

13  anything that came up in the investigation?

14      A    No, sir, there was not.

15      Q    And no police training, right, he's not ex

16  law enforcement?

17      A    Not to my knowledge, no.

18      Q    And in itself -- let me back up.  If the

19  weapon that Jeff had was in this holster, could the

20  weapon be taken out of the holster without opening

21  the holster?

22      A    I don't know if that particular weapon,

23  because it was a little small for the holster, could

24  be taken out, but normally no, that is why the

25  holster is made that way, it is virtually 100
```

Weinhaus, Vol. 2

1    percent retention of weapon.  I've never heard of

2    one coming out.

3         Q   You never heard of one coming out?

4         A   No, sir.

5         Q   So you've got to pull down with a lot of

6    force, flip up, sweep it over and put your hand down

7    on the gun?

8         A   Yes, sir.

9         Q   In fact at one point you told Perry Smith

10   that it would be impossible to have your hand on

11   both the holster and the butt of the gun; right?

12        A   Yes.  Normally you can't reach that far to

13   get the ring open.  It's pretty hard to do with two

14   hands.

15        Q   You've got to do one before the other?

16        A   Yes.

17        Q   Do you consider yourself a pretty quick

18   shot, pretty good shot?

19        A   Yes, sir.

20        Q   And how long would it take you, as a man

21   with military experience, law enforcement

22   experience, to open this holster, sweep it open and

23   then grab a gun and then withdraw it from the

24   holster?

25             MR. PARKS:  Objection, Your Honor, calls for

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   speculation on the part of the witness.

 2        JUDGE SUTHERLAND:  Overruled, you can

 3   answer, if you can.

 4        THE WITNESS:  With practice I could probably

 5   do it in under a second.

 6        Q   (By Mr. Eastwood) Under a second?

 7        A   But normally I could probably do it in 1.5

 8   to 2 seconds.  I've trained with that holster.

 9        Q   You've trained with that holster, 1.5, seven

10   years military, 16 years Highway Patrol?

11        A   Yes, sir.  I know that because we engage

12   targets that turn and stay stationary for three

13   seconds.  During that time you have to draw that

14   weapon, fire and hit the target before it turns

15   back.

16        Q   So you can get it open, you can sweep it

17   up -- you can pull it down, sweep it open, you can

18   withdraw the gun and then shoot in about three

19   seconds?

20        A   Yes.

21        Q   With all of your experience?

22        A   Yes, sir.

23        Q   Now in itself Jeff having a gun in a

24   holster, a holster that is difficult to open, was

25   not a danger to you; right?

Weinhaus, Vol. 2

```
 1      A   I did not think that he would use the gun.
 2 He was open carrying the gun.  I was alarmed at the
 3 presence of the gun, but I wasn't threatened by the
 4 gun in the holster, specifically my life being in
 5 danger.
 6      Q   In your training you're taught in Missouri
 7 citizens are allowed to open carry guns and you're
 8 going to encounter citizens with open carry guns?
 9      A   Yes, sir.
10      Q   There's nothing illegal about it?
11      A   Not to my knowledge.
12      Q   Nothing inherently dangerous about it?
13      A   No, sir.
14      Q   And of course although you do have military
15 experience, when you were confronted with Jeff, you
16 were confronted with a law enforcement policing
17 situation; right, not a military situation?
18      A   Yes, sir.
19      Q   Did you ever scream at Jeff, "what are you
20 doing with that gun"?
21      A   I believe I did yell something to that
22 effect very loud.
23      Q   Scream, yell?
24      A   Yes, sir.
25      Q   Now Sergeant Folsom, you received training
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  from the Highway Patrol on the use of force and

 2  firearms; right?

 3      A    Yes, sir, I have.

 4      Q    And that includes training on what to do

 5  interacting with a member of the public who happens

 6  to have a gun; right?

 7      A    Yes, sir.

 8      Q    And generally speaking does your training

 9  teach you to escalate or deescalate a potential

10  threat?

11      A    My training teaches me to assess the

12  situation and choose an option of force

13  appropriately.

14      Q    So your training does not teach you to

15  deescalate the situation before using force?

16      A    It depends on the situation.

17      Q    What type of situations where would you not

18  try to deescalate the threat before using force?

19      A    If someone had a firearm and was going to

20  shoot me, I'm not going to try to deescalate, I'm

21  going to fire and defend myself and the people with

22  me.  That's too far to deescalate from.

23      Q    Now if you are about to issue a warrant, do

24  they teach you to use certain words or gestures to

25  get citizens to comply with the arrest warrant?

Weinhaus, Vol. 2

```
 1        A    They don't teach us specifically to use

 2   words or gestures for arrest warrants.  We have

 3   specific training on how to talk to people in

 4   general when we deal with the public.

 5        Q    And what type of training is that, is this

 6   training about the reasonableness of force?

 7        A    No, we just have training to remain polite

 8   and courteous, and we have some training they call

 9   verbal judo, which I participated in when I came on.

10        Q    Can you tell the jury what verbal judo is?

11        A    Verbal judo is a technique of deescalating a

12   situation.  A lot of times a person may be agitated,

13   so they may call you a bad name, so you would say

14   something to the effect, "well, I appreciate that

15   but the reason why I stopped you is you didn't stop

16   at the stop sign."  Instead of being offended or

17   coming at them for calling you a bad name, you try

18   to deescalate the situation.

19        Q    Is part of verbal judo trying to distract

20   the suspect?

21        A    I don't believe verbal judo involves

22   distracting, it just involves trying to deescalate

23   the situation so there isn't an argument or

24   something to that effect.

25        Q    Deescalate the threat and achieve
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 2

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   compliance, is that fair to say?

2       A   It just is a technique used to prevent an

3   argument.

4       Q   Have you been taught about the use of force

5   continuum?

6       A   I have received some training about use of

7   force continuums, but we do not use a continuum in

8   our organization at this time.

9       Q   At this time.  When you were taught use of

10  force continuum, were you taught that by the Highway

11  Patrol or by another organization?

12      A   I was taught that in the military as well as

13  the Highway Patrol.

14      Q   So it has been part of your training and

15  experience; right?

16      A   Yes, it has.

17      Q   It perhaps affects you when your instincts

18  kick in in a dangerous situation?

19      A   I believe it can.

20      Q   Can you tell the jury what it is?

21      A   We do not presently use the use of force

22  continuum, but any use of force continuum involves a

23  list of options.  Perhaps you encounter someone, you

24  can use a verbal command, you can use officer

25  presence by having more officers present.  You can

Weinhaus, Vol. 2

1  use pepper spray.  You can use unarmed self defense.

2  You can use an ASP baton, a canine dog if he was

3  present or you can use deadly force.

4      Q   I took the deposition of a use in force

5  instructor for the Highway Patrol, a man named Jeff

6  White, are you familiar with him?

7      A   Yes, sir, I am.

8      Q   And I anticipate we may hear from him in

9  this trial.  Were you trained by Jeff White?

10     A   I've been to one or two of his training

11 classes.  I believe I participated in a program that

12 he taught called Active Shooter.

13     Q   What is Active Shooter?

14     A   Active Shooter is a situation involving --

15 after the Columbine shooting, it was kind of derived

16 from that that law enforcement officers instead of

17 securing perimeter and waiting when there was an

18 active shooter on site, because it takes a while to

19 get a SWAT team or tactical unit in place, we

20 develop small groups and enter into a building when

21 they could actively hear someone shooting and try to

22 engage that person to save lives until the SWAT team

23 could arrive.

24     Q   That was not the situation you were

25 confronted with in September?

Electronically Filed - EASTERN DISTRICT OF APPEALS - February 25, 2014 - 03:52 PM

 1      A    No, it was not.

 2      Q    Now going back to the use of force

 3  continuum, which I understand the Highway Patrol

 4  does not use but you say it's nevertheless been part

 5  of your training and experience in the Army, early

 6  on in the Highway Patrol, have you ever heard use of

 7  force described as a series of steps?

 8      A    Yes, I have.

 9      Q    And the idea is the lowest step is a very

10  low level use of force, it might not even be force

11  itself, it could just be the mere presence of a

12  uniformed law enforcement officer?

13      A    I've seen something similar to that, yes.

14      Q    Then up a few steps to open hand combat?

15      A    Yes, sir.

16      Q    Up a few steps to closed hand combat?

17      A    Yes, sir.

18      Q    Could be tackling someone?

19      A    Yes, sir.

20      Q    Using a baton?

21      A    Yes, sir.

22      Q    And then at the top deadly lethal force?

23      A    Yes, sir.

24      Q    Could you stand up for me, sir, just for a

25  minute.  How tall of a man are you?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    I'm 6'2".

 2      Q    How much do you weigh?

 3      A    Right now I weigh a little more than usual,

 4 265, 270.

 5      Q    You can have a seat, thank you very much.

 6 How much did you weigh on September 11th, 2012?

 7      A    I weighed exactly 222, 225 on September

 8 11th.

 9      Q    You were in pretty good shape then?

10      A    I had been in a good exercise program and

11 was exercising, yes, sir.

12      Q    Mr. Weinhaus, could you stand up for a

13 minute.  Thank you.  Okay, you can have a seat.

14 You're a lot taller than Jeff Weinhaus; right?

15      A    Yes, sir.

16      Q    You're a lot bigger than Jeff Weinhaus;

17 right?

18      A    Yes, sir.

19      Q    And when you were confronted with Jeff

20 Weinhaus, did you use verbal judo to deal with the

21 fact that he had a gun?

22      A    I didn't.  I did not have the opportunity.

23      Q    You did not have the opportunity.  So you

24 did not use verbal commands to achieve compliance?

25      A    The only thing I did was I announced that he
```

 1  had a gun at the same time I began to give him

 2  verbal orders to get down on the ground.

 3     Q   And does verbal judo normally teach you, or

 4  any of your training for that matter, teach you to

 5  draw attention to a gun when someone has a gun or

 6  does it teach you to use verbal commands to distract

 7  from a gun?

 8     A   Verbal judo is argumentative people.  It has

 9  nothing to do with a gun.  If someone has a gun, I'm

10  not going to employ a verbal judo tactic.

11     Q   But we talked about this in your deposition,

12  Jeff was a little argumentative when he got out of

13  that car; right?

14     A   Yes, sir.

15     Q   You had an exchange and you said, I'm

16  paraphrasing here, we'll watch the video in a

17  minute, but something like "What do you got a gun

18  for, Jeff?"

19      And he said, "What do you got a gun for";

20  right?

21     A   Yes, something to that effect.

22     Q   And you said, "I'm authorized to have a

23  gun," and that's true; right?

24     A   Yes, sir.

25     Q   And he said, "I'm authorized to have a gun"?

```
 1       A    Yes, sir.

 2       Q    And you agreed with me that he was being a

 3  smartalic; right?

 4       A    Yes, sir.

 5       Q    So is that not an argumentative situation in

 6  which verbal judo is an appropriate response?

 7       A    At the time I did what I was trained to do.

 8  I announced that he had a weapon to the other

 9  officers to let them know that he had a weapon.  I

10  also did not know his intention with that weapon, so

11  by asking him a question, I've been trained when you

12  encounter someone that's armed, a lot of times if I

13  ask you a question like why are the lights on, that

14  will delay your reaction or anything until I can

15  step closer, move away, take cover.  So at the same

16  time when I said what are you doing with that gun, I

17  was able to achieve two techniques with one.  That's

18  something I was trained on as a bodyguard, because

19  if someone pulled a gun in a crowd, we would yell

20  "gun", or if we saw a gun we would say "gun".  At

21  the same time those are the techniques that I used.

22  When he started manipulating the holster, that's

23  when I told him to get down.

24       Q    Let's break it down into smaller chunks.  So

25  you didn't say why is the sky blue or any type of
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1    statement to distract from the gun; right?

 2        A    No.  At the present time I had to let

 3    everyone know there was a gun, and I asked him the

 4    question the best I could doing both at the same

 5    time.

 6        Q    You drew everyone's attention, including

 7    Jeff's, to the gun?

 8        A    Yes.

 9        Q    And you testified, you told several people,

10    I think including me in your deposition, that you

11    were about five to seven feet away from Jeff; is

12    that right?

13        A    Yes.  Initially when I first saw the gun, I

14    was about seven, I'd say seven feet away.  I made

15    some steps during the altercation that brought me to

16    within five feet.

17        Q    And when you first saw the gun, he did not

18    have his hand on the gun or the holster; right?

19        A    No, he did not.

20        Q    So if you were concerned for your safety,

21    and you're a lot bigger than him, why didn't you do

22    something like charge him, tackle him, try to take

23    him out in a way that did not involve the use of

24    lethal force?

25        A    I have done those things before.  As a

Weinhaus, Vol. 2

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  matter of fact as we discussed, I was in a shooting

2  where I did charge someone and ruptured my testicle.

3  I have disarmed people with knives and while on the

4  Highway Patrol been cut with a knife.  I was not

5  close enough to engage any type of tactic like that.

6  Seven feet on a gravel surface, I was not close

7  enough to engage him or tackle him.  I did not know

8  what his intention was.

9       Q    Even a scrawny guy like Jeff Weinhaus?

10      A    That scrawny guy had a gun.

11      Q    As did you?

12      A    Yes, I did.

13      Q    Seven feet is less than a full car length,

14 isn't it?

15      A    Yes, sir.

16      Q    Now you also said in your report that

17 Weinhaus broke into a cold sweat or chill and did

18 not respond to your conversation; is that correct?

19      A    Yes.

20      Q    And when was it that he broke into this cold

21 sweat and non-responsive state.  Was it before you

22 had the interchange "how are you doing, Jeff, what

23 do you got a gun for, what do you got a gun for,"

24 was it before that?

25      A    It was after, I believe I said it looked

 1  like he had a cold chill that came over him.  He

 2  started to shake a little bit.

 3      Q   So had you already drawn your weapon when he

 4  started to shake?

 5      A   My weapon was at the low ready and he had

 6  opened his holster.

 7      Q   And Corporal Mertens, did he have his weapon

 8  at a low ready?

 9      A   I could not see him, he was behind me and to

10  the right, but I obviously seen the video and it

11  appears that he does, but I could not see Corporal

12  Mertens when that was going on.

13      Q   Now you also testified that Jeff's eyes

14  never left your face?

15      A   No, they did not.

16      Q   So you must have been staring right into his

17  eyes to know that; right?

18      A   I was staring at his face as I came around

19  the car, and then I saw the gun, and every time I

20  looked at him he was staring me right in my face.

21      Q   So you might have looked away but when you

22  looked back he was looking at you?

23      A   I never noticed him look anywhere else but

24  my face.

25      Q   Now at seven feet away, how were you able to

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    look into Jeff's eyes, to look at his left hand, to

2    look at his right hand, to look at his holster and

3    to look at your back sight at the people and gas

4    tanks and everything else behind Jeff, how were you

5    able to do all that in a short period of time?

6         A    The best way I can explain that, sir, is I

7    can see your hands.  I can see your eyes.  I can see

8    the people behind you and what's there, instantly.

9         Q    Instantly?

10        A    If I look at these people, I can see their

11   hands, I can see what's behind them on the wall, I

12   can see everything.  I mean images are in 3D, I can

13   see what's behind you, where your hands are, where

14   your face is pointed.

15        Q    Sure but you gave some detailed testimony as

16   to where Jeff's eyes were looking and located, is

17   that fair to say?

18        A    Yes, it is, and I believe they were focused

19   on me and looking at me every time I saw him.

20        Q    And you also gave detailed testimony as to

21   what he was doing with his left hand standing seven

22   feet away?

23        A    I believe I said that I could not see -- at

24   some point during that my vision started to focus in

25   on his right hand.

Weinhaus, Vol. 2

```
 1      Q    Not his eyes?

 2      A    No, my vision started to tunnel in on his

 3 right hand when he opened the holster.

 4      Q    So you looked away from his left hand or

 5 eyes?

 6      A    I do not recall seeing him, I just remember

 7 my vision tunneled in on the right hand and the gun.

 8      Q    Is it fair to say in a very short period of

 9 time it's hard to look at all three things at once,

10 plus behind me?

11      A    I guess I don't understand your line of

12 questioning.  I can always see what's behind you

13 standing here talking to you.

14      Q    But in the space of a second or two or

15 three, can you really see into my eyes, what my

16 right hand is doing and what the left hand is doing

17 and what the people behind me are doing?

18      A    In the span of a second, two or three, of

19 course I can.

20      Q    Now at some point you told Jeff to get down

21 on the ground; is that right?

22      A    Yes, sir.

23      Q    Did Jeff start to comply with your order?

24      A    No, he did not.

25      Q    In no way?
```

Weinhaus, Vol. 2

```
 1      A   In no way did he ever motion towards the
 2  ground, comply with my order.  When I told him to
 3  get down on the ground, he was opening the holster
 4  and he did not comply at all.
 5      Q   Did not comply at all.  Then why did you
 6  tell me under oath in your deposition that Jeff
 7  crouched down in a defensive position?
 8      A   What I stated was that he shifted his body
 9  from a bladed position to a front on position with
10  me and he crouched down with his knees.  When he
11  said man, you're going to have to shoot me, he
12  crouched down and began to draw the gun.
13      Q   So he was crouching before you told him to
14  get down on the ground?
15      A   I already told him to get down on the
16  ground.  He said, "Man, you're going to have to
17  shoot me," and then as part of him trying to draw
18  his gun, he lowered his center of gravity and began
19  to pull the gun out.
20      Q   Did you consider the crouching to be part of
21  compliance with your order to get down?
22      A   No, I considered it to be he was squaring up
23  on his target like I'm trained to do, and typically
24  when we draw a weapon, we're going to square
25  ourselves to the target, simultaneously crouch our
```

Weinhaus, Vol. 2

```
1   body down and fire.  That's how I'm trained to go
2   into a firing position.
3       Q   How come you didn't tell Jeff hands up or
4   get your hands off the gun?
5       A   The only thing I could think of was get down
6   on the ground.  I don't know, I didn't have -- I had
7   a short amount of time.  I felt if he was on the
8   ground, that would be the safest place.
9       Q   Have you ever said hands up as a trained
10  officer?
11      A   I believe I probably have.
12      Q   Or said get your hands off the gun, hands
13  away from the gun?
14      A   Yes.
15      Q   But you didn't do this here?
16      A   I didn't have time.
17      Q   Didn't have time.  So instead you said get
18  down on the ground.  What did Jeff do with his left
19  hand after you said get down on the ground?
20      A   Like I said, my vision began to tunnel in
21  and I didn't really -- I can't tell you what
22  happened with his left hand.  When I said get down
23  on the ground and he said man you're going to have
24  to shoot me and he started pulling that gun out, all
25  I could see was the gun in his hand.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        Q    So he didn't start to lower himself?

2        A    No, he said man, you're going to have to

3   shoot me and he crouched down.

4        Q    So he did crouch?

5        A    I believe you're exaggerating.

6        Q    And you don't know what he did with his left

7   hand?

8        A    I couldn't focus on the left hand, only the

9   right hand and the weapon.

10       Q    Why couldn't you focus in on the left hand?

11       A    It's part of a phenomenon being threatened

12  and being in a deadly force situation, it's usual in

13  my training to have tunnel vision.

14       Q    So you had tunnel vision and in fact you

15  couldn't see his right hand, eyes and left hand and

16  behind him?

17       A    At that moment, no.

18       Q    Now Jeff made a statement and you say it was

19  "you're going to have to shoot me man"?

20       A    Yes, sir.

21       Q    Could it be "you don't have to shoot me

22  man"?

23       A    Absolutely not.

24       Q    Absolutely not?

25       A    Absolutely not.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1     Q    No way that could be objectively true?

 2     A    No.

 3     Q    It's fair to say you didn't hear it that

 4  way?

 5     A    Right, no, I didn't hear it that way.  I've

 6  listened to the audio recording and I don't believe

 7  that's what was said.  I heard him say "you're going

 8  to have to shoot me man" as he began to draw the

 9  weapon from the holster.

10     Q    Putting aside his right hand and holster and

11  what you say he did, is a citizen stating "you're

12  going to have to shoot me" sufficient grounds to

13  shoot them, to use deadly force?

14     A    No, sir, it would not be in itself.

15     Q    In fact what might be an appropriate

16  response to a citizen saying "you're going to have

17  to shoot me"?

18     A    I guess there could be dozens of responses.

19     Q    Verbal judo?

20     A    Yes, sir.

21     Q    Some non-lethal force?

22     A    Yes, sir, in certain situations I believe

23  you could.

24          MR. EASTWOOD:  Your Honor, I want to now

25  turn to the video itself.  I don't know if the Court

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   wants to keep going or take a break?

 2          JUDGE SUTHERLAND:  Let's go for a few more

 3   minutes.

 4          MR. EASTWOOD:  I'm not playing the whole

 5   video at this time.

 6          JUDGE SUTHERLAND:  We probably saw as much

 7   of the roof of the car as we need to see.

 8      Q   (By Mr. Eastwood) I'm going to stick with

 9   the phase of the tape that deals with Jeff pulling

10   into the parking lot and the interaction with you,

11   okay?

12      A   Yes, sir.

13                  (VIDEO BEING PLAYED)

14      Q   (By Mr. Eastwood) And I suggest to you, you

15   see the car traveling down there, he's pulling in.

16   Is it fair to say the door just opened there?

17      A   I believe so, sir.

18      Q   So in your recollection did he open the door

19   only once the car had stopped?

20      A   I don't remember when exactly the door come

21   open, if it come open while he was coming to a stop

22   or came to a stop.  I was getting out of our car

23   then.

24      Q   In that taped section of the tape there, I

25   didn't hear an engine rev, did you?

Weinhaus, Vol. 2

```
 1        A    I didn't hear anything.

 2        Q    I didn't hear the car speed up, did you?

 3        A    I did not.

 4        Q    I heard Jeff's voice sound relatively calm,

 5   would you agree with that characterization as he was

 6   talking on the phone or talking to himself?

 7        A    Initially I thought he sounded agitated.

 8        Q    You thought he sounded agitated.  Do you

 9   think he sounded agitated just now on the phone or

10   to himself?

11        A    Initially he was agitated.

12        Q    When he was talking about the pastors and

13   preachers not coming with him?

14        A    Yes, sir.

15        Q    He doesn't mention an Army; right?

16        A    Excuse me?

17        Q    He doesn't mention an Army on this tape;

18   right?

19        A    No, I don't believe he does.

20        Q    That's Sergeant Mertens there?

21        A    Corporal Mertens, yes, sir.

22        Q    I apologize.  How would you characterize

23   Jeff's tone of voice in that interchange there, calm

24   or agitated?

25        A    He's just kind of in a way being a
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    smartalic, I think.
 2        Q   And that's consistent with your experience
 3    of Jeff previously; right?
 4        A   Yes, sir.
 5        Q   He's a smartalic, argumentative guy; right?
 6        A   Yes, sir.
 7        Q   Now you just said get down on the ground;
 8    right?
 9        A   I believe we both said it.  I think I hear
10    Corporal Mertens saying it as well.
11        Q   And that's you; right?
12        A   Yes, sir.
13        Q   And is that at or about the time you first
14    shot?
15        A   I believe it's pretty close.  I've already
16    dropped the folder that's in my right hand and I'm
17    beginning to bring my right hand up to my left hand
18    to what we call marry up our grip.  I know I fired
19    before I had my grip all the way because the slide
20    cut my hand.
21        Q   I remember that, I remember that.
22        A   But I'd say you're within a fraction of a
23    second of me firing the weapon.
24        Q   How long a period of time do you think
25    passed between the first time you stated "get down
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   on the ground" and when the first shot rang out?

 2        A   It wasn't very long, a few seconds.

 3        Q   If I submit to you that it was less than --

 4   it was somewhere around three seconds, would that

 5   sound accurate?

 6        A   I believe it would, sir.

 7        Q   Now, you've been with the Highway Patrol a

 8   long time.  How many times have you arrested

 9   middle-aged men about the size of Jeff Weinhaus?

10        A   I've arrested hundreds of people.

11        Q   Hundreds?

12        A   I couldn't classify middle-aged people.

13        Q   How many of them have been armed out of the

14   hundred?

15        A   I've arrested several armed people.

16        Q   And how many times have you ordered people

17   to get down on the ground?

18        A   Several times.

19        Q   And in your experience as a law enforcement

20   officer, how long would it take a middle-aged guy

21   the size of Jeff Weinhaus to comply with the order

22   to get down on the ground, being as you were on a

23   gravel incline parking lot?

24           MR. PARKS:  Objection, Your Honor, calls for

25   speculation on the part of the witness.
```

Weinhaus, Vol. 2

```
 1              JUDGE SUTHERLAND:  Sustained.
 2      Q    (By Mr. Eastwood) You have no opinion, sir?
 3              MR. PARKS:  Objection.
 4              JUDGE SUTHERLAND:  Objection is sustained.
 5      Q    (By Mr. Eastwood) So we heard about four
 6  shots there and you testified yesterday you did two
 7  in the chest and two to the head?
 8      A    Initially I fired two to the chest, one to
 9  the head and then I fired one additional round
10  towards the head.
11      Q    And do you know the angles of entry and of
12  exit of those bullets that went through Jeff's
13  chest?
14      A    I saw the impact areas, of course when I did
15  fire and of course when we rendered medical aid, but
16  I've never seen the report that details any angles.
17  I've never seen any of his medical records.
18      Q    Would it surprise you if the entrance wounds
19  were up high and the exit wounds were lower on his
20  body?
21      A    No, I'm taller than he is, that wouldn't
22  surprise me at all.
23      Q    The angle could also be consistent with
24  someone who was getting down on the ground; right?
25      A    I don't believe so, sir.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q   Why not, because if it goes in high and

2   exits lower, the person is lower than you; right?

3    A   That doesn't mean that the person shooting

4   isn't taller and in this case I am.

5    Q   How much taller are you than him?

6    A   I don't know how tall he is.

7    Q   But your height difference explains any

8   difference between the height difference of the

9   entry and exit wounds?

10    A   If a person is standing here and the other

11   person is standing here and they're taller and above

12   this person, when they fire, the rounds are going to

13   come in high and exit lower unless there's a

14   different type of incline.

15    Q   How far away were you from Jeff?

16    A   About seven feet.

17    Q   And that height difference is going to make

18   such a difference that it's going to be noticeably

19   higher and noticeably lower for the entry and exit

20   wounds?

21    A   I don't know how noticeably higher or lower

22   it is, sir, but that's my explanation.  I would

23   anticipate that if the person who fired was taller

24   than the person, vice versa if the person was

25   shorter I would anticipate the round to enter lower

1   and exit higher.

2      Q   We'll get to that in a second then.

3         JUDGE SUTHERLAND:  It's about time for

4   morning recess.  If you want to finish up with the

5   video first, that's fine.

6         MR. EASTWOOD:  Judge, I'm going to have to

7   spend more time with the video and stills with the

8   video as we go forward.  So if you want to do the

9   break now, Your Honor.

10        JUDGE SUTHERLAND:  All right.  Ladies and

11  gentlemen, the Court again reminds you of what you

12  were told at the first recess of the Court.  Until

13  you retire to consider your verdict, you must not

14  discuss this case among yourselves or with others or

15  permit anyone to discuss it in your hearing.  You

16  should not form or express any opinion about the

17  case until it is finally given to you to decide.  Do

18  not do any research or investigation on your own

19  about any matter regarding this case or anyone

20  involved with the trial.  Do not communicate with

21  others.  Do not read, view or listen to any

22  newspaper, radio, electronic communication from the

23  Internet or television report of the trial.  We'll

24  be in recess for 15 minutes.

25        (WHEREUPON A RECESS WAS TAKEN)

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              (BENCH CONFERENCE BEGINS)
 2         MR. EASTWOOD:  Your Honor, I would like to
 3   make a record, I plan to call upon defendant not to
 4   testify but to remove his shirt and tie and jacket
 5   to show the bullet wound scars on his body.  I
 6   believe that this will impeach Folsom's testimony as
 7   to the entry and exit wounds because the scars speak
 8   for themselves and are obvious to any layperson as
 9   to the location of they entered the body high and
10   left the back low.  I realize this is a somewhat
11   dramatic thing to do.  I do not believe this is a
12   violation of the defendant's Fifth Amendment right.
13   I believe he is still not testifying by doing so and
14   that the prosecution has adequate opportunity to
15   cross examine this evidence by simply also pointing
16   to the body of the person.  By analogy the defendant
17   has already stood up.  On the other hand I realize
18   that the prosecutor probably objects to this No. 1;
19   and No. 2, if the Court does not sustain or
20   overrules my motion to do this, then I would in the
21   alternative wish to make an Offer of Proof to the
22   jury or to the Court when the jury is not in the
23   presence.
24         MR. PARKS:  And Your Honor, I object to
25   this.  If the defendant is going to make this
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    demonstrative exhibit of his body, he's testifying,

2    and I do not have any way of cross examining about

3    this, plus the defendant is not offering any medical

4    testimony about the trajectory of the bullets or

5    anything like that, so all we would be doing would

6    be speculating about entry and exit wounds, and I

7    believe that would be misleading to the jury, and I

8    would object to any use of these wounds without me

9    being able to cross examine the defendant.

10          MR. EASTWOOD:  My response is I do not think

11   that expert and medical testimony is necessary to

12   make a scar readily visible to a juror.  I think out

13   of their ordinary life experience they can see a

14   scar is up high in the chest and much lower in the

15   back of the chest.  That is not testimony, it is

16   simply showing the presence of wounds on the

17   defendant's person.  There's ample evidence already

18   in the record that the defendant was shot by

19   Sergeant Folsom and medevaced to the hospital, so

20   this is not something that is speculative in any

21   way.

22          JUDGE SUTHERLAND:  Even if the defendant

23   does not say a word, I still believe such a

24   demonstration is testimonial in nature.  I frankly

25   don't think it impeaches Sergeant Folsom's testimony

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   for a couple of reasons.  No. 1, he hasn't disputed

2   the fact that the entry wounds on the front of

3   defendant's chest or body are higher than the exit

4   wounds on the back.  Secondly, that's consistent

5   with his testimony that the defendant, he believes,

6   was starting to crouch down as he was drawing the

7   gun or attempting to draw the gun out of his

8   holster, so it really doesn't impeach anything, but

9   since I believe it to be testimonial in nature, even

10  though the defendant is not necessarily saying a

11  word, I believe he's going to have to take the

12  witness stand and testify before he can do that, so

13  the request is denied, let's put it that way.

14        MR. EASTWOOD:  May I inquire of the Court

15  this:  If I make an Offer of Proof, will the Court

16  still consider that to be a waiver of the Fifth

17  Amendment privilege?

18        JUDGE SUTHERLAND:  No, no, not for an Offer

19  of Proof.

20        MR. PARKS:  I believe this could be

21  construed as an Offer of Proof.

22        JUDGE SUTHERLAND:  Since it's just take your

23  shirt off and let's look at it, I'd certainly

24  consider this an Offer of Proof.

25        MR. EASTWOOD:  I think that's right.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1              JUDGE SUTHERLAND:  And I think that will be

2    acceptable.

3              MR. PARKS:  I'm not objecting to an offer,

4    this being used as an offer.

5              MR. EASTWOOD:  To further supplement the

6    record as to the Offer of Proof, I take the Court's

7    position and I agree with it.  The idea of the

8    impeachment was the dramatic difference between the

9    height of what I allege to be the entry wound and

10   the exit wound, so therefore given the testimony

11   that he was seven feet away yet there is a height

12   difference that he may have been crouching

13   nevertheless that is a dramatic difference and that

14   would be consistent with the defendant's compliance

15   with the order to get on the ground.

16             JUDGE SUTHERLAND:  It's also consistent with

17   the witness's testimony that he was crouching down.

18   So I don't think it impeaches the officer's

19   testimony in any way, so.

20             MR. EASTWOOD:  Thank you, Your Honor.

21                  (BENCH CONFERENCE ENDS)

22        (WHEREUPON THE JURY ENTERED THE COURTROOM)

23             JUDGE SUTHERLAND:  Please be seated.

24   Mr. Eastwood, you may continue your cross

25   examination.

```
1              MR. EASTWOOD:  Thank you very much, Your

2    Honor.

3         Q    (By Mr. Eastwood) Sergeant Folsom, before

4    the break I was inquiring of you with the video and

5    the brief time period between when Jeff Weinhaus

6    exited the car and when you fired your first shot.

7    I submitted to you and you did not dispute that it

8    was approximately three seconds on the tape from

9    when you first stated "get down on the ground" and

10   when the first shot was fired by you; is that fair

11   to say?

12        A    Yes, sir, I believe that was accurate.

13        Q    And then you also testified that based on

14   your experience in the military, in law enforcement,

15   seven years Army, 16 years Highway Patrol; is that

16   right?

17        A    Yes, sir.

18        Q    That you could open one of these, pull out

19   the weapon and shoot in three seconds?

20        A    Yes, sir.

21        Q    And you knew Jeff Weinhaus had no military

22   training; right?

23        A    Yes, sir.

24        Q    No law enforcement experience?

25        A    Yes, sir.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q   In fact were there any facts that made you

2  think Jeff Weinhaus could undo this particular Army

3  type holster, pull out a gun and shoot you in three

4  seconds?

5          MR. PARKS:  Objection, Your Honor, calls for

6  speculation on the part of the witness.

7          MR. EASTWOOD:  I'm asking what he knows.

8          JUDGE SUTHERLAND:  Sustained.

9    Q   (By Mr. Eastwood) You also testified

10 yesterday that, and I think this morning as well,

11 that you didn't know what Jeff Weinhaus did with his

12 left hand once you got the tunnel vision; is that

13 fair to say?

14   A   Yes, sir, I lost track of his hand.

15   Q   Is it possible that he could have put his

16 left hand up in the air?

17   A   I don't recall that but anything is

18 possible.  I could only really see his right hand on

19 the gun.

20   Q   Well, I want to show you, and can everyone

21 see this on their screen.  This is a still, and

22 although I think as the Court noted yesterday, as

23 the Judge noted yesterday, the date sure is wrong,

24 we do have an hour, minute and secondhand timer;

25 right?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yes, sir, I see it there.

 2      Q    So I don't think the time is 1:42:03 but you

 3  do have a second timer; right?

 4      A    Yes, sir.

 5      Q    And is it fair to say you've already

 6  discharged your weapon there?

 7      A    Yes, sir, it looks like there's a shell

 8  casing exiting.

 9      Q    And a shell casing doesn't come out of the

10  gun until after you squeezed the trigger; right?

11      A    Yes, sir.

12      Q    And the bullet has left the gun?

13      A    Yes, sir.

14      Q    And this is all recorded on Jeff's left

15  hand; right?

16      A    Yes, sir.

17      Q    On his wrist watch?

18      A    Yes, sir.

19      Q    So if we go back in time very slowly, these

20  stills, I submit to you, are one still for each

21  1/29th of a second.  The hand, the angle of this

22  shot would suggest the hand was then facing at least

23  outward towards Corporal Mertens; right, the left

24  hand?

25      A    Yes, I believe it had to have been somehow
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   pointed at Corporal Mertens to get his picture.

2       Q    Corporal Mertens is not pointing his gun at

3   Jeff; right?

4       A    I can't tell, it looks like he's pointing

5   his gun to the ground, to me.

6       Q    In fact isn't that a position called a low

7   ready?

8       A    Yes.

9       Q    And that is a defensive position; correct?

10      A    It's just a position.

11      Q    It's a position, that's fair to say.  It's

12  not a position you're going to be in when you're

13  about to take a shot?

14      A    It is a position in preparation to make a

15  shot.

16      Q    But in fact in a potentially dangerous

17  situation, it's not uncommon for them to walk around

18  in a low ready?

19      A    No, it's faster to achieve a shot from the

20  low ready than from the holster or lower.

21      Q    When a gun is in a low ready, it's pointed

22  toward the ground; right?

23      A    Yes, sir, usually.

24      Q    Is one of the reasons for that is that if

25  the gun accidentally discharges, the bullet will hit

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   the ground?

2       A   I don't know if that's one of the reasons,

3   I've just been trained on the position.

4       Q   But it's fair to say as a matter of common

5   sense that if the gun was pointed higher, that it

6   could do a lot more damage if it accidentally went

7   off; right?

8       A   I would agree with that, sir.

9       Q   So let's continue going back in time on

10  these stills after Corporal Mertens is in the low

11  ready.  I just want to remind you the secondhand is

12  here and it says 03 when you're firing your weapon;

13  right?  There's the shell casing coming out, so

14  we're in second 03 when that bullet is coming out;

15  right?

16      A   Yes, sir.

17      Q   What's that, is that Jeff's car, Subaru?

18      A   Yes.

19      Q   Is that the front of the Subaru?

20      A   No, it looks like the side, maybe the rail

21  that goes along the roof there.

22      Q   Is that the roof along there, right there?

23      A   Looks like it.

24      Q   And that's the MFA oil station sign in the

25  background?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A   Yes, sir.

2      Q   Roughly speaking around here is when he

3  drove in before he made his loop around?

4      A   Yes, sir.

5      Q   And the secondhand here says two; right?

6      A   Yes, sir.

7      Q   And when you were firing your weapon, in

8  fact when the shell casing was coming out of the

9  weapon, the secondhand said three; right?

10     A   Yes, it still said three.

11     Q   So if we go up there, would it suggest to

12 you that Jeff's left hand was in the air based on

13 the angle of the video?

14     A   No, it would not.

15     Q   What would it suggest to you?

16     A   It could be at any angle here.  It's just

17 capturing the -- to me up in the air would be like

18 this.  It could be here at his mid section or torso

19 to capture that video.

20     Q   But that's the roof of the Subaru; right?

21     A   It's the side of the pillar, not the roof.

22     Q   Is it going upwards towards the sky that

23 direction?

24     A   Looks like it has that angle, yes sir.

25     Q   And if you assume the watch was worn as one

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   normally wears a watch on the left hand in this

 2   position, so the hand was at least as high as the

 3   roof of the Subaru; right?

 4        A    No, sir.

 5             MR. PARKS:  Objection, Your Honor, that

 6   calls for speculation on the part of the witness.

 7             JUDGE SUTHERLAND:  Sustained.

 8        Q    (By Mr. Eastwood) Let me ask you this.  You

 9   testified earlier that the roof of a Subaru is

10   higher than the roof of a normal sedan car; right?

11        A    It's higher than the roof of our car, yes,

12   sir.

13        Q    And in this picture it's fair to say you can

14   start to see most of the roof rack of the Subaru;

15   right?

16        A    I can see some of it, sir.

17        Q    So that wouldn't suggest to you that the

18   wrist watch video recorder was in such a place that

19   it could -- was high enough to record most of that

20   roof; right?

21             MR. PARKS:  Objection, calls for speculation

22   on the part of the witness.

23             JUDGE SUTHERLAND:  Sustained.

24        Q    (By Mr. Eastwood) Do you have any opinion

25   based on what you're looking at, not speculation,
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    any opinion on where Jeff's left hand was?

2         MR. PARKS:  Objection, Your Honor, that's

3    calling for speculation.

4         JUDGE SUTHERLAND:  Sustained.

5    Q    (By Mr. Eastwood) Secondhand here is at 02;

6    right?

7    A    Yes, sir.

8    Q    And we just went over how by secondhand 03

9    the video image sweeps around, captures you, kind of

10   captures the under side of your arm there; right?

11   A    Yes.

12   Q    Under side of your hand; right?

13   A    Yes, it appears to.

14   Q    You're left-handed?

15   A    Yes, sir, I am.

16   Q    And you shoot normally with your left hand,

17   at least that's what you hold the grip of the gun

18   with?

19   A    I can shoot with either had, I prefer to

20   draw with my left hand.

21   Q    It captures the underside of the barrel;

22   right?

23   A    Captures the under side of the gun.

24   Q    So the camera is in a low enough position it

25   can show all these things; right?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          MR. PARKS:  Objection, calls for speculation

2    on the part of the witness.

3          MR. EASTWOOD:  I'm asking the witness to

4    acknowledge what he sees.

5          JUDGE SUTHERLAND:  Overruled, you may

6    answer.

7          THE WITNESS:  Could you repeat the question,

8    sir.

9     Q    (By Mr. Eastwood) The camera accurately

10   captures the lower level of your arm, your hand, the

11   lower level of your gun; right?

12    A    Yes, sir.

13    Q    The camera is in a low enough position to

14   capture all that; right?

15    A    Yes, sir.

16    Q    And you've already shot there and it's one

17   second, approximately, one second or less than that

18   approximately from when the camera was showing the

19   top of the Subaru; right?

20    A    I don't know that I've already shot there.

21    Q    Oh, sure, we can back up.  There it is.  In

22   fact do you see a little white smoke or powder in

23   that still, it's a little hard to detect, I don't

24   know if you see it?

25    A    I do see some haze.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q    Is that consistent with a bullet exiting a

2  gun?

3      A    I wouldn't know, sir.

4      Q    Are you a firearms expert?

5      A    I'm a firearms instructor, not an expert.

6      Q    You've seen a gunshot before many times;

7  right?

8      A    Yes, sir.

9      Q    Now, you testified yesterday to Mr. Parks

10  that you fired four shots; is that right?

11      A    Yes, sir.

12      Q    And you said two in the chest, two in the

13  head?

14      A    Yes, sir.

15      Q    Do you remember approximately where the --

16  where you shot him in the chest?

17      A    I remember I saw -- he was wearing a dress

18  shirt and I saw the round hit him somewhere in here.

19  It looked just right on his heart or slightly above,

20  and I saw the round hit but what I mostly saw was

21  the blood coming out almost instantly out on his

22  shirt staining that area.

23      Q    Did you see the blood before you shot him in

24  the head?

25      A    I think I saw it while I was shooting.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  You're talking about fractions of a second.

2      Q    And then you fired a third bullet into his

3  head; right?

4      A    Yes.

5      Q    And then you testified yesterday that after

6  the third bullet you saw the whites in his eyes?

7      A    Yes, sir, I did.

8      Q    Based on your training and experience, what

9  does it indicate, if anything, when after someone is

10 shot you see the whites of their eyes?

11     A    In my opinion it indicated that he was

12 perhaps deceased or knocked out.  I never seen

13 anyone's eyes roll up in their head like that.

14     Q    When you shot Jeff Weinhaus, you intended to

15 kill him?

16     A    I intended to stop the threat and

17 incapacitate him.  If he died, that's what happened.

18     Q    Where were you taught to shoot?

19     A    Center mass.

20     Q    Cardiothoracic area?

21     A    Yes, sir.

22     Q    And the effect of that is to kill someone?

23     A    The effect is whatever the effect is.  We're

24 taught to shoot center mass.

25     Q    Did you intend to kill Jeff when you shot

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    him?

2        A    No.

3        Q    If you saw the whites of his eyes after the

4    third bullet, why did you keep shooting?

5        A    I'm taught to scan for additional targets.

6    I heard this screaming towards the gas station, and

7    when I heard a gun go off on my right side, I

8    thought perhaps he had fired a round into the gun, I

9    didn't realize Corporal Mertens possibly could have

10   been behind me and fired, and he was still standing,

11   still had his hand on the gun.  At that point he

12   started to rotate, he was moving, and I shot one

13   last shot to his head and he dropped instantly.

14       Q    In fact he turned around before he fell on

15   the ground; right?

16       A    After I fired the last shot he continued to

17   rotate and fell down.

18       Q    Do you know where the last shot you fired

19   hit him?

20       A    I didn't see it hit.  The whole front sight

21   of my gun was covering his face and head, but I

22   believe it hit him somewhere in the neck or head

23   region.

24       Q    Do you know if it went into the front or

25   back of his head?

1       A    I have no idea.  Like I said, my sight was

2   covering his head and he was turning at the same

3   time.

4       Q    Because after you fired the fourth shot,

5   Jeff was facing away from you and fell flat on his

6   face; right?

7       A    He was facing at an angle from me.  He was

8   not facing a perfect 180 degrees from me.  I had

9   stepped left again, so he fell the direction I was

10  facing.

11      Q    What happened next when Jeff went down?

12      A    When Jeff went down, I scanned again for

13  other targets.  I still heard screaming at the gas

14  station.  At that point I advanced closer to him.  I

15  could see Mike Maruschak, the FBI agent, running in

16  my direction.  Once Mike had advanced closer, I was

17  yelling for him to cover the set perimeter.  I still

18  did not know where the other shot came from.  I

19  thought there might be other people at the gas

20  station involved.  At that point I went up and

21  rolled Mr. Weinhaus on his left side and I could see

22  the gun underneath him.

23      Q    You testified yesterday that he still had

24  his fingers on the gun; right?

25      A    The gun, his fingers were on the ground and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   his gun was laying on top of his fingers pinned

 2   between him and his body.

 3       Q   So it's your testimony that he started to

 4   pull a gun out, had his hands on the gun, you shot

 5   him three times, he spun around, he fell flat on his

 6   face and his fingers never left that gun?

 7       A   I don't know if they never left it, I could

 8   just tell you what his final resting position was

 9   when I found him.

10       Q   Do you have an opinion on why he spun

11   around, was it the force of being shot?

12       A   I do not know.  Often people who are shot do

13   rotate if they're shot off to one side or another.

14   I've worked several shootings.  People do rotate

15   during a shooting, but he could have rotated when he

16   fell, I don't know.  I just know that he began to

17   rotate.

18       Q   Let's look at the camera again, the video.

19   So the watch camera moves around a lot in that

20   sequence of time; right?

21       A   It looks like it, yes, sir.

22       Q   And his body spun around; right?

23       A   Yes, sir, I saw his body spin.

24       Q   But his hands were on the gun, he spun

25   around, he fell over and then when you found his
```

1  hands again they were still on the gun or his

2  fingers were still on the gun?

3      A   Yes.  I described, when I rolled him over,

4  his hand was on the ground, the gun was laying on

5  top of his fingers and his body had the gun pinned

6  in between his fingers and his abdomen.

7      Q   And then you put the gun back in the holster

8  and tossed the holster away?

9      A   I put the gun back in the holster and then I

10  yelled for Mike Maruschak to cover me.  When he had

11  a good cover position, that's when I reached in and

12  undid the holster and tossed it.  I didn't try to

13  undo the holster while I still had my gun pointed at

14  Mr. Weinhaus.

15     Q   When you shoved the gun back in the holster

16  and reclipped it, did you reclip it?

17     A   Yes.

18     Q   Did Corporal Mertens see you do that?

19     A   I don't know what he saw, he was behind me.

20     Q   Did the FBI agent see you do that?

21     A   I don't know what he saw, he was standing to

22  my left, you'll have to ask him.

23     Q   Did Corporal Mertens see you detach the

24  holster and toss it away?

25     A   You'd have to ask him, sir.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q   You don't have any knowledge of whether he

2   knows?

3    A   I'll say I have knowledge that he saw me

4   toss the gun away because we talked about the

5   incident, but I don't know what he saw exactly like

6   if he saw me unclip it and then do this.  We did

7   have a conversation that he saw me throw the gun and

8   the holster behind me.

9    Q   You guys talked before you gave your

10  testimony today and yesterday; right?

11   A   Yes.

12   Q   Compared notes?

13   A   No, I didn't prepare notes.

14   Q   Did you compare notes?

15   A   No, we just talked about the case.  We

16  didn't have notes to compare, we just read the case

17  file.

18   Q   Did you compare what you were prepared to

19  tell the jury?

20   A   We talked about the incident.  I guess you

21  could say we talked about what happened.

22   Q   Were you concerned that you might not be on

23  the same page?

24   A   No, I'm not.

25   Q   In terms of your recollection of what

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  happened?

2       A    I was never concerned.

3       Q    Did you cuff Jeff?

4       A    Yes, sir, I did.

5       Q    How long did you cuff him, after he went

6  down, how long did it take for you to cuff him?

7       A    It was just a few seconds when Mike came and

8  covered me, and I was able to toss the gun, and then

9  I immediately pulled his right hand behind his back

10  and handcuffed him and pulled his left hand behind

11  his back and handcuffed him and rolled him onto his

12  left side.

13       Q    Based on your training, once you cuff a

14  suspect, do you consider the suspect to be in your

15  custody?

16       A    Not always.  In this particular case I

17  handcuffed Mr. Weinhaus but he was not under arrest.

18  I handcuffed him for safekeeping, but I deemed that

19  once I handcuffed Mr. Weinhaus in this situation

20  that he was under arrest.

21       Q    So in this instance did you think Jeff was

22  in your custody?

23       A    Yes, sir.

24       Q    Did you think Jeff was dead?

25       A    Yes, sir, I did.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q   What factors, what information made you

2  think Jeff was dead?

3    A   Because his body was lifeless.  He turned

4  gray.  There was no blood that could be visible in

5  his limbs, and he was bleeding profusely from the

6  wounds.  I rolled him over onto his side, Corporal

7  Mertens came up and we started applying pressure to

8  the areas where he'd been shot and he was just

9  lifeless.  There was no doubt that he was 100

10  percent unconscious or he was deceased.

11    Q   Is it normal procedure still to cuff a dead

12  person if you just shot him?

13    A   I cuffed him, regardless it is procedure, I

14  did not know.  Later he sat up, so, we always cuff

15  everyone.

16    Q   The day of the shooting you did a walk

17  through of the scene with Sergeant D.C. Bauer;

18  right?

19    A   Yes, sir.

20    Q   Why did you tell Sergeant Bauer that Jeff

21  was still struggling when he went down on the

22  ground?

23    A   He struggled after we rolled him over onto

24  his side.  He woke up and he was kind of kicking his

25  leg and struggling, and you can hear that on the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  tape, people asking him to hold still and he was

 2  struggling at that point.

 3     Q   So why did you think he was dead if he was

 4  struggling?

 5     A   I thought he was dead initially but my

 6  opinion now is that he was just knocked out, and at

 7  some point he became conscious and began to

 8  struggle.

 9     Q   How long a period went by between you

10  shooting Jeff, him going down -- strike that.

11      How long a period went by between Jeff being

12  cuffed and you thinking he's dead and Jeff starting

13  to struggle.  How long of a time period, I'm not

14  going to hold you to an exact --

15         MR. PARKS:  I object to that, it's

16  irrelevant to the case in chief here.

17         JUDGE SUTHERLAND:  Overruled, you may

18  answer.

19         THE WITNESS:  Could you repeat the question.

20     Q   (By Mr. Eastwood) How long a time period

21  went between you cuffing Jeff and Jeff struggling?

22     A   When I rolled him onto his side, I

23  handcuffed him and rolled him onto his side, he was

24  still unconscious.  Corporal Mertens took over the

25  medical aid and was talking to him.  I stepped away

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   to make sure Pat, Mike and no one was shot at the

 2   gas station, and when I came back he was struggling

 3   and moving.  And later I looked over again and he

 4   was sitting up, so I don't know exactly what time he

 5   started struggling.  I just know when I looked over

 6   maybe two minutes later, he was struggling and

 7   kicking.

 8        Q   Was he struggling when you removed the gun

 9   from him?

10        A   No, he was out cold.

11        Q   Was he struggling when you removed the

12   holster from him?

13        A   No, sir.

14        Q   Do you recognize -- may I approach, Your

15   Honor?

16            JUDGE SUTHERLAND:  Yes.

17        Q   (By Mr. Eastwood) Do you recognize this

18   document?

19        A   Yes, sir.

20        Q   That's the scene walk through that Detective

21   Bauer did with you?

22        A   Yes, sir.

23        Q   And we spoke, when I took your deposition, I

24   asked you if you reviewed the police reports; right?

25        A   Yes, sir.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    And you said you stood by them; right?

2    A    I said that I believed they were an accurate

3   description.

4    Q    Could you read the highlighted portion of

5   that police report.

6    A    "Weinhaus spun around and fell to the ground

7   face first.  Sergeant Folsom immediately went to

8   Weinhaus and removed the pistol and holster from

9   Weinhaus' hip area and threw Weinhaus' holster and

10  pistol away to a safe distance.  Weinhaus was still

11  struggling with Folsom as Folsom removed the pistol

12  from him.  Sergeant Folsom placed handcuffs on

13  Weinhaus with Weinhaus' arms behind his back."

14   Q    So which is accurate, sir, what it says on

15  the report that you told me was all right or what

16  you just said now on the stand?

17   A    What I said in my initial statements is

18  accurate.  You'd have to ask Mr. Bauer why he wrote

19  that.  I didn't write that.

20   Q    Do you think he made a boo boo, wrote down

21  what you said wrong?

22   A    You'd have to ask him, sir.

23   Q    When I took your deposition, you told me

24  under oath that you wouldn't change anything.  I

25  guess you don't stand by that statement anymore;

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  right?

 2      A   No, I hadn't noticed that, so I wouldn't

 3  change anything.

 4      Q   Do you know how long passed between your

 5  cuffing -- strike that.

 6       Do you know how long passed between your

 7  shooting Jeff and when the ambulance arrived?

 8          MR. PARKS:  Objection, Your Honor,

 9  irrelevant.

10          JUDGE SUTHERLAND:  Overruled, you may

11  answer, if you know.

12          THE WITNESS:  I do not know the exact time.

13  I never timed it, but I heard something close to

14  seven minutes, but I heard that from other people.

15      Q   (By Mr. Eastwood) Sergeant Smith's report

16  indicates that it's nine minutes, does that sound

17  accurate?

18      A   If that's what he wrote, I guess.

19      Q   And you told Perry Smith, the investigating

20  trooper, that Jeff was bleeding out of his head

21  during that time; right?

22      A   Yes, I saw blood -- I saw blood all over his

23  face and torso, and there was a pool of blood on the

24  ground.  The ground was pretty heavily soaked with

25  blood, and he was laying on his side in the blood.

```
 1        Q    Did you provide first aid to Jeff Weinhaus?
 2        A    I rolled him over onto his side, which is
 3   recovery position.  I immediately got down to talk
 4   to him and apply pressure.  I pointed out where I
 5   had struck him with the rounds so Corporal Mertens
 6   could apply appropriate techniques, and I went to
 7   check on everyone.
 8        Q    You went to check on?
 9        A    I went to check on the people at the gas
10   station, Agent Cunningham and make sure no one else
11   was injured or shot.
12        Q    So you did not provide first aid?
13        A    Other than rolling him onto the recovery
14   side and coming back and checking on Corporal
15   Mertens who was doing aid and talking to him, I
16   didn't do any further medical aid.  I made sure the
17   ambulance was on the way.
18        Q    Would your training and experience suggest
19   that it's important to administer first aid to
20   someone who has been shot four times at close range?
21        A    Yes, sir.
22        Q    Can you administer adequate first aid while
23   the suspect is still handcuffed?
24        A    I guess it depends on his injuries, sir.
25        Q    Let's talk about Jeff Weinhaus' injuries,
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   two shots to the chest, two shots to the head.

2   Could you give him adequate first aid while he's

3   still handcuffed?

4          MR. PARKS:  Objection, calls for

5   speculation.

6          MR. EASTWOOD:  Training and experience.

7          JUDGE SUTHERLAND:  Overruled, answer if

8   you're able.

9          THE WITNESS:  We were applying pressure to

10  the wounds.  Scott Mertens started applying pressure

11  to the wounds, and I think that can be done in any

12  position, handcuffed or unhandcuffed.

13     Q   (By Mr. Eastwood) Did you treat for shock?

14     A   When I rolled him over onto his side, that's

15  what's known as the recovery position, so that was

16  the best position to place him in being wounded in

17  the head and torso.

18     Q   This was on a gravel incline; right?

19     A   It was on -- well part that was slightly

20  elevated, yes.

21     Q   And it was gravely?

22     A   Yeah.

23     Q   Did you do anything to protect his head or

24  did anyone do anything underneath his head?

25          MR. PARKS:  Objection, irrelevant.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          JUDGE SUTHERLAND:  Overruled.

 2          THE WITNESS:  We don't have anything to put

 3   under his head.

 4     Q    (By Mr. Eastwood) Didn't have any clothes to

 5   put under his head?

 6     A    I don't think anyone was thinking that.  We

 7   rolled him over to his side and applied pressure to

 8   the wounds.  We could have done a lot of things.

 9     Q    Sometimes treating for shock is to cover the

10   patient to warm the patient up; is that correct?

11     A    Yes, sir.

12     Q    That was not done here?

13     A    Like I said, we didn't have anything to put

14   over him to warm him.

15     Q    You testified that you didn't give first

16   aid.  Do you know if anyone else treated for

17   breathing?

18     A    You'd have to ask Corporal Mertens.  I know

19   he had him in the recovery position and he began to

20   struggle not long after that.

21     Q    Struggle, he was still cuffed; right?

22     A    Yeah, he began kicking his feet.

23     Q    He was still in your custody; right?

24     A    Yes, sir.

25     Q    Did anyone check heart rate and pulse to
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  your knowledge?

 2     A    You'd have to ask Corporal Mertens if he

 3  did, sir.

 4     Q    Did you search Jeff's person, his clothes,

 5  for weapons, contraband or anything like that?

 6     A    When I handcuffed him and rolled him over on

 7  that side, I searched his side and I briefly

 8  searched the other side and rolled him over into the

 9  position, I didn't see anything.

10     Q    Were you particularly concerned about

11  weapons or contraband at that point in time?

12     A    Once I had him handcuffed behind his back

13  and I swept his waistband and other areas reachable

14  and I didn't see any weapons, I wasn't that

15  concerned.

16     Q    Sergeant Folsom, I think you testified

17  earlier you're a pretty good shot; right?

18     A    I think a decent shot, yes, sir.

19     Q    You're a pretty quick shot; right?

20     A    Yes, I'm very fast.

21     Q    And in fact you know how to use your weapons

22  almost instinctively based on your military training

23  and law enforcement training; right?

24     A    Yes, sir.

25     Q    But you also have a nerve injury, don't you?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A   Yes, sir, I do.

 2      Q   And you have a condition in your nerves that

 3  makes you partially paralyzed; is that not correct?

 4      A   Yes, sir, I do.

 5      Q   And it also gives you tremors and shakes; is

 6  that not correct?

 7      A   Yes, sir, it does.

 8      Q   It affects your arms?

 9      A   It affects both my arms and legs.

10      Q   Does it affect your hands?

11      A   Yes, it does.

12      Q   So it affects your arms and your hands?

13      A   Yes, sir.

14      Q   And it impairs your fine motor skills,

15  doesn't it, sir?

16      A   At times it does.

17      Q   In fact you get disability compensation for

18  these tremors, don't you?

19      A   Yes, I am a disabled veteran.

20      Q   And these tremors, these shakes, they're

21  made worse by the presence of adrenaline, aren't

22  they?

23      A   In my case, when the adrenaline jumps, my

24  tremors are worse.  I know that from previous

25  experiences, it's just something I can't control but
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    my tremors are worse with adrenaline.  It's normal

2    for people to have tremors after something like that

3    or a dump of adrenaline, so in my case having

4    already being partially paralyzed in my nerves and

5    having the added adrenaline, my hands do shake.

6       Q    And in fact on the day and time that you

7    shot Jeff Weinhaus, those shakes and tremors kicked

8    in, didn't they?

9       A    Yes.  When I began to secure the weapon from

10   Mr. Weinhaus and put it in the holster, my hands

11   began to shake.

12      Q    And your training teaches you that when you

13   see a gun, your adrenaline automatically rushes in,

14   and they teach you that in the Highway Patrol;

15   right?

16      A    I think when anyone sees a gun their

17   adrenaline starts to elevate.

18      Q    Fair statement, I think that's a matter of

19   common sense, sure.  And so when you saw Jeff

20   Weinhaus had a gun, your adrenaline kicked in;

21   right?

22      A    Yes, sir.

23      Q    And you also told Perry Smith, and I think

24   you just told us earlier, that you had cut your hand

25   just before you shot Jeff; is that also correct?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    No, sir, that's not correct.

 2        Q    Did you cut your hand?

 3        A    My thumb was cut after I fired the first

 4   round by the slide coming back.

 5        Q    Which hand was it cut?

 6        A    On my right thumb, it's still scarred today.

 7        Q    How did you cut it?

 8        A    When I fired my weapon with the left hand, I

 9   had not met my grip yet, and when I went to put my

10   grip in, the slide came back from me firing the

11   round, and when the slide came forward, it sliced

12   open my thumb as I met my grip prior to firing the

13   second round.

14        Q    Did it hurt you?

15        A    Yes, sir, it was painful.

16        Q    Did the pain bother you?

17        A    Now?

18        Q    No, at the time.

19        A    No, I didn't even notice it until after it

20   was over.

21        Q    Are you taught that you are a better shot

22   when you have both hands on a gun than one hand on a

23   gun?

24        A    Yes, sir.

25        Q    And when you first started shooting Jeff
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   Weinhaus, you only had one hand on the gun; right?

2        A    When I fired the first round, I only had one

3   hand on the weapon, sir.

4        Q    And you moved as you shot Jeff Weinhaus;

5   right?

6        A    Yes, sir.

7        Q    You moved in I think you said a counter

8   crescent position; right?

9        A    I moved to the left, yes, sir.

10       Q    And you moved because in your back sight you

11  had innocent civilians, FBI, propane tanks and gas

12  tanks; right?

13       A    Yes, sir.

14       Q    But you started shooting when those things

15  were still in your back sight; right?

16       A    No, sir.

17       Q    You've reviewed Perry Smith's report on this

18  investigation; right?

19       A    Yes, sir.

20       Q    And you told me under oath when I took your

21  deposition that you thought it was substantially

22  accurate; right?

23       A    Yes, sir.

24       Q    And you wouldn't change anything?

25       A    Yes, sir.

Weinhaus, Vol. 2

369

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q   Perry Smith seems to suggest that you fired

2  and then that you were trying to get a safe backdrop

3  as you moved; is that correct?

4    A   I think he probably miswrote that.  I moved

5  trying to get a safe backdrop.

6    Q   Do you want to look at it?

7    A   I believe you, sir.  You'd have to ask Perry

8  Smith why he wrote that.

9    Q   You didn't catch that when you reviewed

10  this?

11    A   No, sir.

12    Q   Did you tell him something different?

13    A   I don't believe that I did.  As a matter of

14  fact, I was audio recorded, so I don't believe that

15  I did.

16    Q   You don't believe that you told him

17  something different?

18    A   No.

19    Q   You think he wrote it down wrong?

20    A   You'd have to ask him.

21    Q   Didn't you also tell Perry Smith, though,

22  when you spoke to him and he recorded your

23  conversation that you were nervous that you may have

24  fired at the guttermen?

25    A   It happened so fast I was nervous when I

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  heard the screaming.  When I heard the screaming, I

2  was nervous that maybe I hadn't cleared the backdrop

3  as well as I thought I had.

4      Q   And you also told Perry Smith that at the

5  time you suspected the guttermen might somehow be

6  affiliated with Jeff; right?

7      A   I did, in my opinion, they just showed up at

8  the half abandoned store and started cleaning out

9  the gutters.  There were minimal gutters, I just

10 wasn't sure why they were there.

11     Q   So you could have been shooting at the enemy

12 for all you know; right?

13     A   I did not fire at them.

14     Q   But you did tell Perry Smith that you may

15 have fired at them; right?

16     A   I told him when I heard the screaming, I was

17 not sure that maybe I hadn't cleared the backdrop

18 completely but in my opinion I had.

19     Q   And as you moved in this circular fashion,

20 were you concerned that you were getting into the

21 line of fire of Corporal Mertens?

22     A   No.  Corporal Mertens was, I believe, to my

23 right and rear, and so I was stepping at the same

24 time and I was increasing my distance away from him,

25 but I wasn't even aware that he had fired until

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  after the incident was over and I asked him if he

 2  fired his weapon and he said he thought he had.

 3      Q   Sergeant Folsom, you testified earlier that

 4  you killed a man earlier in the line of duty as a

 5  law enforcement officer; is that correct?

 6      A   Yes.

 7      Q   In fact you shot a man in his home after you

 8  said he had a gun; right?

 9          MR. PARKS:  I object to the relevance of

10  this.

11          MR. COMBS:  Approach, Your Honor.

12          JUDGE SUTHERLAND:  Yes, come on up.

13              (BENCH CONFERENCE BEGINS)

14          MR. EASTWOOD:  I think this is relevant for

15  a couple of reasons; common scheme or plan in his

16  shooting of other civilians with a gun.  I think it

17  also goes to the fact that the way that both events

18  were reported is strikingly similar.  I think that

19  that goes to its intent for shooting Mr. Weinhaus,

20  and I think it's fair impeachment.  He opened the

21  door by testifying to it.

22          MR. PARKS:  What's the relevance of it to

23  here?  It doesn't have anything to do with this

24  case, and it doesn't go to any impeachment of him.

25  He was on duty, it was ruled a clean shoot.  What's

```
 1   the relevance?

 2          JUDGE SUTHERLAND:  I don't think it's very

 3   relevant and it's remote in time as well.  The

 4   objection is sustained.

 5          MR. EASTWOOD:  I would like to make an Offer

 6   of Proof of that at the appropriate time.  Thank

 7   you, sir.

 8                (BENCH CONFERENCE ENDS)

 9      Q    (By Mr. Eastwood) Do you dislike

10   Mr. Weinhaus?

11      A    No, I do not dislike him.  I feel sorry for

12   him.

13      Q    That day you went to the gas station, had he

14   gotten under your skin?

15      A    No, sir.

16      Q    But you were kind of scared of him; right?

17      A    No, sir, I was not afraid of him.

18      Q    You weren't afraid of him but you were

19   alarmed by him once he drove into the parking lot;

20   right?

21      A    I was alarmed by his actions.

22      Q    Who uncuffed Jeff when the paramedics

23   arrived, was it you?

24      A    I don't believe that I did.  At some point

25   later I found out that my handcuffs were on the
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   trunk of Corporal Mertens' car.  I don't believe it
 2   was me.
 3        Q    But you were the one that cuffed him though?
 4        A    I cuffed him initially but I don't believe I
 5   unhandcuffed him.
 6        Q    Just to review, since you shot Jeff
 7   Weinhaus, you have been on leave from the Highway
 8   Patrol?
 9        A    Right after I shot Mr. Weinhaus, I was off
10   for a few days, I came back to work for a few days,
11   then I've been off on extended leave, I believe,
12   since November 11th, I believe it is.  I've never
13   worked again, other than my Court testimony.
14        Q    You turned your gun over at the scene;
15   right?
16        A    Yes, I turned over my small subcompact gun.
17        Q    Have you ever been issued a gun since by the
18   Highway Patrol?
19        A    I still have guns issued by the Highway
20   Patrol.  They asked me if I wanted that gun replaced
21   and I said no.
22        Q    But you can't use them in the line of duty
23   right now; right?
24        A    I am not on active duty.  I'm not supposed
25   to take any enforcement actions, so I do not carry a
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  weapon.
 2      Q   Are you allowed to wear the uniform of the
 3  Highway Patrol right now?
 4      A   No, sir.
 5          MR. EASTWOOD:  I have no further questions
 6  at this time, Your Honor.
 7          JUDGE SUTHERLAND:  Redirect?
 8          MR. PARKS:  I have no redirect, Your Honor.
 9          JUDGE SUTHERLAND:  May this witness be
10  finally excused?
11          MR. PARKS:  He's more than welcome to stay
12  or he can leave as far as I'm concerned.
13          JUDGE SUTHERLAND:  Thank you.  You are
14  excused and free to stay or go as you wish.
15          MR. PARKS:  This might be a good time for a
16  lunch break or do you want me to start on the next
17  one?
18          JUDGE SUTHERLAND:  Yes, we have lunch set up
19  for about noon.  Call your next witness.
20          MR. PARKS:  I call Corporal Mertens.
21      (WHEREUPON CORPORAL MERTENS WAS SWORN IN)
22       DIRECT EXAMINATION OF CORPORAL MERTENS
23  QUESTIONS BY MR. PARKS:
24      Q   Please state your name for the Court.
25      A   My name is Scott, middle initial E, last
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   name is Mertens.
 2        Q    And you are a corporal with the Missouri
 3   State Highway Patrol; is that correct?
 4        A    That is correct.
 5        Q    How long have you been with the Highway
 6   Patrol?
 7        A    Since January 1st of 1996.
 8        Q    And have you had any special training in the
 9   detection of drugs or marijuana?
10        A    Yes, I have.
11        Q    What training have you had?
12        A    I've had training in the academy.  I also
13   served as the Troop I eradication officer for a year
14   and also zone eradication for several years in the
15   zone that I was assigned in prior to coming into the
16   Criminal Investigation Unit.
17        Q    And I direct your attention to August 22nd.
18   Did you and Sergeant Folsom do a non-custodial
19   interview with Mr. Jeff Weinhaus?
20        A    Yes, we did.
21        Q    And do you see Mr. Weinhaus in the courtroom
22   today?
23        A    The podium is blocking him.
24        Q    You may stand.
25        A    But yes, he's there with the glasses on the
```

1    right side of the defense table.

2         MR. PARKS:  Your Honor, would the record so

3    reflect the witness has identified the defendant.

4         JUDGE SUTHERLAND:  The record will so

5    reflect.

6         Q    (By Mr. Parks) When you went to the

7    defendant's home, why did you go there?

8         A    It was Sergeant Folsom's investigation.  I

9    hadn't been involved in the investigation until that

10   time, and he requested I go with him to contact

11   Mr. Weinhaus referencing a threat on a judicial

12   officer.

13        Q    Did you initially go to the house or did you

14   have to find the house?

15        A    We had to find the house.  We looked in

16   Crawford County first and we had some information

17   that he was at Piney Park, I think from a webcast or

18   something that he had done, so we ended up at Piney

19   Park at the residence he was at.

20        Q    When you got to the residence, what

21   happened?

22        A    There was several residences, two or three

23   residences up there, we weren't sure which one was

24   his, and the first one that was up the road, we

25   decided we'd start with that one.  So we walked to

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  that residence, knocked on the door and Mr. Weinhaus

 2  answered the door.

 3      Q    Where were you standing when Mr. Weinhaus

 4  came to the door?

 5      A    Probably three or four steps, maybe five

 6  steps down because it was a small walkway, and for

 7  officer safety reasons when you walk up on the

 8  house, you don't want to put both people right up

 9  there next to the door in case something happens.

10      Q    When Mr. Weinhaus came to the door, did you

11  recognize him?

12      A    Absolutely.

13      Q    How did you recognize him?

14      A    From the video that I had previously seen.

15      Q    When he came to the door, what happened?

16      A    Mr. Weinhaus stepped out of the doorway,

17  shut the door behind him.  Sergeant Folsom engaged

18  him in conversation, asked if we could move off the

19  porch area there and into the grassy area kind of

20  down below, and Jeff ultimately led us over to the

21  carport area, passed the carport area to his truck

22  to give us a pamphlet that he had.

23      Q    Was there a conversation then between

24  Sergeant Folsom and the defendant?

25      A    Yes.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    And were you a part of that conversation?

2    A    Off and on.

3    Q    Was there anyone else in the house?

4    A    Yes.  At the time we did not know that but

5  eventually we found out that his wife Judy was in

6  the house.

7    Q    And did she come out of the house?

8    A    Yes, eventually.

9    Q    Did you contact her?

10    A    Yes, I did.

11    Q    Did you ask her for permission to search the

12  house?

13    A    Yes, I did.  No, I'm sorry, I asked her if

14  there was anything illegal in the house.

15    Q    And what happened?

16    A    She said that she did not have anything

17  illegal in the house.

18    Q    So when you searched the house, were you

19  looking for anything illegal that she might have

20  had?

21    A    We were looking for anything that was

22  included in on the warrant once the warrant was

23  issued.

24    Q    And after the conversation ended with you

25  and Sergeant Folsom and the defendant, what happened

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  next?
 2      A   Sergeant Folsom had placed him in handcuffs
 3  and he went to go apply for a search warrant for the
 4  residence.  He left me behind to have conversation
 5  and keep the Weinhauses from entering their
 6  residence, to secure the residence so they didn't go
 7  in and destroy any type of evidence.  So I stayed
 8  behind with another trooper that we called for
 9  back-up, and he also arrived there to help me so I
10  wasn't stuck there by myself with people.
11      Q   After the search warrant was obtained, what
12  did you and Sergeant Folsom do next?
13      A   Sergeant Folsom returned, we left two or
14  three of the officers outside with Mr. Weinhaus to
15  make sure he didn't come in during the search and we
16  conducted a search of the residence.
17      Q   When you searched the residence, did you
18  start in the upstairs area?
19      A   Yes.
20      Q   What did you find there?
21      A   Sergeant Folsom seized some computers there
22  just at the top of or as you come into the front
23  door, there was like a computer desk there and
24  explained that that was for the judicial threats.
25  We have a computer forensic lab that would look at
```

```
 1   the hard drives and anything that was on the
 2   computer.
 3        Q   And did you find anything else in the
 4   upstairs?
 5        A   There was also a gun located in the back
 6   bedroom, I would call it, probably the master
 7   bedroom.
 8        Q   And I show you what has been marked as
 9   State's Exhibit No. 27.  Does this look like the gun
10   and holster that you found in the house?
11        A   Yes.
12        Q   And did you seize this gun and holster at
13   that time?
14        A   No, we did not.  We determined it belonged
15   to someone other than Mr. Weinhaus, and there was
16   nothing else packaged with it, no drugs in the
17   drawer with it or anything illegal, so we decided
18   that the gun would not be seized.
19        Q   What did you do next?
20        A   The basement was also searched while we were
21   there.
22        Q   The basement area?
23        A   Yes, the basement area.
24        Q   And did you notice anything unusual about
25   the basement area?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    If you compare it to my basement, no,
 2   because I have a lot of clutter, newly built house
 3   and many boxes still unpacked in there, but it was
 4   just a big storage area, and then off to one corner
 5   on the -- if you're looking at the front, it would
 6   have been on the right side of the house was kind of
 7   a room partitioned off with -- that you saw in the
 8   video.
 9        Q    During your conversation, had the defendant
10   talked about this being his command center?
11        A    I believe he did but to say that's his exact
12   words, I do not know.
13        Q    When you got into this room, did you
14   recognize the background from the video?
15        A    Yes, the background was the same as what we
16   saw in the video.
17        Q    Did you commence to search this area of the
18   house?
19        A    Yes, we did.
20        Q    What did you find there?
21        A    Actually to clarify that, Sergeant Folsom
22   searched that area, I was standing in the background
23   because there's not really enough room for two
24   people in there, it was a very small area.  I did a
25   secondary search after Sergeant Folsom did his
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   preliminary search just to make sure.  We try to do

 2   that in case an officer misses something or doesn't

 3   see something, a second officer at least has an

 4   opportunity to put eyes on it.

 5        Q    I show you what has been marked as State's

 6   Exhibit No. 6.  Do you recognize this photo?

 7        A    Yes, I do.

 8        Q    What do you recognize this photo to be?

 9        A    That is some of the evidence that Sergeant

10   Folsom discovered in the area of Mr. Weinhaus' back

11   room.

12        Q    I show you what's been marked as State's

13   Exhibit No. 7.  Do you recognize this photo?

14        A    Yeah, it's the same evidence, just spread

15   out.

16        Q    And all of this evidence was taken from the

17   container, with the exception of the large bottle,

18   all came out of that case?

19        A    That is correct.

20        Q    And what are the items that are in that

21   case?

22        A    I didn't bring my glasses, so it's hard for

23   me to see.  There was some -- two marijuana smoke

24   pipes or what we'd call marijuana smoke pipes, a

25   crusher, it crushes marijuana, you put marijuana
```

1    inside it and you kind of spin it and crush it.  It

2    even has the marijuana leaf on top of the crusher,

3    and you just asked for the ones inside, right?

4        Q    Yes.  And then the items on the outside, the

5    jar?

6        A    The glass jar and the Camel tin.

7        Q    And the glass jar contained what?

8        A    I believe it contained marijuana.

9        Q    And the tin is where you found the -- where

10   the pills were found?

11       A    Yes, Sergeant Folsom found the pills inside

12   the container.

13       Q    And also the scale was found inside this

14   container?

15       A    Yes, I believe so, yes.

16       Q    And looking at six, we can see, you can see

17   the scale inside that with all the marijuana and the

18   drugs and the drug paraphernalia, that was all

19   packaged together?

20       A    Yes.

21       Q    Did you search any place else in the house?

22       A    We just searched the entire house.

23       Q    And did you find anything else of

24   evidentiary value?

25       A    Not of evidentiary value, I don't believe.

1      Q    Did you find a bag of marijuana?

2      A    Oh, yeah, I'm sorry, yes, we did find a bag

3   of marijuana just off to the left of the place where

4   Mr. Weinhaus had -- if you're looking at the front

5   of the house, it would have been to the left of the

6   place where Mr. Weinhaus had his little office set

7   up.

8      Q    I show you what has been marked as State's

9   Exhibit No. 11.  Do you recognize this photo?

10      A    Yes, that's the bag that contained the

11   marijuana on the top of the shelf.

12      Q    Did you seize that?

13      A    Yes, I did.

14      Q    And where was that located?

15      A    That was located -- you can kind of see a

16   doorway in the lower left and that goes to the

17   laundry room, and this laundry room, the laundry

18   room and the office were kind of separating or that

19   was in between the laundry room and the little

20   office area where he had the backdrop for his pod

21   cast.

22      Q    After you had searched and seized these

23   items, what did you do next?

24      A    I was responsible for filling out the search

25   warrant return, so I began filling out the search

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  warrant return of everything to include the serial

2  numbers of the computer, things like that, list of

3  what we seized.  We have to do that within a certain

4  amount of time and get it back to the Court so the

5  Court knows what we seized from the residence.

6      Q    And these items were sent to the Missouri

7  State Highway Patrol for analysis?

8      A    Yes, they were.

9      Q    I direct your attention now to September

10  11th, 2012.

11      A    Yes.

12      Q    Did you and Sergeant Folsom execute an

13  arrest warrant on the defendant?

14      A    Yes, we did.

15      Q    On September 11th, what were your plans for

16  executing this arrest?

17      A    Sergeant Folsom and I discussed what we were

18  going to do that day and tried to figure out how to

19  get Jeff to meet us without a huge confrontation or

20  anything like that.  So we decided to do the ruse of

21  returning his computers, and we came up with the

22  ruse to call him and say hey, we're here to return

23  your computers.  We wanted to do it before the 17th,

24  the day that he called Constitution Day, so he could

25  be arrested prior to that day of his day that he

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  said he was going to occupy the courthouse.

 2       Q    And you had seen the videotape of

 3  Mr. Weinhaus where he said that he -- September 17th

 4  was the day when these county officials or

 5  officials, state officials should remove themselves

 6  from office?

 7       A    Yes, I had seen that.

 8       Q    And when you got to the scene, what did you

 9  do?

10       A    When we got to the scene, we -- to the scene

11  at the?

12       Q    At the gas station, the MFA station.

13       A    When we got to the MFA station, we kind

14  of -- the first time we went there or later?  I'm

15  not sure what you're asking me there.

16       Q    When you set up to effect the arrest of

17  Mr. Weinhaus, what did you do?

18       A    We met with the FBI agents there, kind of

19  came up with a plan of how we were going to take

20  Mr. Weinhaus into -- under arrest, and then Sergeant

21  Folsom ended up calling Mr. Weinhaus on the

22  telephone who said he was going to bring additional

23  people, so at that time we decided to have the FBI

24  stage across the parking lot so in case someone else

25  did come, they could approach from behind and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    provide kind of security from behind the other

2    people so they didn't know that they were there.

3         Q    And I show you what has been marked as

4    State's Exhibit No. 14.  Do you recognize this?

5         A    Yes.

6         Q    What do you recognize this to be?

7         A    I recognize that as the parking lot of the

8    MFA Oil Station on Route K.

9         Q    And the white car here, is that your car?

10        A    That was my issued patrol car at the time.

11        Q    And the blue Subaru, what car is that?

12        A    The Subaru is Mr. Weinhaus' car.

13        Q    And now this photo was taken after the

14   shooting; is that correct?

15        A    That is correct.

16        Q    And so there are other cars, we see a white

17   Highway Patrol car and a wagon, several other

18   Highway Patrol and county vehicles there that were

19   not there during the incident; is that correct?

20        A    That is correct.

21        Q    I show you what has been marked as State's

22   Exhibit No. 19.  Do you recognize this?

23        A    Yes, that is just another angle of the MFA

24   parking lot.

25        Q    And I show you what has been marked as

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    State's Exhibit No. 16.  Do you recognize that?

2        A    Yes.

3        Q    Now this is the angle of the car where --

4    this is where Jeff's car, the defendant's car ended

5    up; is that correct?

6        A    That is correct.

7        Q    When the defendant's car pulled in, and you

8    all were sitting here in your white car prior to the

9    defendant pulling in; is that correct?

10       A    Yes.

11       Q    How were you dressed?

12       A    I was dressed in khaki cargo style pants,

13   they're like a 511 style pant, and a Highway Patrol

14   emblemed polo shirt.

15       Q    How were you armed?

16       A    I was armed with an issued Glock 27, it's a

17   subcompact pistol.

18       Q    Now that is what you normally carry in your

19   role as a detective; is that correct?

20       A    They give us the option of carrying the

21   larger Glock 22, it's a larger model, it has more

22   capacity and a magazine for more rounds, but I

23   usually chose to carry the subcompact just because

24   you can conceal it a little better from people.

25       Q    It's easier to ride in the car with that

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  one, isn't it?

 2       A   Easier all the way around.

 3       Q   Did you have your larger capacity Glock with

 4  you?

 5       A   Yes, it was inside the car.

 6       Q   What other weapons did you have?

 7       A   I had an AR15, and I also had a shotgun

 8  inside the car.

 9       Q   Did you have a ballistic vest?

10       A   Yes, I did.

11       Q   Do you have that on at the time?

12       A   No, I did not.

13       Q   Why not?

14       A   We're not required to wear our ballistic

15  vests as investigators, the road guys are because

16  they deal with people on a regular basis.  When we

17  usually go somewhere that we think is going to be a

18  major threat or something like that, we'll put the

19  vests on.  That day Sergeant Folsom and I even

20  discussed in the car, I think he brought it up to

21  me, and I said "well, Jeff is not going to do

22  anything.  If he thinks he's getting his computers

23  back, it's just going to be an easy arrest", and so

24  we chose not to put the vests on.

25       Q   And so you were at the driver's door and got
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   out of the driver's door of the car when
 2   Mr. Weinhaus arrived?
 3        A    That is correct.
 4        Q    And Sergeant Folsom got out of the passenger
 5   side seat of the white car; is that correct?
 6        A    That is correct.
 7        Q    And where did you take up position?
 8        A    I started to go toward Mr. Weinhaus' vehicle
 9   and Sergeant Folsom stopped me and requested that I
10   go to the trunk and pop the trunk to support the
11   ruse that we were returning his computer.
12        Q    And had you all planned to do this ruse?
13        A    Yes.
14        Q    And I show you what's been marked as State's
15   Exhibit No. 17.  Do you recognize this?
16        A    Yes.
17        Q    And in this photo, where would you have been
18   when Mr. Weinhaus got out of his vehicle?
19        A    As I was approaching, when he got out of the
20   vehicle, I think I actually had turned around to
21   push the trunk release inside the car.  We had had
22   the windows down, it was a nice day, we were sitting
23   there in the parking lot with the car off, so we had
24   rolled down the windows, and I reached into the car
25   to push the trunk release and then walked back to
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   the trunk.  So somewhere in that period of time is

 2   when he would have gotten out of the car.

 3        Q    What happened next?

 4        A    I lifted the trunk, opened the trunk and

 5   heard him and Sergeant Folsom start to engage in

 6   conversation, and I heard Sergeant Folsom say, "what

 7   are you doing with that gun".

 8        Q    What do you do at this time?

 9        A    Drew my gun, brought it to the high ready.

10   I was on the SWAT team, and we're taught that to

11   keep it up high because it's a lot quicker to push

12   it out and take control of the firearm than it is to

13   keep it low all the time.

14        Q    Did you see the defendant at this time?

15        A    Yes, I did.  I had a clear view of

16   Mr. Weinhaus.

17        Q    What was the defendant doing at this time?

18        A    The defendant was engaged in conversation

19   with Sergeant Folsom and I was approaching him.

20        Q    What did you see?

21        A    As I was approaching Mr. Weinhaus, I saw him

22   reach down and he pulled on the flap of the green

23   holster, which released it.  Mr. Weinhaus stuck his

24   hands back down to his side and gave a, I would call

25   it a cold chill or something like that, where he did
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   like a tremor, and immediately I thought this is

 2   bad.

 3        Q    And is this the holster that he had on or is

 4   this the type?

 5        A    It is similar.

 6        Q    So you saw him go down and release?

 7        A    I did not see him grab the strap.  I just

 8   saw him reach up in front of it and pull it down and

 9   release it, and I saw the front of it pop up

10   slightly.

11        Q    And what did his hand do next?

12        A    His hand went down to his sides and you

13   could even hear me stutter in the video because my

14   adrenaline is going, I'm starting to get really

15   nervous and keep telling myself I've got to breathe,

16   I've got to breathe, I've got to breathe.

17        Q    What happened next?  Do you need a glass of

18   water?

19        A    No, I'll be all right.  Mr. Weinhaus stuck

20   his hand underneath the holster and grabbed the butt

21   of the gun, and I brought my gun straight out

22   immediately and took a sight picture on his head.

23        Q    Were you yelling for him to get down on the

24   ground?

25        A    I was telling him to get down on the ground.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1     Q    What happened next?

2     A    He was not complying and as soon as he stuck

3  his hand under the flap and started to pull the

4  weapon out of the holster, I fired my service

5  pistol.

6     Q    Did you hear Sergeant Folsom fire?

7     A    Yes, I did.  I never heard mine go off, so I

8  wasn't even sure I fired.  I felt the recoil of my

9  gun, but I did hear Sergeant Folsom's rounds going

10  off.  I never heard my round.  I actually had to

11  take my magazine out to make sure I did fire because

12  I knew I could feel the recoil, so.

13     Q    What did you do after you had shot at the

14  defendant?

15     A    We're taught to immediately go and cover the

16  officer that -- Sergeant Folsom was ahead of me and

17  he had already started to engage Mr. Weinhaus on the

18  ground, so I went up and provided cover until he was

19  able to secure the weapon.  Sergeant Folsom told me

20  he still has his hand on the gun or something to

21  that effect, and he struggled with him for a little

22  while trying to get the holster undone from the belt

23  it looked like, and then he tossed the holster, he

24  tossed the holster behind Mr. Weinhaus, and I saw

25  the gun was inside the holster, and I also saw Agent

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   Maruschak from the FBI coming our direction.  So I

 2   immediately left where I was standing.  And because

 3   I saw Agent Maruschak started to take cover of

 4   Mr. Weinhaus, I immediately went to the car and

 5   contacted Troop C headquarters and requested an

 6   ambulance and additional people.

 7        Q   When you saw the defendant go down, what did

 8   you think had happened?

 9        A   I thought he died.  I can remember thinking

10   in my head going it looked like an MMA fight when

11   somebody gets knocked out, it was just a timber, he

12   went straight down and his muscles all tensed up and

13   I thought he died.

14        Q   What did you do after Sergeant Folsom had

15   removed the gun from the defendant?

16        A   I went to the car to --

17        Q   After you came back, did you apply first aid

18   to the defendant?

19        A   I tried to keep -- no, not immediately.

20   There was -- the two cars that we stationed on

21   either end of where our position was in case

22   Mr. Weinhaus ran or tried to flee in his vehicle, we

23   had them stationed on either side of us so we would

24   have them available to stop him before he got too

25   far.  Whenever I called for help, I could hear one

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   of the cars coming our way with his siren and engine

2   coming, I could hear him coming, so I stepped over

3   to actually park him, which we're taught to do in

4   accident scenes and other scenes to make sure that

5   nobody damages any of the physical evidence, and I

6   was taught to block the position that Mr. Weinhaus

7   was in because we didn't want anything to be tainted

8   or anything like that.  So I parked his car kind of

9   where it blocked Mr. Weinhaus' position from the

10  rest of the parking lot.  And you can kind of see

11  that in this picture here, the silver car out in

12  front of Mr. Weinhaus' car is where I had him park.

13  And then when I was talking to him, Mr. Weinhaus

14  started to move and I said he's not J4, which is

15  he's not dead.

16      Q   And you heard that on the video or on the

17  watch video?

18      A   I don't think we got that far in the watch

19  video at that time.

20      Q   What did you do next?

21      A   I went to my trunk and got some personal

22  protective equipment, gloves, and then I went and

23  started to deal with Mr. Weinhaus.

24      Q   Was Mr. Weinhaus moving?

25      A   Yes, he was trying to sit up and I kept

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   trying to tell him just to lay still, and I kept

2   him -- I tried to keep him on his side for the

3   longest time but then he kept trying to sit up.  And

4   I thought he's causing himself more damage by trying

5   to sit up, so I let him go ahead, and I said

6   Jeffrey, I'm going to let you sit up but don't move

7   after that, and I kept him like that until the

8   ambulance got there.

9        Q    What kind of first aid were you applying?

10       A    Keeping him calm.  There was no blood coming

11  out of his chest at the time.  There was blood

12  dripping from his face but it had kind of stopped,

13  it wasn't like it was just running out of his face

14  or anything like that.  I think he hurt his nose

15  when he fell forward.

16       Q    And prior to this time, had you ever had any

17  contact with the defendant?

18       A    Yes, on August 22nd.

19       Q    But besides the going and doing the search

20  warrant at his home, had you ever had any contact

21  prior to that?

22       A    No, I had not.

23       Q    This investigation?

24       A    No.

25       Q    Did you have any animosity toward the

1  defendant?

2      A   No, Jeff and I got along very well on the

3  22nd, and in fact when he called our headquarters,

4  he referred to me as a very professional officer.

5      Q   So as you testified, you did not expect any

6  trouble from the defendant?

7      A   No, I did not.  And Sergeant Folsom and I

8  had discussed that and I figured as long as I was

9  there, everything was going to be fine with

10  Mr. Weinhaus.

11        MR. PARKS:  I have no further questions of

12  this witness, Your Honor.

13        JUDGE SUTHERLAND:  We'll start on cross.

14  Cross examination.

15        MR. EASTWOOD:  Thank you very much, Your

16  Honor.

17        **CROSS EXAMINATION OF CORPORAL MERTENS**

18  **QUESTIONS BY MR. EASTWOOD:**

19      Q   Good morning, Corporal Mertens.

20      A   Good morning.

21      Q   What are your current duties and rank with

22  the Highway Patrol?

23      A   I'm a corporal with the Missouri State

24  Highway Patrol, and my duties are a criminal

25  investigator assigned to the Division of Drug and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Crime Control within the Highway Patrol.

2        Q    That's where you were assigned at the time,

3    that's where you were assigned at the time of the

4    shooting?

5        A    Yes.

6        Q    And are you still working there today?

7        A    Yes, I am.

8        Q    Still wearing the uniform?

9        A    I do not wear a uniform very often.  I dress

10   like this most days.

11       Q    You're entitled to wear a uniform and carry

12   a gun and use it in the line of duty?

13       A    Yes, absolutely.

14       Q    How long was Sergeant Folsom your partner or

15   supervisor?

16       A    I came into the unit I think it was March of

17   2006, and he was the supervisor of the unit at that

18   time.

19       Q    And was he your partner at that time too?

20       A    He was my supervisor.  Since there was only

21   two of us at the time, I'd say yeah, he would be my

22   partner.

23       Q    Partner and supervisor?

24       A    Yeah.

25       Q    And was he your partner and supervisor up to

```
 1   the time of the shooting?
 2       A   Yes.
 3       Q   And then who was your partner or supervisor
 4   since the shooting, someone else?
 5       A   Yes.
 6       Q   Who is that person?
 7       A   Sergeant Dottie Taylor, and I also have
 8   another person that works in the unit named Sergeant
 9   Greg Dubuois.
10       Q   None of those individuals had any
11   involvement in the Weinhaus investigation or
12   shooting?
13       A   That is correct.
14       Q   Were you aware -- well let me ask you this,
15   first of all.  Why didn't you -- did you think at
16   any time that you ought to serve the warrant on Jeff
17   at his house earlier in the day of the shooting
18   other than another location?
19       A   We discussed that and we -- that was not a
20   viable option.
21       Q   You and Sergeant Folsom?
22       A   That is correct.
23       Q   And Sergeant Folsom had been your partner,
24   your supervisor, your mentor for about six years at
25   this point?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1      A    I would say close to six, yes.

2      Q    You trusted him and respected his opinion?

3      A    Yes.

4      Q    Trusted his judgment?

5      A    Yes.

6      Q    You had his back?

7      A    Yes.

8      Q    And you concurred in his judgment that it

9  was not advisable to serve the warrant at Jeff's

10 house?

11     A    I don't think it was just his decision, it

12 was something we discussed and our training tells us

13 both that's not a good idea.

14     Q    But you sat in this courtroom when Sergeant

15 Folsom testified; right?

16     A    That is correct.

17     Q    And you also heard that he wasn't too happy

18 in some ways about having to go serve this arrest

19 warrant?

20     A    He expressed that at the time also.

21     Q    He was anxious because Jeff had really gone

22 after him?

23     A    He wasn't anxious about Jeff going after

24 him, he was more anxious that someone else didn't

25 take over the investigation.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    Oh, okay.  You mean so he'd be relieved of

2  his responsibilities for the investigation and

3  someone else put on it?

4    A    Yes.

5    Q    Did he resent Lieutenant Satterfield for

6  making him serve this warrant?

7    A    That's something you'll have to ask

8  Mr. Folsom, not me.

9    Q    Did he ever say anything to you about

10  Mr. Satterfield?

11    A    Not that I recall.

12    Q    Now Sergeant Folsom testified at some length

13  about his experience with Jeff Weinhaus.  Is it fair

14  to say this wasn't his first rodeo with Jeff

15  Weinhaus, he was pretty familiar with him.  Were you

16  pretty familiar with him?

17    A    I think Sergeant Folsom testified that this

18  was an investigation but he had heard of Jeff

19  previously.  I don't think he had any other

20  investigations with Jeff, to my knowledge.

21    Q    But Sergeant Folsom did say that he was

22  aware, maybe he hadn't heard directly but he was

23  aware that Jeff Weinhaus had said that he was going

24  to occupy courthouses on many dates before?

25    A    Yes, but I don't think he was assigned that

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   investigation is what I'm saying.
 2       Q    And he'd been publishing the Bulletinman for
 3   16 years at least and making these threats off and
 4   on?
 5       A    I'm not sure how long he's been publishing
 6   his stuff.
 7       Q    Were you aware that Jeff had made these
 8   threats to remove people from office and to occupy
 9   the courthouses?
10       A    During the investigation that came up, yes.
11       Q    And he had made them many times before?
12       A    I do not know how many times he had made
13   them before.
14       Q    But to your knowledge he never actually did
15   that, occupied a courthouse?
16       A    Not that I know of.
17       Q    He never actually had done anything directly
18   to an elected official or judge, right?
19       A    Not that I'm aware of.
20       Q    In fact, did you think that Jeff was
21   somewhat harmless before you got to the MFA station?
22       A    To me, yes.
23       Q    Is that part of the thinking behind your --
24   the fact that you did not wear a bullet proof vest?
25       A    Sure.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1       Q    And in fact I think you told Perry Smith,

 2  the investigating trooper, that he, when he got out

 3  of the car, he appeared nicely dressed; right?

 4       A    I said he was nicely dressed, yes.

 5       Q    So he was wearing a shirt and tie; right?

 6       A    Yes.

 7       Q    I also took your deposition; right?

 8       A    Yes.

 9       Q    You were under oath?

10       A    Yes.

11       Q    You knew about depositions, you'd been

12  deposed before, there was a court reporter and

13  Mr. Parks there?

14       A    Yes.

15       Q    It was a fair proceeding?

16       A    Yes.

17       Q    And you also told me that after Jeff got out

18  of the car, this all happened so fast; right?

19       A    It happened very fast.

20       Q    And you've seen that video, you've seen it

21  here in Court, in your deposition, you probably saw

22  it when you were getting ready for trial; right?

23       A    Yes.

24       Q    You watched it together with Sergeant

25  Folsom?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    No.

 2      Q    At no time?

 3      A    I don't believe so, no.

 4      Q    Now do you have any knowledge or opinion as

 5   to how long it took Jeff to undue his holster and

 6   remove the gun?

 7      A    All I know is from what I saw.

 8      Q    And you can't put a number of seconds on

 9   that?

10      A    Not and be accurate.  It happened very fast.

11   Like I said, I turned from my trunk, started to walk

12   toward him and that's when I saw him start to undue

13   the holster.

14      Q    In fact when Jeff got into the -- Jeff first

15   got out of his car, Sergeant Folsom, your partner,

16   your supervisor, had directed you to go and stand

17   behind the trunk of your car; right?

18      A    No, he did not.

19      Q    When did he direct you to do that?

20      A    He didn't direct me to do that, to stand

21   behind my trunk, he directed me to open my trunk.

22      Q    So to open your trunk, did you go behind the

23   car?

24      A    I went behind the car and opened the trunk,

25   that's correct.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    And Jeff was standing by the driver's side

2    of his car when he first got out?

3    A    No.  When he first got out, yes.

4    Q    That would be logical, right, he would have

5    to be standing by it at some point.  And did Jeff

6    move towards the back of his car or sideways away

7    from his car?

8    A    Toward the -- not toward the back but kind

9    of straight north.

10   Q    Like there?

11   A    Straight north from where the circle is that

12   you're pointing at.

13   Q    Towards the X?

14   A    Towards the X.

15   Q    Towards Sergeant Folsom?

16   A    Towards Sergeant Folsom.

17   Q    Could you see Jeff when you were standing

18   over here behind the car?

19   A    Yes, you could even see that in the vehicle

20   because you have a full view of me and I have a full

21   view of Jeff.

22   Q    At what point in time during the

23   conversation, during the interchange were you able

24   to see Jeff?

25   A    As soon as I turned from the trunk I could

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   see Jeff.
 2        Q    The Subaru at least partially blocked him at
 3   some point in time; right?
 4        A    I was not looking at him at that time
 5   apparently because the time that I saw him was when
 6   I turned from the trunk and saw the -- saw him
 7   standing there.
 8        Q    And he was facing north; right?
 9        A    He was facing towards Sergeant Folsom.
10        Q    And the holster was on his right-hand side;
11   right?
12        A    It was in the right front.
13        Q    And Sergeant Folsom earlier testified that
14   Jeff was standing in the bladed position with his
15   left food forward; right?
16        A    Yes, he did testify to that.
17        Q    So if Jeff is standing facing north in a
18   bladed position with his left foot facing forward,
19   how are you able to see the holster standing over
20   there?
21        A    I'm standing behind the vehicle, and you can
22   see in the video that I have a full view of Jeff's
23   body, and Jeff's head squared up to Sergeant Folsom,
24   as he testified, and I could see the holster, and I
25   could see him pull the holster flap down and release
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1   the holster flap.
2       Q   I heard you say that before but my question
3   is in the video you can certainly see the wrist
4   catch camera on the left-hand side of Jeff, you can
5   see you standing over here, but if Jeff's left foot
6   is forward and the wrist watch camera video can see
7   you out to the side, how could you see his holster
8   on his right-hand side?
9       A   Because in my position I did not see him
10  bladed.
11      Q   It was just Sergeant Folsom that saw him
12  bladed?
13      A   Yes.
14      Q   So you saw something different than Sergeant
15  Folsom?
16      A   Absolutely.
17      Q   So you have a different recollection of
18  that.  Now Jeff's hand, at any point after Sergeant
19  Folsom, and I think you chimed in "get down on the
20  ground", did you ever see it go up in the air?
21      A   No, I did not.
22      Q   In fact you told me in your deposition that
23  it absolutely did not go up?
24      A   Absolutely did not go up.
25      Q   After you said get down on the ground?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1        A    That is correct.

2             JUDGE SUTHERLAND:  We need to break for

3    lunch pretty soon.

4             MR. EASTWOOD:  I want to play a brief clip

5    from the camera and it would be a good point in the

6    cross examination to take a break.

7             JUDGE SUTHERLAND:  A captive lunch for you

8    today.  I remind you what you were told at the first

9    recess.  Until you retire to consider your verdict,

10   you must not discuss this case among yourselves or

11   with others or permit anyone to discuss it in your

12   hearing.  You should not form or express any opinion

13   about the case until it is finally given to you to

14   decide.  Do not do any research or investigation on

15   your own about any matter regarding this case or

16   anyone involved with the trial.  Do not communicate

17   with others about the case by any means.  Do not

18   read, view or listen to any newspaper, radio,

19   electronic communication from the Internet or

20   television report of the trial.  We'll be in recess

21   until 1:10 p.m.

22            (WHEREUPON A LUNCHEON RECESS TOOK PLACE)

23            JUDGE SUTHERLAND:  Was lunch okay?  Okay,

24   you may take the stand, you're still under oath.

25   Mr. Eastwood, you may continue your cross
```

1    examination.

2          MR. EASTWOOD:  Thank you, Your Honor.

3     **CONTINUED CROSS EXAMINATION OF CORPORAL MERTENS**

4     **QUESTIONS BY MR. EASTWOOD:**

5          Q   Good afternoon.  I believe before we broke

6     for lunch we were talking about what happened in the

7     very few seconds before Sergeant Folsom started

8     shooting, is that your recollection too?

9          A   Yes.

10         Q   I think we're on the same page as to where

11    we left off.  And you testified that although Jeff's

12    right side was away from you, nevertheless you had a

13    good view of his holster?

14         A   Yes, it was on the right front instead of

15    the right side.

16         Q   So even though he was bladed with his left

17    foot, you could see that from where you were?

18         A   I didn't say he was bladed, I said he was

19    squared with Sergeant Folsom.

20         Q   Sergeant Folsom said he was bladed?

21         A   That's correct.

22         Q   And crouched?

23         A   I think you guys discussed him crouching

24    down to draw the weapon, but he was not crouched as

25    in crouched down to the ground.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q    What's the distinction?

2      A    What Sergeant Folsom was saying was pure

3   speculation that he leaned forward with his

4   shoulders.  A lot of times when someone draws a gun,

5   they will lean forward.  We're taught to do that.

6      Q    You're taught to do that in law enforcement

7   training?

8      A    Yes.

9      Q    Jeff has no law enforcement training?

10      A    Not that I'm aware of.

11      Q    He's not a veteran either?

12      A    I have no idea.

13      Q    But to your knowledge he never served in the

14   military and wasn't trained in military tactics;

15   right?

16      A    I never was given that information, no.

17      Q    And which hand did Jeff use to undo this

18   holster?

19      A    He used his right hand.

20      Q    So were you looking at his right-hand the

21   whole time -- strike that.

22       Were you looking at his right hand in the two

23   to three seconds prior to Sergeant Folsom shooting

24   his first shot?

25      A    I wasn't only looking at his right hand, no,

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   I was looking at his entire body.  I had a view of
 2   his entire body.
 3        Q    When Sergeant Folsom said, "why do you have
 4   a gun, Jeff", where did you look first?
 5        A    I looked at Jeff Weinhaus.
 6        Q    Where on his body?
 7        A    I looked at Jeff Weinhaus, I'm not sure if I
 8   looked at any particular part of his body but I
 9   could see his entire body.
10        Q    How far away from him were you?
11        A    From the map over there I would hate to
12   guesstimate.
13        Q    I'll bring it over, helps you, helps the
14   jury, helps everyone.  Where were you, were you
15   here?
16        A    I was behind the car, yes.
17        Q    By the trunk?
18        A    That's right.
19             MR. EASTWOOD:  Your Honor, I'll move it back
20   so you can see.
21             JUDGE SUTHERLAND:  I can see fine.
22        Q    (By Mr. Eastwood) You were here because you
23   were pretending to get computers out of the trunk?
24        A    Yes.
25        Q    And Jeff got out of the car?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yeah.

 2      Q    And then you said he moved due north?

 3      A    Yes.

 4      Q    And where did he stop around, the X?

 5      A    I'm not sure exactly where he stopped at.

 6 All I know is I could have the full view of his

 7 body.

 8      Q    So if you're standing here, presumably he

 9 was at least up to about there; right?

10      A    That would be correct.

11      Q    Because the Subaru otherwise would be --

12      A    Blocking my view, yeah.

13      Q    Because it's higher than a regular sedan?

14      A    That's correct.

15      Q    And in this position walking north with his

16 left foot forward, at least what Sergeant Folsom

17 said, you were able to see his holster?

18      A    Jeff was not walking at the time that I saw

19 him.  Jeff was standing still.

20      Q    So at some point he walked from the car door

21 to about there?

22      A    Correct.

23      Q    And what did he say during that time period?

24      A    I heard Sergeant Folsom and him talking.

25 Sergeant Folsom said, "What are you doing with that
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  gun?"

2       Jeff said, "What are you doing with your gun?"

3       And Sergeant Folsom replied, "I'm authorized."

4       He said, "Well, I'm authorized too," and the

5  conversation carried on.  He told him to get on the

6  ground.  Jeff said, "You're going to have to shoot

7  me man" or "You're going to have to shoot me,"

8  something to that effect, and that's when the firing

9  started.

10      Q   Now, we're going to watch the video in a

11 second but you had your gun out?

12      A   Absolutely.

13      Q   At some point in the video before Jeff said

14 you don't have to shoot me or you don't have to

15 shoot me man or you're going to have to shoot me

16 man, you had your gun out before that?

17      A   To clarify that, he didn't say you don't

18 have to shoot me.

19      Q   In your opinion?

20      A   No, he never said that.

21      Q   No room for doubt?

22      A   No room for doubt.

23      Q   We'll let the jury listen to the tape but

24 you had your gun out at a low ready?

25      A   No, I had mine out at a high ready.

1    Q   But at a high ready is it pointed out or is
2  it pointed towards the ground?
3    A   Usually it's pointed straight ahead.  It's
4  here where you just point straight out.
5    Q   And do you normally take a shot from that
6  position?
7    A   You can take a shot, that's the whole
8  purpose of having it here, that you can shoot as
9  you're extending it out.
10   Q   You shoot during the extension?
11   A   Yes.
12   Q   And you said you were able to see all of
13  Jeff at this time?
14   A   Absolutely.
15   Q   You can see a little legend down here, are
16  you able to read that, sir?
17   A   Yes, I am.
18   Q   So were you about 10, 15 feet away from him?
19   A   Judging by the legend, I would say anywhere
20  from 10 to 20, maybe 25.
21   Q   And when Sergeant Folsom said, "Get down on
22  the ground," you echoed back, "Get down on the
23  ground," didn't you, didn't you also say that?
24   A   I think I said, "Get down, get down, get on
25  the ground," something to that effect.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1     Q   Something to that effect fair to say?

 2     A   Yes.

 3     Q   You were both giving a similar order?

 4     A   Yes, we're taught to give similar orders so

 5  you don't have somebody doing opposite things.  You

 6  don't want somebody saying get down and the other

 7  person saying raise your hands and then you have a

 8  problem with they don't know what to do.

 9     Q   What would you have said if Sergeant Folsom

10  hadn't said something first?

11     A   We're trained to say get down.

12     Q   Not hands up?

13     A   Not hands up.

14     Q   Not hands off the gun?

15     A   Not hands off the gun.

16     Q   And you say that Jeff's hand went to his

17  holster?

18     A   Yes.

19     Q   Right hand?

20     A   His right hand went to his holster.

21     Q   And Jeff's left hand, what happened to it?

22     A   I do not know.

23     Q   You do not know?

24     A   Nope.  I was not concentrated on his left

25  hand.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    But I did take your depo; right?

 2      A    That is correct.

 3      Q    And you were under oath?

 4      A    Yes.

 5      Q    And you've been to that rodeo before, you

 6 know how depos work?

 7      A    Yes, we discussed that earlier.

 8      Q    Good.  You told me in your depo that his

 9 left hand never went in the air; right?

10      A    Right.

11      Q    And now you're not sure; right?

12      A    You'll have to repeat that.

13      Q    You're not sure now what happened to his

14 left hand?

15      A    I said I did not see where his hand went.

16      Q    Well, you did not see, you also told me in

17 your depo that his left hand was absolutely with his

18 right hand; isn't that true?

19      A    I don't recall that.

20      Q    Let's turn to your deposition.

21      A    I'm pretty sure I didn't say that, so.

22      Q    Well, I guess I'm a little confused reading

23 your testimony because -- are you okay with me

24 reading it to you?

25      A    Absolutely.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Where are we?
 2      Q   (By Mr. Eastwood) Page 48.  "Question:"
 3  That would be me.  "Okay, let me stop you there.
 4  When you said he reached, with which hand did he
 5  reach?"
 6      "Answer:  With the right hand, I believe."
 7      "Question:  Okay, and what was his left hand
 8  doing at the time?"
 9      "Answer:  I don't recall."
10      "Question:  Okay, could it have been with the
11  right hand?"
12      "Answer:  I just said it was with the right
13  hand."
14      "Question:  Oh, did you?"
15      "Answer:  Yes."
16      "Question:  Okay."
17      "Answer:  That he reached down with the right
18  hand."
19      "Question:  But could his left hand been
20  reaching over toward his right hand?"
21      "Answer:  Oh, absolutely."
22      "Question:  But you're not sure?"
23      "Answer:  I'm not sure."
24      A   Okay, you asked me could it have been there,
25  it could have been there, absolutely, it could have
```

1    been there, if that's what you were asking me and

2    what I understood from the deposition.  I never said

3    that his left hand was over in front of himself or

4    reaching with the right hand.  You asked me if it

5    was possible, I said it was possible.

6         Q   Because you weren't paying attention to his

7    left hand; right?

8         A   I was paying attention to Mr. Weinhaus,

9    whether his left hand moved in front of him, I have

10   no idea.

11        Q   So you're 20, 25 feet away and you were

12   paying attention to Mr. Weinhaus but you didn't know

13   what his left hand was doing?

14        A   That is correct.

15        Q   After Sergeant Folsom said, "Get down on the

16   ground," you don't know whether Jeff put his left

17   hand up in the air or not, do you?

18        A   Jeff Weinhaus never put his left hand up in

19   the air.

20        Q   I want to turn your direction to the screen

21   in front of you.  Can you see that?

22        A   I can.

23        Q   And the Court can and the jurors can.  You

24   were here when I ran through these stills with

25   Sergeant Folsom; right?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    A    Yes, I was.

2    Q    And we know the date is wrong on this and we

3    know the clock is not at the right hour and minute,

4    but it's functioning and it's at second three of

5    minute 42, and you can see a shell coming out of

6    Sergeant Folsom's gun; right?

7    A    That is correct.

8    Q    And the angle of the wrist watch camera is

9    sort of below Sergeant Folsom; right?

10    A    Excuse me?

11    Q    The angle of the wrist watch camera is at a

12    low angle to Sergeant Folsom?

13    A    That is correct.

14    Q    And when we go back, there we have the white

15    smoke, it's tricky to see but I think Sergeant

16    Folsom saw it if we go back, these stills are 1/29th

17    of a second, that's you?

18    A    That's correct.

19    Q    You're at your high ready?

20    A    Correct.

21    Q    So the gun is not quite aiming at Weinhaus;

22    right?

23    A    Right.

24    Q    And then we're no longer at second 03, we're

25    at second 02 on the clock, and the clock is taking a

```
 1   picture there and you can see the roof of the

 2   Subaru; right?

 3       A   You don't see the whole roof, you see the

 4   side of the car.

 5       Q   And you see the oil station, that was --

 6   that sign, that sign, sir, is probably down around

 7   there; right?

 8       A   It's labeled on your thing there.

 9       Q   So it's right there; right?  So you're

10   seeing that part of the Subaru; right?

11       A   Yes.

12       Q   And you're seeing the sign there; right?

13       A   That's correct.

14       Q   And you're seeing it on a wrist watch camera

15   that was on Jeff Weinhaus' left wrist; right?

16       A   Yes.

17       Q   And this is one second before the first

18   bullet comes flying out of Sergeant Folsom's gun;

19   right, roughly one second?

20       A   Is that a question?  I'm sorry.

21       Q   Yes, it is, sir.

22       A   Yes.

23       Q   Did you see the butt of the gun?

24       A   Excuse me?

25       Q   The handle, the grip of Jeff Weinhaus' gun?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1      A    No, I just saw him reach underneath the

 2  holster to pull out the gun.

 3      Q    Did you ever see the pistol, his handgun

 4  come free and clear from the holster?

 5      A    To my knowledge it never came free of the

 6  holster.

 7      Q    And you fired; right?

 8      A    Absolutely.

 9      Q    And do you know how many shots?

10      A    I originally thought just one, but after the

11  investigation was complete, it was determined I

12  fired twice.

13      Q    And we talked about that in your depo and

14  you said gee, that was an honest mistake and we got

15  that all on the record; right?

16      A    I think so, I don't recall.

17      Q    I think that's right.  And when you fired --

18  strike that.

19       Later on during the investigation, a bullet

20  strike was found here on the wall; right?

21      A    That is correct.

22      Q    Do you have an opinion on whether or not

23  that came from your gun?

24      A    It most likely came from my gun.

25      Q    And what is the basis for that opinion?

1      A    Just from where I was standing and the

2   direction of where the bullet strike was at, I would

3   say that was probably my round.

4      Q    Did you have this building, this area in

5   your back sight when you were shooting?

6      A    Yes, I did.

7      Q    Do you know if any of the bullets you fired,

8   I'm not asking for speculation, do you have

9   knowledge of whether any of the bullets you fired

10   hit Jeff Weinhaus?

11      A    I've been told that it was the one that went

12   across the back of his neck, but I'm not sure if

13   that's correct.

14      Q    The one that went through?

15      A    I'm not sure.

16      Q    You don't know.  And while you were

17   shooting, was Sergeant Folsom moving?

18      A    I was not looking at Sergeant Folsom, I

19   could not say.

20      Q    Were you concerned that Sergeant Folsom

21   could enter your line of fire?

22      A    No, I was not.

23      Q    Because you're standing here; right?

24      A    Right.

25      Q    And Sergeant Folsom indicated that he was

```
 1   standing there, I submit to you, when he fired;

 2   right?

 3       A    Yeah, but I believe he was standing a little

 4   further back from where he has the X because

 5   Mr. Weinhaus would have been up higher north from

 6   the vehicle, otherwise my line of sight would not

 7   have been able to be where I saw him.

 8       Q    So it's consistent with you being there and

 9   the bullet being there for you to fire in that

10   direction; right?

11       A    Well, I did not fire from the trunk of my

12   car.

13       Q    Where did you fire from, farther north?

14       A    No, I was toward Mr. Weinhaus.

15       Q    Farther east?

16       A    Yes.

17       Q    Farther south maybe?

18       A    Yes, I was looking at his vehicle for cover

19   as I was approaching.

20       Q    And based on these markings that Sergeant

21   Folsom put on the map, you think they're inaccurate

22   because they don't make sense in terms of the lines

23   of fire?

24       A    Absolutely.

25       Q    Did you have concerns when you were firing
```

1    that there were propane tanks and gas dispensing

2    machinery in your back sight?

3        A    No, I had more vision of the side of the

4    building that was old cannibalized gas pumps.  It

5    looks like they had been the old ones that were at

6    the store.  I could see those but I could see the

7    whole side of the building, and then I also had a

8    wooded area behind -- we were kind of on an upper

9    thing that went down an incline and then a real

10   steep incline and then there was trees and stuff in

11   the background from behind that.

12       Q    Were you concerned about potentially hitting

13   the gutter repairmen that were working on the MFA

14   station?

15       A    They were not in my line of sight, no.

16       Q    Were you concerned about them nevertheless

17   that they could potentially be in your line of

18   sight?

19       A    They were not in my line of sight, so I did

20   not give them concern.

21       Q    Where on this map were the guttermen?

22       A    They were working on the --

23       Q    Here?

24       A    Yes, over in that area.

25       Q    And you're standing over here and firing

```
 1   there?

 2       A   I'm not firing there, I'm firing at

 3   Mr. Weinhaus.

 4       Q   And that's in your line of sight?

 5       A   Yes, that and probably further north was my

 6   line of sight.

 7       Q   And the propane tanks were here?

 8       A   No.

 9       Q   Here?

10       A   Yes, on the front of the building.  It was

11   the small -- like you go in and do an exchange for

12   your barbecue or anything like that, it was just a

13   cage with those in there.

14       Q   Do you recall if the front of the MFA

15   building has glass windows?

16       A   It might have a glass door or glass window,

17   I do not recall.

18       Q   And you had no concern that your bullets

19   could enter into the MFA building at any time?

20       A   No.

21       Q   No concern they could hit the fuel pumps?

22       A   No.

23       Q   No concern they could hit the propane tanks?

24       A   None.

25       Q   No concern they could hit the guttermen?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    A    None.

2    Q    No concern they could hit the FBI?

3    A    No.

4    Q    No concern they could hit the delivery guy

5   delivering his sodas?

6    A    No.

7    Q    In fact, sir, it's your testimony that you

8   were focused on Jeffrey Weinhaus; right?

9    A    Absolutely.

10    Q    And so you really thought that perhaps your

11   back-up, the FBI, might take care of problems over

12   toward the MFA building; right?

13    A    I did not see anybody else there that caused

14   me alarm at the time, so I was not worried about

15   other people at the time, I was worried about

16   Mr. Weinhaus.

17    Q    Were you concerned that the gutter repairmen

18   might possibly be accomplices or somehow affiliates

19   of Mr. Weinhaus?

20    A    No, I was not.

21    Q    Sergeant Folsom had that concern, did he

22   not?

23    A    He said he did.

24    Q    But you did not?

25    A    I did not.

```
 1       Q    You thought it was a safe location, other
 2   than Jeff himself?
 3       A    I'm sorry?
 4       Q    You thought the MFA station with the other
 5   people there was a safe location, except for Jeff;
 6   right?
 7       A    I'm not sure what you're asking me there.
 8       Q    Did you feel threatened by the guttermen?
 9       A    No.
10       Q    Did you feel threatened by customers in the
11   store?
12       A    No.
13       Q    Did you feel threatened by the store clerk?
14       A    No.
15       Q    Did you feel threatened by the deliveryman
16   delivering Dr. Pepper sodas?
17       A    No.
18       Q    The only threat to you was Jeff Weinhaus;
19   right?
20       A    No.
21       Q    He wasn't a threat?
22       A    Not to me he was not.
23       Q    But you shot at him; right?
24       A    Yes.
25       Q    And why did you shoot at him?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    Because he started to draw his pistol out

 2   and Sergeant Folsom was in line.   Jeff Weinhaus

 3   never looked at me the whole time the conversation

 4   was going on.   Jeff Weinhaus was concentrated on

 5   Sergeant Folsom the whole time, and I knew Sergeant

 6   Folsom had no cover whatsoever once he stepped out

 7   from the area behind the car.   He had no cover.

 8   There was a tree that was pretty far back but he

 9   would have had to travel 30, 40 feet, maybe yards, I

10   don't know, to get to a tree.

11        Q    These trees?

12        A    Yes.   So I was more concerned at the threat

13   that was posed to Sergeant Folsom by Mr. Weinhaus

14   than I was to me.

15        Q    You thought Jeff was a threat to Sergeant

16   Folsom, your partner, your supervisor, your mentor

17   of six years; right?

18        A    I thought he was a threat to Sergeant

19   Folsom, yes.

20        Q    And you shot at Jeff to protect Sergeant

21   Folsom; right?

22        A    That is correct.

23        Q    You did not think he was a threat to you?

24        A    He was not a threat to me at that time.

25        Q    Thank you.   Did you see Sergeant Folsom
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   handcuff Jeff?
 2       A   Yes, I did.
 3       Q   How long was that after Jeff went down?
 4       A   Immediately.
 5       Q   And just to review, is your observation
 6   consistent with Sergeant Folsom's that after Jeff
 7   was shot, he was spun around and fell flat on his
 8   face?
 9       A   That's correct.
10       Q   Do you remember if it was clockwise or
11   counter clockwise?
12       A   If I remember correctly, I think he faced
13   away from me, so he would have been moving
14   clockwise, I believe, not positive on that, but I
15   think he rotated clockwise and then fell straight
16   down.
17       Q   Let me return to the video for a second.  I
18   think your testimony is consistent with the video.
19                   (VIDEO WAS PLAYED)
20       Q   (By Mr. Eastwood) It's hard to tell which
21   way he spun.  Looks like he's spinning to the left
22   or back to the right now, at least from what the
23   camera appears to tell us.  It appears from that
24   sequence that perhaps he spun to the left and then
25   to the right.  The camera goes to the left and
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   right?

2        A    Like I said, in my mind I picture him

3   spinning to the right clockwise away from me.

4        Q    It all happened so fast?

5        A    That's correct.

6        Q    And I'm sure as a human being and as a

7   trained officer, your adrenaline kicked in too;

8   right?

9        A    Absolutely.

10       Q    And that changes your perception of events;

11  right?

12       A    I don't know if it changes the perception.

13       Q    Do they teach you that it changes your

14  perception or recollection of events when they train

15  you with the Highway Patrol?

16       A    Not the perception I don't believe.

17       Q    Time doesn't slow down or speed up?

18       A    Oh, yes, it changes things like that.

19  Everything slowed down for me.  I could feel myself

20  walking.  I could feel the gravel under my feet.  My

21  senses got really heightened just prior to firing

22  the gun, and like I said, I didn't even feel -- I

23  felt the recoil but did not hear the gunshots.  My

24  hearing shut down for the loud noises, so things

25  like that does happen but it doesn't change your --

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  of what happened, if that's what you're asking me.

2      Q   Sure.  It changes hearing and sight but not

3  in the sense that it makes them unreliable?

4      A   Correct.

5      Q   It changes your perception of what you

6  heard, your perception of what you saw?

7      A   I wouldn't agree with the word perception.

8      Q   Now, you did see Sergeant Folsom handcuff

9  Jeff; right?

10      A   Yes.

11      Q   And after that Sergeant Folsom testified

12  that he removed the gun and the holster from Jeff's

13  waist band?

14      A   That is incorrect.

15      Q   Incorrect that he testified as to that?

16      A   Yes.

17      Q   Okay.  What is your recollection?

18      A   He testified that he removed the gun first

19  and then he handcuffed him.

20      Q   Did you observe Sergeant Folsom put the gun

21  back into the holster?

22      A   No, I was standing -- where Jeffrey was

23  laying down, Sergeant Folsom rolled his back toward

24  me as he was trying to get the gun out, and I was at

25  a cover position watching for any movement of

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Mr. Weinhaus.  We're taught not only in the academy
2    but through continued training that one person stays
3    back to cover the suspect while the other person
4    goes up to handcuff.  So when he went up to
5    handcuff, he told me, "he's still got his hand on
6    the gun, Scott," and that's when he took the gun out
7    and threw the gun backwards, and once he started
8    handcuffing him, Agent Maruschak came up, so I
9    didn't see him reaching underneath him.  I was more
10   concentrating on any movement from Mr. Weinhaus at
11   that time if he would happen to roll up on Sergeant
12   Folsom.  Because that's a very dangerous position if
13   you have to go up and confront somebody with a gun
14   that's laying on the ground.  They could have it
15   tucked up underneath them.  We practice that in the
16   academy and do that where a person will have the gun
17   underneath them and you have to control their body
18   and keep their body down, and that's what Sergeant
19   Folsom was trying to do.  My strict job was just in
20   case he was to roll up and try to shoot, I was there
21   for any type of back-up or anything that I needed to
22   do at that point.
23       Q   Now here you had seen Jeff get shot four
24   times; right?
25       A   That is correct.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q    Twice to the chest, twice in the head?

2      A    That's correct.

3      Q    And you were still concerned he was a

4   threat?

5      A    Absolutely.

6      Q    You didn't think he was dead?

7      A    I did think he was dead.

8      Q    You did think he was dead, but you thought

9   he was a threat still even though he was dead?

10     A    Just because I thought he was dead doesn't

11  mean he was dead.

12     Q    Evidently that turned out to be the case.

13     A    That is the case.

14     Q    But you thought he was dead at the time?

15     A    I did think he died at the time.

16     Q    But nevertheless you provided cover to your

17  partner?

18     A    That's what you're trained to do.

19     Q    While he cuffed the body of someone you

20  thought was dead?

21     A    Yes.

22     Q    And you did not see him put the gun back in

23  the holster?

24     A    By the angle I was at, I could not see that.

25     Q    And you did not observe Sergeant Folsom toss

1    the holster with the gun in it some distance away

2    from Jeff Weinhaus?

3         A    Yes, I did observe that.

4         Q    You did observe it?

5         A    Yes.

6         Q    Did you actually see him toss it or did you

7    see it once it landed some distance away on the

8    ground?

9         A    I watched him toss it out.

10        Q    And was the flap of the holster closed?

11        A    I don't believe so, I don't remember.  I

12   don't think it was closed because I remember looking

13   at it later, and I think the gun was partially out

14   of the holster on the ground for some reason, but

15   that's just what I'm recalling in my mind.

16        Q    We just talked about Sergeant Folsom putting

17   the gun back in the holster.

18        A    Yes.

19        Q    So when you say the gun was partially out of

20   the holster on the ground, it's conceivable the gun,

21   if the holster was not latched, the gun could have

22   come out when Sergeant Folsom tossed it; right?

23        A    That's what I just said, yes.

24        Q    So the gun could be sitting partially out of

25   the holster from Sergeant Folsom?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A   Yes, and like I said, that's what I remember

 2   seeing on the ground, but I don't know if it was

 3   latched or what it was, it's what I see in my mind.

 4      Q   Is it a blur, a little bit, your memory?

 5      A   Yes, on certain aspects of it, yes.

 6      Q   Now, you told -- at some point on the tape

 7   you told Jeff "stay with us", right, words to that

 8   effect, "stay with us, Jeff", there's a voice on the

 9   tape that says that, is that yours, sir?

10      A   I think so, something like that.

11      Q   If it was you, why did you say that?

12      A   To keep him calm, try to calm him down, stay

13   with us, that's a normal thing you would say to

14   somebody who has been seriously injured.  I don't

15   really have a reason other than that.

16      Q   You probably wouldn't say that to someone

17   you thought was dead; right?

18      A   Well, at that time I knew he was not dead.

19   At that time that's whenever I noticed that he had

20   started to move, and I had gone, like I said

21   earlier, gone to my trunk and got personal

22   protective gloves and went back, and whenever you

23   hear me saying that on tape "stay with us, stay with

24   us", I'm trying to keep him calm so he knows

25   somebody is there trying to help him.  That way he
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  doesn't sit there and try to fight and continue.

2      Q   Now, did someone provide first aid to Jeff

3  while he was handcuffed?

4      A   The only thing that I did was keep him calm.

5  I assessed his injuries, like I said, there was not

6  a lot of blood coming out of his chest.  Even if you

7  were to put something on his chest, if it's a

8  sucking chest wound, we have very little first

9  responder training, you don't want to close that off

10  because if it's a lung injury, it might be something

11  that would damage that.  So on the chest I just

12  assessed it, there was not a lot of blood coming out

13  of it, I knew the ambulance was close, I knew we

14  were close to St. Clair, and by the time he started

15  moving, it was no time until the ambulance got there

16  once I started to assess his injuries.

17      Q   I'm confused.  I think we established from

18  Perry Smith's report there's nine minutes between

19  him getting shot and the ambulance getting there,

20  right, so he's bleeding out for nine minutes; right?

21      A   He was not bleeding profusely where it was

22  just coming out of him, no.

23      Q   You didn't see blood coming out of his head?

24      A   There was dripping but it was not like a

25  large amount was just coming out of his face.  There

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  was drips off his nose and things likes that.

 2      Q   There was blood coming out of his chest?

 3      A   Yes, there was blood on his shirt, but as I

 4  was assessing him it wasn't pouring out of his

 5  chest.

 6      Q   If you observe his shirt today, do you think

 7  it would be blood soaked?

 8      A   Oh, yes, I'm sure it would over time.

 9      Q   Holes where the bullets went in and out?

10      A   I would imagine.

11      Q   When you said you assessed him, what aid did

12  you provide him in the nine minutes before the

13  ambulance --

14      A   It wasn't nine minutes because there was a

15  time between where he was still unconscious that we

16  thought he was dead.  I had actually gone and made a

17  phone call and came back and that was after I

18  directed the guy in, and then as I came back from

19  making a phone call, I noticed that Jeff started to

20  move and that's when I started to render aid to

21  Jeff.

22      Q   So you and your partner shot a guy four

23  times, you handcuffed him, you think he's dead and

24  you leave to go make a phone call.  How long did it

25  take for you to leave and go make a phone call?

```
 1      A    Just a few seconds.

 2      Q    Who did you call?

 3      A    I called my father.

 4      Q    Why did you not call an ambulance?

 5      A    I had already called an ambulance.

 6      Q    So you called an ambulance and you then

 7 called your father?

 8      A    I didn't use my phone to call an ambulance,

 9 I used my patrol radio.

10      Q    You did a walk through with D.C. Bauer;

11 right?

12      A    I do not recall who it was, it may have been

13 Mr. Bauer.

14      Q    In that walk through -- have you reviewed

15 that report?

16      A    I have not.

17      Q    Never?

18      A    Never.

19      Q    You never reviewed it with me when I took

20 your deposition?

21      A    No, I did not.

22      Q    You never reviewed it in your preparation

23 for your testimony here today?

24      A    No, I did not.

25      Q    Did you review the report that Perry Smith
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   made on you?

 2        A    Yes, I did.

 3        Q    And you reviewed your own report?

 4        A    Yes.

 5        Q    But you did not review D.C. Bauer's report?

 6        A    No, I did not.

 7        Q    And when I took your deposition and asked

 8   you about the reports you reviewed, you told me that

 9   they were accurate; right?

10        A    You asked me if I reviewed the statement

11   that I had made and the report that Perry had

12   prepared, and I said that they were accurate, except

13   for the one shot we talked about.

14        Q    And we talked about that, right, because

15   later on you looked in the clip and it was a

16   different number of bullets that had been expended

17   from your weapon?

18        A    No, that's not when I realized it.  The

19   Glock 27 has a small capacity magazine, and you can

20   get an extension on those, and I forgot, whenever I

21   counted my bullets, I forgot to allow for the

22   extension.  So I thought I only fired one round at

23   Mr. Weinhaus and later whenever Mr. Smith, Sergeant

24   Smith came to interview me, he asked if I could have

25   fired twice, and I said I wasn't sure, I could have.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    He said, "Well, we found two of your shell casings

2    that match your pistol," so that's how I knew I had

3    fired two rounds.

4        Q   If you look at the tape, let's agree the

5    shooting occurs around -- can you see the numbers at

6    the bottom left of your screen?

7        A   I can only see the 1:41 and partial five.

8        Q   Do you see it says 5:10, is that visible?

9        A   No.

10       Q   There are the first bullets going off, I

11   submit to you that it's about 5:18 on this counter

12   in the bottom left corner.

13       A   It's blurry on my screen, I can't see it.

14       Q   Let's go about two minutes and 30 seconds

15   later, we're going to go up to about 7:00, just

16   before 7:46 on the tape, so from 5:15 to 7:46.

17                    (PLAYING VIDEO)

18       Q   (By Mr. Eastwood) "He's not J4", is that

19   your voice?

20       A   Yes.

21       Q   What does J4 mean?

22       A   Death, fatal, dead.

23       Q   Is that when you first realized that Jeff

24   Weinhaus wasn't dead?

25       A   Yes.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q   So two and a half minutes after you shot him
 2   and he was cuffed after he was shot, then you
 3   realized he wasn't dead?
 4      A   Yes.
 5      Q   How long until the ambulance got there in
 6   your mind?
 7      A   It wasn't very long because I started
 8   assessing him.  I think I even had one of the
 9   troopers that was there, Corporal Keithly or Trooper
10   Servais, I'm not familiar with them, they're in a
11   different troop than I am, but they were there
12   standing with me while I was crouched down trying to
13   assess Mr. Weinhaus.
14      Q   When you say assess, what particular exact
15   tasks were you doing in this assessment?
16      A   Looking at his injuries.  I had very basic
17   first aid skills, so I was just trying to assess his
18   injuries at that time and keep him calm.
19      Q   So besides looking at him, were you doing
20   anything else with your hands for instance?
21      A   No.  Well, yeah, because I'm trying to hold
22   him down from sitting up for a while, if that's what
23   you're asking, hold him down from sitting up from
24   his prone position.
25      Q   Why were you trying to hold him down?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A    Try to keep them calm, keep them laying

2   down, you don't want them to sit up and cause

3   themselves further injury.

4      Q    Did you release the restraints?

5      A    No, I did not.

6      Q    Why not?

7      A    We were not taught to do that, we're taught

8   to keep the restraints on.

9      Q    Even if the guy has no weapons?

10     A    Just because you don't have a weapon doesn't

11  mean you can't fight.

12     Q    Even if you've been shot four times?

13     A    Even if you've been shot four times.

14     Q    Twice in the head and twice in the chest?

15     A    Yes, and I was told he also struck an EMT

16  during transport.

17     Q    Who told you that?

18     A    Either Sergeant Smith or somebody in the

19  investigation.

20         MR. EASTWOOD:  Move to strike as hearsay.

21         JUDGE SUTHERLAND:  Overruled, it's a proper

22  response to the question, ask the next question.

23     Q    (By Mr. Eastwood) At one point when I took

24  your deposition you said that Jeff gave you a cold

25  chill or he had experienced a cold chill?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yeah, he did not give me a cold chill, he
 2   experienced a cold chill or a tremor.
 3      Q    What did you mean by that?
 4      A    Just his whole body kind of gave a shake,
 5   like if you get a cold chill.  He was standing there
 6   and when he stuck his hand down to his side after he
 7   unlatched it, he just had this tremor across his
 8   body.
 9      Q    Is a cold chill a technical term?
10      A    I have no idea, that's just what I described
11   it as.
12      Q    Is it a term that you are taught in your
13   training as a law enforcement officer?
14      A    No, it's my word that I used that he had
15   this tremor.
16      Q    Is it a term that the Highway Patrol
17   commonly uses in describing suspects?
18      A    Not that I know of.
19      Q    Did you and Sergeant Folsom collaborate when
20   you wrote your police reports?
21      A    No, we did not.
22      Q    Is it just a coincidence that you both used
23   this description of a cold chill?
24      A    I think that's a known term.  I wouldn't
25   think it was anything major.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    Not a technical term?

2    A    I'm sure we discussed the cold chill prior

3  to writing the reports, but I don't think it was a

4  corroboration in writing the reports.

5    Q    So you did discuss what you were going to

6  write in your reports?

7    A    We discussed the incident.

8    Q    Sir, Sergeant Folsom was your mentor,

9  friend, supervisor for six years.  Are you upset

10  that he is no longer serving along side you?

11       MR. PARKS:  Objection, Your Honor,

12  irrelevant.

13       JUDGE SUTHERLAND:  Sustained.

14    Q    (By Mr. Eastwood) Have you made any efforts

15  to help Sergeant Folsom return to duty?

16    A    No, I have not.

17       MR. PARKS:  Same objection.

18       JUDGE SUTHERLAND:  Sustained.

19    Q    (By Mr. Eastwood) Do you still feel a sense

20  of loyalty to Sergeant Folsom?

21       MR. PARKS:  Objection again, Your Honor.

22       JUDGE SUTHERLAND:  Sustained.

23    Q    (By Mr. Eastwood) So again, just to make

24  clear, any similarities and certain phrases or words

25  in your police reports is just a coincidence?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A   I wouldn't say it's just a coincidence.  I

2  would say we had discussed the incident.  We did not

3  sit down -- and in fact whenever I wrote my

4  statement out, Sergeant Folsom was in an interview

5  with I think it was Sergeant Smith and a Corporal

6  Scott, I can't think of his last name right now, but

7  he was in there whenever I was writing out my

8  statement.

9          MR. EASTWOOD:  I have no further questions

10  for this witness at this time.  Thank you.

11          JUDGE SUTHERLAND:  Redirect.

12      **REDIRECT EXAMINATION OF CORPORAL MERTENS**

13  **QUESTIONS BY MR. PARKS:**

14      Q   Corporal Mertens, you were asked if you were

15  positive that the defendant said, "You're going to

16  have to shoot me man"; is that correct?

17      A   That is correct.

18      Q   And is that what he said to you?

19      A   That is what he said to Sergeant Folsom.

20      Q   And I direct your attention to February 21st

21  of 2013.  Were you in this courtroom for a motion

22  hearing in which the defendant addressed the Court?

23      A   Yes, I was.

24      Q   And did you hear the defendant tell the

25  Judge at that time, "You will also note that as soon

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  as I said you're going to have to shoot me, they

2  did"?

3          MR. EASTWOOD:  Objection, Your Honor, may we

4  approach?

5          JUDGE SUTHERLAND:  Yes.

6              (BENCH CONFERENCE BEGINS)

7          MR. EASTWOOD:  Your Honor, I can tell what

8  Mr. Parks is trying to do, but this is not the

9  proper way to do it, though.  If he's trying to

10  impugn another Court statement by the defendant that

11  was happening in Court, you can use a transcript or

12  do something else, but I think this is kind of an

13  odd and improper way to introduce statements of the

14  defendant.

15          JUDGE SUTHERLAND:  Well, the defendant made

16  the statement even though he was in custody.

17          MR. PARKS:  He was in open court.

18          JUDGE SUTHERLAND:  He was in custody but not

19  being interrogated.  He simply made the statement

20  and the witness heard it.  I think it's appropriate.

21              (BENCH CONFERENCE ENDS)

22          JUDGE SUTHERLAND:  The objection is

23  overruled.  I'm not sure if the question was

24  answered.

25      Q   (By Mr. Parks) Do you need me to restate

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   that question?
 2       A   Please.
 3       Q   On February 21st, 2013, were you in the
 4   courtroom for a motion hearing in which the
 5   defendant addressed the Court?
 6       A   Yes, I was.
 7       Q   And did you hear the defendant say to the
 8   Court, "You will also note that as soon as I said
 9   you're going to have to shoot me, they did."  Is
10   that a fair and accurate statement that the
11   defendant made?
12       A   Yes, the defendant did say, "I said you're
13   going to have to shoot me."
14           MR. PARKS:  No further questions, Your
15   Honor.
16           JUDGE SUTHERLAND:  Recross.
17       RECROSS EXAMINATION OF CORPORAL MERTENS
18   QUESTIONS BY MR. EASTWOOD:
19       Q   Do you know what brain damage, if any, Jeff
20   Weinhaus had from the shooting?
21       A   Excuse me?
22       Q   What brain damage, if any?
23       A   I have no idea.
24       Q   Were you involved in his arrest, eventual
25   arrest?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1       A    No, I was not.

 2       Q    Have you ever reviewed the medical records

 3  from St. John's Mercy?

 4       A    No, I have not.

 5       Q    So you have no knowledge of his state of

 6  mind on the day that he made that statement to you

 7  in your presence in Court, "You'll have to shoot me

 8  man"?

 9       A    I'm sorry?

10       Q    You have no knowledge of his state of mind

11  on the day that he made this statement, "You're

12  going to have to shoot me, man"?

13       A    On the date in Court?

14            JUDGE SUTHERLAND:  Yeah, the date in Court.

15            THE WITNESS:  I thought you were talking

16  about on September 11th.  No, I do not know his

17  state of mind either time.

18       Q    (By Mr. Eastwood) No knowledge of his mental

19  capabilities either time?

20       A    No, I do not.

21       Q    And further, Corporal Mertens, is it your

22  opinion that in an of itself the statement, "you're

23  going to have to shoot me man," is not sufficient

24  grounds to use lethal force against a suspect?

25       A    Could you say that again.
```

Weinhaus, Vol. 2

1     Q    "You're going to have to shoot me man", is

2    that reason enough in itself to shoot a suspect?

3     A    Not in itself, no.

4     Q    You'd have to have something else; right?

5     A    You'd have to have something such as this

6    incident where he undoes the holster and starts to

7    draw the pistol out.

8     Q    And let's go back one more time to this tape

9    and we'll listen to that conversation one more time.

10                    (VIDEO WAS PLAYED)

11    Q    (By Mr. Eastwood) Does Jeff's tone when he

12   says, "You're going to have to shoot me man", or

13   "You don't have to shoot me man", whatever you hear

14   on the tape and that's really a question for the

15   jury to decide, is his tone threatening?

16             MR. PARKS:  Objection, Your Honor, improper

17   question for recross examination.

18             JUDGE SUTHERLAND:  Sustained.

19    Q    (By Mr. Eastwood) Was his voice loud?

20             MR. PARKS:  Same objection.

21             JUDGE SUTHERLAND:  Sustained.  This all

22   could have been covered on cross.  Objection is

23   sustained.

24             MR. EASTWOOD:  No further questions.

25             MR. PARKS:  No further questions, Your

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   Honor.

 2        JUDGE SUTHERLAND:  May this witness be

 3   finally excused?

 4        MR. PARKS:  Yes.

 5        MR. EASTWOOD:  Yes.

 6        JUDGE SUTHERLAND:  You may step down.  Call

 7   your next witness.

 8        MR. PARKS:  The State will call Sergeant

 9   Perry Smith.

10      (WHEREUPON SERGEANT PERRY SMITH WAS SWORN IN)

11        **DIRECT EXAMINATION OF PERRY SMITH**

12   **QUESTIONS BY MR. PARKS:**

13        Q   Please state your name for the Court.

14        A   Perry Smith.

15        Q   Sergeant Smith, you are with the Missouri

16   State Highway Patrol; is that correct?

17        A   Yes, sir, I am.

18        Q   I direct your attention to September 11th of

19   2012.  Were you the officer that collected evidence

20   at the scene of the shooting at the MFA gas station

21   on Highway K?

22        A   Yes, sir, I was.

23        Q   And I'm going to show you what has been

24   marked as State's Exhibit No. 20.  Do you recognize

25   that?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    A    Yes, sir, I do.

2    Q    And what do you recognize that to be?

3    A    This appears to be the scene of the

4  shooting, and it appears to be Mr. Weinhaus'

5  vehicle, patrol vehicle as well as evidence markers

6  that have been placed in the area.

7    Q    Is this a fair and accurate representation

8  of the scene as you -- you took this photo; is that

9  correct?

10   A    Yes, I did.

11   Q    Is this a fair and accurate representation

12  of the scene?

13   A    Yes, sir, it is.

14   Q    I show you what's been marked as State's

15  Exhibit No. 20.  Do you recognize this photo?

16   A    Yes, sir, I do.

17   Q    Or 22, I'm sorry, State's Exhibit 22.  And

18  do you recognize this photo?

19   A    Yes, sir, I do.

20   Q    Is this a fair and accurate representation

21  of the scene?

22   A    Yes, sir, it is.

23   Q    And then after the scene I'll show you what

24  has been marked as State's Exhibit No. 22 (sic).  Do

25  you recognize this photo?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yes, sir, I do.

 2      Q    And this is a photo of the defendant's car;

 3  is that correct?

 4      A    That's correct.

 5      Q    Did you search that car?

 6      A    Yes, sir, I did.

 7      Q    And I show you what's been marked as State's

 8  Exhibit No. 23, 24, 25 and 26.  Did you take these

 9  photographs of the interior of the car?

10      A    Yes, sir, I did.

11      Q    And are these photographs fair and accurate

12  representations of what you found in the car?

13      A    Yes, sir, they are.

14           MR. PARKS:  Your Honor, at this time I would

15  ask that State's Exhibit No. 20, 21, 22, 23, 24, 25

16  and 26 be admitted into evidence.

17           MR. EASTWOOD:  May I review the photographs

18  briefly, Your Honor?

19           JUDGE SUTHERLAND:  Yes.

20              (BENCH CONFERENCE BEGINS)

21           MR. EASTWOOD:  Your Honor, for the record

22  and for the reasons already discussed in the motion

23  in limine, I believe it's defendant's second motion

24  in limine, I would object to the introduction of

25  evidence of weapons found in the car.  I believe
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  it's prejudicial, irrelevant to the charges against

2  the defendant or to what was in the officer's mind

3  at the time of the shooting.  It has nothing to show

4  to resisting arrest or to his attempted assault on a

5  law enforcement officer.

6         JUDGE SUTHERLAND:  That's State's Exhibits

7  24, 25 and 26?

8         MR. EASTWOOD:  Yeah, 23 through 26.

9         JUDGE SUTHERLAND:  Objection to those

10  exhibits is overruled.  State's Exhibits 20 through

11  26 conclusive are admitted.

12         MR. EASTWOOD:  Thank you, Your Honor.

13             (BENCH CONFERENCE ENDS)

14     Q   (By Mr. Parks) And Sergeant Smith, I direct

15  you to what's been marked as State's Exhibit 20, do

16  you recognize this photo?

17     A   Yes, sir, I do.

18     Q   What is this a photo of?

19     A   That's a photo taken of Mr. Weinhaus'

20  vehicle, Corporal Mertens' vehicle as well as

21  evidence markers on the ground.

22     Q   What do those evidence markers indicate?

23     A   Pieces of evidence on the ground.

24     Q   And I show you what has been marked as

25  State's Exhibit No. 21.  Do you recognize this?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    A    Yes, sir, I do.

2    Q    And do you recognize this item as the gun in

3 the holster that was found at the scene?

4    A    Yes, sir, I do.

5    Q    Did you seize that gun and holster?

6    A    Yes, sir, I did.

7    Q    And 22 is just a close-up of the gun and

8 holster; is that correct?

9    A    Yes, sir.

10    Q    And then did you do a search of the interior

11 of the car?

12    A    Yes, sir, I did.

13    Q    What did you find in the interior of the

14 car?

15    A    On the interior of the car I found a 22

16 caliber black and white pistol loaded with six

17 rounds, also an A T & T slider type cell phone, a 12

18 gauge shotgun and an Ion video camera.

19    Q    And I show you what's been marked as State's

20 Exhibit No. 23.  Do you recognize this?

21    A    Yes, sir, I do.

22    Q    And what do you recognize this to be?

23    A    That's the Rome 22 caliber pistol.

24    Q    This is the gearshift here, and then over

25 here would be the driver's side.  So this is sitting

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  in the floor board of the passenger seat; is that
 2  correct?
 3       A   That's correct.
 4       Q   And I show you what has been marked as
 5  State's Exhibit No. 24, do you recognize this?
 6       A   Yes, sir, I do.
 7       Q   What do you recognize this to be?
 8       A   That's the right rear passenger door.  The
 9  photo was taken of the interior.  It shows the Ion
10  video camera as well as the barrel of the 12 gauge
11  shotgun.
12       Q   This is the barrel right here; is that
13  correct?
14       A   Yes, sir, that's correct.
15       Q   And was that shotgun loaded?
16       A   Yes, sir, it was.
17       Q   What was it loaded with?
18       A   Six rounds of 12 gauge ammunition.
19       Q   And again State's Exhibit No. 25, this is
20  the stock of the weapon; is that correct?
21       A   Yes, sir, it is.
22       Q   And No. 26, what is this?
23       A   That's a photograph of the shotgun after I
24  pulled it from behind the seat and laid it up on the
25  back seat with the evidence marker.
```

1      Q    And I show you now what has been marked as

2   State's Exhibit No. 27.  Do you recognize this?

3      A    Yes, sir, I do.

4      Q    And inside of it is a military type holster,

5   a black nine millimeter pistol, some rounds and a

6   magazine.  Did you seize these from the scene?

7      A    Yes, sir, I did.

8      Q    And are these the same items that were shown

9   in State's Exhibit 21 and 22?

10     A    Yes, sir, they are.

11     Q    The photos of the pistol.  I show you now

12  what has been marked as State's Exhibit No. 28.  Do

13  you recognize this?

14     A    Yes, sir, I do.

15     Q    And what do you recognize this to be?

16     A    This is the box containing the 22 caliber

17  Rome pistol.

18     Q    Did you seize this and box this up?

19     A    Yes, sir, I did.

20     Q    Is this in the same condition as it was when

21  you sealed it?

22     A    Yes, sir, except that it has been sent to

23  the lab and it has laboratory tape on it.

24         MR. PARKS:  Your Honor, I would ask that

25  State's Exhibit 28 be admitted into evidence.

```
 1              MR. EASTWOOD:  I object for the same
 2    reasons.
 3              JUDGE SUTHERLAND:  Objection is overruled.
 4    State's Exhibit 28 is admitted.
 5        Q    (By Mr. Parks) Could you open Exhibit 28,
 6    please?
 7        A    Yes, sir.
 8        Q    And again what is inside of State's Exhibit
 9    No. 28?
10        A    It's a Rome 22 caliber pistol.
11        Q    Could you hold that up for the jury to see,
12    please.  And this is the weapon that you found in
13    the interior of the car?
14        A    Yes, sir.
15        Q    And that gun was loaded?
16        A    Yes, sir, it was.
17        Q    And that was in this holster clipped to the
18    box in the car?
19        A    Yes, sir, it was.
20        Q    And I show you now what has been marked as
21    State's Exhibit 29.  Do you recognize this?
22        A    Yes, sir, I do.
23        Q    And what do you recognize this to be?
24        A    This is the 12 gauge shotgun that I seized
25    from Mr. Weinhaus' vehicle.
```

Weinhaus, Vol. 2

```
 1      Q    And was this packaged by you also?

 2      A    Yes, sir, it was.

 3      Q    And with the exception of the laboratory

 4  blue tape, is this in the same condition as when you

 5  seized it and sealed it?

 6      A    Yes, sir, it is.

 7           MR. PARKS:  Your Honor, I would ask that

 8  State's Exhibit 29 be admitted into evidence.

 9           MR. EASTWOOD:  I object for the same reasons

10  stated in my motion in limine.

11           JUDGE SUTHERLAND:  Objection overruled.

12  State's Exhibit 29 is admitted.

13      Q    (By Mr. Parks) Could you open this, please?

14      A    Yes, sir.

15      Q    And could you take this out and show it to

16  the jury, please.  And what is this?

17      A    A 12 gauge shotgun that I seized from

18  Mr. Weinhaus' vehicle.

19      Q    And inside this box are six shells, were

20  these shells found in this weapon?

21      A    Yes, sir, they were.

22      Q    And I show you what has been marked as

23  State's Exhibit No. 30.  Do you recognize this?

24      A    Yes, I do.

25      Q    What do you recognize this to be?
```

1     A    This is the packaging containing the watch
2   Mr. Weinhaus was wearing.  Along with it also had
3   his wedding ring.
4     Q    And the wedding ring has been returned to
5   him or his family; is that correct?
6     A    Yes, sir, that's correct.
7          MR. PARKS:  Your Honor, I would ask that
8   State's Exhibit No. 30 be admitted into evidence.
9          MR. EASTWOOD:  No objection, Your Honor.
10         JUDGE SUTHERLAND:  30 is admitted.
11    Q    (By Mr. Parks) Could you open State's
12  Exhibit No. 30, please?
13    A    Yes, sir.
14    Q    And could you open the bag on the inside,
15  please.  And this contains a plastic container in
16  which the watch is contained?
17    A    Yes, sir.
18    Q    And this is the video watch that
19  Mr. Weinhaus was wearing on his left wrist?
20    A    Yes, sir, it is.
21         MR. PARKS:  Your Honor, may we approach?
22         JUDGE SUTHERLAND:  Yes.
23            (BENCH CONFERENCE BEGINS)
24         MR. PARKS:  Your Honor, at this time I
25  believe all of the State's exhibits have been

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  admitted except for Exhibit No. 12.

2         JUDGE SUTHERLAND:  That's what I show.

3         MR. EASTWOOD:  And that is the actual

4  marijuana?

5         MR. PARKS:  Well, the marijuana was actually

6  in the same bag as the Morphine.  I didn't realize

7  it was packaged there, so it came in with Exhibit

8  No. 9.

9         JUDGE SUTHERLAND:  Okay.

10        MR. PARKS:  So I'm not asking because it was

11 packaged with another exhibit.

12        MR. EASTWOOD:  So just for the record,

13 everything is in, in other words?

14        JUDGE SUTHERLAND:  Yeah.

15        MR. EASTWOOD:  I take the same position.

16              (BENCH CONFERENCE ENDS)

17        MR. PARKS:  I have no further questions of

18 this witness at this time, Your Honor.

19        JUDGE SUTHERLAND:  Cross examination.

20        MR. EASTWOOD:  Thank you, Your Honor.

21           **CROSS EXAMINATION OF PERRY SMITH**

22 **QUESTIONS BY MR. EASTWOOD:**

23     Q   Good afternoon.

24     A   Good afternoon, sir.

25     Q   I don't think we met before, have we?

```
 1      A    No, sir, we have not.

 2      Q    And I didn't take your deposition or

 3 anything like that?

 4      A    No, sir, you didn't.

 5      Q    How long have you been with the Highway

 6 Patrol, sir?

 7      A    19 years.

 8      Q    And do you have any discipline on your

 9 license?

10      A    No, sir.

11      Q    Ever had a serious reprimand or discipline

12 from the Highway Patrol?

13      A    No, sir.

14      Q    Good record?

15      A    Yes, sir.

16      Q    Thank you, sir.  How many police officer

17 involved shootings have you investigated?

18      A    15, 20.

19      Q    Has the officer been cleared in every single

20 one of those investigations of wrong doing?

21      A    Yes, sir, they have.

22      Q    15 for 15.  Is it customary for the Highway

23 Patrol to investigate its own officer-involved

24 shootings?

25      A    Yes, sir, it is.
```

Weinhaus, Vol. 2

```
1        Q    Did you ever ask the FBI to investigate or
2   some other law enforcement agency to investigate?
3        A    No, sir.
4        Q    I turn your attention -- I received from
5   Mr. Parks in the course of discovery in this case a
6   large packet of police reports into the
7   officer-involved shooting.  Have you reviewed all of
8   those reports?
9        A    Yes, sir.
10       Q    Is it fair to say -- I don't know if there's
11  a technical term but you were the lead investigator
12  or chief investigator into this officer-involved
13  shooting?
14       A    That's fair.
15       Q    And so you have knowledge of all of these
16  reports, you reviewed them.  You might need to
17  refresh yourself obviously.
18       A    Yes, sir.
19       Q    I couldn't remember them all but...
20       A    Yes, sir.
21       Q    And do you have concerns about any of them
22  being inaccurate or incomplete?
23       A    No, sir.
24       Q    You weren't in Court over the last two days
25  when Sergeant Folsom and Corporal Mertens have been
```

Weinhaus, Vol. 2

```
 1  testifying, were you?
 2      A   No, sir, I was not.
 3      Q   Did you review their depositions?
 4      A   No, sir, I did not.
 5      Q   You just reviewed the reports, the reports
 6  from the shooting?
 7      A   Yes, sir.
 8      Q   And did you talk with Mr. Parks before you
 9  gave -- before you started testifying today?
10      A   Pardon me?
11      Q   Did you talk with the prosecutor, Mr. Parks,
12  before you started testifying today?
13      A   Yes, I did.
14      Q   What did you talk about?
15      A   He -- we discussed the evidence, we
16  discussed how long he thought I was going to testify
17  and he apologized for taking so long.
18      Q   Did you review your testimony in advance
19  with Mr. Parks?
20      A   I'm sorry, what?
21      Q   Did you review your testimony in advance
22  with Mr. Parks?
23      A   I reviewed for my Court testimony today.
24      Q   With Mr. Parks?
25      A   On the evidence portion and the watch
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  portion.

2      Q   Did you make any investigation into the

3  drug-related charges against Jeff Weinhaus?

4      A   No, sir, I didn't.

5      Q   Did you make any investigation into the You

6  Tube video-related charges against Jeff Weinhaus?

7      A   No, sir, I didn't.

8      Q   Did you ever see it?

9      A   I'm not sure which ones you're talking

10 about.  I've seen several portions.

11     Q   Did it have captions in it or no?

12     A   I don't recall.

13     Q   Within the package of reports, there is a

14 packet with your name on it as the reporting officer

15 entitled -- it's Report 31 Examination of Cell Phone

16 and Video Camera.  Did you conduct an examination

17 into Jeff Weinhaus' cell phone?

18     A   No, sir, I didn't.

19     Q   But you reported on it; right?

20     A   Yes, sir, I did.

21     Q   And where did you obtain the information

22 from your report from?

23     A   Missouri State Highway Patrol's Computer

24 Forensic Unit.

25     Q   This is out in Jeff City?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1       A    Yes, sir, it is.

 2       Q    You got a proper search warrant to go

 3  through the cell phone?

 4       A    Yes, sir, I did.

 5       Q    And so did you prepare this report?

 6       A    Yes, sir, I did.

 7       Q    And among the reports there is a -- there

 8  are text messages; right?

 9       A    Yes.

10       Q    Among the data that you reported on there

11  was a text message?

12       A    Yes, there were text messages on the phone.

13       Q    A series of text messages?

14       A    Yes.

15       Q    And they're from different people with the

16  last name Weinhaus?

17       A    Yes.

18       Q    There's a Judy Weinhaus, do you know who

19  that is?

20       A    Yes, sir, I do.

21       Q    Who is that?

22       A    I believe it's his wife.

23       Q    And she goes by Judy Kropf Weinhaus?

24       A    Yes, that's my understanding.

25       Q    And then there's a Grant Weinhaus, do you
```

```
 1  know who that is?

 2       A    Mr. Weinhaus' son; is that correct?

 3       Q    I think it's his brother, and there's also a

 4  Levi Weinhaus.

 5       A    I believe that may be his son and Grant is

 6  the brother.

 7       Q    Do you know if he's the one who lives in the

 8  house with Mr. Weinhaus and his wife in Piney Park?

 9       A    No, sir, I do not know that.

10       Q    You don't know, okay.  Did you make and did

11  you read the contents of these text messages?

12       A    Yes, sir, I did.

13       Q    And there's a text message with Levi

14  Weinhaus that says, "Pick my weed plant"; right?

15       A    Yes, sir.

16       Q    And in your custom and training, experience

17  and training in law enforcement, what is a weed

18  plant?

19            MR. PARKS:  I object to this line of

20  questioning, Your Honor.  He doesn't have any

21  firsthand knowledge of the -- who made these texts

22  or who sent them or anything like this, so it's all

23  hearsay.

24            JUDGE SUTHERLAND:  Sustained.

25       Q    (By Mr. Eastwood) Let me ask you this.  Did
```

1  you ever share this report with any of the other

2  officers investigating the search of Mr. Weinhaus'

3  house?

4      A    No, sir, I didn't.

5      Q    And you have no knowledge whether Sergeant

6  Folsom or Corporal Mertens reviewed this report, do

7  you?

8      A    That report was conducted after the search

9  of Mr. Weinhaus' residence.

10     Q    So you don't know if they reviewed this

11 report; right?

12     A    I'm not sure.

13     Q    You don't know if they're aware of its

14 contents; right?

15     A    That's correct.

16     Q    Thank you.  You also -- there was also a

17 report made -- are you from Troop C originally?

18     A    Yes, sir, I am.

19     Q    And can you just tell the jury what area

20 Troop C is?

21     A    Troop C is as far south on 55 as Perry

22 County, runs up into St. Louis County, runs north

23 all the way up into Pike County, west out to Warren,

24 and if you're traveling down 44 it runs all the way

25 out to Franklin County.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    And we're in the Troop C area here?

 2      A    Bordered by the Mississippi River, yes, sir.

 3      Q    And Troop C, did you review the -- it has a

 4   radio frequency or perhaps several, right, that the

 5   troopers communicate over?

 6      A    Yes, sir, that's correct.

 7      Q    And as part of your investigation into this

 8   officer-involved shooting, you reviewed the Troop C

 9   communication reportings; right?

10      A    That's correct.

11      Q    And you prepared a report on it, didn't you?

12      A    That's correct.

13      Q    And at one point on that recording there's

14   an officer who says, "they're messing with Weinhaus

15   again."  No. 1, do you know what that means?

16      A    No, sir, I don't.

17      Q    Did you pass that information on to any

18   other officers investigating this shooting?

19      A    No, sir, I didn't.

20      Q    Did you pass it on to Sergeant Folsom or

21   Corporal Mertens?

22      A    They probably have a copy of that report in

23   the stack of reports they got, sir.

24      Q    Sure.  And then after someone says they're

25   messing with Weinhaus again, another person says,
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  "Not over the radio."  Do you know who said that?

2      A   The one that said "not over the radio" was

3  Lieutenant Seales.

4      Q   Do you know why Lieutenant Seales might say

5  "not over the radio"?

6      A   He wasn't -- I don't believe he was

7  specifically speaking about your prior sentence

8  there.

9      Q   So what was he speaking about when he said

10  "not over the radio"?

11      A   I'd have to review my report to see exactly

12  what he's speaking about.

13      Q   Do you mind if I read this to you?

14      A   No, sir, that's fine.

15      Q   On Page 2 of this report on the Troop C

16  communications you write, I believe, on Page 2, "in

17  the background another Troop C communications

18  operator was asking 251 if 557", these numbers refer

19  to officers; is that correct?

20      A   Yes, sir, that's correct.

21      Q   Do you know who 251 is?

22      A   Corporal Keithly.

23      Q   And 557?

24      A   I believe that may be Sergeant Folsom.

25      Q   557 advised if it was self inflicted or

1    officer inflicted.  Lieutenant Seales can be heard

2    saying not over the radio.

3         A    That's correct.

4         Q    Is there a police practice why you would not

5    discuss the issue whether it was self inflicted or

6    officer inflicted over the radio?

7         A    Because people have access to scanners and

8    can scan that information, and that's not

9    information that we typically like to release to the

10   public because they have access to it, sometimes for

11   notification of family members.

12        Q    When you say you don't want the public to

13   have that information, do you mean during the short

14   term during the investigation or ever have the

15   information?

16        A    In the short term.

17        Q    The holster that was on Jeff Weinhaus, did

18   you review this holster as part of your

19   investigation?

20        A    No, sir, I didn't.

21        Q    Did Jeff Weinhaus' weapon or holster form

22   any part of your investigation or reporting in this

23   matter?

24        A    Did it what?

25        Q    Did this holster or the weapon that was in

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   it, was that any part of your investigation?

 2        A    Yes, sir, it was.

 3        Q    In what respects?

 4        A    I seized it as evidence and submitted it to

 5   the lab for test firing.

 6        Q    And what did you find from the lab?

 7        A    That the weapon was capable of firing.

 8        Q    And had it been fired?

 9        A    Not that I was aware of.

10        Q    So it wasn't -- no one shot a bullet out of

11   it on September 11th to your knowledge?

12        A    That's correct.

13        Q    Are you familiar with this type of holster?

14        A    No, sir, I'm not.

15        Q    Did you investigate what type of holster it

16   was as part of your investigation?

17        A    No, sir, I didn't.

18        Q    You just seized it as evidence?

19        A    Yes, sir.

20        Q    Did you note in any of your reports that it

21   is a somewhat difficult holster to open?

22        A    No, sir, I didn't.

23        Q    And you are not here today to give an

24   opinion on whether or not Sergeant Folsom and

25   Corporal Mertens' use of force was appropriate or
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   not, are you?

2       A    No, sir, I'm not.

3       Q    Is that ever your job as part of an

4   investigation into an officer-involved shooting?

5       A    No, sir.

6       Q    You're really there more to gather the

7   evidence in a clean manner?

8       A    Yes, sir.

9       Q    Clean I mean make sure of chain of custody

10  is done right, not contaminated and all that?

11      A    Yes, sir.

12      Q    How long have you been with Troop C?

13      A    19 years.

14      Q    How long in that time have you been out in

15  the field?

16      A    I spent 12 years on the road in Jefferson

17  County, two years in narcotics and the last six

18  years in criminal investigations.

19      Q    Do you do a lot of traffic stops at times in

20  that?

21      A    In my current position?

22      Q    No, in your past position?

23      A    Yes, sir, I did.

24      Q    Guesstimate number of traffic stops?

25      A    I don't think I could guesstimate, sir.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q   A lot, hundreds, thousands?

2      A   A lot.

3      Q   So it's fair to say you have experience --

4   I'll ask you the next follow-up question.  In many

5   of those traffic stops or some of them did you

6   search the car?

7      A   Yes, sir, I did.

8      Q   And in your experience, was it common to

9   find firearms inside a car?

10     A   No, sir, it wasn't.

11     Q   No?  Really?  So in Jefferson County it

12  would be unusual for someone to drive around with

13  say a shotgun in their car?

14     A   It's possible, people do it.  As far as

15  unusual, I don't know what your operational

16  definition is exactly.

17     Q   I'm saying, you said you did many, hundreds,

18  thousands of traffic stops.

19     A   I did not say that.

20     Q   Well, I put words in your mouth, I'll take

21  that back, but you did many, many traffic stops, you

22  couldn't put a number on it but you testified you

23  did a lot?

24     A   That's correct.

25     Q   And in some of those cases you searched the

```
 1  cars?

 2      A   Yes, sir, that's correct.

 3      Q   Or the truck or whatever it is?

 4      A   Yes, sir, that's correct.

 5      Q   And in some of those cases you found

 6  firearms; right?

 7      A   Yes, sir, that's correct.

 8      Q   And having a firearm is not illegal; right?

 9      A   Correct.

10      Q   You're not a danger to the public or fellow

11  drivers just because you have a firearm in your car?

12      A   Yes, sir, you are correct.

13      Q   Are you here to give testimony on Jeff

14  Weinhaus' state of mind or intentions on September

15  11th?

16      A   No, sir, I'm not.

17      Q   In the course of your investigation, did you

18  discover whether Sergeant Folsom or Corporal Mertens

19  knew of the gun, the holstered gun and the shotgun

20  in the car at the time of the shooting?

21      A   No, sir.

22      Q   They did not know or you don't know?

23      A   They did not know.

24      Q   They did not know?

25      A   I had no evidence that they did know.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        Q    They were totally unaware that these weapons
 2   were in the car?
 3        A    From my understanding, yes, that's correct.
 4        Q    And during the course of your investigation,
 5   you discovered no evidence that Jeff Weinhaus said
 6   anything about these weapons in the car to the
 7   troopers?
 8        A    That's correct.
 9        Q    Can you find any evidence that he ever
10   attempted to use these weapons in any respect at the
11   gas station, any evidence that he tried to use these
12   weapons?
13        A    Witness statements from Sergeant Folsom
14   indicated that he did.  Corporal Mertens indicated
15   that he did, and the cell phone watch that he was
16   wearing turned to the right right before the shots
17   were fired capturing the shooting.  So you asked for
18   evidence, I think those would be parts.
19        Q    You are absolutely right, and the jury has
20   heard testimony from both those troopers and they
21   have seen that weapon.  But that's not my question.
22   My question is about the weapons, not the gun, not
23   the height point and holster, everyone concedes that
24   was on Jeff Weinhaus' person.  I'm talking about the
25   weapons that were in the car.  Sergeant Folsom and
```

```
 1   Corporal Mertens didn't know about those weapons
 2   when they shot Jeff; right?
 3         MR. PARKS:  Objection, calls for
 4   speculation.
 5         MR. EASTWOOD:  I'm asking for his knowledge
 6   on what evidence he uncovered in his investigation.
 7         JUDGE SUTHERLAND:  Overruled.  You may
 8   answer.
 9         THE WITNESS:  From information I had they
10   were not aware of those weapons.
11   Q   (By Mr. Eastwood) Did you find any evidence
12   that Jeff made any statements about those weapons
13   that were in the car?
14         MR. PARKS:  Objection, Your Honor, hearsay.
15         JUDGE SUTHERLAND:  And it's repetitive as
16   well, sustained.
17   Q   (By Mr. Eastwood) Did you find any evidence
18   that Jeff attempted to use or go for the weapons
19   that were in the car?
20   A   No, sir, I did not.
21   Q   Now both troopers had the same type of Glock
22   weapon; is that correct, sir?
23   A   Yes, sir, that's correct.
24   Q   And in fact you oversaw as part of your
25   investigation, Highway Patrol Forensics examining
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    those guns and also bullets they recovered; right?

 2         A    I submitted those to the lab, sir.

 3         Q    And is it fair to say that forensics

 4    couldn't tell whether the bullet that was recovered

 5    from Jeff Weinhaus' body came from Folsom or

 6    Mertens, they could not tell which gun it came from?

 7         A    That's correct.

 8         Q    Did you also recover a bullet from the side

 9    of the MFA building, around there?

10         A    No, sir, I did not.

11         Q    Did you uncover evidence of a bullet strike

12    on the wall?

13         A    Yes, sir, I did.

14         Q    Did you make any conclusions in your

15    investigation about where that bullet strike -- how

16    it occurred?

17         A    Yes, sir, I did.

18         Q    What was your conclusion?

19         A    It appeared that that round was probably

20    fired from Corporal Mertens.

21         Q    Did your investigation include any

22    recommendations or conclusions on whether Corporal

23    Mertens' or Sergeant Folsom's use of force was

24    appropriate or justified?

25         A    No, sir, it did not.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    And does it include any recommendations or

2    conclusions on whether the fact that Corporal

3    Mertens' bullet struck the building was an issue

4    that needed to be investigated further?

5    A    No, sir.

6    Q    The watch, just so we can be clear, the

7    wrist watch, did you make any conclusions as to

8    where the camera lens was inside this watch?

9    A    I believe it was in the six hole or the six

10   spot.  If I could look at it again.

11   Q    Absolutely, sir.  I'll walk around.

12   A    Yes, sir, it appears to be down by the six,

13   where the six clock is.

14   Q    It's quite concealed, isn't it?

15   A    Yes, sir, it is.

16   Q    I don't think anyone from the Highway Patrol

17   was aware that this watch was also a camera in the

18   early days of your investigation, were they?

19   A    No, sir, we were not.

20   Q    In fact the day of when a walk through of

21   the scene was done with Sergeant Folsom and Corporal

22   Mertens, no one at the Highway Patrol was aware that

23   this watch existed as a recording device or that

24   there was a recording; right?

25   A    Yes, sir, you're correct.

1    Q    And in fact the next day you took -- you

2  interviewed both Sergeant Folsom and Corporal

3  Mertens and you recorded that interview; right?

4    A    Yes, sir, we did.

5    Q    And was that at Troop I or C?

6    A    Troop I.

7    Q    Down in Rolla?

8    A    Yes, sir.

9    Q    And at that time neither you nor Corporal

10  Mertens or Sergeant Folsom was aware of the

11  existence of the wrist watch camera; right?

12   A    Yes, sir, you're correct.

13   Q    And when Sergeant Folsom and Corporal

14  Mertens made written statements as part of your

15  investigation and part of your reporting, they were

16  not aware of the existence of the wrist watch

17  camera?

18   A    That's correct.

19   Q    When did you find out about the fact that

20  this was a recording device?

21   A    In March.

22   Q    Of this year?

23   A    Of 2013, yes, sir, that's correct.

24   Q    So that was some six months, seven months

25  after the shooting; right?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A    Yes, sir, you're correct.

2      Q    Had your investigation otherwise concluded

3  by that point?

4      A    Yes, sir, it had.

5      Q    And when you reviewed that footage, did you

6  first see it in March?

7      A    Yes, sir, I did.

8      Q    You got a warrant, opened it up?

9      A    Yes, sir.

10     Q    Were you concerned that the video footage

11 itself contradicted any of the other reporting or

12 evidence in your investigation?

13     A    No, sir, I was not.

14     Q    I want to go back just to the weapons as a

15 whole that were seized.  Jeff was never charged with

16 unlawful possession of these weapons as part of your

17 investigation; right?

18     A    As far as I know.

19     Q    As far as you know, all these guns are

20 legal, right, these particular guns; right?

21     A    Yes, sir.

22     Q    None of them have been come by improperly or

23 illegally?

24     A    No, sir.

25     Q    The handgun and the shotgun in the car or

1    rifle, whatever went to call it, was it concealed or

2    readily apparent when you searched the car?

3        A    Readily apparent.

4        Q    It was not hidden somewhere?

5        A    No, sir.

6        Q    How long have you known Sergeant Folsom,

7    sir?

8        A    I really didn't know him, sir.

9        Q    And how long have you known Corporal

10   Mertens?

11       A    I really didn't know Corporal Mertens

12   either, sir.

13       Q    Different troop?

14       A    Yes, sir.

15       Q    Have you been concerned about any conflict

16   of interest by yourself or anyone else in conducting

17   this investigation?

18       A    No, sir, I have not.

19       Q    Do you have any opinion on why Jeff did not

20   exit his vehicle with the other two weapons in his

21   car as part of your investigation?

22           MR. PARKS:  Objection, calls for speculation

23   on the part of the witness.

24           JUDGE SUTHERLAND:  Sustained.

25           MR. EASTWOOD:  Nothing further.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1              JUDGE SUTHERLAND:  May this witness be

 2   excused as well?

 3              MR. PARKS:  Yes, Your Honor.

 4              JUDGE SUTHERLAND:  Thank you.  You may step

 5   down.  Let's take a recess now.  The Court again

 6   reminds you of what you were told at the first

 7   recess of the Court.  Until you retire to consider

 8   your verdict, you must not discuss this case among

 9   yourselves or with others or permit anyone to

10   discuss it in your hearing.  You should not form or

11   express any opinion about the case until it is

12   finally given to you to decide.  Do not do any

13   research or investigation on your own about any

14   matter regarding this case or anyone involved in the

15   trial.  Do not communicate with others about the

16   case by any means.  Do not read, view or listen to

17   any newspaper, radio, electronic communication from

18   the Internet or television report of the trial.

19   We're in recess for 15 minutes.

20              (WHEREUPON A BRIEF RECESS TOOK PLACE)

21              JUDGE SUTHERLAND:  Call your next witness.

22              MR. PARKS:  State calls Corporal Jeff White.

23         (WHEREUPON CORPORAL JEFF WHITE WAS SWORN IN)

24         DIRECT EXAMINATION OF CORPORAL JEFF WHITE

25   QUESTIONS BY MR. PARKS:
```

1      Q    Please state your name for the record.

2      A    Jeffrey L. White.

3      Q    And Corporal White, you are a corporal with

4   the Missouri State Highway Patrol; is that correct?

5      A    That's correct.

6      Q    And how long have you been with the Highway

7   Patrol?

8      A    17 years, sir.

9      Q    And during those 17 years, have you had

10  special training in firearms and firearms

11  instruction?

12     A    Yes, sir.

13     Q    What have you done?

14     A    I've been certified as a firearm, police

15  firearms instructor by both the National Rifle

16  Association, the FBI and through the Missouri State

17  Highway Patrol.

18     Q    And since 2007, what have your duties

19  included with the Highway Patrol?

20     A    My primary duty is the chief firearms

21  instructor for the Missouri State Highway Patrol at

22  our training academy in Jefferson City.

23     Q    And you train all the recruits on firearms

24  and firearm safety; is that correct?

25     A    That is correct.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q   And you teach them situational -- how to

2  handle themselves in certain situations handling

3  firearms?

4    A   Yes, sir.

5    Q   And you have instructed them in the use of

6  deadly force; is that correct?

7    A   Yes, sir.

8    Q   And is this your primary function now with

9  the Highway Patrol as a firearms instructor with the

10 academy with the Highway Patrol?

11   A   Yes, sir.

12   Q   And I direct your attention to September

13 11th, 2012 and the shooting incident that we are

14 here about today.  You were not involved in that

15 shooting; is that correct?

16   A   That is correct.

17   Q   And you were not present at the scene or

18 after the scene for that?

19   A   No, sir.

20   Q   Is that correct?

21   A   That is correct.

22   Q   Can you explain to the jury what you

23 instruct or how you instruct new troopers in the use

24 of their firearms in deadly situations?

25   A   It's a wide range of instruction involving

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   those types of situations.  It starts with a

 2   foundation of firearms safety, firearms handling,

 3   proper use, carry, wear of the firearm.  Then we

 4   start introducing live fire training on static

 5   targets.  As we build through their training, we

 6   start introducing what we call force-on-force

 7   training or where they're working against other

 8   students and at times civilian role players that we

 9   bring in that portray the part of the bad guy or

10   potentially innocent bystander or victim.  They then

11   have to decide what the situation is, what's going

12   on, decide whether or not force needs to be used,

13   what level of force needs to be used and then

14   properly apply that force.

15       Q    There has been some talk here today about

16   the force continuum, are you familiar with that

17   instructional method?

18       A    Yes, sir.

19       Q    Does the Highway Patrol teach that method

20   anymore?

21       A    No, sir.

22       Q    Why not?

23       A    What we have found is the force continuum,

24   the diagram of the force continuum is a stair step,

25   and what we have found is students would be

1  reluctant to utilize the force that was required

2  because they would be locked into a stair step

3  thought process.  The bad guy is here, I'm here, so

4  I can go to here.  So we moved away from that model,

5  and we now use what we call the force options.

6      Q   What is the force option?

7      A   To diagram it for our students, we tell them

8  to picture themselves in the middle of the wagon

9  wheel, they're at the hub and they have the spokes

10  that are out supporting the wheel.  The spokes are

11  then their force options, and then depending upon

12  the situation, they can dry upon any of those force

13  options at any time without having to worry about a

14  stair step arrangement, having to think where

15  they're at in relation.  They can respond with what

16  they feel is the appropriate level of force based on

17  their training and experience and what the situation

18  dictates.

19      Q   Is this also called action reaction

20  training?

21      A   No, the action reaction training is a

22  specific training that we do that really brings

23  these force options to light, and it's really all

24  part of our force on force training.

25      Q   Can you give us an example.

Weinhaus, Vol. 2

1      A   Our action reaction training is, and we do

2  it with the recruits, where for example I'll be

3  standing there and I'll have one of our training

4  weapons, it shoots a non-lethal projectile with a

5  significant pain penalty, and they will have a

6  similar weapon.  I'll tell them to go ahead and put

7  their weapon towards me, finger on the trigger if

8  they want, and whenever they perceive me as a

9  threat, to go ahead and press the trigger and try

10  and shoot me.  I tell them they can't do anything

11  until they perceive me as a threat.  I may be having

12  my weapon holstered.  I may have it in my hand down

13  at my side.  I may have my hands in the air with the

14  weapon.  I may be sometimes holding it to my head.

15  Whenever they perceive me as a threat, they're

16  allowed to shoot.  The thing that we're pointing out

17  with them and the reason we do it as demonstration

18  training is every single time I do this training, I

19  beat them.

20      Q   Why is that?

21      A   It demonstrates the principle that action is

22  always going to be faster than reaction.  They're

23  having to react to my movement; therefore, they have

24  to wait until they see my movement, perceive it,

25  process it and then send a signal back to their

1    trigger finger to make that action happen, and

2    that's again I beat them every time with them

3    knowing and telling them up front that I am going to

4    become a threat to them.

5         Q    Who decides how much force should be used in

6    any given situation?

7         A    The officer on the scene ultimately has to

8    decide how much force they're going to apply based

9    on whatever it is the suspect presents to them.

10        Q    So it's the perception of the suspect that

11   causes the officer to react?

12        A    Yes, sir.

13        Q    It's not the reaction of the officer to the

14   defendant?

15        A    No.  There has to be some kind of

16   circumstance that's causing the officer to perceive

17   a danger.  Lethal force can be used when the officer

18   perceives a threat to their life, the life of

19   another or serious bodily injury to themselves or

20   another.

21        Q    And in these situations, what happens to the

22   officer as the situation escalates to the point

23   where he's going to have to fire his weapon

24   psychologically?

25        A    This area has been studied extensively.  We

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   teach a four-hour block of instruction on this
 2   portion alone, it's called survival mentality, and
 3   what happens is the officer, upon perception of
 4   danger, would -- will go through several
 5   physiological changes.  They will have a large
 6   adrenaline dump, their heart rate can increase from
 7   resting heart rate to up to 200 beats per minute in
 8   just seconds.  There are certain physiological
 9   changes that happen within a person during the time
10   that this heart rate increases, things such as they
11   can have diminished auditory capacity, they will
12   have auditory exclusion, sounds will no longer be
13   important to the body based on its perception of
14   survival, so the body shuts that down.  Digestive
15   system will shut down.  Other non-essential areas
16   will cease to function, so to speak.  The officer
17   will have a narrowing of their field of vision, a
18   tunnel vision is what it's typically termed as.  The
19   officer will also have -- at times there can be a
20   distortion of time.  They can either perceive things
21   happening in fast motion, typically it turns into a
22   slow motion time.  The officer can perceive that
23   they've frozen, they're unable to move or that
24   events are transpiring very, very slowly like
25   everything is moving through some kind of oil or
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    something where it's really, really slow.

2         Q    When you talk about the auditory senses

3    shutting down, would somebody be able to fire their

4    weapon and not hear the weapon discharge?

5         A    There have been reported cases of that, yes,

6    sir.

7         Q    Do you teach troopers how to react to a

8    situation of an armed individual?

9         A    Yes, sir.

10        Q    What do you teach them?

11        A    A lot of -- we give them several options.

12   There's no one specific way to handle all

13   situations, so we try to make it situational

14   dependent and give them multiple situations in which

15   to tryout the various tools that we give them.  It

16   can be anything from having the person stop where

17   they are, possibly turn away from them, put them on

18   the ground, just any number of things.

19        Q    What do you teach your officers or when do

20   you teach your officers to use lethal force?

21        A    When they perceive a threat to themselves or

22   others, either a threat to their life or the threat

23   of serious physical injury.

24        Q    If you were teaching a class of troopers and

25   you gave them an example of someone who had a pistol

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  in a holster on their side, would that be enough to

2  use lethal force with nothing else going on?

3       A   With no other elements, no, sir, that would

4  not be sufficient reason.

5       Q   If that holster had a flap on it and the

6  suspect opened that flap, what would you teach your

7  officers to do at that point?

8       A   I would teach the officers that that greatly

9  elevates the danger to them.  The fact that the

10  person is operating in proximity to the weapon to

11  where they can remove the flap or undue the flap

12  puts them in a position at that moment where the gun

13  can be put into play instantly and utilized against

14  them.

15       Q   Would this be a situation where they would

16  be authorized to use lethal force?

17       A   Yes, sir.

18       Q   If that person took his hand and put the

19  hand under the flap of the holster, what would you

20  teach them, how would you teach them to handle that

21  situation?

22       A   That is actually one of the elements that we

23  talk about when the person is in proximity with

24  their weapon with the use of that action versus

25  reaction drill.  This is obviously, at that point,

```
 1   the person has their hand on the weapon, they are in
 2   a position where they would be able to beat the
 3   officer.
 4        Q    Would that be a situation in which the
 5   officer would be allowed to use deadly force?
 6        A    Yes, sir.
 7        Q    If the suspect started to draw his pistol
 8   out of the holster, what would you teach your
 9   troopers?
10        A    At that point deadly force or deadly threat
11   against them is imminent and they should be
12   utilizing deadly force at that point.
13        Q    Would the officer be behind the curve if he
14   allowed the suspect to start to draw his gun before
15   he fired?
16        A    Very much so.
17        Q    And this is something that you would teach
18   them not to try to get into that situation?
19        A    Yes, sir.
20        Q    If the defendant had his hand on the gun and
21   yelled, "you're going to have to shoot me man,"
22   would this be a situation in which you would teach
23   your troopers to use lethal force?
24        A    Yes, sir.
25        Q    Why?
```

1    A    The person has already given an indication

2  of what -- that they're anticipating the use of

3  deadly force by the officer, and they are making

4  motions by placing their hand on the weapon that is

5  going to have to force the officer to have to do

6  that.

7    Q    So in other words your training to the

8  officer is to perceive the threat, and when they

9  perceive the threat, to take the appropriate action?

10   A    Yes, sir.  As I said, if we get to the point

11 where we are trying to play catch-up with the

12 suspect, absolutely the best we can hope for is a

13 tie, which for us is a loss.

14       MR. PARKS:  Thank you very much.  No more

15 questions.

16       JUDGE SUTHERLAND:  Cross examination.

17       MR. EASTWOOD:  Thank you, Your Honor.

18       **CROSS EXAMINATION OF CORPORAL JEFF WHITE**

19 **QUESTIONS BY MR. EASTWOOD:**

20   Q    Good afternoon, sir.

21   A    Good afternoon.

22   Q    It's good to see you again.  We met last

23 week so I could take your deposition; is that

24 correct?

25   A    That is correct.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1     Q    And I apologize, your title is Corporal

2  White; is that correct?

3     A    Yes, sir.

4     Q    Corporal White, how long have you been

5  teaching use of force for the Missouri Highway

6  Patrol?

7     A    I started as an adjunct instructor for the

8  academy in 2000, been teaching full-time since 2007.

9     Q    When was it that you got your certifications

10  from the NRA and some of these other agencies?

11     A    My first certification was when I was still

12  with the sheriff's department in Boone County.  The

13  certification with the NRA was in 1986.

14     Q    And did you ever compare -- strike that.

15  Did you ever train Sergeant Folsom in the use of

16  force for firearms?

17     A    As I said during our deposition, the only

18  opportunity I would have had to have trained him

19  would have been both 2007 and 2008 when all troopers

20  came through the academy for in-service training for

21  active shooter training.

22     Q    I'm going to ask you some questions I asked

23  you in your deposition because I need the jury to

24  hear your answers, okay, sir, but to your knowledge

25  you have no personal knowledge of whether or not you

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   trained Sergeant Folsom; right?
 2        A    No, sir.
 3        Q    And at least in preparation for your
 4   deposition, I don't know if it's changed since then,
 5   you did not review what training Sergeant Folsom
 6   had; is that correct?
 7        A    That's correct.
 8        Q    So you don't know what training he's had?
 9        A    No, sir.
10        Q    And if I told you that Sergeant Folsom had
11   served in the Army, is it possible that he had had
12   different training in use of force than that which
13   he might receive from you in the Highway Patrol?
14        A    Would the Army have taught him differently
15   than what the patrol would be teaching?
16        Q    Yes, sir.
17        A    Yes.
18        Q    Do you know what the Army would teach him?
19        A    Not specifically, no, sir.
20        Q    But you know it would be different perhaps?
21        A    Yes, there's a good possibility.
22        Q    And have you trained Corporal Mertens?
23        A    Yes.
24        Q    And when was that?
25        A    It would have been during the time that both
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  of us were on the Troop F SWAT team.

 2      Q   How long a period was that when you were on

 3  the SWAT team together?

 4      A   To the best of my recollection it would have

 5  been a six-year period.

 6      Q   You were together for six years?

 7      A   Yes, sir.

 8      Q   Doing SWAT the whole time?

 9      A   It was an additional duty.  We only have a

10  part-time SWAT team, we had four part-time for the

11  state.

12      Q   So you weren't regularly serving along side

13  him, it was only when the SWAT team was activated?

14      A   The trainings were two days a month and then

15  during any activations.

16      Q   Were you training Corporal Mertens then or

17  serving along side him?

18      A   I was in charge of training for the SWAT

19  team during the time we were doing that since I was

20  a firearms instructor.

21      Q   Was the use of firearms instruction any

22  different for the SWAT team situation than it would

23  be for an ordinary situation interacting with a

24  civilian?  If that was too big, I can restate.

25      A   I can say the basic training is the same as

1 far as when we're authorized to utilize weapons.

2 The only difference would be in tactics and the fact

3 that we would have multiple people available to

4 respond to a situation at that point.

5     Q    SWATs are pretty serious extreme situations;

6 right?

7     A    Yes, sir.

8     Q    Very high threat level?

9     A    Yes, sir.

10     Q    Extreme use of force required, highest level

11 of force required in many cases?

12     A    The potential is always there, yes, sir.

13     Q    The type of weaponry and tactical maneuvers

14 are anticipating very, very dangerous situations?

15     A    Yes, sir.

16     Q    And to be clear, the situation from your

17 knowledge, your review of the Jeff Weinhaus matter

18 was not a SWAT team type situation; right?

19     A    No, sir.

20     Q    Did you talk to Sergeant Folsom before

21 testifying here today about this incident, about the

22 shooting incident?

23     A    No, sir.

24     Q    Did you talk to Corporal Mertens about the

25 shooting incident?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        A    No, sir.

2        Q    Did you review the investigative reports

3   that Perry Smith prepared?

4        A    No, sir.

5        Q    What materials did you review in preparation

6   for your testimony today?

7        A    I viewed the videotape as it was presented

8   by the prosecutor's office.

9        Q    This is the wrist watch videotape?

10       A    Yes, sir.

11       Q    And you reached -- did you reach any

12   conclusions based on your review of that tape?

13       A    Yes, sir.

14       Q    And what was your conclusion?

15       A    My conclusion was that the use of force was

16   within reason for the situation that was presented.

17       Q    Now is that based solely on what you saw and

18   heard in the video or also based on certain

19   assumptions?

20       A    Based on what I saw and heard on the video,

21   sir.

22       Q    Let's walk through it one by one.  In the

23   video you don't see the holster; right?

24       A    No, sir.

25       Q    You don't see the gun in the holster; right?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      A    No, sir.

2      Q    You see footage that is taken by a camera

3 that is on Jeff Weinhaus' left wrist; correct?

4      A    Yes, sir.

5      Q    You cannot see his right hand at any time in

6 the video; right?

7      A    Correct.

8      Q    You cannot -- you can only at best see what

9 the camera depicts and hear what Jeff, Sergeant

10 Folsom, Corporal Mertens each say, and in brief

11 periods of time you see Sergeant Folsom and you see

12 Corporal Mertens; right?

13      A    Yes, sir.

14      Q    And so your testimony that the use of force

15 was justified here is based then on an assumption

16 that Jeff's hand did what Sergeant Folsom and

17 Corporal Mertens testified it did; right?

18      A    Yes, sir.

19      Q    You can't tell that from the video alone?

20      A    No, sir.

21      Q    And I assume you learned of this testimony,

22 I guess it was Mr. Parks or someone told you that

23 this is what it would be; right?

24      A    Yes, sir.

25      Q    Now, when I met with you, you kindly brought

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   some of the training materials that you use in

 2   teaching use of force?

 3        A    Yes, sir.

 4        Q    And I think before that.  And I know you

 5   already went over this with Mr. Parks that you no

 6   longer teach the force continuum, that you have this

 7   hub and spoke system almost of force options?

 8        A    Yes, sir.

 9        Q    And the key really is reasonableness; right?

10        A    Yes, sir.

11        Q    It's sort of like Goldilocks, not too hot,

12   not too cold.  One is extreme force, excessive

13   force, and that would be inappropriate; is that

14   correct?

15        A    That's correct.

16        Q    And at the other end is too little force,

17   and that results in a law enforcement officer

18   potentially being shot or wounded, killed; right?

19        A    Yes, sir.

20        Q    And it seems to me that your critique of the

21   force continuum was that perhaps it encouraged too

22   little force, too little reactive force by the

23   officer, and that left the officer vulnerable, is

24   that fair to say?

25        A    It was more of a concern over it causing

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   delays in deciding to use higher levels of force.

 2        Q    They couldn't get up those steps, couldn't

 3   get to a higher level fast enough in order to act

 4   appropriately given the level of threat they were

 5   confronted with?

 6        A    Yes, sir.

 7        Q    They were sort of thinking I have to keep on

 8   going up.  And you also in these training materials

 9   teach something called the universal human phobia;

10   is that correct?

11        A    Yes, sir.

12        Q    And what is the universal human phobia?

13        A    Interpersonal, I'm sorry, interpersonal

14   human aggression.

15        Q    In other words fighting, two individuals

16   fighting; right?

17        A    That is an example of it, yes.

18        Q    And when confronted with interpersonal human

19   aggression, what are some of the conditions that the

20   body experiences?

21        A    As I spoke about before, there are things

22   that will occur; the heart rate will go up,

23   adrenaline dump will occur, non-essential systems

24   will start shutting down based on the body's

25   perception of the threat.
```

 1      Q    And as these stress hormones come in or are

 2   dumped into the body, it's also correct that fine

 3   motor skills deteriorate; isn't that true?

 4      A    Yes, sir.

 5      Q    That visual reaction time changes?

 6      A    Yes.

 7      Q    That cognitive reaction time changes?

 8      A    Yes, sir.

 9      Q    That as the heart rate elevates, as the

10   stress level goes up, complex motor skills

11   deteriorate?

12      A    Yes, sir.

13      Q    In fact if your heart rate gets high enough,

14   you may freeze or seize up?

15      A    Yes, sir.

16      Q    You may uncontrollably void your bladder or

17   bowels?

18      A    Yes, sir.

19      Q    You lose gross motor skills, you lose

20   control of much of your body?

21      A    At different stages different functions will

22   be affected, yes, sir.

23      Q    In your training experience on the Highway

24   Patrol, have you dealt with individuals who have had

25   nerve damage?

Electronically Filed - EASTERN DISTRICT OF APPEALS - February 25, 2014 - 03:52 PM

1     A     Not that I'm aware of, no, sir.

2     Q     Have you dealt with individuals who have

3  tremors or shakes in their hands that are abnormal

4  for a healthy law enforcement officer?

5     A     Yes, sir.

6     Q     Tell me about that.  How do you train

7  someone who has a tremor or shake or motor skills

8  issue, how do you train them to correctly respond

9  with the right level of force?

10     A     Just the physical ailment itself won't

11  preclude their proper judgment.  What it becomes

12  then is mechanical function as far as being able to

13  utilize their firearm in a proper method and get

14  shot placement where they intend.

15     Q     So it's the firing of the gun that's a

16  concern?

17     A     Yes, sir.

18     Q     You also teach that in such situations there

19  are what's called perceptual distortions; is that

20  correct?

21     A     Yes, sir.

22     Q     And that can be diminished or intensified

23  sound?

24     A     Yes, sir.

25     Q     So it's completely foreseeable that an

Electronically Filed - EASTERN DISTRICT OF APPEALS - February 25, 2014 - 03:52 PM

1   officer might not remember the sound of a bullet;

2   right?

3        A    Yes, sir.

4        Q    And you can have heightened visual clarity

5   or less visual clarity, both are normal responses;

6   is that correct?

7        A    Yes, sir.

8        Q    And you can have temporary paralysis?

9        A    Yes, sir.

10       Q    You can also have memory loss for parts of

11   the event; is that correct?

12       A    Yes, sir.

13       Q    You can also have memory distortion for your

14   memories of some of the event; is that true?

15       A    Yes, sir.

16       Q    You can have intrusive or distracting

17   thoughts; right?

18       A    Yes.

19       Q    You can have disassociation?

20       A    Yes.

21       Q    Can you explain what disassociation is?

22       A    Disassociation is the feeling that this is

23   happening to someone else, this isn't happening to

24   me, you're seeing it from like a third person

25   perspective.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1     Q    You can have memory loss for some of your

2   actions; right?

3     A    Yes, sir.

4     Q    So in other words your perception, it is

5   entirely normal, foreseeable and indeed part of the

6   body's response to have significant changes to

7   vision, to hearing, to perception of time, to

8   perception, to recollection of memory?

9     A    These are potential things that can happen.

10  It's not a guarantee that it will happen to any

11  specific individual, they may suffer one of them or

12  all of them, but it is very both case and officer

13  specific.

14    Q    And it certainly is something that you teach

15  and that because it's foreseeable that officers

16  could be in these situations; right?

17    A    That is correct.

18    Q    You also have a color code system of mental

19  physical awareness; is that correct?

20    A    Yes, sir.

21    Q    It goes from white, yellow, orange, red to

22  black; right?

23    A    That is correct.

24    Q    And in the white, that's one extreme of the

25  color continuum, you're really not -- a person is

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  not in a combative state of mind, if they were
 2  attacked, they'd probably die; right?
 3      A   That is correct.
 4      Q   Condition black, you're in mortal combat;
 5  right?
 6      A   Yes, sir.
 7      Q   Fighting for your life, flight or fight, you
 8  have to defend yourself or you will be killed?
 9      A   That is correct.
10      Q   Have you ever taught, as an instructor,
11  whether or not it is appropriate for an officer to
12  confront a suspect who has personally threatened him
13  before as opposed to his peer officers?
14      A   I'm sorry, I'm not sure I understand your
15  question.
16      Q   Do you ever teach situations in which an
17  officer has to confront a suspect when that suspect
18  has made personal attacks, personal threats against
19  that officer in particular?
20      A   No, sir.
21      Q   There's not really training for that?
22      A   There isn't any that we provide.
23      Q   There's no training.  So if a suspect, if
24  you feel for some reason, at least in your mind, is
25  out to get you, there's no use of training in force
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  or firearms?

2      A   No, sir.

3      Q   Is it foreseeable, however, in such a

4  situation, based on your skills and you're an

5  expert; right?

6      A   Yes.

7      Q   Is it foreseeable that an officer confronted

8  with a suspect who had personally threatened him,

9  personally attacked him, personally criticized him,

10  would have an elevated stress level than an officer

11  who had no previous interaction with that suspect?

12      A   Potentially.

13      Q   And would that change the officer, the

14  officer who has the elevated stress levels who is

15  dealing with this suspect in a particularly

16  stressful situation, could that change his

17  perception of the event?

18      A   It would change definitely his perception of

19  the potential danger that was there.

20      Q   It would change his perception of the threat

21  level?

22      A   It very well could.

23      Q   And with the heightened stress, it could

24  also change his memory of the event?

25      A   Potentially, yes.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1      Q    It could distort his memory of the event?

2      A    Potentially.

3      Q    It could change his perception of sound, of

4 vision?

5      A    Potentially, yes.

6      Q    Now, when you teach use of firearms --

7 strike that.

8       Obviously we're talking about reasonable use of

9 force here, that's part of your expertise; right?

10     A    Yes, sir.

11     Q    The reasonable and appropriate reactive use

12 of force to a threat?

13     A    Yes, sir.

14     Q    And in some situations it is appropriate for

15 the officer to draw his weapon and potentially fire

16 it; right?

17     A    Yes, sir.

18     Q    And you talked about that some with

19 Mr. Parks.  And in your training, do you teach the

20 officer to hold the gun with both hands?

21     A    We teach both one handed and two handed

22 hold.

23     Q    Is there a preferred stance and grip that

24 you teach?

25     A    Preferred would be two hands.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        Q    Why is that?

2        A    It allows steadier hold.  Generally it

3   allows for greater control over shot placement.

4        Q    And that helps protect the officer and

5   protect those around him, the shot placement; right?

6        A    Yes, sir.

7        Q    Prevents an innocent civilian from being hit

8   by a stray bullet?

9        A    Yes, sir.

10       Q    So one hand is less preferable to two hands?

11       A    Yes, sir.

12       Q    Now sometimes an officer can have an injury

13   to his hand; is that correct?

14       A    Yes, sir.

15       Q    What do you teach in those circumstances?

16       A    Are you referring to an injury sustained

17   during the needed use of the firearm?

18       Q    Correct, yes, specifically, yes.  If one of

19   the officer's hand, for example, has a cut on it,

20   would that affect how the officer would grab or use

21   the gun?

22       A    Depending on the severity of the cut, it

23   could, yes.

24       Q    What would you advise, say if the cut was

25   severe enough that it hurt enough that the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  officer -- it was distracting to the officer?

2      A   At that point potentially a one-handed grip

3  would be preferable.

4      Q   Do you teach troopers about the law.  I know

5  you're not a lawyer, I don't think you are, are you,

6  sir?

7      A   No, sir.

8      Q   But do you teach the troopers about the law,

9  as you understand it, on use of force?

10     A   To an extent, yes, sir.

11     Q   You have teaching materials that cite cases

12  about appropriate use of force?

13     A   Yes, sir.

14     Q   And you also teach or in the course of

15  teaching this you also teach officers about

16  excessive use of force; is that correct?

17     A   Yes, sir.

18     Q   In fact excessive use of force is illegal;

19  right?

20     A   Correct.

21     Q   Unconstitutional?

22     A   Yes, sir.

23     Q   Now you also teach something called the

24  fleeing felon doctrine; right?

25     A   Yes, sir.

Electronically Filed · EASTERN DISTRICT CT OF APPEALS · February 25, 2014 · 03:52 PM

```
 1      Q   And can you briefly tell the Court what the

 2  fleeing felon doctrine is, tell the jury rather?

 3      A   The fleeing felon doctrine is doctrines

 4  established to where an officer -- the courts have

 5  stated that a fleeing felon can be brought under

 6  apprehension by whatever means necessary.  We teach,

 7  though, that it only can be -- they can only utilize

 8  that force which is reasonable to bring that person

 9  under control.  That does not give them carte

10  blanche to use deadly force to bring the person

11  under control.

12      Q   Do you have an opinion in this matter

13  whether Jeff Weinhaus was a fleeing felon?

14      A   I do.

15      Q   And what is that opinion?

16      A   He was not.

17      Q   He was not a fleeing felon.  So this was not

18  a situation where force was necessarily appropriate

19  because of -- because he was a fleeing felon.  Your

20  conclusion is based rather on the video and the

21  assumption that Jeff's right hand did what it did;

22  right?

23      A   Yes, sir.

24      Q   By the way, do you have an opinion or do you

25  have an assumption, in your opinion, as to what
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   Jeff's last hand was doing?

 2        A    No, sir.

 3        Q    In fact I think we talked about this

 4   earlier, what Jeff's hand was doing is irrelevant to

 5   you; right, to your opinion?

 6        A    Based on the circumstances you described

 7   when the question was asked previously, yes, sir.

 8        Q    And we spoke about this, in fact your

 9   opinions about use of force are based on what's

10   called the totality of the circumstances; right?

11        A    Yes, sir.

12        Q    It's really difficult to say just because

13   someone said this or just because someone did that,

14   that automatically requires the use of deadly force,

15   it's really the whole picture; right?

16        A    That is correct.

17        Q    And so it's possible, I guess, that Jeff,

18   this is a hypothetical, but it's possible that Jeff

19   could have been crouching down, could have had his

20   left hand in the air, but your opinion is based

21   solely on what his right hand was doing; is that

22   correct?

23        A    That is correct.

24        Q    Are you familiar with this particular

25   holster?

Electronically Filed - EASTERN DISTRICT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Not that particular one but you did mention
 2   the style, sir.
 3      Q    And do you have personal experience or
 4   experience in training troopers with the use of
 5   holsters such as this?
 6      A    I have personal experience but not from
 7   training troopers.
 8      Q    Just in your private life?
 9      A    Yes, sir.
10      Q    And do you have an opinion whether these
11   holsters require additional effort or time to open?
12      A    Just to open?
13      Q    Yes, just to open?
14      A    No, it's a pull down and lift away.
15      Q    Are there sort of expected response times
16   when you're training troopers for a trooper to
17   remove his weapon from a holster and then bring it
18   up and shoot?
19      A    There are no set criteria.  We strive hard
20   to get them to be able to do it in the quickest
21   manner possible.
22      Q    Is there an approximate time range of
23   seconds that you have as a goal or expectation?
24      A    Ideally we want to be able to, on signal,
25   draw and get an accurate round on target within two
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    seconds.

2        Q    So in your mind an officer who was properly

3    trained in the use of firearms could draw and then

4    raise and shoot his weapon in about two seconds?

5        A    If they were using the standard issue

6    holster that we have, that's what we train from the

7    recruit status.

8        Q    Based on your personal knowledge of that

9    type of holster, do they take longer to open and

10   withdraw than the standard?

11       A    Yes, sir.

12       Q    How much longer?

13       A    I haven't worked with one in quite some

14   time, I couldn't give you a time frame.

15       Q    Would you be impressed if a well-trained

16   trooper could do it in three seconds, unlatch, lift,

17   withdraw, aim, shoot, three seconds, would that be

18   an impressive time period for you?

19       A    I would imagine with training and practice a

20   person could do it in a time less than that.

21       Q    Less than that?

22       A    Yes, sir.

23       Q    Do you have any knowledge of what training

24   Jeff Weinhaus had in the use of firearms?

25       A    No, sir.

Weinhaus, Vol. 2

```
 1      Q    In the use of holsters like this?

 2      A    No, sir.

 3      Q    And you didn't make any inquiry into that as

 4 part of your opinion here today?

 5      A    No, sir.

 6      Q    I asked you during your deposition on

 7 whether the type of holster mattered, didn't I?

 8      A    Yes, sir.

 9      Q    And you told me it didn't really, right, in

10 terms of the standard training, that the response is

11 the same, that use of force is justified regardless

12 of holster type if the guy reaches for his holster?

13      A    Again based on the totality of the

14 circumstances involved, yes, sir.

15      Q    Sergeant Folsom, however, testified earlier

16 today that he was familiar with this type of

17 holster, that he had served in the military and was

18 familiar with this type of particular holster.

19 Would that change your opinion on the

20 appropriateness of force based on whether the

21 holster was closed, whether it had begun to open,

22 whether it had -- whether the suspect's hand was

23 touching the holster as all, the fact that this

24 takes longer to open if Sergeant Folsom knew what

25 type of holster this was, would that alter your
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  opinion?

2     A   I'm sorry, you lost me with the question in

3  there.

4     Q   I'll rephrase.  Your opinion you said was

5  that the use of force was justified based on the

6  video and based on the testimony about the right

7  hand was made without regard to the holster type; is

8  that correct?

9     A   That's correct.

10     Q   But Sergeant Folsom testified that he

11  recognized this particular type of holster, and we

12  just talked about the fact that this holster takes

13  longer to open; right?

14     A   Yes, sir.

15     Q   So would that change your opinion if the

16  trooper recognized and knew what type of holster

17  this was, would that change your opinion as to when

18  deadly force was appropriate?

19     A   Based on that circumstance alone?

20     Q   Yes, sir.

21     A   No, sir.

22     Q   And is it your opinion that if he's even

23  reaching for it, it's okay to shoot him?

24     A   If he's reaching for his weapon?

25     Q   Just reaching for his holster.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    The holster with a weapon contained within

 2   it?

 3        Q    Presumably, but you don't know.

 4        A    I would say yes.

 5        Q    How far away would the hand have to be?

 6        A    It would have to start towards the holster.

 7        Q    From wherever it was?

 8        A    Yes, sir.

 9        Q    So if his hand was up in the air and it

10   started to come here, would that be considered a

11   reach?

12        A    It would depend, once again, on the totality

13   of the circumstances.  What were his instructions,

14   what should he be doing, what are my actions at that

15   time, all of those things, all of those factors come

16   into play.

17        Q    You also teach what to do when confronted

18   with appropriate responses, and you do teach verbal

19   judo; right?

20        A    I do not, no.

21        Q    But you do consider that an appropriate

22   response under certain circumstances; right?

23        A    To respond verbally to a threat?

24        Q    Yes, sir.

25        A    If there's time and circumstances warrant
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  it, yes, sir.

2      Q   So here we're confronted with a situation

3  where two troopers are executing an arrest warrant.

4  Jeff Weinhaus didn't know that.  There's nothing to

5  suggest he knew that, but my question is this:  What

6  would you teach, assuming Jeff was not reaching for

7  the gun, what types of things might you teach a

8  trooper to say or command in order to get the

9  suspect to comply?

10     A   As we said before with our training, we try

11 to give them a variety of options so they have

12 several things to draw from.  One of those could be

13 given the command of don't move.  Another could be

14 get on the ground.  Another could be put your hands

15 away from the weapon.

16     Q   In fact we spoke about hands during your

17 deposition; right?

18     A   Yes, sir.

19     Q   And I think you said that you told me that

20 talking about the hands, keeping the hands away from

21 the weapon was something important to do when you

22 have a person who is armed; right?

23     A   Yes, sir.

24     Q   And you reviewed the videotape here, neither

25 Sergeant Folsom nor Corporal Mertens said anything

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   about hands; right?

2        A    No, sir.

3        Q    In fact they said get down on the ground;

4   right?

5        A    Yes, sir.

6        Q    And there's some contradicting testimony but

7   there is an indication that Jeff may have crouched

8   down some, and so my question is if Jeff crouched

9   down and put his hands in the air, would you

10  consider that complying with get down on the ground?

11       A    As you just demonstrated?

12       Q    Sure.

13       A    Potentially, yes.

14       Q    And do you have an opinion on a reasonable

15  amount of time that it would take for a suspect to

16  get down on the ground?

17       A    As we spoke of before, it's hard to put a

18  time frame on it, depends on the circumstances, the

19  situation, the location, the subject's physical

20  condition.  The main thing that we'd be looking for

21  would be compliance.

22       Q    Middle-aged white man on a gravel incline,

23  how long would it take him, what's reasonable, if

24  you could ballpark at all, based on the

25  circumstances you've seen on the video, what would

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  be a reasonable amount of time to comply, raise his

2  hands in the air and get down on the ground?

3     A   Reasonable, anywhere from two to five

4  seconds.

5     Q   I don't know if you've reviewed this video

6  but it appears that between Sergeant Folsom saying

7  first time get down on the ground and first shot

8  fired is three seconds, do you have an opinion on

9  that or no?

10     A   That seems appropriate, yes.

11     Q   Do you have an opinion whether or not Jeff

12  was complying with the order of get down on the

13  ground?

14     A   My opinion is that he was not.

15     Q   And again that's based on the assumption

16  from the testimony that the right hand was going to

17  the gun or based on other factors?

18     A   That plus the viewing of the videotape.

19     Q   I'd like to show the video, the freeze frame

20  again, and I have to do this because I understand

21  you have not been in the courtroom, and so although

22  the jury has seen this a number of times at this

23  point, I need to show it again to you.

24   (WHEREUPON THE VIDEO WAS PLAYED IN FREEZE FRAME)

25     Q   (By Mr. Eastwood) Obviously the date, hour

```
 1   and minute are incorrect, but I submit to you that
 2   this is a still from the video.  Is this sort of
 3   recognizable to you, sir, from your review of the
 4   video?
 5        A    Yes.
 6        Q    And this appears to be Sergeant Folsom and
 7   it appears that a cartridge is coming out of his
 8   gun; right?
 9        A    Yes, sir.
10        Q    So one can presume or infer that he's
11   already fired a shot because of the shell casing?
12        A    Yes, sir.
13        Q    If you look at the secondhand it says 03, so
14   we're going to go back in time.  If you go here, you
15   can see maybe a white plume of smoke or something
16   coming out of the barrel of the gun, and you go back
17   and the hand appears, or excuse me, the camera,
18   which is on the hand, sweeps left, you see Corporal
19   Mertens there at a high ready, is that what it's
20   called?
21        A    Yes, sir.
22        Q    And then we see the secondhand goes back to
23   two?
24        A    At this point you're scrolling backwards; is
25   that correct?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 2

```
 1        Q   Yes, sir, I'm going back in time.  I've gone
 2   back approximately a second in time, and the wrist
 3   watch is now showing the roof of the defendant's
 4   car, actually his wife's car, a Subaru and gas
 5   station sign, and I mean you kind of recognize where
 6   that is, right, you've seen a map of the scene
 7   before; right?
 8        A   Yes, sir.
 9        Q   So you know that if the defendant is
10   standing about there somewhere, that it's showing
11   the roof of his car and it's showing the sign down
12   there; right?
13        A   Yes, sir.
14        Q   And assuming it's in the six hand of the
15   watch, the hand is somewhat suggesting it's somewhat
16   elevated; right?
17           MR. PARKS:  Objection, calls for speculation
18   on the part of the witness.
19           JUDGE SUTHERLAND:  Sustained to the form of
20   that question.
21        Q   (By Mr. Eastwood) If Jeff Weinhaus had both
22   his left hand and his right hand in the air a second
23   before he was shot, would you say that the shooting
24   was appropriate?
25        A   No.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        Q    Thank you.  And to be clear, your opinion

2   that the shooting was justified is based on the

3   assumption that the right hand was reaching for the

4   gun or touching the gun or reaching for the holster

5   or touching the holster; correct?

6        A    That is one of the circumstances, yes.

7        Q    Is there any other circumstance other than

8   that assumption that would suggest the use of force

9   was justified?

10       A    The statement made by the defendant prior

11  to, the "you're going to have to kill me, man," his

12  demeanor, other factors.

13       Q    Demeanor, when you say demeanor, how do you

14  infer the defendant's demeanor from this video?

15       A    In his responses to Sergeant Folsom.

16       Q    Do you have an opinion as to the tone and

17  cadence of the defendant's speech?

18       A    You described it best in the deposition as

19  smartalicy.

20       Q    Was the defendant shouting?

21       A    No, sir.

22       Q    Did it have a hostile tone?

23       A    No, sir.

24       Q    When Sergeant Folsom and Corporal Mertens

25  ordered him to get down on the ground and the

 1    defendant makes a statement in response, is it in a

 2    softer volume, softer tone than that which the order

 3    given by Sergeant Folsom and Corporal Mertens?

 4         A    Yes, sir.

 5         Q    Now, do you also teach first aid?

 6         A    Yes, sir.

 7         Q    Do you teach first aid as an appropriate

 8    response potentially to an officer-involved

 9    shooting; correct?

10         A    That is correct.

11         Q    You shoot a member of the public, and

12    perhaps there very well may be a reason or not, but

13    if you shoot a member of the public, you have an

14    obligation to administer first aid; right?

15         A    Yes.

16         Q    And obviously an officer first needs to

17    secure the scene; right?

18         A    Yes, sir.

19         Q    An officer first needs perhaps to cuff the

20    person so the person is no longer a threat to the

21    officer?

22         A    Yes, sir.

23         Q    Perhaps search them for weapons?

24         A    Yes, sir.

25         Q    But once someone has been shot and cuffed

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  and the scene has been secured, then you have an

2  obligation to administer first aid, isn't that fair

3  to say?

4       A   Yes, sir.

5       Q   Is it appropriate instead of administering

6  first aid to simply call an ambulance?

7       A   I'm sorry?

8       Q   Say the guy is in cuffs, scene is secure,

9  the guy has been shot, cuffed, shot down, cuffed,

10 scene secured, instead of administering first aid,

11 is it appropriate for a trooper to instead call an

12 ambulance instead of administering first aid?

13      A   It would not be inappropriate, it would be

14 imperative that an ambulance be called.

15      Q   Fair enough but would calling an ambulance

16 in itself relieve the trooper of the obligation to

17 provide first aid?

18      A   If the injuries were within the scope of

19 training that the officer has in order or the

20 ability to deal with, they would be in a position

21 they need to render that aid, yes.

22      Q   So let's talk about what type of things they

23 can do.  Can officers treat for shock?

24      A   Yes, sir.

25      Q   Can officers check breathing?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Yes, sir.

 2      Q    Can officers administer CPR?

 3      A    Yes, sir.

 4      Q    Can officers stop bleeding?

 5      A    Yes, sir.

 6      Q    Can officers -- and they do, officers are

 7 equipped with gloves and pocket masks and other

 8 types of health and safety type things to protect

 9 themselves in the administering of the first aid;

10 right?

11      A    Yes, sir.

12      Q    Do you know whether or not Sergeant Folsom

13 or Corporal Mertens administered first aid in this

14 shooting?

15      A    No, sir.

16      Q    And you have no opinion on the first aid or

17 lack of first aid given to Jeff Weinhaus?

18      A    No, sir.

19      Q    Now Sergeant Smith (sic), you are a

20 decorated trooper, is that not true, you received an

21 award of merit from the Highway Patrol?

22      A    Yes, sir, I'm Corporal White.

23      Q    Excuse me, I'm sorry, did I use the wrong

24 rank?

25      A    You called me Sergeant Smith.
```

```
 1      Q    It's been a long day for us all.

 2      A    I understand.

 3      Q    Corporal White.  You are a decorated

 4  trooper; is that correct?

 5      A    Yes, sir.

 6      Q    And you received an award of merit from the

 7  Highway Patrol; is that correct, sir?

 8      A    Yes, I did.

 9      Q    And that's a prestigious thing, right, it

10  recognizes bravery, recognizes doing the correct

11  thing; right?

12      A    Yes, sir.

13      Q    And you received that award for an

14  officer-involved shooting; is that correct?

15      A    Yes, sir.

16      Q    And you were the officer involved in the

17  shooting?

18      A    That is correct.

19      Q    And in fact it occurred during a routine

20  traffic stop; is that not correct?

21      A    Not a routine stop, sir.

22      Q    I apologize but it did occur during a

23  traffic stop; is that correct?

24      A    Yes, sir.

25      Q    And at that point the suspect went for a
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  gun, is that not true, the driver that you pulled

2  over?

3     A   He exited the vehicle as soon as I stopped

4  behind him.  He exited the vehicle with a gun in

5  hand.

6     Q   Gun in hand?

7     A   Yes, sir.

8     Q   And you took evasive maneuvers, you used

9  tactics to evade him?

10     A   I began shooting at him.

11     Q   And after you shot him, at some point did

12  you cuff him?

13     A   No, sir.

14     Q   Why not?

15     A   There was a delay in time between him being

16  shot and being able to approach his vehicle and then

17  actually dealing with the subject.

18     Q   Was cuffing not necessary?

19     A   No, sir.

20     Q   It was not necessary?

21     A   That's correct.

22     Q   And why was it not necessary?

23     A   One of the injuries that the suspect

24  sustained was a shot to his head right above his

25  right eye.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1      Q    How many shots did he receive?

2      A    Two rounds hit him.

3      Q    Two rounds?

4      A    Yes.

5      Q    So only two bullets, I shouldn't say only

6  two bullets hit him?

7      A    That's correct.

8      Q    Where did they hit him?

9      A    The first round that struck him went through

10  his rib cage on his right side.

11     Q    So medium level chest?

12     A    It went between two of the ribs, hit a

13  portion of the liver, lower portion of the lung and

14  lodged up against his spine.

15     Q    So one shot to the chest, one shot to the

16  head?

17     A    Yes, sir.

18     Q    And based on that you determined that

19  cuffing him was not necessary?

20     A    Based on the fact that EMS arrived on the

21  scene very shortly afterwards and were able to

22  determine that he was dead.

23     Q    Did you administer first aid to the suspect?

24     A    I was prepared to.

25     Q    You were prepared to.  At any time did you
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    assume the suspect was dead and that he did not need

2    either first aid or EMS?

3         A    Not until he was declared dead by the EMS

4    who arrived on the scene.

5         Q    But you never made an assumption he was dead

6    and did not need medical attention?

7         A    No, sir.

8         Q    So you received the award of merit for your

9    actions that day; is that correct, sir?

10        A    That is correct.

11        Q    And you have continued to work for the

12   Highway Patrol ever since; is that correct?

13        A    That is correct.

14        Q    And at no time -- did you surrender your

15   weapon that you shot the suspect with?

16        A    Yes, sir.

17        Q    And there was an officer-involved shooting

18   investigation?

19        A    There was.

20        Q    And you got your weapon back?

21        A    Yes, sir.

22        Q    And at all times you were able to wear the

23   Highway Patrol uniform?

24        A    Yes, sir.

25        Q    And at no time did you take a leave of

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  absence for any reason?

2      A   No, sir.

3          MR. EASTWOOD:  Thank you very much.

4          JUDGE SUTHERLAND:  Redirect.

5      **REDIRECT EXAMINATION OF CORPORAL JEFF WHITE**

6  **QUESTIONS BY MR. PARKS:**

7      Q   Sergeant White, during your shooting

8  incident when the shooting had stopped, how long was

9  it before you broke cover to go to where the suspect

10 was lying?

11     A   It was seven minutes while I was waiting the

12 arrival of back-up officers.

13     Q   Why didn't you run up to him immediately?

14     A   It would have been tactically unsound to do

15 so.  There were two large shapes -- one of my shots

16 shattered the back window of the car rendering it

17 impossible to see through.  There were two large

18 dark shapes invisible through the shattered window.

19 The traffic going by was causing the car to move.

20 At that point I was under the assumption that there

21 were additional subjects in the car, so tactically

22 it was most sound to remain at the back of my car

23 where I had hard cover and wait for back-up officers

24 to clear the car.

25     Q   So is it a fair statement to say that every

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  shooting is different?

 2      A   Oh, absolutely.

 3      Q   And every response to that shooting is

 4  different?

 5      A   Absolutely.

 6      Q   And the response given to any such shooting

 7  depends upon the circumstances?

 8      A   The circumstances, the prior training the

 9  officer has received, prior experiences, just any

10  number of things.

11          MR. PARKS:  I have no further questions,

12  Your Honor.

13          JUDGE SUTHERLAND:  Recross.

14      RECROSS EXAMINATION OF CORPORAL JEFF WHITE

15  QUESTIONS BY MR. EASTWOOD:

16      Q   The shooting for which you won an award,

17  seven minutes for the EMS to arrive, you were by

18  yourself, sir; right?

19      A   Yes, sir.

20      Q   You didn't have a partner with you?

21      A   That is correct.

22      Q   You didn't have two FBI agents as back-up?

23      A   No, sir.

24      Q   You weren't in a parking lot?

25      A   No, sir.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1    Q   You were along the side of a highway;

 2 correct?

 3    A   Yes, sir.

 4    Q   And you believed that there were other

 5 shooters in the car?

 6    A   Potentially.

 7    Q   Potentially, yes, but it was a legitimate

 8 and rational fear?

 9    A   Yes, sir.

10    Q   So it's safe to say the scene was not

11 secure?

12    A   In my mind no, sir, not at all.

13    Q   The suspect was not in custody?

14    A   No.

15    Q   He was not cuffed?

16    A   No.

17    Q   The danger or potential danger, reasonable

18 potential danger was still out there?

19    A   Yes, sir.

20        MR. EASTWOOD:  No further questions.

21        JUDGE SUTHERLAND:  May this witness be

22 excused?

23        MR. PARKS:  Yes, Your Honor.

24        JUDGE SUTHERLAND:  Thank you.  You may step

25 down.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  I would like to reverify that
 2    all exhibits, except for Exhibit 12 offered by the
 3    State, have been admitted into evidence.
 4          JUDGE SUTHERLAND:  That is correct.
 5          MR. PARKS:  State rests, Your Honor.
 6             (BENCH CONFERENCE BEGINS)
 7          JUDGE SUTHERLAND:  I've been handed
 8    Defendant's Motion for Judgment of Acquittal.  If
 9    it's all right with both of you or all of you, I
10    would like to hold the argument on this until we
11    recess and let the jury go this evening, is that all
12    right?
13          MR. EASTWOOD:  That's fine.
14          MR. PARKS:  That's fine.
15          JUDGE SUTHERLAND:  So we can get some of
16    your evidence out of the way.
17          MR. EASTWOOD:  The offers of proof are you
18    talking about as well?
19          JUDGE SUTHERLAND:  Yeah, I think so, we'll
20    hold the offers of proof and argument for defense's
21    Motion for Judgment of Acquittal until the jury is
22    recessed and gone for the day because it's now five
23    after 4:00.  We'll only go for about another hour or
24    thereabouts.
25          MR. EASTWOOD:  The defense is not ready to
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  proceed at this time with its case.  We will be

2  ready at 8:30 in the morning.  We have three

3  witnesses and they will take 45 minutes total.

4          MR. COMBS:  The way the case is going, we

5  called and canceled them because we didn't know.

6  They had to work.

7          JUDGE SUTHERLAND:  You guys don't have

8  anybody for this afternoon?

9          MR. EASTWOOD:  Three witnesses, they're all

10 working people.  I made a bad judgment call that the

11 State would not rest this afternoon based on where

12 we were.

13         JUDGE SUTHERLAND:  In those circumstances

14 we'll take care of all the stuff now, let the jury

15 go now.

16         MR. COMBS:  We didn't know if the FBI agents

17 were testifying too.  It's our mistake.

18         MR. EASTWOOD:  The FBI agents are here too,

19 so I anticipated they'd be called.

20              (BENCH CONFERENCE ENDS)

21         JUDGE SUTHERLAND:  Looks like we're going to

22 get out a little earlier than anticipated today

23 because we've run out of witnesses today.  May we

24 start at 8:30 tomorrow morning, is that okay?  To

25 get this done tomorrow, it's possible, I have no way

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   of knowing right now, but it's possible we might
 2   have to run a little late tomorrow, okay.  I've only
 3   tried two cases past midnight in 35 years.  I hope I
 4   don't have to do that.  It gets real tiring.  We
 5   won't do that.  If we can't get done at a reasonable
 6   hour by tomorrow evening, sometime after 5 o'clock
 7   though, it's possible we might have to go Friday.  I
 8   don't really anticipate that right now, but I don't
 9   want to, if things take longer than anticipated, I
10   don't want to shock you, but if we can start at
11   8:30, that will be of assistance.
12        So for the last time today, the Court again
13   reminds you of what you were told at the first
14   recess of the Court.  Until you retire to consider
15   your verdict, you must not discuss this case among
16   yourselves or with others or permit anyone to
17   discuss it in your hearing.  You should not form or
18   express any opinion about the case until it is
19   finally given to you to decide.  Do not do any
20   research or investigation on your own about any
21   matter regarding this case or anyone involved with
22   the trial.  Do not communicate with others.  Do not
23   read, view or listen to any newspaper, radio,
24   electronic communication from the Internet or
25   television report of the trial.  If you can get to
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   the jury room by 8:15, hopefully everybody on time
 2   tomorrow so we can get a head count and get going at
 3   8:30, I would greatly appreciate it.  We are in
 4   recess and you are free to go today.
 5        (WHEREUPON THE JURY EXITED THE COURTROOM)
 6        JUDGE SUTHERLAND:  We'll proceed with the
 7   offers of proof, Motions of Summary Judgment for
 8   Acquittal.  There were at least two offers of proof
 9   the defendant was talking about.
10        MR. PARKS:  Did you want more on the offers
11   of proof or just let the oral arguments stand.
12        MR. EASTWOOD:  We have the letter from the
13   sheriff.
14        JUDGE SUTHERLAND:  I have that marked as an
15   exhibit.  Are you going to have any exhibits?
16        MR. EASTWOOD:  I don't believe so.
17        JUDGE SUTHERLAND:  Even tomorrow?
18        MR. EASTWOOD:  No, I only intend to
19   introduce testimony.
20        JUDGE SUTHERLAND:  Let's mark it as
21   Defendant's Exhibit A then.
22        MR. COMBS:  The letter?
23        JUDGE SUTHERLAND:  The letter.  We did the
24   one Offer of Proof by the argument about taking the
25   shirt off and showing the wound, so that one is
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  done, and then we have the sheriff's letter and I
 2  think there was one other.
 3          MR. EASTWOOD:  We can mark it Defendant's
 4  Exhibit A.
 5          JUDGE SUTHERLAND:  Proceed with your Offer
 6  of Proof.
 7          MR. EASTWOOD:  This is an Offer of Proof.
 8            (MARKED DEFENDANT'S EXHIBIT A)
 9          MR. EASTWOOD:  This is a letter or an
10  original letter from Franklin County Sheriff Gary
11  Toelke to the defendant Jeffrey Weinhaus.  It is
12  relevant, I believe, because the third paragraph
13  says, "my deputies were not with the Highway Patrol
14  on the day they obtained the search warrant or the
15  day of the shooting.  We were not aware that a
16  search warrant had been issued.  My office was aware
17  that the Highway Patrol was going to be looking for
18  you prior to the search warrant being issued, but we
19  were not with them."  I wanted to impeach Sergeant
20  Folsom on this because I believe there was
21  contradictory testimony in prior statements by him
22  on the issue of notification of the sheriff.
23          JUDGE SUTHERLAND:  Okay.
24          MR. PARKS:  No argument, Your Honor.
25          JUDGE SUTHERLAND:  Defendant's Exhibit A is
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  admitted for purposes of the Offer of Proof, not
 2  admitted in front of the jury and my ruling still
 3  stands but we've got that.  Was there one other
 4  matter?
 5          MR. EASTWOOD:  Yes, Your Honor, and I
 6  apologize.  The other Offer of Proof goes to
 7  eliciting testimony from Sergeant Folsom as to
 8  his -- the other shooting.  The theory here is
 9  common scheme or plan.  There are a lot of
10  similarities between the other shooting that
11  Sergeant Folsom was involved in and this particular
12  shooting in the sense that both involved shooting
13  the individual at a close range.  It's someone that
14  Sergeant Folsom by, on inference, on reasonable
15  inference and belief, had antagonistic personal
16  feelings toward, and in both there was an
17  officer-involved shooting, and there is not an exact
18  similarity but in that instance the victim or the
19  suspect was shot and killed and there were no
20  witnesses.  In this one the suspect was shot, was
21  not killed but almost killed, and there is only one
22  corroborating witness, the partner.  So for that
23  reason I wish to inquire to Sergeant Folsom the
24  details on the other shooting which I elicited in
25  his deposition.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        MR. PARKS:  Your Honor, I believe in this
 2   instance they were searching a house for a suspect
 3   who was accused of either a homicide or a serious
 4   felony.  Sergeant Folsom cornered him, Sergeant
 5   Folsom was disarmed, the suspect was armed, a
 6   scuffle and a fight pursued, at which point Sergeant
 7   Folsom was able to get the suspect's weapon away
 8   from him and shot him.  There's no similarities here
 9   whatsoever, and I believe this was -- this incident
10   happened within an eight or 10 year period prior to
11   this incident.
12        MR. EASTWOOD:  My response is I believe that
13   the incident was not a serious felony, it was
14   domestic violence, which is serious, but it was not
15   a homicide, and here the person who was shot had
16   ruptured Sergeant Folsom's left testicle thereby
17   giving him perhaps a motive to shoot him, and I was
18   going to analogize that here to the conduct of Jeff
19   Weinhaus giving motive for Sergeant Folsom to shoot
20   him.  So that's the basis of the Offer of Proof.
21        JUDGE SUTHERLAND:  Offer of Proof is
22   accepted.  The ruling is the same, the State's
23   objection is sustained.  Did they take Mr. Weinhaus
24   back?
25        MR. EASTWOOD:  They did.  Did you want to
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1    inquire of him?

 2          MR. PARKS:  Did you want to argue this

 3    motion or submit it the motion?

 4          MR. EASTWOOD:  I could argue it now.

 5          JUDGE SUTHERLAND:  I'd just as soon argue it

 6    now while we've got time.

 7          MR. EASTWOOD:  You wish the attorneys to

 8    retain the exhibits; is that correct, Your Honor?

 9          JUDGE SUTHERLAND:  Yeah.  Motion for

10    Judgment of Acquittal.

11          MR. EASTWOOD:  Your Honor, on the first

12    charge, the possession of a controlled substance,

13    this is the Morphine tablet, I believe the State has

14    failed to make a submissible case on the element of

15    possession.  The testimony showed that the Morphine

16    tablet was recovered from the basement, which the

17    officers admitted is normally a common area of the

18    house.  Although there is evidence that the

19    defendant did record videos there, the evidence also

20    shows that he shared this house with his wife and

21    his son, that the son had a bedroom or someone in

22    the family had a bedroom in the basement and then

23    outside of it was this common area.  I just do not

24    believe there is sufficient evidence for a

25    reasonable juror to find either actual or

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  constructive possession attributable only to the

 2  defendant.

 3         MR. PARKS:  It was found in what the

 4  defendant described as the command center.  The

 5  officers testified that they had smelled marijuana

 6  in the house and on the person.  They testified that

 7  the defendant yelled into his wife, "they're looking

 8  for the drugs, they're looking for the drugs."  And

 9  they also testified that the wife stated that there

10  was nothing illegal in the house that belonged to

11  her.  I believe the State has made a submissible

12  case to submit this to the jury.

13         MR. EASTWOOD:  The wife's statement is

14  hearsay, and more importantly even if you take the

15  wife out of it, you still have the son, and the

16  officer also testified that there was nothing

17  special about command center, that basements have

18  all sorts of names, man cave, bear pit, whatever you

19  want to call it, that it's very common to have a rec

20  room, den or place, and further he also testified

21  that the computer is often a family asset used by

22  multiple members of the family, so the mere

23  proximity of the drugs to the computer does not

24  imply actual constructive possession by the

25  defendant alone.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            JUDGE SUTHERLAND:  I have mixed feelings
 2  about the two controlled substance charges.  I got
 3  reversed by the Court of Appeals a number of years
 4  ago on a case where officers went into a motel room
 5  where the defendant we were trying, that we did try,
 6  and his girlfriend were, and as soon as they entered
 7  the door the defendant is diving over to conceal
 8  something, and the Court of Appeals said joint
 9  possession, you don't know whose it was.  I couldn't
10  quite believe it.  This is a little different.  I'm
11  going to deny it as to the marijuana charge, deny
12  the Motion for Judgment of Acquittal.  The fact that
13  the officer testified that there was an odor of
14  marijuana about defendant's person is sufficient to
15  establish some use or at least constructive
16  possession of marijuana.  The Morphine, however, is
17  a little --
18            MR. PARKS:  Of course the Morphine was found
19  with the marijuana, Your Honor.
20            MR. EASTWOOD:  Was found proximate to the
21  marijuana in a common area of the house.
22            JUDGE SUTHERLAND:  That's weak but I'm going
23  to deny the Motion for Judgment of Acquittal on that
24  as well.  I don't want to argue the tampering with a
25  judicial officer portion of the motion for the
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  defendant, but I've got some problems with that.

2  You kind of argued this on your prior motions to

3  dismiss that count, but I -- the pod cast was

4  certainly offensive, rude and a lot of other things,

5  but I've heard no evidence despite some testimony

6  that he apparently showed up to Crawford County

7  Courthouse, a public place, where he has a right to

8  be, and the 911 center, which is not really a public

9  place, but there's no evidence that he took any

10 steps to actually put in motion his thoughts of

11 executing people or whatever, maybe throw them out

12 of office, whatever the case may be, and I think

13 he's still under his First Amendment rights under

14 that.

15        MR. PARKS:  That one in the pod cast with

16 the subtitles, he specifically said Judge Kelly

17 Parker is one of the people that he was going to

18 come and get, and you don't have to wait for the

19 defendant to act.

20        JUDGE SUTHERLAND:  No, you don't have to

21 wait for him to show up at the courthouse with a

22 shotgun, that's true, but he's got to do something.

23        MR. COMBS:  There's been plenty of testimony

24 of him making these threats all the time and making

25 these radical political speeches and not following

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   through.

2       JUDGE SUTHERLAND:  I'm rather fond of judges

3   not being threatened, I have this little thing about

4   that.

5       MR. EASTWOOD:  The other thing, Judge, is

6   that there was no evidence of anything for him to

7   interfere with in the course of his judicial duties.

8   I understand the general threat resigned but there's

9   not a case or controversy.

10      JUDGE SUTHERLAND:  There were names in those

11  annotations, as you referred to them.  I don't do

12  any of those websites, I stay off of those things,

13  although my granddaughters live on them, that's

14  another problem.  I just -- there just isn't

15  anything there to support that charge.  I don't want

16  to say there's nothing, the pod cast is a start but

17  there's go to be something more than just the pod

18  cast.  So I'm going to grant defendant's Motion for

19  Judgment of Acquittal as to Count 2, the charge of

20  tampering with a judicial officer.  Are we having an

21  argument on the assault or attempted assault?

22      MR. EASTWOOD:  I'd like to take them one at

23  a time, if I may, Your Honor.  There's obviously two

24  sets of charges here, two troopers.  As a threshold

25  matter, it's not clear to me whether the State is

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   trying to submit an assault or attempted assault
 2   case.  Maybe I'm fast forwarding to jury
 3   instructions and the jury needing to be instructed
 4   on attempt.  My argument here is that I think the
 5   only thing to support the element of a substantial
 6   step is the testimony of Folsom and Mertens
 7   themselves, there's nothing else.  Certainly none of
 8   the investigators, use of force experts, anyone like
 9   that, it all depends on the assumption of the
10   testimony.  So that very thin -- maybe that thin
11   piece of evidence gets them home because there's
12   nothing else to corroborate it, but perhaps that
13   does make it submissible, but then we go back to the
14   testimony itself.  The testimony indicates that at
15   no time did the defendant ever look at Mertens, did
16   he ever act towards Mertens, in fact Mertens said,
17   "I shot him because he was going for Sergeant
18   Folsom, I did not feel threatened by him."  And I
19   think that's critical because even if we take the
20   testimony as they say it is, under that construction
21   there was no assault or attempted assault on
22   Mertens.  In fact Mertens shot only to stop an
23   attempted assault on Folsom, and what the State has
24   done by doubling up on the charges here is really
25   taking one act, if we take Sergeant Folsom and
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   Corporal Mertens' version of the events, which is an

 2   attempt on Folsom and replicate it as to Mertens but

 3   the evidence isn't there.  And Mertens is the first

 4   person to tell you that, and Folsom's testimony also

 5   corroborates that story, and there's no other

 6   evidence to support evidence of an assault or

 7   attempted assault on Mertens.

 8        MR. PARKS:  Your Honor, they've got two

 9   officers both ordering the defendant to go to the

10   ground.  Defendant yells you're going to have to

11   shoot him.  Who knows whether if he would have got

12   that gun out whether he would have shot Mertens

13   first or Folsom first.  I think it's a submissible

14   case that the jury can decide.

15        JUDGE SUTHERLAND:  I have to agree with the

16   State on that one.  The motion as to counts --

17   actually that essentially would cover the armed

18   criminal action counts as well, four, five, six and

19   seven.

20        MR. EASTWOOD:  And as an aside, Your Honor,

21   I think that it's important that the jury receive

22   proper instructions on attempt and that sort of

23   thing here because -- or substantial step.  I know

24   we're not doing instructions now.

25        JUDGE SUTHERLAND:  Maybe in a few minutes.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1          MR. PARKS:  There is no substantial step in

2   an assault of a law enforcement officer, it's this

3   or that.

4          MR. EASTWOOD:  I think attempt has to be

5   defined.  The last one is resisting and interfering

6   with arrest for a felony.  I just think No. 1,

7   obviously the defendant was not arrested.  I realize

8   that's not the test, it's whether he was being

9   detained or arrested.  I think there isn't

10  sufficient evidence to show the defendant was not

11  complying with the officers' orders.  There's

12  nothing -- there's no affirmative step.

13         MR. COMBS:  He didn't have time.  He got

14  shot four times.

15         JUDGE SUTHERLAND:  If there's no shooting,

16  officer says get on the ground, he doesn't get on

17  the ground, he can be charged with failing to comply

18  with a reasonable request.

19         MR. EASTWOOD:  Correct but not with --

20         JUDGE SUTHERLAND:  What I didn't hear, tell

21  me if I'm wrong, I didn't hear anyone say, "I have a

22  warrant for you, you're under arrest, we're taking

23  you into custody," anything like that.

24         MR. PARKS:  I don't think you have to do

25  that when you're in a situation in which a gun is
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  being drawn, Your Honor.  I mean you can only do so

2  much.

3          JUDGE SUTHERLAND:  I understand.

4          MR. PARKS:  There was the testimony that he

5  was under arrest by the officers.

6          JUDGE SUTHERLAND:  He was arrested later but

7  my question is how can you resist something that you

8  don't know somebody is doing.

9          MR. COMBS:  He thought he was getting his

10  computers, he didn't know.

11          JUDGE SUTHERLAND:  Maybe he came to hunt

12  bear, you know, in more ways than one, but seems to

13  me somebody -- before you can be charged with

14  resisting arrest, you've got to -- even if he

15  whipped out the handcuffs and he tried to grab his

16  wrists and put them on and hadn't said anything,

17  that might have been enough, but I haven't heard any

18  evidence of any of that.  So I do grant the Motion

19  for Judgment of Acquittal as to Count 8, the

20  resisting or interfering with arrest for a felony

21  charge.  Obviously I'll have to say something to the

22  jurors tomorrow morning about that.  I think what

23  I'll tell them is I've acquitted defendant on both

24  of those counts as a matter of law, and if they want

25  to know why, I'll talk to them after the trial is

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   over with.

2        MR. EASTWOOD:  Your Honor, as a procedural

3   matter, obviously I will re-raise this motion at the

4   close of defense evidence as to those aspects we're

5   not trying.

6        JUDGE SUTHERLAND:  I understand, we just

7   won't need to argue them so long.  Mr. Parks has

8   given me a set of instructions a long time ago and

9   another set here.  I'd like to take a look at those

10  right now since we've got a little time.

11            (TRIAL ADJOURNED FOR THE DAY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   State of Missouri

 2                   SS.

 3   County of Franklin

 4       I, Kim Wrocklage, duly commissioned, qualified

 5   and authorized to administer oaths and to certify to

 6   depositions, do hereby certify that pursuant to

 7   agreement in the civil cause now pending and

 8   undetermined in the Circuit Court of Franklin

 9   County, State of Missouri, to be used in the trial

10   of said cause in said court, I was attended at the

11   offices of Franklin County Justice Center, 401 E.

12   Main Street, Union, in the County of Franklin, State

13   of Missouri on the 9th day of October, 2013.

14       The said witnesses were sworn to testify the

15   truth, the whole truth, and nothing but the truth in

16   the case aforesaid and thereupon testified as is

17   shown in the foregoing transcript.  Said testimony

18   was reported by me in shorthand and caused to be

19   transcribed into typewriting, and the foregoing

20   pages correctly set forth the testimony of the

21   aforementioned witnesses, together with the

22   questions propounded by counsel and remarks and

23   objections of counsel thereto, and is in all

24   respects a full, true, correct and complete

25   transcript.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    I further certify that I am not of counsel or

2   attorney for either of the parties to said suit, not

3   related to nor interested in any of the parties or

4   their attorneys.

5

6        _____/s/ Kim Wrocklage, CCR No. 885_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25