Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

**STATE OF MISSOURI**

**vs.**  ED100807

**JEFFREY WEINHAUS**

## VOLUME 3

**BEFORE THE HONORABLE JUDGE KEITH SUTHERLAND**

**TRANSCRIPT OF TRIAL TESTIMONY**

**TAKEN OCTOBER 10TH, 2013**

**REPORTED BY KIM WROCKLAGE, CCR**



**WROCKLAGE REPORTING, LLC**

**467 BROOKFIELD DRIVE - WASHINGTON, MO 63090**

**(636) 583-1953 or (314) 210-6917**

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          IN THE CIRCUIT COURT OF FRANKLIN COUNTY

2               STATE OF MISSOURI

3

4    STATE OF MISSOURI,

5              PLAINTIFF,        ED100807

6    vs.                    No. 12AB-CR02409-01

7    JEFFREY WEINHAUS,

8              DEFENDANT.

9

10        Volume 3, Trial Testimony taken at the

11   Franklin County Justice Center, 401 E. Main Street,

12   Union, in the County of Franklin, State of Missouri,

13   on the 10th day of October, 2013, before Kim

14   Wrocklage, CCR.

15

16

17

18

19

20

21

22

23

24

25

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4    Mr. Robert "Bob" Parks

5    Franklin County Prosecuting Attorney's Office

6    20 N. Church Street, 2nd Floor

7    Union, MO 63084

8    (636) 583-6370

9

10   FOR THE DEFENDANT:

11   Mr. Hugh A. Eastwood (heastwood@eastwoodlawstl.com)

12   Law Offices of Hugh A. Eastwood

13   7777 Bonhomme, Ste. 1603

14   Clayton, MO 63105

15   (314) 727-3533

16

17   Mr. Christopher M. Combs (combschris1@gmail.com)

18   Law Offices of Christopher M. Combs

19   4542 West Pine Blvd.

20   St. Louis, MO 63108

21   (314) 578-1465

22

23   ALSO PRESENT: Jeffrey Weinhaus

24

25
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1                  INDEX OF EXAMINATION

 2                      Voir Dire

 3   On Behalf of the State       Page 29,  Line 25

 4   On Behalf of the Defendant   Page 77,  Line 20

 5

 6                   Opening Statement

 7   On Behalf of the State       Page 151, Line 3

 8   On Behalf of the Defendant   Page 157, Line 17

 9

10                   Sergeant Folsom

11   Direct Examination by Mr. Parks    Page 166, Line 17

12   Continued Direct by Mr. Parks      Page 205, Line 16

13   Cross Examination by Mr. Eastwood  Page 249, Line 5

14   (Vol. 2)

15

16                    Matthew Fox

17   Direct Examination by Mr. Parks    Page 192, Line 14

18   Cross Examination by Mr. Eastwood  Page 198, Line 3

19   Redirect Examination by Mr. Parks  Page 204, Line 17

20

21             Corporal Mertens (Volume 2)

22   Direct Examination by Mr. Parks    Page 374, Line 22

23   Cross Examination by Mr. Eastwood  Page 397, Line 17

24   Redirect Examination by Mr. Parks  Page 445, Line 12

25   Recross Exam by Mr. Eastwood       Page 447, Line 17
```

1                    INDEX OF EXAMINATION CONTINUED

2


3                      Sergeant Perry Smith

4    Direct Examination by Mr. Parks      Page 450, Line 11

5    Cross Examination by Mr. Eastwood  Page 460, Line 21

6


7                      Corporal Jeff White

8    Direct Examination by Mr. Parks      Page 482, Line 24

9    Cross Examination by Mr. Eastwood  Page 493, Line 18

10   Redirect Examination by Mr. Parks  Page 531, Line 5

11   Recross Exam by Mr. Eastwood         Page 532, Line 14

12


13                    Marty Leach (Volume 3)

14   Direct Examination by Mr. Eastwood Page 563, Line 4

15   Cross Examination by Mr. Parks       Page 573, Line 20

16   Redirect Exam by Mr. Eastwood        Page 576, Line 2

17   Recross Examination by Mr. Parks   Page 578, Line 16

18   Further Direct by Mr. Eastwood       Page 580, Line 11

19


20                      Steve Everhart

21   Direct Examination by Mr. Combs      Page 581, Line 14

22   Cross Examination by Mr. Parks       Page 591, Line 2

23   Redirect Examination by Mr. Combs  Page 592, Line 19

24


25

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          INDEX OF EXAMINATION CONTINUED

2

3                    Heather Clark

4    Direct Examination by Mr. Eastwood Page 593, Line 22

5    Cross Examination by Mr. Parks     Page 601, Line 3

6

7                   Closing Argument

8    By Mr. Parks          Page 614, Line 11

9    By Mr. Eastwood       Page 622, Line 4

10   By Mr. Parks          Page 637, Line 2

11

12                   Guilt Verdict

13   By Judge Sutherland Page 650, Line 17

14

15        Opening Statement Punishment Phase

16   By Mr. Parks          Page 664, Line 5

17   By Mr. Eastwood       Page 664, Line 21

18

19           Testimony by Sergeant Folsom

20   By Mr. Parks          Page 665, Line 6

21

22         Testimony by Judy Kropf Weinhaus

23   By Mr. Eastwood       Page 671, Line 19

24

25

```
 1              INDEX OF EXAMINATION CONTINUED

 2


 3            Closing Argument Punishment Phase

 4  By Mr. Parks          Page 676, Line 17

 5  By Mr. Eastwood       Page 678, Line 6

 6  By Mr. Parks          Page 679, Line 25

 7


 8                  Sentencing Verdict

 9  By Judge Sutherland Page 682, Line 8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1              INDEX OF EXHIBITS ADMITTED

2   State's Exhibit

3   1 - You Tube Video w/o Captions, Pg. 170

4   1A- You Tube Video with Captions, Pg. 170

5   2 - Search Warrant, Pg. 178

6   3 - Photo of Gun/Holster, Pg. 181

7   4 - Photo of Gun, Pg. 181

8   5 - Photo of Command Center, Pg. 183

9   6 - Photo Contents of Drawer, Pg. 186

10  7 - Photo Individual Items, Pg. 186

11  8 - Photo of Pills in Case, Pg. 186

12  11- Photo of Marijuana Bag, Pg. 214

13  13- Diagram of Scene, Pg. 211

14  14- Photo of Scene from End of Parking Lot, Pg. 233

15  15- Watch Video, Pg. 233

16  16- Photo Position of Cars, Pg. 233

17  17- Photo Driver's Side of Cars, Pg. 233

18  18- Photo Behind Green Car, Pg. 233

19  19- Photo Passenger's Side of White Car, Pg. 233

20  20- Photo Markers for Shell Casings, Pg. 453, Vol. 2

21  21- Photo Holster, Pg. 453, Vol. 2

22  22- Photo Pistol/Holster, Pg. 453, Vol. 2

23  23- Photo of 22 Clipped to Box, Pg. 453, Vol. 2

24  24- Photo of Barrel of Shotgun, Pg. 453, Vol. 2

25  25- Photo of Shotgun Covered in Back Seat, Pg. 453
```

Weinhaus, Vol. 3

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            INDEX OF EXHIBITS ADMITTED CONTINUED

 2

 3   State's Exhibit

 4   26- Photo of Shotgun After Recovery, Pg. 453, Vol. 2

 5   27- Pistol and Holster, Pg. 225, Vol. 1

 6   31- Lab Report, Pg. 197, Vol. 1

 7   32- Statement by Marty Leach, Page 575, Vol. 3

 8

 9   Defendant's Exhibit

10   B- Notarized Statement by Mr. Leach, Pg. 577, Vol. 3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1          JUDGE SUTHERLAND:  Please be seated.  Ready

 2   for evidence for the defendant.  Call your first

 3   witness.

 4          MR. EASTWOOD:  Yes, Your Honor, I'm ready to

 5   call my first witness.

 6          JUDGE SUTHERLAND:  Sir, if you come on up

 7   front, up here, sir, raise your right hand and be

 8   sworn by the clerk, please.

 9          (WHEREUPON MARTY LEACH WAS SWORN IN)

10          JUDGE SUTHERLAND:  Before you start your

11   direct examination, Mr. Eastwood, I neglected to

12   make the announcement to the jury that I should

13   have.  After you left yesterday afternoon, there was

14   what's called a Motion for Judgment of Acquittal

15   that was filed, and I did grant that motion and

16   acquit the defendant on Count 2, the tampering with

17   a judicial officer charge, and Count 8, the

18   resisting arrest charge.  So those two counts are no

19   longer an issue in the case.  It's not appropriate

20   for me to explain why right now.  When the case is

21   all over with, I'll come back to the jury room and

22   be glad to talk to you about it, explain it to you

23   and answer any questions that you may have, but for

24   right now we're down from eight counts to six.  I

25   just don't want you to be confused later on when you

1   get the instructions because there will be nothing

2   in the instructions about Count 2 or Count 8.

3   Proceed with your examination.

4                **DIRECT EXAMINATION OF MARTY LEACH**

5   **QUESTIONS BY MR. EASTWOOD:**

6        Q    Thank you very much, Your Honor.  Mr. Leach,

7   Marty, what would you prefer I call you?

8        A    Marty is fine.

9        Q    Marty, could you please introduce yourself

10  to the jury.  State your name.

11       A    Martin Junior Leach.  How are you all doing

12  today.

13       Q    Where do you live, Marty?

14       A    4079 Yellow Dog Road.

15       Q    Where is that?

16       A    Lonedell, Missouri.

17       Q    Is that here in Franklin County?

18       A    Yes, it is.

19       Q    How long have you been a member of this

20  community?

21       A    About 18 years.

22       Q    And what do you do for a living, sir?

23       A    I'm a laborer.

24       Q    Are you familiar with the MFA gas station on

25  Highway K in St. Clair?

Weinhaus, Vol. 3

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A   Yes, I am.

 2      Q   Are you a regular there?

 3      A   Yes, I am.

 4      Q   Were you there on September 11th, 2012?

 5      A   Yes, I was.

 6      Q   And why were you there, sir?

 7      A   To replace a gutter that I tore up

 8  previously when I pulled in the parking lot.

 9      Q   When did you tear it up?

10      A   About two weeks before the shooting.

11      Q   Why did you decide to repair it instead

12  of --

13      A   Because it was -- I tore it up, it was my

14  responsibility to take care of it.  I tore it up

15  with the top of a dump truck.

16      Q   Were you there with anyone?

17      A   Yeah.

18      Q   Who were you there with?

19      A   My coworker, Steve Everhart.

20      Q   Do you know Steve well?

21      A   Yes, worked with him about 11 years now.

22      Q   Are you friends as well as coworkers?

23      A   Yes.

24      Q   Now I want to show you a diagram, sir, and

25  I'm going to ask you some questions.  Sir, this is a
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   diagram of the MFA station.  This is the MFA sign.

2   This is Highway K along there.  I want everyone to

3   be able to see it.  This is Highway K along there.

4   This is the MFA building.  This is the gas pump.

5   Where on this diagram was the gutter?

6       A   That piece of overhang that sticks out to

7   the left of the gas pumps, at the outer edge right

8   there.

9       Q   Before September 11th of last year, did you

10  know Jeff Weinhaus, the defendant?

11      A   No, sir.

12      Q   When you arrived at the gas station on

13  September 11th, did you notice anything unusual?

14      A   Well, there was a vehicle parked at the end

15  of that overhang that we had to ask to move.

16      Q   I want to slow down, okay?

17      A   Okay.

18      Q   Do you mean the vehicle was parked here?

19      A   It was parked right at the back edge of it.

20      Q   Right here?

21      A   Right in that area, yes.

22      Q   Did you notice anything else?

23      A   No, nothing in particular.  When we pulled

24  in the parking lot, I was coming from St. Clair.  I

25  had to swing wide with the truck that I was driving,

Weinhaus, Vol. 3

```
 1   so I swung wide in the parking lot to get parallel
 2   with the building in between the gas pump and the
 3   building.
 4       Q   Were there other people or cars in the
 5   parking lot?
 6       A   Not at the time we arrived.  There was
 7   another vehicle parked back over this way, but I
 8   don't have no idea who it was.
 9       Q   Down here?
10       A   Yeah, towards that general area.
11       Q   What type of automobile?
12       A   It was an automobile, I didn't pay much
13   attention because I had no reason to.
14       Q   Were you able to start working on the gutter
15   when you arrived?
16       A   No.
17       Q   Why was that?
18       A   Because the vehicle that was parked down at
19   the edge was sticking out past the edge of the
20   overhang, and we had to ask him to move because we
21   were going to work off the back of the truck.  We
22   didn't have ladders, we were going to get on the
23   back of the flat-bed and work off of that.
24       Q   Did you know who was in that car?
25       A   No.
```

Weinhaus, Vol. 3

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Q    Did you go into the gas station building and

2  talk to anyone inside the store?

3    A    Not until afterwards.

4    Q    Did you notice any customers going in and

5  out?

6    A    The one person in that vehicle that I

7  mentioned parked over this way, he walked out.

8    Q    Did you ask the driver of the car to move?

9    A    No, I didn't.  My partner that was with me

10  Steve did.

11    Q    Did you hear that conversation?

12    A    No, but I could see him.  The driver of the

13  automobile rolled down the window approximately a

14  couple inches, and I could see Steve with his hands

15  motioning explaining to the guy would you back up so

16  we can work on the gutter.

17    Q    Did the driver respond to you?

18    A    Not to me, to Steve, I'm assuming he did to

19  Steve because the guy did start to move his vehicle.

20    Q    How much did he move it?

21    A    He backed it up 10, 12 feet and swung out

22  this way out towards the front and pulled forward a

23  little bit and stopped.

24    Q    Is this car here a fair representation of

25  where he moved to?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    Pretty close, yeah.

 2      Q    Did you see Jeff Weinhaus pull into the

 3 parking lot?

 4      A    No.

 5      Q    Did you hear Jeff Weinhaus pull into the

 6 parking lot?

 7      A    No.

 8      Q    Did you hear a car engine revving or

 9 accelerating?

10      A    No.

11      Q    Did you notice Jeff Weinhaus getting out of

12 his car?

13      A    No.

14      Q    At any point did anything direct your

15 attention to Jeff Weinhaus?

16      A    No, the shooting.

17      Q    Okay.  So tell me about that.  What

18 happened?

19      A    Well, I was standing between -- on the

20 driver's side of the truck and Steve was up in the

21 back of the truck handing me out stuff laying in the

22 back of the truck so we could get up in it and work

23 without stomping all over it, and he handed me the

24 first piece of gutter, I sat it down on the ground,

25 went up to get the second piece of gutter, set it
```

Weinhaus, Vol. 3

```
 1   down on the ground, and as I was turning around is
 2   when I heard the first shot.  I turned to my right
 3   and there was Mr. Weinhaus.
 4        Q    Stop there.  So you heard a shot, you turned
 5   and you looked at Mr. Weinhaus.  What did you see?
 6        A    Mr. Weinhaus was facing me falling.
 7        Q    So you were over here?
 8        A    Yes.
 9        Q    And Mr. Weinhaus, where was he?
10        A    From the front, from the gas pumps he was
11   towards you.
12        Q    Up over here?
13        A    Yeah, in that area except towards the right.
14        Q    And was he facing you or was his back to
15   you?
16        A    He was facing me when I made eye contact or
17   contact with him.
18        Q    He was facing towards you?
19        A    Yes.
20        Q    Did you see Jeff's arms and his hands?
21        A    No.  Oh, yes, I saw his arms and his hands.
22        Q    What were they doing?
23        A    Hanging down to his side.
24        Q    Did you see a gun in Jeff's hand?
25        A    No.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    Did you see Jeff's hand on a gun?

 2      A    No.

 3      Q    What happened next once you turned around

 4  and saw Jeff Weinhaus looking at you?

 5      A    Jeff was falling towards me.  After the

 6  first shot there was a hesitation and there were

 7  three more shots, and it was boom, boom, boom, boom

 8  as he was falling and he hit the ground, shooting

 9  was over.

10      Q    Are you saying the shots happened as he was

11  facing towards you, facing that way?

12      A    After the first shot, yes.

13      Q    Where were the shooters relative to Jeff?

14      A    As Jeff was falling, the officer that was

15  doing the shooting come into my view somewhere after

16  the second shot I'm assuming, somewhere in that

17  general area, and he was standing -- Jeff was

18  between me and the officer who was shooting.

19      Q    So the officer was passed Jeff?

20      A    Yeah, behind Jeff.

21      Q    Jeff was between you and the officer?

22      A    Yes.

23      Q    Did you see Jeff fall?

24      A    Yes.

25      Q    How did he fall?
```

```
 1        A    Fell stiff legged and hit the ground.  First
 2   thing that hit the ground was his face.
 3        Q    Were you in the line of fire of the shooter?
 4        A    Yes.
 5        Q    Were you looking down the barrel of the gun?
 6        A    Yes.
 7        Q    Do you know, did you know at that time who
 8   the shooter was?
 9        A    No.
10        Q    Were you fearful for your safety?
11        A    Yeah, everything happened so fast I guess I
12   got fearful for my safety after everything happened.
13   I didn't have enough sense to get out of the way.
14        Q    After Jeff Weinhaus fell to the ground, what
15   did the shooter do next?
16        A    The shooter holstered his weapon.
17        Q    And then what did he do?
18        A    Nothing basically, nothing, he holstered his
19   weapon immediately afterwards and the other two
20   agents that were down in this car that we asked to
21   move, that's when they come running passed us.
22        Q    This car down here?
23        A    Yeah, yes, sir.
24        Q    Did those agents say anything to you?
25        A    No, sir.
```

Weinhaus, Vol. 3

1     Q   Did you see the shooter or anyone else do

2  anything to Jeff?

3     A   Yeah, a short time after he was on the

4  ground, I looked over and the officer that did the

5  shooting was letting go of Jeff's arm, that's when

6  he rolled back over on his back, and that's when I

7  seen a holster appear on the ground.

8     Q   Where was the holster relative to Jeff's

9  body?

10     A   10 or 12 feet away from him to my right.

11     Q   At any time did any of the men identify

12  themselves as law enforcement?

13     A   After the second time I asked them.

14     Q   You asked them?

15     A   Yeah.

16     Q   And what did they say?

17     A   They said, "yes, we're police officers."

18  One of the agents that was in the red car that we

19  asked to move when we pulled in the parking lot is

20  the one that identified them.

21     Q   Did you see anything that justified the

22  shooting?

23     A   No, sir.

24        MR. PARKS:  Objection, Your Honor, calls

25  speculation.

Weinhaus, Vol. 3

```
 1              JUDGE SUTHERLAND:  Sustained.
 2       Q   (By Mr. Eastwood) Withdrawn.  Has the
 3   incident affected how much you trust law
 4   enforcement?
 5              MR. PARKS:  Objection.
 6              JUDGE SUTHERLAND:  Sustained.
 7       Q   (By Mr. Eastwood) Do you fear retribution
 8   for giving your testimony?
 9              MR. PARKS:  Objection.
10              JUDGE SUTHERLAND:  Sustained.
11       Q   (By Mr. Eastwood) Do you have any stake in
12   the outcome?
13       A   No.
14       Q   Do you have anything to win?
15       A   No.
16       Q   Anything to lose?
17       A   No.
18              MR. EASTWOOD:  Thank you very much.
19              JUDGE SUTHERLAND:  Cross examination.
20              **CROSS EXAMINATION OF MARTY LEACH**
21   **QUESTIONS BY MR. PARKS:**
22       Q   Now Mr. Leach, on the day of this incident,
23   do you remember making a statement to an officer --
24       A   Yes.
25       Q   -- about what happened?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    Yes, sir.  I believe it was a St. Clair
 2   officer.
 3        Q    That is correct.  And I'm going to show you
 4   what has been marked as State's Exhibit No. 32.
 5        A    Okay.
 6        Q    Do you recognize this as the statement that
 7   you gave to the officer?
 8        A    Yes, sir, that's my writing.
 9        Q    Could you please read that for the Court.
10        A    "Standing in parking lot facing away from
11   officers and person that got shot, heard five or six
12   shots, quick shots, turned around, seen man facing
13   me going down to ground.  Officers behind him."
14   Can't read my own writing.  "Facing me guns drawn."
15        Q    And is that a fair and accurate statement --
16        A    Uh-huh.
17        Q    -- of what happened that day?
18        A    Yes.
19             MR. PARKS:  No further questions, Your
20   Honor.
21             JUDGE SUTHERLAND:  Any redirect?
22             MR. EASTWOOD:  Can I see that statement
23   again, Bob?  No, Your Honor.
24             MR. PARKS:  State would ask that State's
25   Exhibit No. 32 be admitted into evidence.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. EASTWOOD:  I object.

 2             (BENCH CONFERENCE BEGINS)

 3          JUDGE SUTHERLAND:  On what grounds?

 4          MR. EASTWOOD:  I think his testimony is the

 5    best evidence.  I don't see that this impeached

 6    anything.  I don't know what this goes to.

 7          MR. PARKS:  It's just a written statement

 8    that he gave to the officer on the day of the

 9    shooting, and it's different than what he's saying

10    here now.

11          MR. EASTWOOD:  I don't see how it's

12    different except as to the number of shots.  He said

13    four more shots, here he says five or six.

14          MR. PARKS:  He said in direct examination

15    that he heard a shot, turned around and he heard

16    four or five more shots.  He says in this statement

17    the person got shot, heard five or six shots, turned

18    around.  So here he's saying he's hearing -- in the

19    statement he's saying he hears five or six shots, on

20    the witness stand he's saying he heard the shots

21    later, so it's a contradiction of what he said.

22             (BENCH CONFERENCE ENDS)

23          JUDGE SUTHERLAND:  Objection is overruled.

24    It's been marked, State's Exhibit 32 is admitted.

25          MR. EASTWOOD:  May I redirect?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          JUDGE SUTHERLAND:  Yes.

2          **REDIRECT EXAMINATION OF MARTY LEACH**

3  **QUESTIONS BY MR. EASTWOOD:**

4      Q    Marty, did I meet with you last month?

5      A    Excuse me?

6      Q    Did I meet with you last month, sir?

7      A    Yes, sir.

8      Q    And did I meet with you with the private

9  investigator?

10     A    Yes, sir.

11     Q    And we met you out at McDonalds by Six

12 Flags; right?

13     A    Yes, sir.

14     Q    And did you make a statement to me at that

15 time?

16     A    Yes, sir.

17     Q    And did you make it in writing?

18     A    Yes, sir.

19     Q    And is this the statement you made to me?

20          MR. PARKS:  Your Honor, I object to this

21 statement at this time.  It's improper recross or

22 redirect examination because it was never brought up

23 in his direct examination.

24          JUDGE SUTHERLAND:  Yeah, objection is

25 sustained.

Weinhaus, Vol. 3

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. EASTWOOD:  Your Honor, may I approach?

 2          JUDGE SUTHERLAND:  Yes.

 3              (BENCH CONFERENCE BEGINS)

 4          MR. EASTWOOD:  May I make an offer of proof

 5   on this later on, please, sir?

 6          JUDGE SUTHERLAND:  Well, I don't know that

 7   that's necessary.  I think I'm going to change my

 8   mind.

 9              (BENCH CONFERENCE ENDS)

10          JUDGE SUTHERLAND:  Let's mark it, I am going

11   to admit it.  I'm going to change my mind, the

12   objection is overruled.  Mark that as Defendant's

13   Exhibit B and it is admitted.

14              (MARKED DEFENDANT'S EXHIBIT B)

15      Q    (By Mr. Eastwood) So when I met with you at

16   the McDonalds by Six Flags, I think it was in early

17   September, you and I spoke; right?

18      A    Yes.

19      Q    And you -- I wrote down what you were

20   saying; right?

21      A    Yes.

22      Q    And there was another man there; right?

23      A    Yes.

24      Q    And he notarized it?

25      A    Yes.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q    And do you want to review that statement

2  real quick?

3      A    Do you want me to read this?

4      Q    Don't read it out loud, read it to yourself.

5      A    Okay.

6      Q    Are you changing anything in that statement?

7      A    No.

8      Q    Stand by it?

9      A    Yes.

10     Q    Is that statement consistent with what you

11  told this jury here today?

12     A    Yes.

13         MR. EASTWOOD:  Thank you, sir.  No further

14  questions.

15         JUDGE SUTHERLAND:  Recross.

16         **RECROSS EXAMINATION OF MARTY LEACH**

17  **QUESTIONS BY MR. PARKS:**

18     Q    But this statement is not what you told the

19  police on the day of the shooting, is it?

20     A    Yeah, pretty much.

21     Q    Let me go back.  In the statement that you

22  gave to the police, which you read for the jury.

23     A    Yes.

24     Q    You said, "the person got shot, heard five

25  or six quick shots, I turned around, seen man facing

Weinhaus, Vol. 3

```
1   me going down."  So when the day of the shooting you
2   told the police that you didn't see anything until
3   after the shots and that's when you turned around
4   and saw the defendant falling.  That's what you told
5   the police on the day of the shooting; correct?
6        A   If that's the way it's worded, I guess I
7   did, but as I was turning around to set the second
8   piece of guttering on the ground is when I turned to
9   look.
10       Q   I'm just asking you, is that the statement
11  you gave to the police?
12       A   Yes, that's my writing.
13       Q   When did the fire trucks arrive?
14       A   Fire trucks?
15       Q   When did the fire trucks arrive?
16       A   I didn't see any fire trucks.  Fire trucks?
17       Q   Fire trucks.
18       A   Like pumper trucks?
19       Q   Did you see an ambulance arrive?
20       A   Yes.
21       Q   Did the fire trucks --
22           MR. EASTWOOD:  I object to the line of
23  questioning as beyond the scope of the direct.
24           JUDGE SUTHERLAND:  Overruled.  Go ahead.
25       Q   (By Mr. Parks) You never saw the fire
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   trucks?

2       A   Fire trucks like pumper trucks?

3       Q   The emergency vehicles.

4       A   Yeah, I seen an ambulance.

5       Q   Did you see the fire trucks come in before

6   then?

7       A   No.

8           MR. PARKS:  Thank you very much.

9           THE WITNESS:  I never seen any fire trucks.

10          JUDGE SUTHERLAND:  Further redirect.

11      **FURTHER DIRECT EXAMINATION OF MARTY LEACH**

12  **QUESTIONS BY MR. EASTWOOD:**

13      Q   Marty, did you hear gunshots on September

14  11th?

15      A   Yes.

16      Q   Did you turn around?

17      A   Yes.

18      Q   Did you see Jeff Weinhaus staring at you?

19      A   Yes.

20      Q   Did you see his hands out?

21      A   Yes.

22      Q   Did you see a gun in those hands?

23      A   No.

24      Q   Did you hear more gunshots?

25      A   Yes.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      Q    Did you see him fall flat on his face?

 2      A    Yes.

 3           MR. EASTWOOD:  Thank you, sir.

 4           JUDGE SUTHERLAND:  May this witness be

 5   finally excused?

 6           MR. PARKS:  As far as the State is

 7   concerned.

 8           MR. EASTWOOD:  Yes, Your Honor.

 9           JUDGE SUTHERLAND:  You may step down and

10   you're free to go.  Call your next witness.

11           MR. COMBS:  We're going to call

12   Mr. Everhart, Steve Everhart.

13          (WHEREUPON STEVE EVERHART WAS SWORN IN)

14           DIRECT EXAMINATION OF STEVE EVERHART

15   QUESTIONS BY MR. COMBS:

16      Q    Good morning, Mr. Everhart.

17      A    Good morning.

18      Q    Could you please speak up so the jury can

19   hear you.

20      A    Sure.

21      Q    Do you want to introduce yourself to the

22   jury?

23      A    Steve Everhart.

24      Q    And Mr. Everhart, where do you live?

25      A    Franklin County.
```

Weinhaus, Vol. 3

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        Q    You live in Franklin County?

 2        A    Yes.

 3        Q    What do you do for a living?

 4        A    Small excavating, Bobcat work, stuff like

 5   that.

 6        Q    How long have you been a member of this

 7   community and lived in Franklin County?

 8        A    Since '82.

 9        Q    And are you familiar with the MFA gas

10   station?

11        A    Yes.

12        Q    On Highway K in St. Clair?

13        A    Yes.

14        Q    And are you a regular or do you frequent the

15   store beyond the work you were doing there that

16   day --

17        A    Sure, yes.

18        Q    -- of the incident.  And you just go there

19   as a customer to get gas?

20        A    Yes.

21        Q    And on September 11th of 2012, why were you

22   there at the MFA gas station?

23        A    To repair a gutter.

24        Q    And who were you there with?

25        A    With Marty Leach.
```

```
 1      Q    And do you guys typically do jobs together?

 2      A    Yeah, we've been working together for the

 3 last 10 years.

 4      Q    So would it be fair to say he's a friend of

 5 yours?

 6      A    Yes, sure.

 7      Q    And can you show me, does this look like a

 8 fair depiction of the gas station that you were at

 9 that day, September 11th, 2012?

10      A    Yes, it does.

11      Q    And could you give me an idea, this is the

12 building obviously, where the gutter was that you

13 all were repairing?

14      A    The green extension in the front, the porch.

15      Q    Right here?

16      A    No, on the overhang, there you go.

17      Q    And why were you repairing the gutter?

18      A    I believe Marty bumped into it with a truck

19 before, days before.

20      Q    Sure, so you were there to fix it?

21      A    Yeah, he asked me to give him a hand, so I

22 went to give him a hand.

23      Q    And before that day, the day of the

24 incident, the reason we're all here today, did you

25 know Mr. Weinhaus?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1      A    No.

 2      Q    You never seen him before or met him before?

 3      A    No.

 4      Q    And when you arrived that day to repair the

 5   gutter, did you notice anything unusual?  You said

 6   you'd been there before as a customer, so you're

 7   familiar with what it's like to go in there?

 8      A    No, nothing unusual.  There was one vehicle

 9   parked in our line of work there.

10      Q    And can you give me an idea on the diagram

11   where it was parked, is this the vehicle, roughly?

12      A    Probably a little closer out to the four

13   dots on the edge of the overhang there.

14      Q    And were you able to start working

15   immediately to repair the gutter when you first

16   arrived?

17      A    No, we waited in the truck because the

18   vehicle was in our way to where we were going to

19   work out of the back of the truck, so I got out to

20   ask them to move, and they were kind of reluctant

21   and backed up just a little bit, just far enough for

22   us to get in there, so we kind of squeezed in there

23   and got the truck where we needed it.  So I got out,

24   jumped in the back of the truck and started handing

25   parts out to Marty, and then behind me I heard
```

Weinhaus, Vol. 3

```
 1  shooting.
 2      Q   Let's back up.  So why would you say -- you
 3  used the word reluctant.  What makes you think they
 4  were reluctant to move, could you explain that a
 5  little further?
 6      A   I knocked on the window of the car, and the
 7  window come down.  I couldn't see in there, it
 8  didn't come down but a couple of inches.
 9      Q   And what did you say?
10      A   I said, "we're trying to repair this gutter,
11  could I get you to back up 10 feet."  And the car
12  moved back a few feet, not quite far enough to get
13  what we needed.  I didn't think much of it, so I
14  pulled Marty up close to the front of their car and
15  got him backed in.
16      Q   Did the gentleman in the car say sure?
17      A   Didn't say anything.
18      Q   Just rolled the window back up and pulled
19  back.  Is there anything unusual about this car
20  beyond the fact that the gentleman just rolled the
21  window down a crack, didn't say anything to you and
22  slowly moved back?
23      A   I wasn't -- didn't really recognize anything
24  unusual.  It was just a car with tinted windows,
25  couldn't really see in.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 3

```
 1       Q   You just thought maybe the guy was being
 2   rude or something like that?
 3       A   Yeah.
 4       Q   And did you notice what was going on in the
 5   parking lot when you were there to repair the
 6   gutter, did you see delivery men or customers or was
 7   the store opened?
 8       A   Yes, the store was open.
 9       Q   Was there anyone getting gas or do you
10   remember?
11       A   Not that I recall.
12       Q   So I'm going to turn your attention to the
13   day of the incident.  You said you never seen or met
14   Mr. Weinhaus before.  Did you hear him pull into the
15   parking lot?
16       A   No, I didn't.
17       Q   Did you hear any screeching tires or revving
18   engines or anything?
19       A   No, nothing caught my attention.
20       Q   Did you notice him get out of his car?
21       A   No.
22       Q   Did anything direct you to -- direct your
23   attention to Mr. Weinhaus?  Did you hear any loud
24   talking or any sort of interaction or conversation
25   that would direct your attention to Mr. Weinhaus?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        A    I didn't hear anything that caught my
 2   attention.
 3        Q    So what was the first thing that caught your
 4   attention?
 5        A    Gunshots.
 6        Q    And when you heard the gunshots, what did
 7   you do?
 8        A    Well, I had a piece of gutter in my hand,
 9   Marty was on the ground and I was handing stuff to
10   him, and when the gunshots happened, I started
11   looking around, and Marty, his hands dropped, so I
12   had to take what I had and put it back in the truck.
13   And I looked all around, and when I looked to my
14   left it was already over.
15        Q    So when you turned around, Mr. Weinhaus
16   was --
17        A    -- on the ground.
18        Q    And how many shots did you hear?
19        A    Probably four or five.
20        Q    So by the time you turned around and saw
21   Mr. Weinhaus, he was already on the ground?
22        A    Yes.
23        Q    Was he motionless?
24        A    Yeah, motionless.
25        Q    So you didn't see Mr. Weinhaus until he was
```

Weinhaus, Vol. 3

1   on the ground entirely motionless?

2       A   Correct.

3       Q   And what happened to Mr. Weinhaus, you

4   didn't see him fall or anything, when you saw him he

5   was on the ground?

6       A   Right.

7       Q   So were you scared at this point?

8           MR. PARKS:  Objection, Your Honor, calls for

9   speculation as to relevance.

10          JUDGE SUTHERLAND:  Overruled.  He can

11  answer.

12      Q   (By Mr. Combs) Were you nervous or scared at

13  this point?

14      A   Yeah, a little, a little concerned wondering

15  what was happening.

16      Q   Of course.  And what happened to

17  Mr. Weinhaus after he was on the ground.  I'm sure

18  you turned, obviously your attention has now been

19  directed to Mr. Weinhaus on the ground; correct?

20      A   Well, for a second and because there were

21  shots fired and someone just got shot, I got out of

22  the truck, didn't know if I was going to have to

23  take cover, or I didn't know what was going on but

24  when I got out of the truck, Marty started asking if

25  they were police or whatever and then the girl come

Weinhaus, Vol. 3

```
 1   out of the store that worked at the store and she
 2   was totally hysterical, so I tried to calm her down.
 3        Q    So did you know who fired the gun, did you
 4   see the shooter?
 5        A    No.
 6        Q    So you don't know who fired the gun?
 7        A    No.
 8        Q    Did you see any of the people involved in
 9   the altercation do anything to the defendant when he
10   was lying on the ground?
11        A    No.
12        Q    So they weren't standing around him?
13        A    They were just standing there, two guys
14   standing there and he was on the ground.
15        Q    To your knowledge of first aid or medical,
16   were they trying to help him did it appear?
17        A    Not that I seen.
18        Q    They were just standing there essentially?
19        A    Like I said, it kind of got really crazy
20   there real fast with the girl coming out of the
21   store.
22        Q    So you didn't -- obviously this happened,
23   I'm sure, in a blink of an eye when you were there?
24        A    Right.
25        Q    Did you know who these men were that were
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   standing around this motionless body in the parking

 2   lot?

 3        A    No.

 4        Q    So did you think they were law enforcement

 5   or what were you thinking at this point?

 6        A    It happened so fast, I really didn't have

 7   time to think about it until my friend Marty asked

 8   them if they were police, and then it just kind of

 9   all fell together like that.

10        Q    So you eventually found out they were law

11   enforcement?

12        A    Yeah.

13        Q    And just lastly, you testified here today

14   that you never met Mr. Weinhaus before?

15        A    Correct.

16        Q    And you don't have any outcome or stake in

17   this case, you're not going to get any money, you're

18   not here to help out Mr. Weinhaus?

19        A    No.

20        Q    You're not going to gain anything or lose

21   anything no matter what happens in this case?

22        A    Nope.

23        Q    You're just here to tell what you saw?

24        A    Yeah.

25             MR. COMBS:  Thank you, sir.  Your witness.

Weinhaus, Vol. 3

```
 1          JUDGE SUTHERLAND:  Cross.

 2      CROSS EXAMINATION OF STEVE EVERHART

 3  QUESTIONS BY MR. PARKS:

 4      Q   Mr. Everhart, do you remember giving a

 5  statement to the police the day of the shooting?

 6      A   Yes, sir.

 7      Q   And I show you what has been marked as

 8  State's Exhibit No. 33.  Do you recognize this as

 9  your statement?

10      A   Yes, sir.

11      Q   And do you stand by this statement here

12  today?

13      A   Yes, sir.

14          MR. PARKS:  Your Honor, I'd ask that State's

15  Exhibit No. 33 be admitted into evidence.

16              (BENCH CONFERENCE BEGINS)

17          MR. EASTWOOD:  This is the same issue.  Are

18  you going to argue it's inconsistent?  I don't think

19  it is inconsistent, so I'm not sure --

20          MR. COMBS:  It's not inconsistent.

21          MR. PARKS:  It's the statement that he gave

22  at the scene, and I want to show that it is

23  consistent with what he's saying and inconsistent

24  with what the last witness said.

25          MR. COMBS:  Two different people that said
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   two different things that saw two different things,
 2   that happens.
 3           JUDGE SUTHERLAND:  Well, it doesn't really
 4   impeach anything.
 5                   (BENCH CONFERENCE ENDS)
 6           JUDGE SUTHERLAND:  Objection is sustained.
 7   State's Exhibit 33 is denied.
 8       Q    (By Mr. Parks) Mr. Everhart, do you remember
 9   seeing the St. Clair fire and rescue truck pull in
10   from the fire department?
11       A    I didn't see it pull in.
12       Q    But you saw it there?
13       A    Yeah.
14       Q    Was it there before or after the ambulance?
15       A    I really don't know.
16           MR. PARKS:  Thank you.  No further
17   questions.
18           JUDGE SUTHERLAND:  Redirect.
19        REDIRECT EXAMINATION OF STEVE EVERHART
20   QUESTIONS BY MR. COMBS:
21       Q    So when you heard the gunshots, you turned
22   around and saw Mr. Weinhaus on the ground.  Did he
23   have a gun?
24           MR. PARKS:  Objection, Your Honor, beyond
25   the scope.
```

Weinhaus, Vol. 3

```
 1          JUDGE SUTHERLAND:  Sustained.

 2      Q    (By Mr. Combs) What drew your attention to

 3  Mr. Weinhaus?

 4          MR. PARKS:  Objection, Your Honor, beyond

 5  the scope of cross examination.

 6          JUDGE SUTHERLAND:  Sustained.

 7          MR. COMBS:  That's fine.  Nothing further.

 8          JUDGE SUTHERLAND:  May this witness be

 9  excused?

10          MR. PARKS:  As far as the State is

11  concerned.

12          MR. COMBS:  Yes, Your Honor.

13          JUDGE SUTHERLAND:  Thank you, you may step

14  down.  You're free to stay or go as you wish.  Call

15  your next witness.

16          MR. EASTWOOD:  I call Heather Clark, Your

17  Honor.

18          MR. COMBS:  Your Honor, she's not feeling

19  well.  Can I give her a glass of water?

20          JUDGE SUTHERLAND:  Sure.

21          (WHEREUPON HEATHER CLARK WAS SWORN IN)

22          DIRECT EXAMINATION OF HEATHER CLARK

23  QUESTIONS BY MR. EASTWOOD:

24      Q    Are you ready?  Heather, can you please

25  introduce yourself to the jury and tell the jury
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Weinhaus, Vol. 3

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   your name.

 2        A    My name is Heather Clark.

 3        Q    And do you know the defendant Jeff Weinhaus?

 4        A    Just as a customer.

 5        Q    And you say as a customer, do you mean as a

 6   customer at the MFA gas station?

 7        A    Yes.

 8        Q    And how long have you worked at that MFA gas

 9   station?

10        A    Four years.

11        Q    And was Mr. Weinhaus a habitual customer at

12   the gas station?

13        A    Yes.

14        Q    And what was his custom and habit of being a

15   customer?

16        A    He'd come in for five dollars of gas, a pack

17   of Marlboro Reds in the box and a 99 cent fountain

18   soda.

19        Q    How often did he do that?

20        A    Every day that I worked, and we work like

21   three or four days a week.

22        Q    Did you ever find him to be aggressive or

23   unpleasant?

24        A    No, his final words every day were, "God

25   bless, Heather, have a great day."
```

Weinhaus, Vol. 3

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1      Q   I want to take you back to September 11th,

2   2012.  Did you see Jeff Weinhaus on September 11th

3   before he was shot earlier that day?

4      A   Yes, I did.

5      Q   Did he come into the store?

6      A   Yes, he did.

7      Q   What was his demeanor, how was he acting?

8      A   He was in a very good mood.  He was stating

9   that he was getting his computers back and it was a

10  good day, and I got busy and he said what he always

11  said, God bless, Heather, have a good day."

12   I said, "you too, Jeff," and he left.

13     Q   And do you remember approximately what time

14  this was?

15     A   I'm thinking it was before noon.

16     Q   That's fine, that's fine.  Now, after Jeff

17  left, did you notice anything unusual at the gas

18  station that day?

19     A   About 10 minutes after he left, two vehicles

20  pulled into my parking lot and one set on one far

21  end and the other one set right up by the building.

22     Q   Heather, do you recognize this diagram?

23     A   Yes.

24     Q   This is a diagram of the MFA station, this

25  is Highway K, this is the MFA sign, these are the

Weinhaus, Vol. 3

596

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   gas pumps, that's the store, does that look about

2   right to you?

3        A    Yes.

4        Q    And where did these cars that came in, where

5   did they park?

6        A    One was over where there's a drawing there.

7        Q    Over here?

8        A    Yes.

9        Q    Was that about right, that was one of the

10  cars and where was the other car?

11       A    Right up against the building beside my

12  vehicle.

13       Q    About right there?

14       A    Yes.

15       Q    Did you talk to any of the people in either

16  of these cars?

17       A    No, they never did get out of their

18  vehicles.  The one across the parking lot kept

19  looking at the store, but they never got out of

20  their vehicles.  I was starting to get concerned

21  about them because they was sitting there for so

22  long and not getting out, and I didn't know what to

23  do about it.  I wanted -- they just made me nervous.

24       Q    Fair enough.  Did you see Jeff when he

25  returned to the store?

Weinhaus, Vol. 3

```
 1       A    Yes, I did.

 2       Q    When was the first time you saw him?

 3       A    He was pulling into the parking lot and he

 4  was pulling over by the white car that was --

 5       Q    Do you mean over here?

 6       A    Yes.

 7       Q    And then what were you doing when Jeff

 8  pulled into the parking lot?

 9       A    I was counting my cigarettes, taking

10  inventory of cigarettes.

11       Q    And were you inside or outside the building?

12       A    Inside.

13       Q    And were you sitting in a particular part of

14  the building?

15       A    I was right up front.

16       Q    You mean the front being this side of the

17  building?

18       A    Yes.

19       Q    And where along the front were you?

20       A    Up by the vehicle.

21       Q    Down here?

22       A    Yeah.

23       Q    Was there a window there?

24       A    Yes, I have three giant windows.

25       Q    Did you have an obstructed view or an
```

1    unobstructed view of Jeff Weinhaus?

2         A    Unobstructed.

3         Q    Were you sitting or standing?

4         A    Standing.

5         Q    Did you see Jeff exit the car?

6         A    Yes, I did.

7         Q    And what way was Jeff facing when he first

8    exited the car?

9         A    He just got out and then I just went back to

10   counting my cigarettes.  I didn't think nothing of

11   it.

12        Q    You looked away?

13        A    I looked back away.

14        Q    Went back to your job?

15        A    Yes.

16        Q    What happened next?

17        A    I bent down to count the cartons and I heard

18   a pop, and I jumped up and I watched Jeff fall.

19        Q    Let me stop you there for a second.  So you

20   looked up, did you see Jeff?

21        A    (Witness nodded)

22        Q    What way was he facing, with his back to you

23   or front to you?

24        A    He was standing with his hands in the air

25   pointing towards the store, looking at the store.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1     Q    And he had his hands in the air?

 2     A    Yes.

 3     Q    Did he have anything in his hands?

 4     A    No.

 5     Q    Did you see his left hand?

 6     A    Yes.

 7     Q    Did you see his right hand?

 8     A    Yes.

 9     Q    Did he have a gun in his hands?

10     A    No.

11     Q    What happened next?

12     A    He fell and I thought he was dead because he

13   never moved after that and blood was just pouring

14   out of him, and then the officer took a couple of

15   steps and shot him six more times while he was

16   laying there, and I freaked out because I didn't

17   know it was a cop.  I thought it was another

18   civilian.  So I run around my counter and tried to

19   lock the door, and I noticed I had customers out

20   there, I was telling them to get into the store, get

21   in here, you know, and they told me it was okay,

22   it's the cops, it's okay, Heather, it's okay.  And I

23   didn't feel that that was okay, and so I went

24   outside and I was thinking what did he do to get

25   shot like that, he had to have a gun.  So I'm
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    looking everywhere and I didn't see a gun still, and

2    he's just laying there and he's bleeding.  I

3    couldn't believe it.

4        Q    Did any of the shooters or the other men

5    ever identify themselves to you as law enforcement?

6        A    No, they did not.

7        Q    Did you see any of those men give emergency

8    first aid to Jeff?

9        A    No, they walked away.

10       Q    Did you see a holster anywhere?

11       A    No.

12       Q    What did the men over here do, do you

13   remember?

14       A    No, my main focus was on Jeff and what was

15   going on over there.

16       Q    Ma'am, do you have any stake in the outcome

17   of this case?

18       A    Pardon?

19       Q    Are you going to get any money or lose any

20   money or do anything like that?

21       A    No.

22       Q    Are you going to win anything or lose

23   anything by testifying here today?

24       A    No.

25            MR. EASTWOOD:  Thank you very much for your

```
 1  testimony.

 2          JUDGE SUTHERLAND:  Cross examination.

 3          CROSS EXAMINATION OF HEATHER CLARK

 4  QUESTIONS BY MR. PARKS:

 5      Q   Ma'am, is it a fair statement to say that

 6  you were hysterical at this time?

 7          MR. EASTWOOD:  Objection.

 8          JUDGE SUTHERLAND:  Overruled.

 9          THE WITNESS:  I wouldn't say hysterical, I

10  was distraught but it was --

11      Q   (By Mr. Parks) It was upsetting to you?

12      A   It was very upsetting.

13      Q   And the two men that were working on the

14  gutters said that they had to come in and help

15  comfort you, is that correct, to help calm you down?

16      A   They told me it was the cops, that

17  everything would be okay.

18      Q   And did that relieve you, did you settle

19  down at that time or were you still distressed?

20      A   I was still distressed because I didn't

21  understand why the cops would shoot him like that

22  when he's laying there dead.

23          MR. PARKS:  No further questions, Your

24  Honor.

25          JUDGE SUTHERLAND:  Redirect?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            MR. EASTWOOD:  No, Your Honor.

 2            JUDGE SUTHERLAND:  May this witness be

 3  finally excused?

 4            MR. EASTWOOD:  Yes, Your Honor.  Thank you.

 5            JUDGE SUTHERLAND:  Thank you, you may step

 6  down.  You're free to go as you wish.  Do you have

 7  another witness?

 8            MR. EASTWOOD:  May I have a moment to confer

 9  with my client, sir?

10            JUDGE SUTHERLAND:  Yes.

11            MR. EASTWOOD:  Your Honor, at this time the

12  defense rests.

13            JUDGE SUTHERLAND:  Rebuttal from the State?

14            MR. PARKS:  May I have one moment, Your

15  Honor?

16            JUDGE SUTHERLAND:  Yes.

17            MR. PARKS:  No rebuttal, Your Honor.

18            JUDGE SUTHERLAND:  Evidence is closed.

19  Ladies and gentlemen, we're going to have to recess

20  for a little bit.  I'm hoping we can do it in less

21  than 30 minutes to finish getting final instructions

22  organized for you.  We've been working on that last

23  night and this morning, so hopefully it won't take

24  too long, but one more time I need to read you your

25  favorite instruction here.  The Court again reminds
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1    you what you were told at the first recess of the
 2    Court.  Until you retire to consider your verdict,
 3    you must not discuss this case among yourselves or
 4    with others or permit anyone to discuss it in your
 5    hearing.  You should not form or express any opinion
 6    about the case until it is finally given to you to
 7    decide.  Do not do any research or investigation on
 8    your own about any matter regarding this case or
 9    anyone involved with the trial.  Do not communicate
10    with others about the case by any means.  Do not
11    read, view or listen to any newspaper, radio,
12    electronic communication from the Internet or
13    television report of the trial.  We're in recess.
14    You may go out with the bailiff.
15            (WHEREUPON A BRIEF RECESS TOOK PLACE)
16            JUDGE SUTHERLAND:  On the record for the
17    instruction conference.
18            MR. EASTWOOD:  Do you also want to make a
19    record on the renewed Motion for Judgment of
20    Acquittal?
21            JUDGE SUTHERLAND:  Additional argument on
22    that?
23            MR. EASTWOOD:  No, sir.
24            JUDGE SUTHERLAND:  Other than the two counts
25    I dismissed yesterday, I'm not going to dismiss any

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   other counts or acquit the defendant on those, so

2   the renewed motion is denied, I guess.   The

3   instruction conference then, I have been tendered by

4   the State and have either already given or intend to

5   give instructions numbered 1 through 5, excuse me, 1

6   through 4 inclusive, 6 through 11 inclusive and 13

7   and 14.   Any objection to any of those instructions?

8          MR. PARKS:   No, sir, not from the State,

9   Your Honor.

10         MR. EASTWOOD:   No, sir.

11         JUDGE SUTHERLAND:   I have been tendered and

12   intend to give -- tendered by defendant and intend

13   to give instructions No. 5 and 12, no objection?

14         MR. PARKS:   No objection from the State,

15   Your Honor.

16         JUDGE SUTHERLAND:   How much time do you

17   want?

18         MR. PARKS:   Your Honor, the verdict forms

19   have blanks in them which need to be filled in.

20         JUDGE SUTHERLAND:   We'll get those, I want

21   to start these out so the clerk can get copies made

22   here.   Okay, anybody want a copy of the

23   instructions?

24    (WHEREUPON A DISCUSSION WAS HELD OFF THE RECORD)

25         JUDGE SUTHERLAND:   How much time for

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   arguments?

 2          MR. PARKS:  30 minutes.  We can go shorter.

 3          JUDGE SUTHERLAND:  How do you want to split

 4   it?

 5          MR. PARKS:  12 and eight.  And I'd like to

 6   reserve, if I don't use my whole 12 minutes, be able

 7   to use it in my second half.

 8          JUDGE SUTHERLAND:  Yeah, up to 10 in the

 9   second half.  What kind of warning?

10          MR. PARKS:  Two minute on each.

11          JUDGE SUTHERLAND:  How much of a warning do

12   you want?

13          MR. EASTWOOD:  I think I'll take a

14   four-minute warning, sir.

15          JUDGE SUTHERLAND:  Just four or four and

16   one?

17          MR. EASTWOOD:  Sure, four and one, I'd

18   appreciate that.  Thank you, Your Honor.

19          JUDGE SUTHERLAND:  It will take them a few

20   minutes to get that organized and stapled together.

21   I want to let the audience know that in any event

22   the jury requests to see any videos, we'll have to

23   clear the courtroom and show it to them in here with

24   no one present except whoever is operating the

25   equipment and myself.  There's no good means to take
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   all this equipment and set it up in the jury room
 2   for them, okay.  We'll be in recess for a few
 3   minutes.
 4            (WHEREUPON A BRIEF RECESS TOOK PLACE)
 5          (WHEREUPON THE JURY ENTERED THE COURTROOM)
 6            JUDGE SUTHERLAND:  Please be seated.  Ladies
 7   and gentlemen of the jury, you'll each find on your
 8   seats a complete set of all the instructions of the
 9   Court.  Those are to assist you, and as I read the
10   instructions to you, if you want to follow along on
11   your copy there and to take with you to the jury
12   room, which helps with your deliberations.  You
13   don't have to pass around one set of the
14   instructions.  However, in the event there is any
15   discrepancy between any of the copies that you have
16   and the official set of instructions, which are the
17   ones I'm going to read to you, please be guided by
18   the official set.  We've never had any problem with
19   the copy collator putting them together, but if
20   there is a problem, please be guided by the original
21   instructions.  I've already read instructions
22   numbered 1 and 2, so I'm not going to reread those.
23   We'll begin with instruction No. 3, the third page
24   in the packet that you have.
25            Instruction No. 3, the law applicable to this
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1   case is stated in these instructions and the two

 2   which the Court read to you immediately after you

 3   were sworn as jurors.  All of the instructions will

 4   be given to you to take to the jury room for your

 5   use during your deliberations.  You must not single

 6   out certain instructions and disregard others or

 7   question the wisdom of any rule of law.  The Court

 8   does not mean to assume as true any fact referred to

 9   in these instructions but leaves it to you to

10   determine what the facts are.

11        Instruction No. 4, the charge of any offense is

12   not evidence, and it creates no inference that any

13   offense was committed or that the defendant is

14   guilty of an offense.  The defendant is presumed to

15   be innocent unless and until your deliberations upon

16   your verdict you find him guilty.  This presumption

17   of innocence places upon the State the burden of

18   proving beyond a reasonable doubt that the defendant

19   is guilty.  A reasonable doubt is a doubt based upon

20   reason and common sense after careful and impartial

21   consideration of all the evidence in the case.

22   Proof beyond a reasonable doubt is proof that leaves

23   you firmly convinced of the defendant's guilt.  The

24   law does not require proof that overcomes every

25   possible doubt.  If after your consideration of all

1  the evidence you are firmly convinced that the
2  defendant is guilty of the crimes charged, you will
3  find him guilty.  If you are not so convinced, you
4  must give him the benefit of the doubt and find him
5  not guilty.
6       Instruction No. 5, under the law the defendant
7  has the right not to testify.  No presumption of
8  guilt may be raised and no inference of any kind may
9  be drawn from the fact that the defendant did not
10  testify.  Under the law the wife of the defendant
11  has the right not to testify.  No inference of any
12  kind may be drawn from the fact that the wife did
13  not testify.
14       Instruction No. 6, as to Count 1, if you find
15  and believe from the evidence beyond a reasonable
16  doubt; first, that on or about August 22, 2012 in
17  the County of Franklin, State of Missouri the
18  defendant possessed Morphine, a controlled
19  substance; and second, that the defendant was aware
20  of its presence and nature, then you would find the
21  defendant guilty under Count 1 of possession of a
22  controlled substance.  However, unless you find or
23  believe from the evidence beyond a reasonable doubt
24  each and all of these propositions, you must find
25  the defendant not guilty of that offense.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1        Instruction No. 7, as to Count 3, if you find

 2   and believe from the evidence beyond a reasonable

 3   doubt; first, that on or about August 22, 2012 in

 4   the County of Franklin, State of Missouri, the

 5   defendant possessed marijuana, a controlled

 6   substance; and second, the defendant was aware of

 7   its presence and nature, then you will find the

 8   defendant guilty under Count 3 of possessing

 9   marijuana.  However, unless you find and believe

10   from the evidence beyond a reasonable doubt each and

11   all of these propositions, you must find the

12   defendant not guilty of that offense.

13        Instruction No. 8, as to Count 4, if you find

14   and believe from the evidence beyond a reasonable

15   doubt; first, that on or about September 11th, 2012

16   in the County of Franklin, State of Missouri, the

17   defendant attempted to cause serious physical injury

18   to Sergeant Folsom by trying to draw a weapon to

19   shoot Sergeant Folsom; and second, that Sergeant

20   Folsom was a law enforcement officer; and third,

21   that the defendant was aware that Sergeant Folsom

22   was a law enforcement officer, then you will find

23   the defendant guilty under Count 4 of assault of a

24   law enforcement officer in the first degree under

25   this instruction.  However, unless you find or
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   believe from the evidence beyond a reasonable doubt

2   each and all of these propositions, you must find

3   the defendant not guilty of that offense under this

4   instruction.

5          Instruction No. 9, as to Count 5, if you find

6   and believe from the evidence beyond a reasonable

7   doubt; first, that defendant committed the offense

8   of assault of a law enforcement officer in the first

9   degree as submitted in instruction No. 8; and

10  second, that defendant committed that offense with

11  the knowing use of a deadly weapon, then you will

12  find the defendant guilty under Count 5 of armed

13  criminal action.  However, unless you find and

14  believe from the evidence beyond a reasonable doubt

15  each and all of these propositions, you must find

16  the defendant not guilty of that offense.

17         Instruction No. 10, as to Count 6, if you find

18  and believe from the evidence beyond a reasonable

19  doubt; first, that on or about September 11th, 2012

20  in the County of Franklin, State of Missouri, the

21  defendant attempted to cause serious physical injury

22  to Corporal Mertens by trying to draw a weapon to

23  shoot at Corporal Mertens; and second, that Corporal

24  Mertens was a law enforcement officer; and third,

25  that the defendant was aware Corporal Mertens was a

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   law enforcement officer, then you will find the

2   defendant guilty under Count 6 of assault of a law

3   enforcement officer in the first degree under this

4   instruction.  However, unless you find and believe

5   from the evidence beyond a reasonable doubt each and

6   all of these propositions, you must find the

7   defendant not guilty of that offense under this

8   instruction.

9        Instruction No. 11, as to Count 7, if you find

10   and believe from the evidence beyond a reasonable

11   doubt; first, that defendant committed the offense

12   of assault of a law enforcement officer in the first

13   degree as submitted in instruction No. 10; and

14   second, that defendant committed that offense with

15   the knowing use of a deadly weapon, then you will

16   find the defendant guilty under Count 7 of armed

17   criminal action.  However, unless you find and

18   believe from the evidence beyond a reasonable doubt

19   each and all of these propositions, you must find

20   the defendant not guilty of that offense.

21        Instruction No. 12, the following terms used in

22   these instructions are defined as follows:  Attempt,

23   to commit an offense, the doing of any act with the

24   purpose of committing an offense, which act is a

25   substantial step towards the commission of the

1    offense.  A substantial step means conduct which is

2    strongly corroborative of the firmness of the

3    actor's purpose to complete commission of the

4    offense.

5        Possess, possessed or possession means either

6    actual or constructed possession of the substance.

7    A person has actual possession if the person has the

8    substance on his or her person or within easy reach

9    and convenient control.  A person who although not

10   in actual possession has the power and intention at

11   a given time to exercise dominion or control over

12   the substance either directly or through another

13   person or persons is in constructive possession of

14   it.  Possession may also be sole or joint.  If one

15   person alone has possession, possession is sole.  If

16   two or more persons share possession of a substance,

17   possession is joint.

18       Serious physical injury means physical injury

19   that creates a substantial risk of death or that

20   causes serious disfigurement or protracted loss or

21   impairment of the function of any part of the body.

22       Instruction No. 13, the defendant is charged

23   with a separate offense in each of the six counts

24   submitted to you.  Each count must be considered

25   separately.  You should return a separate verdict

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   for each count, and you can return only one verdict

2   for each count.

3        Instruction No. 14, when you retire to your

4   jury room, you will first select one of your number

5   to act as your foreperson and to preside over your

6   deliberations.  You will then discuss the case with

7   your fellow jurors.  Each of you must decide the

8   case for yourself, but you should do so only after

9   you have considered all the evidence, discussed it

10  fully with the other jurors and listened to the

11  views of your fellow jurors.  Your verdict, whether

12  guilty or not guilty, must be agreed to by each

13  juror.  Although the verdict must be unanimous, the

14  verdict should be signed by your foreperson alone.

15  When you have concluded your deliberations, you will

16  complete the applicable forms to which you

17  unanimously agree and return them with all unused

18  forms and the written instructions of the Court.

19       Instruction No. 15, the attorneys will now have

20  the opportunity of arguing the case to you.  Their

21  arguments are intended to help you in understanding

22  the evidence and applying the law but they are not

23  evidence.  You will bear in mind that it is your

24  duty to be governed in your deliberations by the

25  evidence as you remember it, the reasonable

```
 1   inferences which you believe should be drawn

 2   therefrom and the law as given in these

 3   instructions.  It is your duty and yours alone to

 4   render such verdict under the law and the evidence

 5   as in your reason and conscious is true and just.

 6   The State's attorney must open the argument.  The

 7   defendant's attorney may then argue the case.  The

 8   State's attorney may then reply.  No further

 9   argument is permitted by either side.

10        Closing argument on behalf of the State.

11        (CLOSING ARGUMENT ON BEHALF OF THE STATE)

12        MR. PARKS:  "You're going to have to shoot

13   me, man," are the words that the defendant said

14   which brought this episode to a tragic end, but how

15   did it all start.  It all started with a pod cast in

16   which the defendant made and posted on You Tube

17   which contained threats to judicial officers, and

18   Judge Kelly Parker called Sergeant Folsom, who he

19   knew, and asked him to do an investigation into this

20   matter.  And Sergeant Folsom did.  He checked with

21   Crawford County, and you remember him testifying up

22   here that he checked with the 911 center, they put

23   an extra guard on it because the defendant had

24   walked into the 911 center, that there had been

25   extra security put on the courthouses so that they
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  could know if the defendant was there or not.  They

 2  took this threat seriously.  And so Sergeant Folsom,

 3  when asked to investigate, investigated to find out

 4  what was really going on.  And you remember Sergeant

 5  Folsom told you they first looked for the defendant

 6  in Crawford County because he was running for

 7  coroner, and when you run for an office in that

 8  county, you're supposed to live in that county, but

 9  they couldn't find him at the address that was

10  listed.  And so they got a license plate number off

11  a car that the defendant had been driving and that

12  led him to Piney Park just outside of St. Clair.

13       You remember Sergeant Folsom testified that

14  they went up to the door at the Piney Park address

15  and the defendant came to the door.  He opened the

16  door, he shut the door and Sergeant Folsom testified

17  that it was a narrow sidewalk with bushes.  You saw

18  the picture that was attached to the search warrant.

19  There wasn't much room but when he opened and closed

20  that door, Sergeant Folsom who's been trained to

21  detect marijuana smelled the odor of marijuana

22  coming out of that house.  As they stepped down and

23  around to the area to talk to the defendant, they

24  also smelled marijuana on his person.

25       You'll remember that Corporal Mertens testified

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   that the defendant's wife came out and told him when
 2   he asked if there was anything illegal in the house,
 3   "I have nothing illegal in the house."  So a search
 4   warrant was obtained.  But they wouldn't let the
 5   defendant go back into the house, standard police
 6   procedure, you don't want somebody going into a
 7   scene that you want to search and destroy evidence.
 8   This upset the defendant.  Sergeant Folsom testified
 9   there was only the two of them, so they put the
10   defendant in handcuffs, he complied, and when the
11   other officers arrived, he was removed from the
12   handcuffs and a search warrant was obtained.  And
13   during that search warrant, in the basement they
14   found the same background that they had seen on the
15   You Tube, what the defendant had told them was his
16   command center, the place that the defendant went to
17   make his broadcasts, the defendant's room.  As the
18   defendant's attorney said, the man cave, the bear
19   pit, this was the domain of the defendant.  And what
20   did they find in that area.  They found a tin or a
21   plastic container with items.  They opened that item
22   and they found a small thing of marijuana.  They
23   found drug paraphernalia.  They found a grinder to
24   grind up the marijuana to smoke.  They found the
25   smoking pipe.  They found the scales.  They also
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1    found a blue tin.  And what did they find in that

 2    blue tin, they found a pill and a half and a blue

 3    pill.  What are those pills?  Well, the lab

 4    technician testified that they tested them.  He told

 5    you that he made a report on those and on the

 6    marijuana that was found in the house, and that it

 7    came back positive for Morphine, Morphine being a

 8    controlled substance.  Morphine that you have to

 9    have a prescription for.  And as it was discussed in

10    voir dire, you don't have to have the physical

11    prescription.  Heck, nowadays the doctors call those

12    things in, you never even see them, but you're going

13    to have a bottle, you're going to have a bottle with

14    that prescription on it, with your name and

15    everything on it.  You do not hide illegal drugs in

16    a tin with marijuana and other drug paraphernalia.

17         What did they find next?  Just outside the

18    command center they found another bag with marijuana

19    in it, and the officers testified that through their

20    experience and training, they knew that this was

21    marijuana.  Now they told you they didn't arrest

22    defendant at that time, they were doing an

23    investigation, and it's standard procedure when you

24    have drugs that are going to have to be sent to the

25    lab like these were, that you don't apply for arrest
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    warrants until such time as the lab tests come back.

2    But this was an unusual situation.  This was a

3    situation where the defendant had made threats and

4    put a specific date on those threats, September

5    17th.  He and his Army were going to come down and

6    remove these people by force.  And so you've got

7    Crawford County on lock down, you've got special

8    security precautions being taken.  Nobody knows at

9    this time what the defendant might do.  And you

10   heard Sergeant Folsom testify that it was decided

11   that they were either going to apply for an arrest

12   warrant and put him under arrest so that they would

13   have some control over him on September 17th, or

14   they were going to have to get a warrant and put a

15   GPS tracking device on his car so that they would

16   have some idea of where he was because they did not

17   know what kind of a threat defendant would be on

18   September 17th.  And everybody knows that when you

19   have a threat, you act aggressively on it.  We

20   don't, in law enforcement, sit back and let things

21   happen if we could.  We try to prevent these kind of

22   actions and that's what they were doing.

23        So they obtained an arrest warrant for the

24   defendant, and you remember Sergeant Folsom and

25   Corporal Mertens both testified they had taken the

```
 1   defendant's computers because he had been using
 2   computers, he'd done pod casts, they didn't know
 3   what else was on there and they wanted to check, and
 4   you heard them testify that the defendant had kept
 5   calling and emailing or emailing Sergeant Folsom,
 6   because he'd given him his card when asked, which is
 7   standard procedure, and it had his email address on
 8   it.  So the defendant had his email address and he
 9   kept emailing him saying, "I want my computers back,
10   I want my computers back."  And so they used the
11   computers as a ruse.  Now they didn't want to go to
12   the house because defendant had been saying he was
13   on Def-Con 4, he was locking down, he was ready to
14   go.  He should have shot Sergeant Folsom the first
15   time he came.  So they wanted some place that was
16   not going to be a problem, if for some reason they
17   had to use force to take down the defendant.
18        And they'll tell you, you heard Sergeant Folsom
19   say he called the defendant.  The defendant said, "I
20   want to meet in a public place."
21        And he said, "Well, what about the MFA station
22   just down from your house?"
23        And he said, "Fine, let's meet there."  And so
24   Sergeant Folsom and Corporal Mertens asked for
25   back-up from the Highway Patrol.  They got two
```

1    uniformed officers from this zone here in Franklin

2    County.  They set the two officers up on the end of

3    the road, and they came in and positioned their car

4    here on the parking lot a long way from anybody

5    else, because when they pulled in, there was nothing

6    there.  The FBI was set up here, as they said, where

7    the truck was because they thought this was an

8    exclusionary place.  But what happened, everybody

9    came in and you saw on the video what happened.  You

10   saw the defendant, you heard the exchange, and I'm

11   not going to play the video for you, you've seen it

12   enough and you can remember what's on that video but

13   you can ask the Court for it.  And as the defendant

14   got out of the car, the officers asked him, they saw

15   the gun, "Hey, what are you doing with a gun?"

16        "What are you doing with a gun?"

17        "Well, I'm authorized."

18        "Well, I'm authorized to do that."

19        "All right, get on the ground," and you hear

20   Sergeant Folsom and you hear Corporal Mertens

21   telling him to get down.

22        And you hear the defendant said, "you're going

23   to have to shoot me, man," and the shots rang out.

24   How do we know besides the tape played that was made

25   by the defendant, how do we know that that's what he

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   said, because in open court in this courtroom at a

2   hearing on February 21st of 2013 the defendant got

3   up and told the Court, "you will also note that as

4   soon as I said you're going to have to shoot me,

5   they did."  The defendant admitted that that's what

6   he said on the tape.

7        Ladies and gentlemen, I submit to you that we

8   as a society do not allow or want our law

9   enforcement officers to put themselves in anymore

10  danger than they have.  They were there to serve a

11  legal warrant.  They gave the defendant commands,

12  and you heard Corporal White from the Highway Patrol

13  testify that when the defendant's hands undid that

14  flap of the gun (sic), they had every right to shoot

15  him but they didn't.  When that hand went under the

16  flap of the gun, Corporal White said they had every

17  right to shoot him.  When his hand went on the

18  handle of the gun and started to bring it out,

19  Corporal White said they were behind the eight ball

20  at that point.

21       JUDGE SUTHERLAND:  You're just over time.

22       MR. PARKS:  They had nothing to do but shoot

23  him.  Thank you.

24       JUDGE SUTHERLAND:  Closing argument on

25  behalf of the defendant.

1    MR. EASTWOOD:  Thank you, Your Honor.

2    JUDGE SUTHERLAND:  You have a minute to get

3  your technology set up here.

4    **(CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT)**

5    MR. EASTWOOD:  Ladies and gentlemen of the

6  jury, it's been a long two and a half days, and I'm

7  not going to speak to you to try to change your

8  minds.  I'm here to try to give you a road map to

9  reasonable doubt.  A road map so that when you go

10  back there and you deliberate with each other, that

11  you have a path to follow to get to not guilty.

12  You've already heard that the Judge has acquitted

13  Jeff on the You Tube video, on the judicial threat

14  charge, and so you saw those You Tube videos and

15  they probably made you dislike Jeff Weinhaus or at

16  least what he was saying or how he talks, but this

17  is not a popularity contest.  It's not a personality

18  contest.  This is not a TV show where you get to

19  vote who you like or not, this is a criminal trial.

20  So I ask you to put your thoughts on that video out

21  of your mind, okay.

22    Let's talk about the drugs because there's two

23  cases here, there's a drugs case and police shooting

24  case, the police shooting Jeff.  The drugs, the

25  testimony showed that the troopers recover one and a

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   half tablets of Morphine and a small amount of weed

 2   from the basement.  You heard that Jeff lives in

 3   that house with his wife and his 19 year old teenage

 4   son, Levi.  You heard there was a bedroom in the

 5   basement, and it looked like a teenage boy's

 6   bedroom, and there was also a common area that

 7   Sergeant Folsom called Jeff's command center, but

 8   you heard Sergeant Folsom admit and you know this

 9   from your common sense that people often use their

10   basements as a common area, and men and teenage boys

11   often have all sorts of goofy names for those areas,

12   command center, bunker, bear pit, man cave,

13   whatever.  There's a separate bedroom in the area,

14   that's a private area.  There was also a bedroom

15   upstairs, Jeff's bedroom with his wife, that's where

16   they found the gun and green holster.  They didn't

17   seize it that day.  It wasn't illegal.  But there

18   was a common area.  Jeff made videos in that common

19   area, so what.  There's a computer on a desk in a

20   common area.  These are not wealthy people.  You

21   know from experience that families have a family

22   computer that members of the family use and share.

23   They seized multiple computers.  They share that

24   desk area, they share communal things.  There are

25   perfectly innocent explanations for many of the
```

 1    things found there.  There's an old postage scale.
 2    It was not an electronic scale or a computer scale,
 3    this is not Breaking Bad, this was not a drug lab or
 4    a high tech drug dealer operation.  They found a
 5    tiny amount of drugs for personal use and not very
 6    much at that.
 7         So let's look at the verdict director.  You
 8    have to find Jeff and not someone else that
 9    possessed those drugs, both the tablets and the
10    weed.  You have to find that Jeff was aware of their
11    presence.  The problem is you've got three people in
12    the house and one of them is a teenage boy, and you
13    know teenage boys do naughty things in basements
14    sometimes.  You heard that Jeff yelled at his wife
15    something about the drugs, does that mean that their
16    Jeff's, no, it doesn't.  He could have been covering
17    for his son.  Sergeant Perry Smith who did the
18    investigation into the shooting said that he found
19    Jeff's cell phone and sent it to forensics.  There
20    was a text message involving a Levi Weinhaus and it
21    mentioned a weed plant.
22         MR. PARKS:  Objection, that was objected to
23    and sustained.
24         JUDGE SUTHERLAND:  Disregard that last
25    comment.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          MR. EASTWOOD:  The chemist said that he

2     could run fingerprints on the tablet, on the

3     container.  Did he?  No.  Same thing for DNA.  Did

4     he?  No.  You've seen no fingerprint or DNA

5     evidence.  How hard would it be to get from three

6     people.  You've watched CSI.  You know it's not that

7     hard to gather forensic evidence to bring it to a

8     jury and make you firmly convinced that someone was

9     guilty of possessing drugs.  So can you honestly say

10    you are firmly convinced beyond a reasonable doubt

11    that those drugs were Jeff's and not someone else's

12    in the house.

13         Let's turn to the gas station, guns, we're

14    talking about guns here.  They're controversial to

15    some people in our society.  An open carry gun is

16    legal in Missouri.  If you don't like it, and I know

17    some people don't, go to Jeff City, change the law.

18    If you want to overturn the Second Amendment, call

19    your member of congress.  I know they're closed but

20    you get the point.  It's the law whether we like it

21    or not.  It's a policy debate and issue we talk

22    about in our society.  You may question Jeff's

23    judgment in bringing a gun to the gas station, but

24    he did nothing wrong and nothing illegal, and every

25    single law enforcement officer agreed with that.

Weinhaus, Vol. 3

```
 1   Think about why he brought a gun.  Maybe he was
 2   frightened.  Two weeks before they came to his
 3   house, questioned him at length, ransacked his house
 4   and kept him out of his house for hours.  Maybe he
 5   was scared.  They seized his computers.  Jeff is
 6   kind of a pest who makes You Tube videos in his
 7   basement.  That was a big deal to him.  It was a big
 8   deal.
 9          Now let's turn to what happened.  Corporal
10   Mertens was the first to tell you it all happened so
11   fast.  You heard the police reports that were made
12   before the watch video was discovered.  The watch
13   video wasn't discovered until March of this year
14   after Sergeant Smith's investigation was closed.  So
15   you heard the troopers giving somewhat contradictory
16   testimony at times because they're trying to massage
17   those facts to make it fit with the video.  There
18   are so many holes in Sergeant Folsom's and Corporal
19   Mertens' testimony, if it was a canoe, it would
20   sink, it wouldn't float down the river.  They
21   described Jeff as a man of God, a religious
22   philosophical man, non-violent.  They said he made
23   these over-the-top, tv talking head type videos and
24   newsletters for a long time, at least 16 years,
25   demanding various judges or officials resign, but he
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  never did anything.  Did he ever harm anyone, was

2  there any evidence of that?  No way.  He was a guy

3  making home movies in his basement and posting them

4  on You Tube.  They were rude, they were obnoxious,

5  they were offensive, but it's America, we have free

6  speech and we don't have to like it but we respect

7  each others' rights.  That's why we're not rioting

8  in the streets.  We have free speech.

9       So on 9/11 of last year, Sergeant Folsom and

10  Corporal Mertens all of a sudden say they were too

11  scared to go to the very house that they had

12  searched two weeks before, ransacked for several

13  hours.  Does that make sense?  Did anything happen

14  in the interim, did Jeff hurt anyone?  No, he made a

15  bunch of movies making fun of Sergeant Folsom,

16  called the Highway Patrol and made fun of him to his

17  boss.  He filed some papers with the Supreme Court.

18  How did they get him to the gas station, they lied

19  to him.  Sergeant Folsom tells you it's okay to lie,

20  okay for policeman to lie to you as long as they

21  document it.  And then you hear that they took him

22  to the gas station because it was a secluded place,

23  but it wasn't a secluded place.  You heard from at

24  least three civilians, innocent civilians that were

25  there.  Was that really a secluded place?  Why

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1  didn't they say hey, Jeff, come on down to the
 2  police station and get your computers, wouldn't that
 3  be a lot easier and safer?  You heard that Jeff
 4  accelerated into the parking lot and that made them
 5  alarmed, but you watched the video, did you hear an
 6  acceleration?  Did anyone notice this car flying in?
 7  I mean where Jeff parked was on a gravel incline.
 8  It is reasonable if you are going to come in, do a
 9  u-turn that you might tap the gas a little.  You all
10  drive, you have common sense about driving.  The
11  troopers said they feared Jeff would ram them.  Did
12  he, no, he parked his car thinking he was going to
13  get the computers and load them into it.  The
14  troopers also said they feared Jeff would bring an
15  Army of supporters.  Did he, no, and were the
16  troopers so afraid they put on their bullet proof
17  vests?  No.  Did they bring their heavy weapons out
18  of the car?  No.  And here's where you start to get
19  contradictory testimony.  Sergeant Folsom thought
20  the guttermen, Marty and Steve, you heard from them
21  this morning, were part of Jeff's Army.  You heard
22  they didn't know Jeff from Adam.  Corporal Mertens
23  thought they were just workers doing their job,
24  which they were.
25       If Jeff was so dangerous, why did they have the

1    FBI all the way down here with gas pumps, propane

2    tanks, civilians, a building in between, is that

3    safe, does that make sense?  Sergeant Folsom said

4    that not wearing a vest was a mistake, that he was

5    being lazy.  Well, there were other mistakes made

6    that day, let's go through them.  Sergeant Folsom

7    acknowledged that under Missouri Law he was required

8    to notify the sheriff of Franklin County about the

9    search warrant two weeks before, but he had not

10   because he had bad cell phone reception.  Is that a

11   really good enough reason not to follow the law,

12   particularly for a law enforcement officer?  You

13   watched that video, gosh, we watched that video a

14   lot, and you heard and saw Jeff exiting the car, you

15   heard the tone and cadence of his voice.  You heard

16   him be a smartalic, that's consistent with Jeff's

17   personality, but you heard the exchange before that.

18   You heard the exchange between the troopers and

19   Jeff.  And you know that the exchange was different

20   on the video than Sergeant Folsom had described it

21   in his written reports before he knew of the

22   existence of the video.  Jeff said, "You don't have

23   to shoot me, man, you're going to have to shoot me,

24   man," I don't know, you decide.  The point is he

25   said it in a soft voice, and either way you heard

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  from both the troopers, as well as Perry Smith, as

2  well as Corporal White, the firearms expert, that

3  saying that is not enough to shoot someone.  It

4  might be dumb, but it certainly is not enough to

5  justify lethal force.  So Jeff has to have gone for

6  his gun if they were justified to shoot him.  But

7  does that make sense?  If Jeff really had bad

8  intent, why didn't he pull into the parking lot and

9  jump out of the car with a shotgun or come out guns

10  blazing?  Why did he do what he did?  Does it really

11  make sense that he had this bad motive or intent?

12      Sergeant Folsom was five to seven feet away.

13  He recognized that green holster from his military

14  training.  He knew this holster at best for a

15  well-trained man in the military who was a quick

16  draw, a good shot would take at least three seconds

17  to pull down, to open, then to grab the grip, then

18  to take it out, then to point, then to shoot.  Why

19  didn't he tackle him.  You saw him, he's a big man.

20  He's a lot bigger than scrawny Jeff Weinhaus.  He

21  knew that Jeff had no gun skills, no training, no

22  military experience.  So why did Sergeant Folsom

23  shoot Jeff?  Jeff had personally attacked and

24  criticized him.  Sergeant Folsom did not want to be

25  there.  His boss, Lieutenant Satterfield who was

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  also criticized in the You Tube video, made him be
 2  there.  I think his adrenaline rushed in.  Corporal
 3  White, the expert, told you what happens when
 4  adrenaline rushes in, it alters perception, sight,
 5  sound, memory distortion, memory loss, tunnel
 6  vision, temporary paralysis.  In extreme cases you
 7  lose control of your bladder or bowels.  You are
 8  seriously altered.  It depends on how much you're
 9  stressed out, how much adrenaline comes in.
10  Sergeant Folsom was more stressed than your average
11  law enforcement officer.  Jeff had criticized him to
12  his colleagues, to his boss.  He didn't want to be
13  there.  He admitted he had a problem with tremors,
14  with shakes, that he was partially disabled.  That
15  kicked in at the shooting.  He had a cut finger.  He
16  was shooting with one hand at first.  That's not
17  optimal, you heard from their expert who said you're
18  supposed to use two hands on the gun, that is
19  optimal, so why did he shoot?  Did he overreact, was
20  it an accident, was it intentional, I'm not sure.  I
21  don't know if you need to be sure, but Sergeant
22  Folsom had to justify what he did.  He shot Jeff
23  Weinhaus when he didn't need to.  So, he said that
24  Jeff had opened and started to draw out his
25  complicated military holster in less than three
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   seconds.  And what do we have to prove that fact, we

2   have only the testimony of Sergeant Folsom and

3   Corporal Mertens.  What's Corporal Mertens' motive

4   for backing up his boss, his mentor, his friend of

5   six years?  I think that speaks for itself.

6       Does the video support the version of events

7   you heard?  Less than one second before you see the

8   bullet flying out you see the left hand going up,

9   you can infer that, you have common sense, you know

10  where that hand was.  You heard that Jeff was in a

11  crouched position.  You saw that angle.  Does it

12  really make sense that someone is pulling a gun out

13  when they're going down like this?  Does that really

14  make sense?  I'm not an expert on guns but that

15  doesn't make sense to me.

16      You heard his explanation about the entry and

17  exit wounds on Jeff's body, that they entered high

18  and exited low.  Is that just the difference in

19  height or does that show that Jeff was complying

20  with the order to get down on the ground.  His left

21  hand seems to be.

22      Corporal White, the expert, conceded that the

23  shooting was justified only if we go on the

24  assumption that their testimony was true.  Sergeant

25  Smith investigated that shooting, he did not make

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    conclusions but he did say out of the 15 police

2    shootings he investigated, all 15 were cleared.  I

3    don't know if that's a truly independent

4    investigation.

5         You heard from Marty and Steve, the guttermen.

6    You heard from Heather, the store clerk.  Are they

7    credible people, do they have a stake in this case?

8    No.  They saw what they saw.  Was it upsetting to

9    them?  Sure.  Can you believe them?  You bet.

10        What about the FBI?  They were there, they were

11   the back-up.  Where is the FBI?  How come you didn't

12   hear from them?  I know why you didn't hear from

13   them, but it's the State's burden to prove up these

14   charges and they did not want you to hear from them.

15   The back-up did not back up the story here and

16   that's a really critical fact, remember that.  The

17   back-up did not back up the story.  Those FBI agents

18   would not come in here and testify.  I think that's

19   a big red flag.  That's a big question mark.

20        Are you sure that because of the angle that

21   Corporal Mertens was really able to see what Jeff

22   was doing on his right side if he was standing in a

23   bladed position as they say?  Again he's backing up

24   his boss for shooting him.

25        I talked a lot about burden of proof.  I

```
 1   probably spoke badly about it when we were picking
 2   this jury.  I hope you got my point when I said what
 3   do you do if I sit in my chair and do nothing.  My
 4   burden, Chris Combs' burden, Jeff Weinhaus' burden,
 5   the defendant's burden is zilch, nothing, nada.  He
 6   has the burden of proving up every element of the
 7   offense beyond a reasonable doubt.  If you have
 8   questions, it's not my job to answer them.  It's the
 9   State's job to answer them.  Remember that, remember
10   that.  He has the burden of answering those
11   questions.
12        The elements of the charge attempted to cause
13   serious physical injury.  There's a lot of evidence
14   to undercut the troopers' testimony.  Mertens makes
15   the case that there was no attempt against Mertens.
16   Mertens said Jeff's eyes never left Sergeant Folsom,
17   that he shot Jeff because he was going for Sergeant
18   Folsom.  There was no attempt on Mertens.  He shot
19   Jeff not to protect himself but to protect his boss.
20   Jeff was shot four times, twice in the chest, twice
21   in the head.  He was cuffed, left for dead for nine
22   minutes before the emergency services got there.
23   They thought he was dead, J-4, you heard that on the
24   tape.  You know these men were trained in first aid.
25   You heard Corporal White say proper procedure is
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  once they're cuffed and secured, you give first aid.

2  Did they?  No.  Corporal Mertens said I looked at

3  him, observed him and then I left him, radioed an

4  ambulance and called my father.  Why would a man

5  call his father after shooting someone, a law

6  enforcement officer, a professional, it's because

7  something bad happened, something not right.  You

8  saw how these men were on the stand.  They were

9  shaken, they looked upset at times.  These are not

10  people who felt they did the right thing defending

11  their lives.  These are people who knew at the

12  bottom of their hearts that the shooting was not

13  justified, that Jeff Weinhaus had not attempted to

14  harm them.  Nothing corroborates the story of Jeff

15  going for his gun except their testimony, not the

16  video, not the witnesses.  You never heard from the

17  FBI.  You know that police do a dangerous job, but I

18  have to tell you that you heard from Corporal White

19  who got an award after he was involved in an

20  officer-involved shooting and who is now the head

21  instructor, Sergeant Folsom has not worked since,

22  cannot wear the uniform.  You can infer something

23  from that about this shooting, you can infer

24  something about that whether this was a proper

25  shooting.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          It is credible to think that there is but one
 2   victim here, Jeff Weinhaus, the victim of a police
 3   shooting and two officers desperately trying to find
 4   an explanation for why they shot him.  If there
 5   is -- if you look at the crimes for which he is
 6   charged, assaulting a law enforcement officer, there
 7   are no victims, you heard from no victims.  My job
 8   is not to change your minds, it is to help you with
 9   these talking points so that when you go back there,
10   you can talk to one another and find that roadmap to
11   reasonable doubt.  Remember it's not whether or not
12   he did it 50/50, it's not yeah kind of, maybe, sort
13   of I think he did it, I'm pretty sure he did it, it
14   is reasonable doubt firmly convinced.  That is a
15   high, high standard.  It's a tough standard.  I
16   don't get to come back to you to talk to you
17   anymore, I wish I could.  I thank you so much.  I'm
18   confident you can follow this roadmap.  You can get
19   to not guilty.  You have enough questions that the
20   State did not make its case.  Thank you very, very
21   much.
22          JUDGE SUTHERLAND:  Mr. Parks.
23          MR. EASTWOOD:  And by Jeff and his family.
24          JUDGE SUTHERLAND:  You may conclude your
25   argument on behalf of the State.  You have a little
```

Weinhaus, Vol. 3

1   less than eight minutes left.

2   **(CONTINUED CLOSING ARGUMENT ON BEHALF OF THE STATE)**

3         MR. PARKS:  That was the best story since

4   Alice in Wonderland and the Cheshire Cat because it

5   distorted everything that happened there.  Defendant

6   put three witnesses on.  They thought the FBI was

7   going to have a different story, why didn't they put

8   them on?  They can put them on as easy as I.  They

9   didn't put them on because everything that the

10  troopers said was the truth.

11        And what about those witnesses.  Well, they

12  were what they all said, they didn't hear anything

13  or see anything until they heard the shots and they

14  turned around and saw the defendant on the ground,

15  except for the store clerk and she was so distraught

16  she told you that she saw him on the ground and then

17  had the officers go up and fire six shots at him

18  while he was laying on the ground.  Now we all know

19  that's not true because we saw the watch video.  And

20  the defendant was making a big deal that he was

21  going down on the ground, he was complying, he had

22  his arms up in the air.  Well, we saw that watch

23  video, and you saw those stills and you saw them

24  over and over again, and remember the still of the

25  Subaru, when the defendant got out of the Subaru and

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1   the watch was pointing down here and it saw the MFA

2   sign, and then Sergeant Folsom told you he came

3   around the car and the defendant was going this way.

4   We know the watch was on his left hand.  So let's

5   suppose for a minute that he's got his hand up.

6   Where is that watch?  Where is that watch pointing?

7   It's pointing back over his shoulder.  The defendant

8   is standing here.  He's got the watch up in the air.

9   What are you going to see?  You're going to see the

10  MFA sign.  What did you see in the video?  You saw

11  Corporal Mertens and Sergeant Folsom.  He had his

12  hands down here.  He was going for his gun.  You

13  heard both officers testify to that.  He undid the

14  flap.

15       During that conversation, that exchange with

16  Sergeant Folsom, three seconds.  Anybody going to

17  rush a man with a gun in three seconds?  You heard

18  him say in that conversation he pulled the flap down

19  and let it go.  He put his hand up underneath the

20  flap.  He put his hand on the handle of the gun and

21  started to bring that gun out, all this while the

22  officers are talking to him, all this while Sergeant

23  Folsom is moving because he tells you he can see

24  that he doesn't have a good shot pattern.  He wants

25  to get over here so he's shooting over here.  This

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   isn't blame the officers.  The officers are not on
 2   trial here.  What the officers did was to defend
 3   themselves, and that's what you heard Sergeant White
 4   say.  And when it came down to the very end with him
 5   manipulating the holster, with him putting his hand
 6   under the flap, with him starting to draw the gun
 7   and the defendant saying to the officers, "You're
 8   going to have to shoot me, man," it is now your job
 9   to decide whether or not -- whether or not you want
10   these officers shot.  Officers are law enforcement,
11   they're trained, we don't send law enforcement
12   officers out to get shot.  We train them to react
13   and take the necessary steps.
14       You heard Corporal White talk about the wagon
15   wheel.  They were faced with a life and death
16   situation.  They had a man who was wide eyed, who
17   was crouching down, who was focused on them, who was
18   going for his weapon and they fired, and they hit
19   him and he went down.
20       All this stuff, "Well, they didn't render first
21   aid."  Well, the defendant looks pretty good to me
22   for being shot four times
23           MR. EASTWOOD:  I object to that, Your Honor.
24           JUDGE SUTHERLAND:  Overruled.
25           MR. PARKS:  The law enforcement officers did
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   what they did.  The defendant tried to assault the
 2   law enforcement officers, that's the two criminal
 3   action charges that you have.  He went for his gun
 4   and they defended themselves.  You have to find the
 5   defendant guilty of assault of a law enforcement
 6   officer and armed criminal action.  We know that the
 7   drugs were in his cave, his command center, his
 8   room, he had control of that because if there was
 9   anybody else that had control of that, they could
10   have called them to say hey, those were my drugs,
11   but they didn't.  They can ask for DNA testing, they
12   could have asked for fingerprint testing but they
13   didn't want to do that because they knew that it
14   would come up as to the defendant.  He is guilty of
15   having the marijuana.  He is guilty of having the
16   Morphine, a prescribed drug in a tin.  Drug dealers,
17   drug addicts have drugs in a tin.  Normal citizens
18   have them in a prescription bottle or as it was said
19   before, one of those little cases where you go
20   either daily or weekly, something, but you got the
21   bottle there, you fill it out of the bottle with the
22   prescription.  The defendant is guilty of all six
23   counts, and the State and the people of Franklin
24   County are asking you to find the defendant guilty.
25   Thank you.
```

```
1              JUDGE SUTHERLAND:  Ladies and gentlemen --
2    well, first Mr. Loepker, you are our insurance
3    policy, our alternate.  So you're not going to be
4    able to deliberate here.  If you want to stick
5    around and see what transpires, that's fine.  If
6    somebody gets sick in the next couple of hours we
7    might need you after all, but you will not be able
8    to go back to the jury room, but I want to express
9    my appreciation for your service.  For the rest of
10   you it's time to retire to the jury room, select
11   your foreperson, deliberate and arrive at your
12   verdict.  The sheriff will direct you to the jury
13   room and will deliver to you your instructions and
14   verdict form, six of which will be proper for your
15   verdicts and should be signed and returned as your
16   verdicts.  The others should be returned not signed.
17   When you have arrived at your verdicts, notify the
18   sheriff by knocking on the door and you will be told
19   when to return to the jury box.  I ask the clerk to
20   swear the bailiffs to keep the jury together during
21   deliberation.
22              (WHEREUPON THE BAILIFFS WERE SWORN)
23              JUDGE SUTHERLAND:  You may retire to the
24   jury room at this time.  Note the jury retired at
25   10:52 a.m.  We're in recess.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          (COURT IN RECESS FROM 10:52 AM TO 11:36 AM)

 2          JUDGE SUTHERLAND:  Bailiff brought me a note

 3   from the jury five to ten minutes ago.  It was a

 4   little ambiguous, so I asked him to take it back and

 5   ask them to clarify.  So I now have a request that

 6   reads as follows, and I'll show it to you because

 7   you can see where the original was in pencil and the

 8   additions are in pen.  "Still photos of video from

 9   defendant's attorney showed."  The grammar is

10   terrible because of the additions here, "from

11   watch," they put from watch in there, and then a

12   separate line, "see video," which is watch video,

13   and then, "read transcript from Folsom and Mertens

14   testimony regarding gun (Jeff's) placement before

15   and after the shooting."  It's signed by --

16          MR. COMBS:  Do you know who the foreman is?

17          JUDGE SUTHERLAND:  It's No. 4, Krista Sieve.

18   She doesn't identify herself as foreman but she's

19   the one that signed it.  You didn't actually have

20   any still photos from the video, it was showing the

21   freeze frame?

22          MR. EASTWOOD:  They are still photos.

23   They're in a folder on a drive, and the Microsoft

24   picture viewer you just hit back and forth and the

25   pictures are in sequential order.  It's broken down
```

1  into 29 stills.

2         JUDGE SUTHERLAND:  That wasn't introduced

3  into evidence.

4         MR. PARKS:  No, Your Honor, so it can't be

5  shown to the jury.

6         MR. EASTWOOD:  I believe that it is a still

7  from a video that is in evidence.  It is

8  demonstrative evidence of a piece of evidence.

9  There was no objection during trial, during the

10  evidence.

11         MR. PARKS:  It was never introduced.

12         JUDGE SUTHERLAND:  It was never introduced

13  into evidence is the problem with it.

14         MR. COMBS:  It was as the tape recording was

15  though.

16         MR. PARKS:  I have no problem with the watch

17  video, it was admitted into evidence.  So them

18  looking at the watch video, I have no problems with.

19         JUDGE SUTHERLAND:  What we need to do is

20  clear the courtroom, show the watch video and if

21  they want to go through it frame by frame, are you

22  the expert on that?

23         MR. EASTWOOD:  Do you want to do it off the

24  computer?

25         MR. PARKS:  There is no transcript.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            JUDGE SUTHERLAND:  No.  All I can tell them
 2  is we do not have a transcript at this time.  I'll
 3  clear the courtroom, let's get the video set up to
 4  watch video.  We'll clear the courtroom, bring them
 5  in, show them the video.  I'll explain to them that
 6  the still photographs were not admitted into
 7  evidence but we can show them frame by frame.
 8            MR. EASTWOOD:  I don't mean to be difficult
 9  but for the record can I make an objection simply
10  that the stills are demonstrative?
11            JUDGE SUTHERLAND:  You can make the
12  objection but it is overruled.
13            MR. EASTWOOD:  I make the objection that the
14  stills are demonstrative of the video.
15            JUDGE SUTHERLAND:  Overruled and I'll
16  explain to them that we don't have the transcript of
17  the testimony.
18            MR. EASTWOOD:  The action starts around 4:30
19  maybe, 4:45.
20            JUDGE SUTHERLAND:  Move it up shortly before
21  that, 4:25 or so.
22            MR. EASTWOOD:  The shots are between 5:00
23  and 5:10.
24  (COURTROOM IS CLEARED EXCEPT FOR JUDGE, JURY, VIDEO
25            OPERATOR AND COURT REPORTER)
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1           MS. SIEVE:  Since it's just you, are we

2    allowed to communicate?

3           JUDGE SUTHERLAND:  It might be better if you

4    do not.  That might constitute deliberations and

5    none of us should be with you when you do that.

6           MR. STRAATMANN:  It's a clarification

7    question.

8           JUDGE SUTHERLAND:  I'm required to tell the

9    attorneys about this but I can do that later.  The

10   question is what is the definition of assault in the

11   first degree.  I can't tell you anymore than what is

12   in the instructions, okay, and I believe it's

13   essentially defined in there as part of the

14   instruction.  It doesn't say this is the definition

15   but it's in there.  As far as your original request

16   as revised, there is no transcript at this point of

17   Sergeant Folsom's or Corporal Mertens' testimony, so

18   I can't read that or provide that for you in any

19   respect.  The still photographs of the video that

20   Mr. Eastwood used were not admitted into evidence,

21   so I can't pass them to you in the jury room or show

22   them to you now.  However, we can go through the

23   video, and since you requested to see the video, I'm

24   going to go ahead and play the video and we can back

25   it up and go through it a small section at a time,

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    and I think that might take care of the problem with

2    not being able to use the actual still photos that

3    were taken off of the video.  I was told by the

4    attorneys before you were brought back in here that

5    the action starts around the four minute and 30

6    second mark.  So we've set the video around 4:25

7    just before that, is that okay?

8              THE JURY:  Yes.

9              JUDGE SUTHERLAND:  So we'll go through the

10   whole thing and back it up and go through it section

11   by section, and if you see a section that you'd like

12   to stop and take a look at it, let me know, okay.

13   Let's play it then.

14              (WHEREUPON THE VIDEO WAS PLAYED)

15              JUDGE SUTHERLAND:  Is that enough?

16        MR. STRAATMANN:  The prosecuting attorney

17   has pictures afterwards, the pictures that were put

18   into evidence.

19              JUDGE SUTHERLAND:  Of the site?

20        MR. STRAATMANN:  Yes.

21              JUDGE SUTHERLAND:  You can see any of the

22   exhibits.  We don't pass weapons to the jury room,

23   but all of the documentary exhibits, photographs.

24              MR. STRAATMANN:  I think the actual crime

25   scene photos of the scene.

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1            JUDGE SUTHERLAND:  You can see those, well
 2    there's a number of them.
 3            MR. STRAATMANN:  We're really wanting to try
 4    to see the actual weapon in the case or out of the
 5    case or however it was, I don't know which one that
 6    was.
 7            JUDGE SUTHERLAND:  Did you want to see any
 8    of the other pictures as well?
 9            MR. STRAATMANN:  If we can.
10            JUDGE SUTHERLAND:  All of the photographs of
11    the scene?
12            MR. STRAATMANN:  Yes.
13            JUDGE SUTHERLAND:  I'm looking at my exhibit
14    list here.  That would be State's Exhibits 16
15    through 22, I believe.  That would be the pistol,
16    holster and the scene location of cars and so forth
17    afterwards.  Do you want to see those?
18            MR. STRAATMANN:  Yeah.
19            JUDGE SUTHERLAND:  Let me make a note
20    because I want to let the attorneys know as well.
21            MR. STRAATMANN:  Can we watch the video one
22    more time, just from when he gets out of the car.
23            (WHEREUPON THE VIDEO WAS PLAYED)
24            JUDGE SUTHERLAND:  Is that enough?
25            MR. STRAATMANN:  Yeah.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1          JUDGE SUTHERLAND:  Okay, why don't you go on

2    back to the jury room.  Your lunch will be here in

3    five to ten minutes.  I would suggest just take a

4    little break when you eat lunch, 20, 30 minutes,

5    however long it takes, and don't even talk about the

6    case, talk about the weather, Cardinals last night

7    or something else and just relax for a few minutes

8    and come back to it.  Sometimes that works out and

9    we'll get those pictures to you.

10     (LUNCHEON RECESS TAKEN FROM 11:56 AM TO 12:56 AM)

11          JUDGE SUTHERLAND:  Right after we handled

12   the first jury question, of course we brought the

13   jury in the courtroom, it was cleared, I explained

14   to them that we didn't have any transcript either of

15   Sergeant Folsom's testimony or Corporal Mertens', so

16   we couldn't provide that for them, neither could we

17   provide still photographs from the video but let

18   them view the video and if they wanted to go through

19   it slowly, we could do that.  What we ended up doing

20   was just listening to the video starting maybe five,

21   ten seconds before your client got out of the car

22   and through the shooting until the video basically

23   went white.  Watched that twice.  They did not ask

24   for any slow ways through it.  They asked if they

25   could discuss among themselves while they were in

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   here watching the video and I told them no, that's
 2   deliberations, they'll have to do that back in the
 3   jury room.  They wanted to know if they could take
 4   notes, I indicated they could since it was part of
 5   deliberations, and then they handed me a note that
 6   reads as follows:  "What is the definition of
 7   assault in the first degree."  And I told them that
 8   I could not give them a definition but basically
 9   there was a definition in the instructions if they
10   just read the instructions.  It didn't say
11   definition but it explained what it was, and they
12   seemed to be satisfied with that.  Then they asked
13   for the photographs of the scene.  They were
14   stumbling around for the name but they got Smith in
15   there right, that were taken afterwards, just to
16   show where everything was.  So at that point I sent
17   them back to the jury room, and we sent State's
18   Exhibits 14 and 16 through 22 inclusive with them.
19   14 and 16 through 22 inclusive.  They wanted the
20   photographs of the holster and pistol and all that
21   stuff, so I went through 22.
22           MR. EASTWOOD:  So that does not include the
23   weapons in the car?
24           JUDGE SUTHERLAND:  No, I already told them
25   we're not sending any weapons.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        MR. EASTWOOD:  Thank you, Your Honor.

2        JUDGE SUTHERLAND:  So there we are.  Off the

3   record.

4        (COURT IN RECESS FROM 1:01 PM TO 2:17 PM)

5        JUDGE SUTHERLAND:  It's my understanding

6   that we have a verdict on Phase 1, the guilt phase

7   of the trial and we'll bring the jury in in just a

8   minute to see if we do or not.  I have one caution.

9   There's a lot of people here on behalf of

10  Mr. Weinhaus, I understand that, as well as some

11  people here on behalf of the State.  I would ask

12  that there be no outbursts of any kind when the

13  verdicts are read.  I have no idea what they are but

14  it's not appropriate.  Let's bring them in and see

15  what we got.

16       (WHEREUPON THE JURY ENTERED THE COURTROOM)

17          **(WHEREUPON THE VERDICT WAS READ)**

18       JUDGE SUTHERLAND:  Ms. Sieve, you are the

19  foreperson of the jury?

20       MS. SIEVE:  Yes, sir.

21       JUDGE SUTHERLAND:  Has the jury reached a

22  verdict?

23       MS. SIEVE:  Yes, sir.

24       JUDGE SUTHERLAND:  Would you hand it to the

25  bailiff, please.  At this time I will read the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
1    verdict of the jury.  As to Count 1, we the jury
2    find the defendant Jeffrey R. Weinhaus guilty of
3    possessing a controlled substance as submitted in
4    instruction No. 6 signed K. Sieve, foreperson.
5    Ladies and gentlemen, is that your verdict for all
6    of you.
7              (ALL YESES WERE HEARD)
8         JUDGE SUTHERLAND:  As to Count 3, we the
9    jury find the defendant Jeffrey R. Weinhaus guilty
10   of possessing marijuana as submitted in instruction
11   No. 7, also signed K. Sieve, foreperson.  Is that
12   the verdict of all of you.
13             (ALL YESES WERE HEARD)
14        JUDGE SUTHERLAND:  As to Count 4, we the
15   jury find the defendant Jeffrey R. Weinhaus guilty
16   of assault of a law enforcement officer in the first
17   degree as submitted in instruction No. 8, signed K.
18   Sieve, foreperson.  Is that the verdict of all of
19   you.
20             (ALL YESES WERE HEARD)
21        JUDGE SUTHERLAND:  As to Count 5, we the
22   jury find the defendant Jeffrey R. Weinhaus guilty
23   of armed criminal action as submitted in instruction
24   No. 9, signed K. Sieve, foreperson.  Is that the
25   verdict of all of you?
```

```
 1                 (ALL YESES WERE HEARD)
 2          JUDGE SUTHERLAND:  As to Count 6, we the
 3   jury find the defendant Jeffrey R. Weinhaus not
 4   guilty, signed K. Sieve, foreperson.  Is that the
 5   verdict of all of you.
 6                 (ALL YESES WERE HEARD)
 7          JUDGE SUTHERLAND:  And finally as to Count
 8   7, we the jury find the defendant Jeffrey R.
 9   Weinhaus not guilty, again signed K. Sieve,
10   foreperson.  Is that the verdict of all of you?
11                 (ALL YESES WERE HEARD)
12          JUDGE SUTHERLAND:  Thank you.  Does anyone
13   want the jury polled?
14          MR. EASTWOOD:  Your Honor, at this time I
15   would ask that the jury be polled.
16          JUDGE SUTHERLAND:  Ladies and gentlemen, I'm
17   going to ask each of you individually as to each
18   verdict one at a time whether it is your verdict or
19   not.  So first as to Count 1, the possession of a
20   controlled substance charge, that was the Morphine
21   charge.  Ms. Craig, was that your verdict?
22          MS. CRAIG:  Yes.
23          JUDGE SUTHERLAND:  Mr. Click?
24          MR. CLICK:  Yes.
25          JUDGE SUTHERLAND:  Mr. Coleman?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MS. COLEMAN:  Yes.

 2          JUDGE SUTHERLAND:  Ms. Sieve?

 3          MS. SIEVE:  Yes.

 4          JUDGE SUTHERLAND:  Ms. Hoffmann?

 5          MS. HOFFMANN:  Yes.

 6          JUDGE SUTHERLAND:  Ms. Hardester?

 7          MS. HARDESTER:  Yes.

 8          JUDGE SUTHERLAND:  Ms. Davis?

 9          MS. DAVIS:  Yes.

10          JUDGE SUTHERLAND:  Mr. Rutherford?

11          MR. RUTHERFORD:  Yes.

12          JUDGE SUTHERLAND:  Ms. Stack?

13          MS. STACK:  Yes.

14          JUDGE SUTHERLAND:  Ms. Cooper?

15          MS. COOPER:  Yes.

16          JUDGE SUTHERLAND:  Mr. Straatmann?

17          MR. STRAATMANN:  Yes.

18          JUDGE SUTHERLAND:  Ms. Tyree?

19          MS. TYREE:  Yes.

20          JUDGE SUTHERLAND:  Then as to Count 3 which

21   is the possession of marijuana charge, the guilty

22   verdict there, Ms. Craig, was that your verdict?

23          MS. CRAIG:  Yes.

24          JUDGE SUTHERLAND:  Mr. Click?

25          MR. CLICK:  Yes.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          JUDGE SUTHERLAND:  Ms. Coleman?

 2          MS. COLEMAN:  Yes.

 3          JUDGE SUTHERLAND:  Ms. Sieve?

 4          MS. SIEVE:  Yes.

 5          JUDGE SUTHERLAND:  Ms. Hoffmann?

 6          MS. HOFFMANN:  Yes.

 7          JUDGE SUTHERLAND:  Ms. Hardester?

 8          MS. HARDESTER:  Yes.

 9          JUDGE SUTHERLAND:  Ms. Davis?

10          MS. DAVIS:  Yes.

11          JUDGE SUTHERLAND:  Mr. Rutherford?

12          MR. RUTHERFORD:  Yes.

13          JUDGE SUTHERLAND:  Ms. Stack?

14          MS. STACK:  Yes.

15          JUDGE SUTHERLAND:  Ms. Cooper?

16          MS. COOPER:  Yes.

17          JUDGE SUTHERLAND:  Mr. Straatmann?

18          MR. STRAATMANN:  Yes.

19          JUDGE SUTHERLAND:  And Ms. Tyree?

20          MS. TYREE:  Yes.

21          JUDGE SUTHERLAND:  And then as to Count 4,

22   guilty verdict there of the assault of a law

23   enforcement officer first degree, and that's the

24   assault on Sergeant Folsom.  Ms. Craig, is that your

25   verdict?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

 1

 2          MS. CRAIG:  Yes.

 3          JUDGE SUTHERLAND:  Mr. Click?

 4          MR. CLICK:  Yes.

 5          JUDGE SUTHERLAND:  Ms. Coleman?

 6          MS. COLEMAN:  Yes.

 7          JUDGE SUTHERLAND:  Ms. Sieve?

 8          MS. SIEVE:  Yes.

 9          JUDGE SUTHERLAND:  Ms. Hoffmann?

10          MS. HOFFMANN:  Yes.

11          JUDGE SUTHERLAND:  Ms. Hardester?

12          MS. HARDESTER:  Yes.

13          JUDGE SUTHERLAND:  Ms. Davis?

14          MS. DAVIS:  Yes.

15          JUDGE SUTHERLAND:  Mr. Rutherford?

16          MR. RUTHERFORD:  Yes.

17          JUDGE SUTHERLAND:  Ms. Stack?

18          MS. STACK:  Yes.

19          JUDGE SUTHERLAND:  Ms. Cooper?

20          MS. COOPER:  Yes.

21          JUDGE SUTHERLAND:  Mr. Straatmann?

22          MR. STRAATMANN:  Yes.

23          JUDGE SUTHERLAND:  And Ms. Tyree?

24          MS. TYREE:  Yes.

25          JUDGE SUTHERLAND:  Then as to Count 5, the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   armed criminal action guilty verdict regarding again

 2   Sergeant Folsom, I believe.  Ms. Craig, is that your

 3   verdict?

 4           MS. CRAIG:  Yes.

 5           JUDGE SUTHERLAND:  Mr. Click?

 6           MR. CLICK:  Yes.

 7           JUDGE SUTHERLAND:  Ms. Coleman?

 8           MS. COLEMAN:  Yes.

 9           JUDGE SUTHERLAND:  Ms. Sieve?

10           MS. SIEVE:  Yes.

11           JUDGE SUTHERLAND:  Ms. Hoffmann?

12           MS. HOFFMANN:  Yes.

13           JUDGE SUTHERLAND:  Ms. Hardester?

14           MS. HARDESTER:  Yes.

15           JUDGE SUTHERLAND:  Ms. Davis?

16           MS. DAVIS:  Yes.

17           JUDGE SUTHERLAND:  Mr. Rutherford?

18           MR. RUTHERFORD:  Yes.

19           JUDGE SUTHERLAND:  Ms. Stack?

20           MS. STACK:  Yes.

21           JUDGE SUTHERLAND:  Ms. Cooper?

22           MS. COOPER:  Yes.

23           JUDGE SUTHERLAND:  Mr. Straatmann?

24           MR. STRAATMANN:  Yes.

25           JUDGE SUTHERLAND:  And Ms. Tyree?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1            MS. TYREE:  Yes.

2            JUDGE SUTHERLAND:  As to the not guilty

3    verdict in the Count 6, which is the assault of a

4    law enforcement officer against Corporal Mertens.

5    Ms. Craig, is that your verdict?

6            MS. CRAIG:  Yes.

7            JUDGE SUTHERLAND:  Mr. Click?

8            MR. CLICK:  Yes.

9            JUDGE SUTHERLAND:  Ms. Coleman?

10           MS. COLEMAN:  Yes.

11           JUDGE SUTHERLAND:  Ms. Sieve?

12           MS. SIEVE:  Yes.

13           JUDGE SUTHERLAND:  Ms. Hoffmann?

14           MS. HOFFMANN:  Yes.

15           JUDGE SUTHERLAND:  Ms. Hardester?

16           MS. HARDESTER:  Yes.

17           JUDGE SUTHERLAND:  Ms. Davis?

18           MS. DAVIS:  Yes.

19           JUDGE SUTHERLAND:  Mr. Rutherford?

20           MR. RUTHERFORD:  Yes.

21           JUDGE SUTHERLAND:  Ms. Stack?

22           MS. STACK:  Yes.

23           JUDGE SUTHERLAND:  Ms. Cooper?

24           MS. COOPER:  Yes.

25           JUDGE SUTHERLAND:  Mr. Straatmann?

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. STRAATMANN:  Yes.

 2          JUDGE SUTHERLAND:  And Ms. Tyree?

 3          MS. TYREE:  Yes.

 4          JUDGE SUTHERLAND:  And finally as to Count

 5  7, the not guilty verdict regarding the armed

 6  criminal action on Corporal Mertens.  Ms. Craig, is

 7  that your verdict?

 8          MS. CRAIG:  Yes.

 9          JUDGE SUTHERLAND:  Mr. Click?

10          MR. CLICK:  Yes.

11          JUDGE SUTHERLAND:  Ms. Coleman?

12          MS. COLEMAN:  Yes.

13          JUDGE SUTHERLAND:  Ms. Sieve?

14          MS. SIEVE:  Yes.

15          JUDGE SUTHERLAND:  Ms. Hoffmann?

16          MS. HOFFMANN:  Yes.

17          JUDGE SUTHERLAND:  Ms. Hardester?

18          MS. HARDESTER:  Yes.

19          JUDGE SUTHERLAND:  Ms. Davis?

20          MS. DAVIS:  Yes.

21          JUDGE SUTHERLAND:  Mr. Rutherford?

22          MR. RUTHERFORD:  Yes.

23          JUDGE SUTHERLAND:  Ms. Stack?

24          MS. STACK:  Yes.

25          JUDGE SUTHERLAND:  Ms. Cooper?
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MS. COOPER:  Yes.

 2          JUDGE SUTHERLAND:  Mr. Straatmann?

 3          MR. STRAATMANN:  Yes.

 4          JUDGE SUTHERLAND:  And Ms. Tyree?

 5          MS. TYREE:  Yes.

 6          JUDGE SUTHERLAND:  I think I have your names

 7   memorized in order.  Ladies and gentlemen of the

 8   jury, we need a few minutes, there's a couple of

 9   instructions we need to get straightened out for

10   this, it won't take but a few minutes to get them

11   organized and get them copied for you to have a

12   copy, but it may take us perhaps 15 minutes,

13   something like that.  So we're going to recess for a

14   few minutes before we begin the second phase.  The

15   reason we can't go straight into the second phase of

16   the instructions at this point is because it depends

17   on what counts you find the defendant guilty of, if

18   any, and we didn't know that until you brought in

19   the verdict.

20          Until you retire to consider your verdict as to

21   punishment, you must not discuss this case among

22   yourselves or with others or permit anyone to

23   discuss it in your hearing.  Do not do any research

24   or investigation on your own about any matter

25   regarding this case or anyone involved with the
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   trial.  Do not communicate with others about the
 2   case by any means.  Do not read, view or listen to
 3   any newspaper, radio, electronic communication from
 4   the Internet or television report of the trial.
 5   We're in recess.  We'll get you back in here as
 6   quickly as we can.
 7          (WHEREUPON THE JURY LEFT THE COURTROOM)
 8          JUDGE SUTHERLAND:  I have been tendered by
 9   the State and intend to give instructions numbered
10   16 through 22 inclusive in the second phase;
11   instructions numbered 21 and 22 will be after
12   evidence and argument.  Any objection to any of
13   those instructions?
14          MR. EASTWOOD:  No, sir.
15          MR. PARKS:  No, Your Honor.
16          JUDGE SUTHERLAND:  Good, because objections
17   are impossible, there's nothing to object to.  How
18   much time do you want for argument, 10 minutes?
19          MR. EASTWOOD:  I don't know if I need that
20   much.
21          MR. PARKS:  That's fine.  10 minutes, 6 and
22   4.
23          JUDGE SUTHERLAND:  Warn at one, one minute
24   warnings?
25          MR. EASTWOOD:  Two minutes, if you don't
```

 1    mind, Your Honor.

 2             (WHEREUPON A BRIEF RECESS TOOK PLACE)

 3         (WHEREUPON THE JURY ENTERED THE COURTROOM)

 4             JUDGE SUTHERLAND:  Please be seated.  You

 5    have found some more instructions on your seats

 6    there again.  That's to assist you in following

 7    along as I read some additional instructions of the

 8    Court.  Instruction No. 16, as to Count 1, you have

 9    found the defendant guilty of possessing a

10    controlled substance.  At this stage of the trial it

11    will be your duty to determine within the limits

12    prescribed by law the punishment that must be

13    imposed for these offenses.  The punishment

14    prescribed by law for possessing a controlled

15    substance is one, imprisonment for a term of years

16    fixed by you but not less than two years and not to

17    exceed seven years.  Two, imprisonment in the county

18    jail for a term fixed by you but not to exceed one

19    year.  Three, imprisonment for a term of years fixed

20    by you but not less than two years and not to exceed

21    seven years and in addition a fine, the amount to be

22    determined by the Court.  Four, imprisonment in the

23    county jail for a term fixed by you but not to

24    exceed one year and in addition a fine, the amount

25    to be determined by the Court.  Five, no

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    imprisonment but a fine in an amount to be

2    determined by the Court.  The maximum fine that the

3    Court may impose is $5,000.00.

4         Instruction No. 17, as to Count 3, you have

5    found the defendant guilty of possessing marijuana.

6    At this stage of the trial it will be your duty to

7    determine within the limits prescribed by law the

8    punishment that must be imposed for these offenses.

9    The punishment prescribed by law for possessing

10   marijuana is one, imprisonment in the county jail

11   for a term fixed by you but not to exceed one year.

12   Two, imprisonment in the county jail for a term

13   fixed by you but not to exceed one year and in

14   addition a fine, the amount to be determined by the

15   Court.  I noticed on the previous line where it says

16   not to exceed one year there's a period, it should

17   be a comma, you can figure that out.  Three, no

18   imprisonment but a fine in an amount to be

19   determined by the Court.  The maximum fine that the

20   Court may impose is $1,000.00.

21        Instruction No. 18, as to Count 7, you have

22   found the defendant guilty of assault of a law

23   enforcement officer in the first degree.  At this

24   stage of the trial it will be your duty to determine

25   within the limits prescribed by law the punishment

Weinhaus, Vol. 3

```
 1   that must be imposed for those offenses.  The
 2   punishment prescribed by law for assault of a law
 3   enforcement -- I'm sorry, that word is missing, I'm
 4   going to add it.  It should be law enforcement
 5   officer.  I'm going to add the word officer in
 6   there, so you may want to look at the official
 7   instruction.  Let me start that sentence over.  The
 8   punishment prescribed by law for assault of a law
 9   enforcement officer in the first degree is one, life
10   imprisonment.  Two, imprisonment for a term of years
11   fixed by you but not less than 10 years and not to
12   exceed 30 years.
13        Instruction No. 19, as to Count 5, you have
14   found the defendant guilty of armed criminal action.
15   At this stage of the trial it will be your duty to
16   determine within the limits prescribed by law the
17   punishment that must be imposed for these offenses.
18   The punishment prescribed by law for armed criminal
19   action is one, imprisonment for a term of years
20   fixed by you but not less than three years.
21        Instruction No. 20, at this stage of the trial
22   we will proceed as follow.  First the attorneys will
23   have an opportunity to make a statement outlining
24   any additional evidence to be presented.  Such
25   evidence may then be introduced.  After that, the
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    Court will provide you with additional instructions.

2    Then the attorneys may make their arguments.  You

3    will then go to the jury room, deliberate and arrive

4    at your verdicts.  Opening statement for the State.

5    **(OPENING STATEMENT/PUNISHMENT PHASE BEHALF OF STATE)**

6           MR. PARKS:  Thank you, Your Honor.  Ladies

7    and gentlemen, as the Court has said, this is the

8    penalty phase.  This is the phase of the trial where

9    you will decide the punishment that Mr. Weinhaus

10   should receive for the four counts of guilty that

11   you have rendered.  I want you to remember the

12   evidence from the first phase.  The State is going

13   to present evidence from Sergeant Folsom who is

14   going to talk to you about how this incident has

15   affected his life.  At the end of Sergeant Folsom's

16   statement, we're going to ask you to consider his

17   statement, his feelings in this case and the

18   evidence that you heard in the first part of the

19   trial to come up with your verdict.

20          JUDGE SUTHERLAND:  Opening statement now?

21   **(OPENING STATEMENT/PUNISHMENT PHASE BY DEFENDANT)**

22          MR. EASTWOOD:  Yes, Your Honor.  Ladies and

23   gentlemen, you'll also hear at this phase of the

24   trial from Judy Kropf Weinhaus, that's Jeff's wife,

25   now ex-wife.  You'll hear about Jeff's character as

```
 1   a husband, as a father and also about the injuries

 2   he suffered the day of the shooting.  Thank you.

 3              JUDGE SUTHERLAND:  Evidence for the State.

 4         MR. PARKS:  Sergeant Folsom.

 5              JUDGE SUTHERLAND:  He's still under oath.

 6         DIRECT EXAMINATION OF SERGEANT FOLSOM

 7   QUESTIONS BY MR. PARKS:

 8      Q    Again, please state your name for the Court

 9   for the record.

10      A    Henry James Folsom.

11      Q    And you are a Sergeant with the Missouri

12   State Highway Patrol?

13      A    Yes, I am.

14      Q    And you are the witness that testified in

15   the guilt phase of this trial; is that correct?

16      A    Yes, I am, sir.

17      Q    And Sergeant Folsom, could you tell the jury

18   how this incident has affected your life.

19      A    Yes, sir.  I'd like to start out to say that

20   I bear no ill feelings toward Mr. Weinhaus, his

21   family or his friends.  I believe in freedom of

22   speech.  I believe in the Second Amendment.  I

23   believe in all the amendments.  I fought for my

24   country so that everyone would have their rights to

25   those amendments.  There is no better place than
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    America for freedom of speech, but one thing people
2    mistake commonly is freedom of speech is not free.
3    Every word that comes out of your mouth can hurt
4    someone, can take something away from someone, can
5    change someone's life forever, and my life has been
6    changed forever.  Scott Mertens' life has been
7    changed forever.  It's not only changed my life but
8    it's affected my family, his family, our ability for
9    our children to even go outside and play.
10       And we'll start off by saying after I arrested
11   Jeff or tried to arrest him, we all know about the
12   incident, you made your decision, Jeff's friends on
13   the Internet on a thing called Copblock.org began
14   posting all these stories of how I lied and things
15   about my personal life.  They put my picture up.  If
16   you Google my name right now, there's a picture of
17   me shooting Mr. Weinhaus that my family and friends,
18   that's what they see when they Google my name.  And
19   there's been threats, there's been people from that
20   group come to my job in Troop I and Troop C, they've
21   been on national radio shows talking about what a
22   liar I am.  I've been a police officer for 24 years.
23   I've served my country.  Not in any of that time has
24   any person ever come forward and said James Folsom
25   lied.  Not one person has ever filed a complaint

```
 1   against me or anything, but these people on the
 2   Internet put all these things on to the point of
 3   where I had to have a camera in my one year old
 4   boy's room to look outside my house because people
 5   were coming by.  Scott Mertens had to have cameras
 6   at his house, and his four boys couldn't even go
 7   outside and play.  You know what it's like to tell
 8   your children they can't go outside and play because
 9   of something you did that was, in your opinion, was
10   right?  But now my family is punished.  My wife is
11   four months pregnant.  This stress has been really
12   bad on my wife, and I'm not ashamed to admit it, my
13   family life is devastated because of this.
14        Scott Mertens, he crashed his car the other
15   night when he left here.  He wrecked his patrol car.
16   The man is one of the best drivers I've ever seen on
17   the Highway Patrol.  He left from here and was so
18   distracted by all this that he crashed his patrol
19   car the other night.  And this event has been
20   stressful for all of us.
21        I will say this:  As far as my employer is
22   concerned, my employer has turned their backs on me.
23   I don't have a job anymore because of Mr. Weinhaus
24   because he decided rather than just put his hands up
25   in the air and surrender and beat half the charges
```

Electronically Filed - EASTERN DISTRICT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   anyway, he was going to draw that gun out of the
 2   holster and gun me down on the same day that his
 3   father died, September 11th before, because his wife
 4   had left him and he was having problems.  I
 5   appreciate that, I still bear no ill will against
 6   him, but he wanted what happened that day to happen.
 7   I had no control over it.  The only thing I could do
 8   is react to save my life.
 9          Unfortunately in my job I've had other people
10   try to kill me, and it does have a traumatic effect
11   on you forever.  I will tell you that after I shot
12   Mr. Weinhaus, I complained -- my employer made us go
13   back to work one day after we shot Mr. Weinhaus.  We
14   had to go back to work the next day.  We got to take
15   one day off and then we were deemed to be fit to
16   come back to work.  And when I complained that I
17   needed some more time off, my employer said it would
18   be at my own expense.  I had a big vacation planned,
19   which I always do around hunting season, and I said
20   well, I'll just work a few days and then I'll go on
21   vacation.  When I came back, my employer was nice
22   enough to relieve me of my duty and send me to a
23   doctor because I'd asked for extra time off, and
24   they said I couldn't work until after this trial was
25   done.  So this cost me all my sick leave just to
```

```
 1   keep my family fed.  I'm not allowed to go out and
 2   get another job, and I'll be honest with you, my
 3   employer was nice enough to inform me that they're
 4   going to file charges against me if I do come back
 5   to work for insubordination, because I was upset
 6   when my employer didn't arrest Mr. Weinhaus when he
 7   got out of the hospital, because my employer didn't
 8   do their jobs.  My employer, they didn't go and get
 9   his medical records and actually find out what his
10   status was when it was time for him to get released,
11   so he got out and was free.  And it upset me, and I
12   complained about it to my boss, who basically rubbed
13   me off the map.  Everyone knows here, I don't hide
14   it, I didn't want to go and arrest him.  He should
15   have been able to go to Court and appear when it was
16   time, but because he called the wrong person on the
17   Highway Patrol a mother fucker, here I sit with no
18   job.  When my sick leave runs out, they're not
19   bringing me back to the Highway Patrol.  In five or
20   six months I won't have a job.  There's been no
21   investigation.  I've offered to take polygraphs, do
22   whatever I can do.  I'm eight years from my
23   retirement.  I'm a disabled veteran.  No one will
24   hire me.  I suffer from PTSD as well.  No one is
25   going to hire me in what I do now.  So I lost the
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  ability to feed my son, my children, because one man

2  decided he was going to cause a revolution and take

3  over the United States of America.  And one man had

4  that power to devastate my life and to devastate the

5  life of my family and change Scott Mertens' family

6  forever, one man.  And I would hope that you would

7  understand my side.  It was never anything personal

8  to me.  I developed the ruse because I did not want

9  to send a SWAT team to his house and cause a big

10  shootout.  I've been called every bad name in the

11  book here.  His attorney has taken every cheap shot

12  that he could take against me, talking about me

13  being paralyzed and a disabled veteran.  I don't

14  know how much lower you can go.  But I just want to

15  explain to you that freedom of speech isn't free,

16  and whether you hurt someone's feelings or people

17  die to give you those rights, we all have those

18  rights, and I hope that you use your rights to

19  sentence him to whatever you feel is appropriate,

20  but I will tell you that my family and my kids still

21  won't be able to play outside.  Maybe it is crap,

22  Jeff, but you did this

23          MR. WEINHAUS:  No, I didn't.

24          THE WITNESS:  Yes, you did.

25          JUDGE SUTHERLAND:  No back and forth on the

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    record.  Go ahead.

2          THE WITNESS:  Out of respect for the Courts

3    and your privilege serving as the jury, I thank you

4    for what you've done, and I've concluded what I had

5    to say, and God bless you all.

6          JUDGE SUTHERLAND:  Cross.

7          MR. EASTWOOD:  No cross examination, sir.

8          JUDGE SUTHERLAND:  Thank you, you may step

9    down.

10          MR. PARKS:  Your Honor, the State will not

11    be calling Corporal Mertens, he's too distraught to

12    testify at this time.  State has no further

13    evidence.

14          JUDGE SUTHERLAND:  Evidence for the

15    defendant.

16          MR. EASTWOOD:  Yes, Your Honor.  I call Judy

17    Kropf Weinhaus.

18     (WHEREUPON JUDY KROPF WEINHAUS WAS SWORN IN)

19      **DIRECT EXAMINATION OF JUDY KROPF WEINHAUS**

20    **QUESTIONS BY MR. EASTWOOD:**

21      Q    Judy, can you please introduce yourself to

22    the jury.

23      A    My name is Judy Kropf, it was Weinhaus at

24    the time.

25      Q    And were you married to Jeff Weinhaus?

Weinhaus, Vol. 3

```
 1      A   Yes.

 2      Q   What period of time were you married to

 3  Jeff?

 4      A   Until May of this year.

 5      Q   When did you get married?

 6      A   December 26 of 2007.

 7      Q   Did you live with him together as a family?

 8      A   Yes.

 9      Q   Is he a violent man?

10      A   No.

11      Q   Did he -- was he a verbally abusive man?

12      A   In a roundabout way sometimes.

13      Q   Toward you or towards people outside the

14  home?

15      A   Towards me sometimes in his writings and

16  papers but most people didn't take him seriously.

17      Q   What type of father was he to his children?

18      A   He was good, he was concerned.  He tried to,

19  his son, when he wasn't living with him, he would

20  talk to him on a daily basis, and he was a good dad

21  when he was living with us.  His younger kids were

22  not as close by and easy to keep in touch with, but

23  he tried to keep in touch with all his kids.

24      Q   He had an ex-wife too, didn't he?

25      A   Yes.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1        Q    He paid child support to her?

2        A    Yes.

3        Q    After the day of the incident at the gas

4    station, was Jeff taken to St. John's Mercy

5    Hospital?

6        A    Yes.

7        Q    And how long was he in the hospital?

8        A    For a month.

9        Q    I know you're not a doctor, I'm not going to

10   ask you for medical testimony, but generally

11   speaking what do you know in laymen's terms of his

12   injury?

13       A    He had brain damage, I can't remember the

14   term, I think it was anorexic brain damage, and it

15   was because he bled out so heavily and because all

16   the oxygen was out of his lungs.  What they

17   explained to me was that he didn't have enough blood

18   pressure to get the blood and oxygen to his brain,

19   so he was without oxygen, which caused the brain

20   damage, which caused memory loss.

21       Q    And do you know if his physical condition

22   has changed?  I'm not asking you for medical

23   opinion, just what you noticed as his wife.

24       A    We were still together until I filed for

25   divorce in March of this year, though he was in jail

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   obviously, but when I would visit him and I would
 2   tell him things, even serious things and we
 3   mentioned it the next day, he wouldn't remember that
 4   I even said it to him.  So he still has memory loss.
 5        Q   I know obviously you're divorced from him.
 6   Do you still support him?
 7        A   Not financially, no.
 8        Q   But do you support him as a person?
 9        A   Yes, oh, yes.
10        Q   Do you care about him?
11        A   Yes.
12        Q   Despite your differences?
13        A   Right, that's correct.
14        Q   Do you think generally that he's a good and
15   decent man?
16        A   Yes.
17        Q   Is what happened at this gas station in
18   character for Jeff Weinhaus?
19        A   No.
20            MR. EASTWOOD:  Thank you very much.
21            JUDGE SUTHERLAND:  I'm sorry, any cross?
22            MR. PARKS:  No, Your Honor.
23            JUDGE SUTHERLAND:  Thank you, you may step
24   down.  Any additional evidence for the defendant?
25            MR. EASTWOOD:  Your Honor, I have no further
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   evidence.
 2           JUDGE SUTHERLAND:  Any rebuttal?
 3           MR. PARKS:  No, Your Honor.
 4           JUDGE SUTHERLAND:  Ladies and gentlemen, I
 5   have a couple more instructions, the last two you'll
 6   see.  There should be 12 there, I think I counted.
 7   Starts with No. 21, the law applicable to this stage
 8   of the trial as stated in these instructions and
 9   instructions numbered one and two that the Court
10   read to you at the first stage of the trial.  In
11   assessing and declaring the defendant's punishment,
12   you should consider the evidence presented to you in
13   this case, the argument of counsel and the
14   instructions of the Court.  You may consider the
15   evidence presented in either stage of the trial.
16   You will be provided with forms of verdict for your
17   convenience.  You cannot return any verdict as a
18   verdict of the jury unless all 12 jurors agree to
19   it, but it should be signed by your foreperson
20   alone.  When you have concluded your deliberations,
21   you will complete the applicable forms to which you
22   unanimously agree and return it, it says it but it
23   should say them, together with all unused forms and
24   the written instructions of the Court.
25           Instruction No. 22, the attorneys will now have
```

```
 1   the opportunity of arguing the case to you regarding

 2   the punishment to be imposed.  Their arguments are

 3   not evidence.  You will bear in mind that it is your

 4   duty to be governed in your deliberations by the

 5   evidence as you remember it, the reasonable

 6   inferences that you believe should be drawn

 7   therefrom, and the law as given in these

 8   instructions.  It is your duty, and yours alone, to

 9   render such verdict under the law and the evidence

10   concerning the punishment to be imposed as in your

11   reason and conscience is true and just.  The State's

12   attorney must open the argument.  The defendant's

13   attorney may then argue the case.  The State's

14   attorney may then reply.  No further argument is

15   permitted by either side.  Argument on behalf of the

16   State.

17        (CLOSING ARGUMENT/PUNISHMENT PHASE BY STATE)

18        MR. PARKS:  Thank you, Your Honor.  Sergeant

19   Folsom said it better than anyone else could,

20   freedom is not free.  There is responsibility that

21   goes along with everyone's actions, and Jeff

22   Weinhaus has no remorse for his actions.  Jeff

23   Weinhaus would come out and do this again if he had

24   the same situation.  Jeff Weinhaus has no respect

25   for the law.  Jeff Weinhaus has no respect for
```

```
 1   anyone except himself.  He would have shot those two
 2   officers down in the street if he would have gotten
 3   the chance.  And after he got out, what did Sergeant
 4   Folsom (sic) do, he started harassing him and he had
 5   his friends harass him and his family and Corporal
 6   Mertens' family, all because he has no respect for
 7   the law.  This man does not deserve to be in our
 8   society.  This man needs to be locked up and that's
 9   what you need to consider.  You heard Sergeant
10   Folsom, you heard what had happened to him.  If he
11   would have just complied with the order to get down
12   on the ground, he would have been facing three
13   charges, one the Judge has thrown out, and he would
14   have been facing nothing more than a possession of
15   Morphine and a misdemeanor marijuana charge, but he
16   came there armed to the teeth.  He came with a gun
17   on his side, he came with a shotgun in the back of
18   his car and he came with another pistol in the
19   driver's seat.  He came looking for a fight, and he
20   found it, and he found it by two trained officers
21   who defended themselves, and now we must ask you to
22   protect the rest of us from this man because this
23   man doesn't care.  You can see him over there
24   smirking.  You can see what he's thinking right now.
25   He could care less.  I'm asking you not to let him
```

```
 1  out among us again, and we will talk about the
 2  specific punishment that I'm going to ask when I get
 3  back up here and address you again.
 4         JUDGE SUTHERLAND:  Argument on behalf of
 5  defendant.
 6     (CLOSING ARGUMENT/PUNISHMENT PHASE BY DEFENDANT)
 7         MR. EASTWOOD:  Ladies and gentlemen, this
 8  shooting is a tragedy.  It is a tragedy that has
 9  destroyed three families, Sergeant Folsom's,
10  Corporal Mertens' and Jeff Weinhaus's.  There are no
11  winners out of what occurred at the gas station that
12  day, there are only losers.  You have heard,
13  however, that Jeff Weinhaus for many years engaged
14  in extremist political speech but never harmed
15  anyone.  You've heard that he was a pest and an
16  annoyance to many in this community with his speech
17  but that he did not hurt them.  The violence that
18  occurred that day was out of character.  You've
19  heard from his ex-wife that although they are
20  divorced, she doesn't have ill will towards him.
21  She still supports him as a man.  That he was a good
22  father, he pays his child support to his ex-wife.
23  You've also heard as a result of this shooting that
24  he is not the same and has not been the same.  So,
25  there are no winners here today, there are only
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1  losers.  The man you see right there is not the man
2  who went to the gas station on September 11th, 2012.
3  He's just not there.  And so you've done your jobs,
4  you've done the toughest part of your job in some
5  ways.  I hope you don't hold it against me that I
6  was advocating for my client just as you don't hold
7  it against Mr. Parks, that's how the system works,
8  it's an adversarial system, that's how the system
9  gets to the truth.  It's not about him, it's not
10  about him, not about Chris Combs, it's about the
11  facts and the evidence and your judgment.  This is a
12  tough one, folks.  This is a tough one.  This is not
13  a predator, this is not a man who was a lifetime
14  threat to the community.  This is about something
15  terrible that happened at a gas station.  It wasn't
16  necessary, it wasn't right but it also does not pose
17  a current threat to the community, and therefore I'm
18  asking you for leniency, because extreme punishment
19  in this instance does not send a message, it doesn't
20  achieve anything, it doesn't heal anything, it
21  serves no purpose.  Thank you.
22       JUDGE SUTHERLAND:  Concluding argument on
23  behalf of the State.  You have five minutes
24  remaining.
25       **(CONCLUDING ARGUMENT/PUNISHMENT PHASE BY STATE)**

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1          MR. PARKS:  Thank you.  Ladies and
 2  gentlemen, I'm asking you to sentence the defendant
 3  in Count 1, which is the possession of the Morphine,
 4  to four years in the Department of Corrections.  I'm
 5  asking you to sentence the defendant on Count 3,
 6  which is the misdemeanor possession of marijuana, to
 7  12 months in a county jail because these are the
 8  normal range of punishments that a first-time
 9  offender would normally get in Franklin County.  And
10  for those charges, four years and 12 months is a
11  reasonable time.  But now we're looking at the
12  assault of a law enforcement officer, and we're
13  looking at the armed criminal action, the use of a
14  weapon against our law enforcement officers.  They
15  ask you to mitigate because he was shot, but he
16  would have shot those officers.  He would do that
17  again.  Jeffrey Weinhaus has no remorse for his
18  actions.  He sits there today smirking at you,
19  laughing at all of us because he thinks that he is
20  above the law.  Now I'm not asking for vengeance,
21  I'm not asking for retribution, I am asking you to
22  keep this man out of society.  How do we do that?
23  We put them in prison.  Ladies and gentlemen, I'm
24  asking you to sentence the defendant to 30 years in
25  the Department of Corrections on Count 4, the
```

```
 1    assault of a law enforcement officer.  I'm asking
 2    you to also give him 30 years for using that gun.
 3    I'm asking you to send a message to everyone.  I'm
 4    asking you to send a message to his followers who
 5    have harassed these two law enforcement officers
 6    that this is not proper.  And I'm asking you to send
 7    a message to him that all rights have
 8    responsibilities.  All of our constitutional rights
 9    come not as a privilege but as a right with a
10    corresponding responsibility to use those rights
11    properly.  And this man did not do that.  This man
12    is a danger to society and I'm asking you for the
13    people of Franklin County, for the people of the
14    State of Missouri, don't put him back among us, put
15    him in jail, put him in the Department of
16    Corrections for 30 years on both counts because he
17    does not need to be among us.  Thank you.
18              JUDGE SUTHERLAND:  Ladies and gentlemen,
19    it's now time for you to retire again, deliberate
20    and arrive at your verdict.  The sheriff will
21    deliver to you instructions and verdict forms.  When
22    you arrive at your verdicts, notify the sheriff by
23    knocking on the door.  You will be told when to
24    return to the jury box.
25              (WHEREUPON THE JURY EXITED THE COURTROOM)
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1           JUDGE SUTHERLAND:  We're in recess until we

2    hear the knock on the door.

3           (COURT IN RECESS FROM 3:20 PM TO 4:43 PM)

4           JUDGE SUTHERLAND:  I understand the jury has

5    arrived at a verdict.  Let's bring them in and find

6    out.

7           (WHEREUPON THE JURY ENTERED THE COURTROOM)

8           **(WHEREUPON THE SENTENCING VERDICT WAS READ)**

9           JUDGE SUTHERLAND:  Ms. Sieve, the jury has

10   reached a verdict as to punishment?

11          MS. SIEVE:  Yes, sir.

12          JUDGE SUTHERLAND:  I'll read the verdicts at

13   this time.  As to Count 1, we the jury having found

14   the defendant Jeffrey R. Weinhaus guilty of

15   possessing a controlled substance, assess and

16   declare the punishment for possessing a controlled

17   substance an imprisonment for a term of two years,

18   signed K. Sieve, foreperson.  Also in the numbered

19   lines below that they filled in two years on the

20   line No. 1 imprisonment for a term of two years.  Is

21   that the verdict of all of you?

22                (ALL YESES WERE HEARD)

23          JUDGE SUTHERLAND:  As to Count 3, we the

24   jury having found the defendant Jeffrey R. Weinhaus

25   guilty of possessing marijuana assess and declare

```
 1   the punishment for possessing marijuana an
 2   imprisonment in the county jail for a term of one
 3   year, again signed K. Sieve, foreperson.  And in
 4   Paragraph 1 below that one is filled in for
 5   imprisonment in the county jail.  Is that the
 6   verdict of all of you?
 7                  (ALL YESES WERE HEARD)
 8        JUDGE SUTHERLAND:  As to Count 4, we the
 9   jury having found the defendant Jeffrey R. Weinhaus
10   guilty of assault of a law enforcement officer in
11   the first degree assess and declare the punishment
12   for assault of a law enforcement officer in the
13   first degree an imprisonment for a term of 30 years,
14   signed K. Sieve, foreperson.  And 30 years is also
15   filled in in the imprisonment blank in paragraph No.
16   2.  Is that the verdict of all of you?
17                  (ALL YESES WERE HEARD)
18        JUDGE SUTHERLAND:  Finally as to Count 5, we
19   the jury having found the defendant Jeffrey R.
20   Weinhaus guilty of armed criminal action assess and
21   declare the punishment for armed criminal action an
22   imprisonment for a term of 30 years, signed K.
23   Sieve, foreperson.  And the 30 years is filled in in
24   Paragraph 1 below that as well.  Is that the verdict
25   of all of you?
```

```
 1                  (ALL YESES WERE HEARD)
 2            JUDGE SUTHERLAND:  Verdicts, guilty verdicts
 3   and the not guilty verdicts as well as the
 4   punishment verdicts are ordered filed.  It's
 5   impossible for me on behalf of everybody to thank
 6   you for your time, your effort in sitting on this
 7   case.  It was a very interesting case and a
 8   difficult case.  We certainly appreciate that.
 9   They'll be taken off the jury panel for the rest of
10   the term, I assume.  I hope the answer is yes.
11   Yeah, they should be taken off for the rest of the
12   term and I'll tell you why, because they're not
13   going to tell you this when they send you out that
14   questionnaire and cover letter but there's a
15   Missouri statute that provides that if you serve on
16   a trial jury, not just come in for the jury to be
17   selected from but if you actually serve on a trial
18   jury, you are entitled to be excused from jury
19   service for the next two years, okay.  It's not
20   mandatory if you just love this stuff and you're
21   having fun and get called again and you want to come
22   in, that's fine, I don't see a whole lot of takers
23   there, but it's a random computer selection whenever
24   they select a new term every few months, it's a
25   random selection, it doesn't -- the program does not
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1   permit us to say hey, these people were on a jury,
 2   don't select them.  It's possible that some of you
 3   might be selected again within the next couple of
 4   years.  So if you get another one of those letters
 5   that says you've been selected for jury service, if
 6   it's within two years of today, call the clerk's
 7   office and say hey, I was on a jury in October of
 8   2013, I'd like to be excused.  It will take me a
 9   minute or two in the courtroom, but I'll come back
10   in the jury room shortly to answer any questions you
11   may have and explain why I dismissed those other two
12   counts.  But with that you are discharged.  I am
13   going to ask anybody that's in the courtroom, other
14   than the jury at this time, to remain in the
15   courtroom, be kept in the courtroom until the jury
16   has had a chance to clear the courthouse, and that
17   will be a few minutes.  With that, ladies and
18   gentlemen, you are discharged.  We have excuses for
19   anybody that needs them for work.
20        (WHEREUPON THE JURY EXITED THE COURTROOM)
21        JUDGE SUTHERLAND:  Mr. Eastwood, do you want
22   an additional 10 days for filing a motion for a new
23   trial?
24        MR. EASTWOOD:  Yes, Your Honor.
25        JUDGE SUTHERLAND:  The defendant is granted
```

1   an additional 10 days for a total of 25 days to file

2   a motion for new trial.  We'll set the argument on

3   the motion for new trial and the sentencing, if the

4   motion for new trial is not granted, for November

5   25, 2013 at 9:00 a.m.  As I understand it, looking

6   at the schedule, we will probably be in Division 7,

7   the courtroom down at the other end on this floor,

8   but that's subject to change, so you may want to

9   check with the clerk's office ahead of time, okay.

10          MR. EASTWOOD:  Thank you, Your Honor.

11          JUDGE SUTHERLAND:  Defendant is remanded

12   into the custody of the sheriff.  We're in recess.

13          MR. PARKS:  Thank you, Your Honor.

14                (TRIAL CONCLUDED)

15

16

17

18

19

20

21

22

23

24

25

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

```
 1  State of Missouri
 2                    SS.
 3  County of Franklin
 4      I, Kim Wrocklage, duly commissioned, qualified
 5  and authorized to administer oaths and to certify to
 6  depositions, do hereby certify that pursuant to
 7  agreement in the civil cause now pending and
 8  undetermined in the Circuit Court of Franklin
 9  County, State of Missouri, to be used in the trial
10  of said cause in said court, I was attended at the
11  Franklin County Justice Center, 401 E. Main Street,
12  Union, in the County of Franklin, State of Missouri
13  on the 10th day of October, 2013.
14      The said witnesses were sworn to testify the
15  truth, the whole truth, and nothing but the truth in
16  the case aforesaid and thereupon testified as is
17  shown in the foregoing transcript.  Said testimony
18  was reported by me in shorthand and caused to be
19  transcribed into typewriting, and the foregoing
20  pages correctly set forth the testimony of the
21  aforementioned witnesses, together with the
22  questions propounded by counsel and remarks and
23  objections of counsel thereto, and is in all
24  respects a full, true, correct and complete
25  transcript.
```

Electronically Filed - EASTERN DISTRICT CT OF APPEALS - February 25, 2014 - 03:52 PM

1    I further certify that I am not of counsel or

2  attorney for either of the parties to said suit, not

3  related to nor interested in any of the parties or

4  their attorneys.

5

6    _____/s/ Kim Wrocklage, CCR No. 885_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25